# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

**TIGER LILY LLC;**
**HUNTER OAKS APARTMENTS UTAH, LLC;**
**NORTH 22ND FLAT, LLC;**
**CHERRY HILL GARDENS LLC;**
**CHURCHILL TOWNHOMES LLC;**
**BRITTANY RAILEY; and**
**APPLEWOOD PROPERTY MANAGEMENT, LLC,**

      Plaintiffs


**vs.**                               **No: 2:20-cv-02692-MSN-atc**


**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
and **BENJAMIN S. CARSON, M.D.** in his official capacity as United States Secretary of Housing and Urban Development;
**UNITED STATES DEPARTMENT OF JUSTICE**
and **WILLIAM P. BARR**, in his official capacity as United States Attorney General;
**UNITED STATES CENTER FOR DISEASE CONTROL AND PREVENTION**
and **NINA B. WITKOVSKY,** in her official capacity as Acting Chief of Staff of the Center for Disease Control and Prevention;
**UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES**
and **ALEX AZAR,** in his official capacity as United States Secretary of Health and Human Services;
**VICE ADMIRAL JEROME M. ADAMS, M.D.**, in his official capacity as United States Surgeon General; and
**D. MICHAEL DUNAVANT,** in his official capacity as United States Attorney General for the Western District of Tennessee,

      Defendants.


## PLAINTIFFS' MEMORANDUM OF LAW AND ARGUMENT
## IN SUPPORT OF THEIR MOTION AND APPLICATION FOR
## EMERGENCY HEARING AND PRELIMINARY INJUNCTION


**THIS IS THE PLAINTIFFS' FIRST APPLICATION FOR EXTRAORDINARY RELIEF**

Plaintiffs recognize that the COVID-19 pandemic has impressed upon the government of the United States, and all its citizens, great responsibility. The current health crisis and associated economic downturn has created, for millions of Americans, the prospect of job, income, and home loss, and unique instances of existential uncertainty. The legislative and executive branches of the government have undertaken efforts to halt the spread of this debilitating pandemic and to assist those suffering from its effect, including sundry public health mandates, economic protections, laws, orders, and regulations. There is little doubt that the aim of these government efforts to preserve, protect, defend, and support the citizenry are undertaken nobly. Plaintiffs join in supporting these, and *any lawful* efforts, which will assist those who are vulnerable and in need. And yet, at the same time, despite the health crisis and need for assistance, government action — perhaps even more in times like these than any others— must still be consistent with the fundamental and protected rights of all and cannot be the result of an over-reach of authority or violation of our foundational principles and liberties.

As stated in the Complaint, (D.E. 1), Plaintiffs, and their undersigned counsel, bring this action with humility and reticence. Plaintiffs' action is in no way intended to be a critique of our government's intentions, nor is it intended to be viewed as a political attack on the motivations of our elected and appointed governmental leaders; yet, the inaction of one branch of the federal government has resulted in the unlawful overreach by another. This unlawful overreach is now causing immediate and irreparable harm to property owners and positioning tenants for prospective irreparable harm. Together, the unlawful overreach threatens catastrophic failures to the housing system and rental market.

When the relief and protections afforded residential property owners and renters contained in the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 (the "Cares Act"),

effectively expired on August 26, 2020, Congress failed to pass thoughtful, comprehensive, and balanced legislation (indeed, any legislation) that could have, and should have, relieved and ameliorated the significant burden the current COVID-19 crisis has placed upon virtually every American business and family. Instead, because of Congress' failures, and in an unconstitutional attempt to provide assistance to Americans facing the prospect of these enormous challenges, the Centers for Disease Control and Prevention (the "CDC"), in coordination and with the concurrence of United States Department of Housing and Urban Development ("HUD") and the United States Department of Health & Human Services ("HHS"), with civil and criminal enforcement authority delegated to the United States Department of Justice ("DOJ"), and at the apparent direction and approval of the executive branch, hastily promulgated the order styled "Temporary Halt in Residential Evictions to Prevent the Further Spread of Covid-19" (the "Halt Order") [1], indiscriminately stripping real property owners —from large real estate investment trusts to individual homeowners renting a room— of the right to use, enjoy, control, and enforce contracts related to the their real property. The Halt Order, at its core, deprives property owners (including the Plaintiffs herein) from exercising their constitutionally protected rights of property ownership and from availing themselves of the eviction procedures lawfully enacted by the legislatures of the States. At the same time, and even worse, the Halt Order threatens these same property owners with criminal prosecution, including the imposition of large fines and up to one (1) year in jail, for any attempts to exercise their well-settled and constitutionally protected property rights.

In promulgating the Halt Order, the CDC, HUD, and HHS bypassed any number of procedural, statutory, and constitutional safeguards, including, but not limited to, the traditional agency rulemaking process and the Congress. The result is a presumably well-intentioned effort

---

[1] The Halt Order, by its terms, became effective on September 4, 2020 following its publication in the Federal Register, 85 Fed. Reg. 55292.

that seriously infringes upon the rights of millions of citizens (and the States) and that violates the Constitution of the United States, as well as federal law and state law.

Many property owners, not just in the Western District of Tennessee but nationwide, currently have tenants residing in rented properties for which the tenants have not paid since March 2020 –pursuant to the eviction moratoria contemplated by the Cares Act and Halt Order. Rental income is used by property owners to, among other things, service the underlying debt that typically accompanies the property (i.e., a mortgage or loan), to pay applicable real property, franchise, and excise taxes, to maintain and keep up the property, to pay employee wages, to engage management companies, and to provide services (including essential services) to tenants. Without rental income, property owners are deprived of their financial lifeblood making their business commercially impracticable. In addition, under the Halt Order, the government imposes a virtually insurmountable obstacle on tenants by requiring those who wish to remain in their rental properties after the expiration of the Halt Order[2] to pay, in full and in a lump sum payment, all accrued, but as yet unpaid past-due rent. For many, this unpaid past-due rent will have accrued between March 2020 and December 2020. This requirement will inevitably lead to mass evictions[3], loss of unrecoverable rental income for property owners and managers, large money judgments against tenants who are already struggling, and foreclosure actions against property owners who, having suffered months of rental income loss, will no longer be able to service their debt obligations.

---

[2] The Halt Order, by its terms, expires on December 31, 2020, subject to extension. (*See* D.E. 1-12 at pg. 6).

[3] While to date, the Shelby County General Sessions Court, under the guidance of its Judges and in coordination with the Clerk's Office and the Sheriff's Office, have worked extremely hard to meaningfully modify operations and protocol so as to successfully remain open and functional — in a safe and effective manner— even during the pandemic, upon its expiration, the back-log of eviction actions created by the Halt Order may cause courthouse overcrowding, administrative delays, and the potential exacerbation of the current public health crises.

The CDC, HUD, and HHS have effectively taken the place of the Congress and the legislatures of the States, usurping the powers of both in violation of the federal and state constitutions, and supplanting and preempting duly enacted laws and guaranteed rights. The CDC, HUD, and HHS have simply decided (for every property owner and tenant in the country) what is best, and have done so without authority, justification, comment, or forethought –all in the name of public health. While noble in its purported purpose, the Halt Order is callous in its effect.

The Plaintiffs, on behalf of themselves and as representative proxy for citizen property owners nationwide, ask this Honorable Court to take emergency action to strike down the Halt Order or, alternatively, to issue immediate injunctive relief in favor of Plaintiffs, suspending the operation of the Halt Order and enjoining the government from enforcement of the Halt Order, including pursuing criminal penalties. Because Plaintiffs are precluded from recovering monetary damages from the Defendants for the damages being suffered as a result of the Halt Order and the Halt Order's blatant infringement upon protected rights, the harm Plaintiffs are suffering each day is therefore inherently irreparable, and this Honorable Court must now act. Overt action by the federal government that violates the rights of free citizens must be challenged, and it is incumbent upon this Honorable Court to ensure that rights enshrined in the Constitution, and our system of laws, are protected and preserved in the face of a meritorious challenge such as this one.

## **ABBREVIATED FACTS**[4]

The Plaintiffs own and/or manage more than Five Thousand (5,000) residential units (hereinafter referred to as "Units"), in the Western District of Tennessee. (D.E. 1 at ¶ 28). In

---

[4] As reflected in this Honorable Court's Order, (D.E. 11), Plaintiffs appreciate that the salient facts have been fully plead in their Complaint. As such, and to comply with this Honorable Court's directive, Plaintiffs provide only an abbreviated recitation of the relevant facts that might be helpful in better contextualizing the emergency and extraordinary relief being sought. Plaintiffs incorporate by reference all facts as set forth in the Complaint. (*See* D.E. 1 at ¶¶ 1-237).

consideration of providing tenants leasehold interests —including exclusive possession, use and enjoyment of the Units owned and/or managed by Plaintiffs— the Plaintiffs lease Units to individuals and families (hereinafter referred to as "tenants") under written residential lease contracts (hereinafter referred to as "lease agreements") pursuant to the Tennessee Uniform Residential Landlord Tenant Act, Tenn. Code Ann. §§ 66-28-101, *et seq*. ("URLTA"). (D.E. 1 at ¶ 29). These lease agreements include provisions, among others: (i) establishing the term of the tenant's leasehold interest in the Unit, after which the tenant is legally required to surrender possession of the Unit to the relevant Plaintiff, and (ii) entitling Plaintiffs to the timely payment from the tenant of the agreed upon monthly rent. (*Id*. at ¶¶ 30, 33). A tenant's failure to pay rent or to vacate the Unit upon expiration of the lease term constitutes a material breach of the lease agreement and entitles the relevant Plaintiff to initiate court action to terminate the lease agreement, dispossess the tenant from the Unit. (*Id*. at ¶¶ 32, 34). In the Tennessee, this legal process must be strictly followed as owners and managers are legally prohibited from any exercise of self-help evictions. (D.E. 1 at ¶ 205); *see* Tenn. Code Ann. § 66-28-504.

While under the lease agreement —and URLTA and the detainer statutes— Plaintiffs are also entitled to bring legal action to recover unpaid rent at the time an eviction action is brought before the court, the unpaid rent is very rarely recovered by a Plaintiff (or any owner) for several reasons: (1) in a great majority of the eviction actions filed in the Western District of Tennessee, and particularly in Shelby County, service of process is accomplished under Tenn. Code Ann. § 29-18-115(e)(2)(a) by posting the Forcible Entry and Detainer ("FED") Warrant upon the front door of the Unit. In all cases wherein service of process is accomplished under this statute, the trial court's jurisdiction is limited exclusively to returning possession of the Unit to the owner or manager and the trial court is prohibited from awarding the owner or manager any monetary

recovery for the tenant's non-payment of rent. (D.E. 1 at ¶ 35); and (2) in the limited scenarios wherein personal service on the tenant of the FED Warrant is accomplished under Tenn. Code Ann. § 29-18-115(e)(1), and the trial court awards a monetary judgment for past-due rent, owners and managers rarely recover these sums from the tenant. (*Id*.). As such, and as a matter of course in the industry, particularly within the Western District of Tennessee, Plaintiffs' primary efforts are to promptly initiate actions against defaulting tenants to dispossess the defaulting tenants from the Units and to regain possession, without concern for recovering delinquent rent. (*Id*. at ¶ 36). Far more important to the Plaintiffs than trying to collect past-due rent, is the prompt recovery of the lawful exclusive use and possession of the Unit, which allows Plaintiffs to: (i) safely secure the Unit, (ii) preserve and protect the Unit from damage, (iii) reduce the outlay of ongoing expenses, and (iv) either retain the Unit in vacancy, or locate and secure a new paying tenant to occupy the Unit. (*Id*. at ¶ 37).

To address various aspects of the COVID-19 pandemic, on March 27, 2020, Congress lawfully passed the Cares Act (D.E. 1 at ¶ 45) which provided a 120-day moratorium on residential eviction filings by owners and managers of Units with a nexus to the federal government (referred to herein as "Covered Properties"). (D.E. 1 at ¶ 46); *see* 15 U.S.C. § 9058(a)(2).[5] The effect of the eviction moratorium was that Plaintiffs were unilaterally required to maintain their obligations to incur all the costs of providing tenants with Units and services, but without receipt of vital rental income. (*See Id*. at ¶ 84). The foregoing notwithstanding, and while the Cares Act eviction moratorium only implicated those owners and managers with a nexus to the federal government, the Cares Act sought to strike a balance with the relief offered to defaulting tenants by also

---

[5] The term "covered property" means any property that--(A) participates in--(i) a covered housing program (as defined in section 12491(a) of Title 34); or(ii) the rural housing voucher program under section 1490r of Title 42; or(B) has a--(i) Federally backed mortgage loan; or(ii) Federally backed multifamily mortgage loan.

providing contemporaneous relief to the associated owners and managers in the form of mortgage and tax forbearances, Paycheck Protection Program ("PPP") forgivable loans, and other COVID-19 related government assistance.  (D.E. 1 at ¶ 48); *see* 15 U.S.C. §§ 9056-9058.

The Cares Act eviction moratorium and thirty (30) day post-expiration notice period enacted by Congress expired August 26, 2020. (D.E. 1 at ¶ 49); *see* 15 U.S.C. § 9058(b)-(c). Congress elected not to extend the eviction moratorium through further legislation, (D.E. 1 at ¶ 52),  and after August 26, 2020, Plaintiffs took lawful steps to terminate defaulted lease agreements,  dispossess tenants —many of whom were three (3) to four (4) months delinquent in their rent obligations to Plaintiffs— and to pursue court proceedings to evict these tenants and regain lawful possession of the Units, (*Id.* at ¶ 53).  On September 1, 2020, the acting Chief of Staff for the Center for Disease Control ("CDC"), Nina Witkofsky[6], in coordination and with the concurrence of HUD, HHS, and with civil and criminal enforcement authority delegated to the DOJ, promulgated the Halt Order, which became effective on September 4, 2020.  (D.E. 1 at ¶ 58; *see* D.E. 1-12 at pg. 2).  Under the Halt Order, the preclusion on evictions against defaulting tenants is expanded from "Covered Properties" under the Cares Act to all individuals and business organizations that own and/or manage any residential real property, of any size or type, anywhere in the United States  —without regard to any federal nexus[7]—  and effectively prevents all evictions against any defaulting tenants for four (4) additional months from September 4, 2020, through December 31, 2020, "underline subject to extension".  (D.E. 1-12 at pg. 6; D.E. 1 at ¶ 59).  Without providing any scientific or statistical basis, the Halt Order's nationwide directive is premised upon

---

[6] Though 42 C.F.R. § 70.2 requires any action thereunder be taken by the "Direct of the Centers for Disease Control and Prevention," Witkofsky, not the Director, Dr. Robert Redfield, issued the Halt Order.

[7] As was required under the Cares Act.

the theory that defaulting tenants who are evicted from Units might become homeless and, if they became homeless, might further spread COVID-19. (D.E. 1-12 at pgs. 5-6).

The claimed legal authority asserted by the CDC, HUD, and HHS[8] for promulgation of the Halt Order is Section 361 of the Public Health Services Act, *see* 42 U.S.C. § 264 and 42 C.F.R. § 70.2. Both 42 U.S.C. § 264 and 42 C.F.R. § 70.2[9] are clearly intended to address federal government efforts related to the spread of already contaminated persons or personal property — most notably foreign nationals and livestock— whose contamination threatens introduction into the United States or interstate expansion from contaminated to non-contaminated U.S. States. (D.E. 1 at ¶ 63). Neither 42 U.S.C. § 264 nor 42 C.F.R. § 70.2 provides for the termination or suspension of real property rights of individual citizens, nor does either provide for any action involving un-contaminated persons or un-contaminated property within a U.S. State (i.e., intrastate action or concerns). (D.E. 1 at ¶ 64). Even more, neither 42 U.S.C. § 264 nor 42 C.F.R. § 70.2 terminates the fundamental constitutional mandate that any action which results in the taking of private property be subjected to due process of law and be offset by just government compensation. (D.E. 1 at ¶ 65). And, nothing in 42 U.S.C. § 264 nor 42 C.F.R. § 70.2 authorizes the CDC, HUD, or HHS to impose criminal prosecution and penalties against property owners for alleged violations.

The Halt Order contains a form "Declaration," (D.E. 1-12 at pg. 6), that is to be executed by the defaulting tenant and delivered to the owner or manager, asserting that he or she is a

---

[8] Section 361 of the Public Health Services Act requires the concurrence of Secretary Carson, Secretary Azar and Admiral Adams as a pre-condition to issuing any order. Secretary Carson, Secretary Azar and Admiral Adams, in their official capacities and on behalf of HUD and HHS respectively, concurred in the issuance of the Halt Order under 42 U.S.C. § 264 and 42 C.F.R. § 70.2.

[9] Full texts of 42 U.S.C. § 264 and 42 C.F.R. § 70.2 are attached as exhibits to the Complaint, (*see* D.E. 1-15, 1-16), and *infra* in Section II(a).

"covered person." Once executed and delivered to the owner or manager, the Halt Order forbids the owner or manager from taking any steps to evict the defaulting tenant for four (4) months – through December 31, 2020 (allegedly, subject to extension). (D.E. 1-12 at pg. 7; D.E. 1 at ¶ 74). Most challenging for the owner or manager is that under the Halt Order, during its entire duration —from September 4, 2020 through December 31, 2020, plus any extension— the owner or manager is provided no financial relief or compensation in any form at all. (D.E. 1 at ¶ 75; *see* D.E. 1.12).

Between the Cares Act eviction moratorium and the Halt Order, Plaintiffs all have tenants who will remain in unlawful and exclusive possession of Units for up to ten (10) months –subject to further extension. (*Id*. at ¶ 79-82). At the same time, Plaintiffs are still being required to spend considerable sums to: provide these defaulting tenants with residential services; to repair and keep up the Units; to pay applicable real estate, franchise, and excise taxes, to pay mortgage and debt service obligations; and to provide income and livelihood to the individual Plaintiff owners, members, shareholders, and employees. (*Id*. at ¶ 82). The risk of owner default and foreclosure is very real.

The Halt Order unlawfully and unconstitutionally interferes with Plaintiffs property and contract rights and their use, enjoyment, and possession of their Units. (*Id*. at ¶ 94). The Halt Order has violated the Plaintiffs' expectations relating to lawful government interference in their business operations and has made their business commercially impracticable. As a result, the Plaintiffs are suffering —or are in immediate danger of suffering— significant financial loss, damages, and irreparable harm. (*Id*. at ¶ 95).

## ARGUMENT

It is the exclusive province of Congress[10], with ultimate approval by the executive, to promulgate and enact law –especially law that has the potential to impact such a long-held and basic right like property ownership[11], or which has the effect of preempting and displacing duly enacted State law. The CDC's function[12] does not include law making, nor does it include being the arbiter of weighty constitutional issues. While the CDC is an important agency, it is not within the scope of the CDC's mission to dictate to every American who may reside on private property, nor has Congress delegated such authority to the CDC. There is no doubt that balanced and constitutional legislative action is needed to address the economic hardships, including home loss or homelessness, wrought upon the country by COVID-19, and the Plaintiffs here call upon the Congress to take such lawful action; however, in the absence of lawful legislative action, the Halt Order's eviction moratorium is *ultra vires* in that it exceeds the statutory and regulatory authority of the CDC, HUD, and HHS in its issuance and application.

As discussed herein at length, the Halt Order violates the Takings Clause and is a denial and deprivation of Plaintiffs' rights to substantive and procedural Due Process under the Fifth Amendment. In addition, the Halt Order, on its face, violates the Tenth Amendment and the Anti-Commandeering Doctrine, cannot pre-empt applicable State law under the Supremacy Clause, impedes Plaintiffs' fundamental right to access the judiciary, and acts as an unlawful suspension of law.

---

[10] U.S. Const. art. I, § 1; *see Clinton v. City of New York*, 524 U.S. 417 (1998).

[11] Few rights are more firmly embedded in our system of laws than the right to own property and to do with that property what we so choose. That right is "deeply rooted in the Nation's history and traditions" and "implicit in the concept of ordered liberty." *See Palko v. State of Connecticut*, 302 U.S. 319, 325 (1937).

[12] The same functionary preclusion exists for HUD and HHS.

Pursuant to Fed. R. Civ. P. 65, Plaintiffs respectfully ask this Honorable Court to set an emergency hearing on the requested injunctive relief at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character, but no later than fourteen (14) days from the date their Motion and Application was made. Plaintiffs' ask this Honorable Court to strike down the Halt Order or, in the alternative, grant immediate injunctive relief against the Defendants precluding any effort by the Defendants to enforce any element of the Halt Order and/or to pursue any criminal or civil penalties against Plaintiffs for alleged violations of the Halt Order. Plaintiffs submit that this challenge to the Halt Order is meritorious and that it demands emergency Court intervention and action –without delay.

## I. THE LEGAL STANDARD FOR A PRELIMINARY INJUNCTION UNDER FED. R. CIV. P. 65.

The purpose of preliminary injunctive relief is to preserve the status quo[13] until a trial upon the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The Plaintiffs' request of this Honorable Court —in the event it does not immediately strike down the Halt Order— is to return the parties to the status quo, pending final adjudication of this cause, wherein owners and managers have protected rights to the use of their real property and wherein state law governs the recovery of possession of their real property due to a tenant's material breach of a lease agreement. As preliminary injunctive relief occurs at the very start of a case, the parties generally only have a short time to prepare and a preliminary injunction is customarily granted on the basis of procedures that "are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395; s*ee also Sole v. Wyner*, 551 U.S. 74, 127 (2007). The Court may consider hearsay, accept affidavit testimony, and consider evidence that in other ways does not strictly comply with

---

[13] The status quo is often defined as the "last uncontested status between the parties which preceded the controversy." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). In the instant case, the status quo is the period of time following the expiration of the Cares Act and preceding the effective date of the Halt Order.

the rules of evidence.  *See*, *e.g.*, *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004); *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993); *Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010).

When considering a motion for preliminary injunction, a court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).  It is committed to the discretion of the trial court whether a preliminary injunction should issue, *Bays v. City of Fairborn*, 668 F.3d 814, 818 (6th Cir. 2012); *U.S. v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496 (2001); however, in the case of a colorable constitutional violation, a preliminary injunction is nearly always appropriate. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).  "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Obama for America*, 697 F.3d at 436 (internal quotations omitted); *City of Pontiac Retired Emps. Assoc. v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc).  "[T]he issues of the public interest and harm to the respective parties largely depend on the constitutionality of the [state action]," *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007), and in some constitutional challenges, the traditional factors essentially "collapse into a determination" of the question of constitutionality, *see Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002) (addressing a First Amendment challenge).  In the case of a constitutional challenge like the subject matter, the likelihood of success on the merits is

a legal question and there is little dispute of the facts in the record. *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007).

As demonstrated more fully *infra*, the facts of this case as applied to the law, satisfy each of the four (4) prongs of analysis and compel this Honorable Court to immediately enter a preliminary, if not permanent, injunction in favor of the Plaintiffs.

## II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

In the test for injunctive relief, a moving plaintiff must first demonstrate to the trial court that there is a likelihood that plaintiff will prevail on the merits of its suit. *See Tenke Corp.,* 511 F.3d at 543. A moving "party is not required to prove his case in full at a preliminary injunction hearing." *Camenisch*, 451 U.S. at 395. However, "[i]n order to establish success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir.1997). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id*.

### A.    <u>Plaintiffs are Likely to Prevail on the Merits of their Claim that the Halt Order is *Ultra Vires*</u>

The CDC's action in promulgating the Halt Order is *ultra vires* in the first instance. While the CDC is charged with, and undertakes, vital and important missions such as promoting health, tracking and studying biological threats, and advising the public and the government accordingly, the CDC is neither charged with nor delegated the duty to institute to develop what is tantamount to federal law regarding real property, or to issue orders that have the practical effect of displacing the duly enacted laws of the States.

The function of the CDC to:

> **. . . serve[] as the national focus for developing and applying disease prevention and control, environmental health, and health promotion and health education activities designed to improve the health of the people of the United States.**[14]

The CDC self-identifies its role as:

> **. . . detecting and responding to new and emerging health threats; tackling the biggest health problems causing death and disability for Americans; putting science and advanced technology into action to prevent disease; promoting healthy and safe behaviors, communities and environment; developing leaders and training the public health workforce, including disease detectives; and taking the health pulse of our nation.**[15]

Reading the Halt Order against the alleged statutory and regulatory authority claimed by the CDC makes the CDC's overreach plain. In determining whether an agency regulation[16] is *ultra vires*, the Court should conduct a two-step *Chevron*[17] analysis. *Garfias–Rodriguez v. Holder*, 702 F.3d 504, 525 (9th Cir. 2012) (en banc); *see also Hachem v. Holder*, 656 F.3d 430, 438 (6th Cir. 2011). First, the court must "look at the statute upon which the regulation is based." *Hachem*, 656 F.3d at 438. If "Congress has directly spoken to the precise question at issue," then the inquiry ends there as the expressed intent of the Congress controls, *Id.* (quoting *Chevron*, 467 U.S. at 842–43); however, "if the statute is silent or ambiguous with respect to the specific issue," then the court must proceed to the second step of the *Chevron* analysis and determine whether the agency has provided a "permissible construction of the statute." *Id.* In conducting the second step, the

---

[14]    Centers for Disease Control and Prevention, *Mission Statement*, https://www.cdc.gov/about/organization/cio-orgcharts/pdfs/CDCfs-508.pdf (last visited September 21, 2020) (emphasis added).

[15]    Centers for Disease Control and Prevention, *Mission, Role and Pledge*, https://www.cdc.gov/about/organization/mission.htm (last visited September 21, 2020) (emphasis added).

[16] Knowing full well that the Halt Order is wholly unlawful, the CDC went to great lengths to attempt to obfuscate a future challenge by declaring that "[t]his Order is not a rule within the meaning of the Administrative Procedure Act (''APA''), 5 U.S.C. §§ 1001, *et seq*., but rather an emergency action taken under the existing authority of 42 CFR 70.2." (D.E. 1-12 at pg. 6).

[17] *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc*., 467 U.S. 837, 842–43 (1984).

reviewing court "may not substitute its own construction [of the statute] for the reasonable interpretation of an agency." *Hosp. Corp. of America & Subsidiaries v. C.I.R.*, 348 F.3d 136, 141 (6th Cir. 2003) (quoting *Peoples Fed. Sav. & Loan Ass'n of Sidney v. Comm'r Internal Revenue*, 948 F.2d 289, 300 (6th Cir. 1991)).

The statute upon which the CDC relies as the source of its authority to issue the Halt Order is quite clear and intentional with respect to the law's reach, as well as the reach of the regulations promulgated therefrom:

> **Nothing in this section . . . or the regulations promulgated under such sections, may be construed <u>as superseding any provision under State law</u> (including regulations and including provisions established by political subdivisions of States) except to the extent that such a provision conflicts with an exercise of Federal authority under this section . . . .**

42 U.S.C. § 264(e) (emphasis added). Thus, there is no grant or delegation of authority, nor is the CDC's broad sweeping interpretation of its authority reasonable –in fact, the complete opposite is true. And yet, the Halt Order was designed, and is indeed intended, to affect and infringe upon State law:

> **Under this Order, a landlord, owner of a residential property, <u>or other person with a legal right to pursue eviction or possessory action</u>, shall not evict any covered person from any residential property in any jurisdiction to which this Order applies during the effective period of the Order.**

(D.E. 1-12 at pg. 2 (emphasis added)).

In so declaring, the Halt Order completely supersedes and supplants the property laws of the States, and especially those applicable to property rights, leaseholds, and detainer actions. This is clearly an impermissible construction of the statute. Both the statute and regulation deal only with the ability and procedure to institute and enforce quarantine procedures and such quarantine procedures can be effectuated without violation of, or conflict with, State property laws.

42 U.S.C. § 264 authorizes the Surgeon General to:

**. . . make and enforce such regulations as in his judgment are necessary to prevent the . . . spread of communicable diseases . . . .**

(emphasis added). The Surgeon General's authority extends only to the prevention of such spread from a foreign country or from state to state (i.e., interstate transmission). *See, e.g., State of La. V. Mathews*, 427 F. Supp. 174, 175 (E.D. La. 1977) (upholding ban on the interstate sale of turtles which may contain salmonella). The statute includes a list of activities which the Surgeon General may make and enforce if in his judgment they are necessary to prevent interstate transmission:

**. . . inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.**

42 U.S.C. § 264(a) (emphasis added).

The list of permitted activities, codified by Congress, has no rational relationship to anything involving State property law, leaseholds, evictions, nor is there any rational relationship to the Halt Order's inaction of criminal prosecution of violators. The language of the statute is even more important as evictions, in and of themselves, are inherently local actions.

What the statute does make clear is that the Surgeon General is empowered to issue regulations that provide for the "*apprehension, detention, examination, or conditional release of individuals*" meeting two expressed criteria: (1) he or she is believed to be <u>infected (or "reasonably believed" to be infected) with a communicable disease</u> and (2) he or she is <u>entering the United States from a foreign country, or engaging in interstate travel</u>[18]. *Id*. at § 264(b)-(d) (emphasis

---

[18] There is nothing to suggest, and the CDC provides no evidence, that evictions implicate large scale interstate travel so as to potentially fall within the ambit of Section 264.

added); *see U. S. ex rel. Siegel v. Shinnick*, 219 F. Supp. 789, 790 (E.D.N.Y. 1963) (finding detention of individual returning from Sweden during smallpox outbreak lawful).

While under § 264, the Surgeon General could potentially argue for the promulgation of a regulation that allows for the detention of a COVID-19 positive individual (an infected person) who <u>also</u> enters Mississippi from Tennessee (engaging in interstate travel), there is no authority for a regulation that requires the individual's Tennessee landlord to allow the individual to remain in his apartment in Tennessee rent free. Likewise, the Surgeon General would be precluded from promulgating a regulation that calls for the same COVID-19 positive individual's apprehension and/or detention if he were simply traveling in only an intrastate context –for instance, from Memphis to Nashville. And, further, the Surgeon General would certainly be precluded from promulgating a regulation that calls for a non-COVID-19 positive individual's apprehension and/or detention under any circumstances.

The Surgeon General is completely and absolutely precluded from promulgating a regulation that calls for any action <u>concerning wholly non-infected persons who are also not engaged in any interstate travel</u> – which is precisely the intended effect of the Halt Order.

The cited regulation, 42 C.F.R. § 70.2, is of no greater scope or assistance to the CDC. The regulation provides, in its entirety:

> **Whenever the Director of the Centers for Disease Control and Prevention determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are <u>insufficient to prevent the spread</u> of any of the communicable diseases from such State or possession to any other State or possession, he/she may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection.**

42 C.F.R. § 70.2 (emphasis added).

Interestingly, while the regulation authorizes <u>only</u> the Director of the CDC to take any such measures, it is not the Director of the CDC, Dr. Robert Redfield's, name that appears on the Halt Order as required. The measures established under the Halt Order, for all intents and purposes, appear to have been issued by Ms. Witkofsky, the Acting Chief of Staff for the CDC. Ms. Witkofsky has no authority —in any respect— under 42 C.F.R. § 70.2 to issue any Order, or any other measures, at all.

But looking past this glaring and potentially fatal issue (if this Honorable Court is willing to do so), once again, the regulation contains the same list of allowable "measures," which have no rational relationship to real property rights, and which is also strictly conditional in nature. Only "<u>in the event</u>" that state (or local) measures are deemed to be insufficient can the CDC step in and take efforts like "fumigating, disinfecting, or sanitizing." *Id*. (emphasis added). Here, the CDC makes no claim that local measures anywhere were or are insufficient. *See Id*.

A plain reading of 42 U.S.C. § 264 and 42 C.F.R. § 70.2 vitiates any notion that either provides legal authority for the CDC to make and enforce the Halt Order or that the Halt Order is a permissible construction, in any way, of the applicable statutes. The Halt Order concerns non-infected persons, who are not engaged in any interstate travel, without any claim of insufficiency relating to state (or local) measures, by issuing regulations far outside the delineated scope of permitted activities under 42 U.S.C. § 264 and 42 C.F.R. § 70.2 or any reasonable extension thereof, and which expressly violate constitutionally protected rights and liberties. As such, the Halt Order is *ultra vires* and the Plaintiffs will prevail on the merits of its claim that the Halt Order should be struck down.

**B. Plitudes are Likely to Prevail on the Merits of their Claim that the Halt Order Violates the Takings Clause**

The Takings Clause of the Fifth Amendment to the Constitution provides: "[N]or shall private property be taken for public use without just compensation." U.S. const. amend. V. The aim of the Takings Clause is to prevent the government from forcing some people, alone, to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. *Eastern Enterprises v. Apfel*, 524 U.S. 498, 522 (1998). Plaintiffs all have private property interests in Units leased to the defaulting tenants.[19] The non-payment of rent by these tenants constitutes a monetary breach of these lease agreements. Under both URLTA and general contract principles of Tennessee law, Plaintiffs are lawfully permitted to terminate these defaulting tenants' lease agreements, take State court action to dispossess the tenants, and recover use and possession of the Units; however, because of the Halt Order, Plaintiffs are now strictly precluded from taking any such otherwise lawful State court action. The Halt Order absolutely deprives Plaintiffs of all commercial and economic use of their Units as they cannot recover rental income, nor can they recover possession of the Units. The preclusions resulting from the Halt Order therefore amount to a complete physical occupation and detention over Plaintiffs' private property and a total deprivation of the use and enjoyment of the Units by the owners and managers. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).

It cannot be disputed that the Halt Order has the effect of taking property away from the Plaintiffs in that the Halt Order transfers all legal rights to exclusive use and possession of the properties at issue to non-paying tenants while simultaneously depriving Plaintiffs' of their protected property rights and entitlements. *Id*. at 435 n.12. The Halt Order forces owners alone to

---

[19] While there is no dispute as to ownership, in the event this Honorable Court deems evidence of Plaintiffs' private property interests to be necessary, Plaintiffs are prepared to provide either affidavits, live testimony, or both.

bear the burden. This inarguably constitutes a government taking for "private use." Because this governmental taking is for a "private use" (i.e. the private use of the defaulting tenants), the Halt Order is an unlawful violation of the Takings Clause which prohibits any and all types of government taking for "private use." *Hawaii Housing Authority vs. Midkiff*, 467 U.S. 229 (1984).

Despite the Halt Order's clear private use effect and impact, the CDC, HUD, and HHS claim the purported reason for issuing the Halt Order is not "private use" but "public use" –i.e., calculated to reduce the risk of increased homelessness, and thus reduce the risk of COVID-19 spread[20]. But even if the Halt Order is in fact deemed a government taking for a "public use" — despite the clear effect to the contrary— a government taking is only permitted for "public use" when the government provides a property owner just compensation for the losses resulting therefrom. *Lutheran Church vs. County of Los Angeles*, 482 U.S. 304 (1987). The Halt Order does not provide any compensation to the Plaintiffs for their total financial loss, nor for their complete loss of exclusive use and enjoyment that resulted directly from the impermissible taking. The government has not compensated[21] the Plaintiffs in any way for this taking; as a result, the Halt Order violates the Takings Clause.

In determining whether a certain government taking, purportedly for "public use," requires just compensation, the Supreme Court has developed two different analyses: (1) <u>The Categorical Test</u>: When a government act eliminates "all economically beneficial uses" of a property, that taking requires just compensation, *Lucas v. South Carolina Coastal Council*, 505 U. S. 1003 (1992); or alternatively, (2) <u>The Ad Hoc Test</u>: In considering whether a government act constitutes

---

[20] This constitutes a highly attenuated conclusion for which the CDC provides no meaningful scientific, statistical, or anecdotal support.

[21] To the contrary, instead of providing the constitutionally required just compensation to owners and managers for this government taking of their property for alleged public use, the government has instead threatened criminal prosecution against any owner or manager who takes any steps to regain use and enjoyment of his or her property.

a taking for "public use" requiring just compensation, the Court considers (a) the economic impact; (b) the extent to which the government act interferes with the reasonable "investment-backed expectations"; and (c) the "character" of the government act, *Palazzalo vs. Rhode Island*, 533 U.S. 606 (201).[22]  Under either analysis, however, the Halt Order constitutes an unconstitutional government taking.  Under the Categorical Test, for the effective period of the Halt Order, all economically beneficial use of the Units occupied by the defaulting tenant is taken from the Plaintiffs and given exclusively to the defaulting tenant, entitling Plaintiffs to just compensation. Because the Halt Order provides no just compensation to the Plaintiffs, the Halt Order is unconstitutional. *Knick vs. Township of Scott*, 139 S. Ct. 2162 (2019).  While the analysis must end there, even were the Court to consider the Ad Hoc Test, the Halt Order would still satisfy the compensation requirement under the three-pronged approach as: (1) the government taking has caused (and will continue to cause) Plaintiffs significant economic impact; (2) the Halt Order interferes with the reasonable use expectation of Plaintiffs; and (3) the Halt Order is an obvious physical invasion of Plaintiffs' Units.  The fact that the government taking is potentially temporary in duration[23] does not diminish the constitutional requirements for compensation. *Arkansas Game & Fish Commission vs. United States*, 568 U.S. 23 (2012); *United States v. Causby*, 328 U. S. 256 (1946).

In either event, whether for private use or public use, the government has taken (and occupied) Plaintiffs' property, depriving each Plaintiff of the complete use and economic benefit of the properties currently being held by defaulting tenants (and to which Plaintiffs are lawfully

---

[22] The Supreme Court has repeatedly stressed that the application of these analyses must be tailored to the specific facts of a given case, and are not amenable to "definitive rules" that distinguish regulations that result in a taking from those that do not.  *Pennsylvania Coal Company vs. Mahon*, 260 U.S. 393 (1922).
[23] Halt Order effective from September 4, 2020, through December 31, 2020, subject to extension. (*See* D.E. 1-12).

entitled under Tennessee law), in violation of their expectations and all without just compensation. As such, the Halt Order violates Plaintiffs' rights guaranteed by the Takings Clause of the Fifth Amendment, and Plaintiffs are likely to prevail on the merits. The Halt Order should be struck down or, in the alternative, the prayed for injunctive relief should immediately issue.

**C.** **Plaintiffs are Likely to Prevail on the Merits of their Claim that the Halt Order Violates Plaintiffs' Rights to Substantive Due Process**

The Fifth Amendment likewise grants every American due process and provides that: "No person shall . . . be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. As stated in detail *supra,* Plaintiffs have protected property interests under Tennessee law[24] with respect to the Units currently occupied by defaulting tenants, and Plaintiffs are being deprived of the exclusive use and enjoyment of their property by operation of the Halt Order.

The Due Process Clause "clothes individuals with the right to both substantive and procedural due process." *United States v. Salerno*, 481 U.S. 739, 746 (1987). The doctrine of Substantive Due Process provides that governmental deprivations of life, liberty, or property are subject to "limitations regardless of the adequacy of the procedures employed," *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017), and even "in the service of a legitimate governmental objective," *City of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

Substantive Due Process protects individuals from the exercise of government power without any reasonable justification, and precludes government from enacting orders that are arbitrary, wrongful, irrational, and overly broad. To establish a violation of substantive due process, a plaintiff must first establish the existence of a constitutionally protected property or liberty interest. *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir.

---

[24] "A property owner's right to own, use, and enjoy private property is a fundamental right." *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 474 (Tenn. 2012) (citations omitted).

1992).  This is simple in the instant case.  The ownership of property is the most fundamental and basic property interest protected by due process rights, and the list of what constitutes "property" under the Fifth Amendment is expansive.  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571–72 (1972); *Hughes*, 387 S.W.3d at 474.  Based upon the purported regulatory and statutory justification of the Halt Order, as compared with the Plaintiffs' constitutionally protected competing property and liberty interest in their real property, the Halt Order is clearly arbitrary, wrongful, and irrational, since there is no rational basis to conclude that the CDC, HUD, or HHS have such sweeping authority under 42 U.S.C. § 264 or 42 CFR § 70.2 as to deprive Plaintiffs of the exclusive use and benefit of their real property for these purposes.  Neither is the Halt Order narrowly tailored to serve any compelling government interest.

Even assuming, *arguendo*, that under 42 USC § 264 and 42 CFR § 70.2, the CDC, HUD, and HHS do somehow have lawful authority to deprive Plaintiffs of the exclusive use and benefit of their real property in order to prevent the "transmission, or spread of communicable diseases," —which they do not— the Halt Order as promulgated is not even limited to that interpretation. The Halt Order precludes Plaintiffs from evicting defaulting tenants occupying Plaintiffs' property with no regard given to whether such real property is infected or contaminated by a communicable disease or dangerous infection nor whether such real property has any relation to prospective interstate transmission of a communicable disease or dangerous infection.  Precluding all evictions, of all defaulting tenants, from all Units, anywhere in the United States, is clearly an irrational and wrongful exercise by the CDC, HUD, and HHS of the limited named powers granted them by 42 U.S.C. § 264 and 42 C.F. R. § 70.2 and is inconsistent —in all respects— with the clear and unambiguous language of the cited statute and companion regulation.  The Halt Order violates basic principles of statutory construction by reading in that which is not there.

Exacerbating this clear misinterpretation and misapplication of the cited statute and regulation, is the Halt Order's sweeping national proscription on evictions, across the United States, purportedly based upon the CDC's conclusion that COVID-19 rates in New York City rival the 1918 flu. (D.E. 1-12 at pg. 2). The Halt Order was decreed without any regard for the fact that the infection rate in New York City was largely due to the City's population density, and the number of homeless in New York City is materially different than those across the United States –and certainly different than those within the Western District of Tennessee. The Halt Order offers no data or evidence to even suggest —let alone data or evidence that demonstrates— that the far lower infection rate in the Western District of Tennessee, as compared to that of New York City, would be at all impacted if Plaintiffs in the Western District of Tennessee evicted non-paying tenants. To the contrary, the CDC's own data proves otherwise. As of the date Plaintiffs' filed their Complaint, (D.E. 1), September 16, 2020, New York had reported 32,625 deaths resulting from COVID-19. By contrast, across the entire State of Tennessee, 2,040 deaths resulting from COVID-19 had been reported. And, in Shelby County, fewer than 450 deaths resulting from COVID-19 had been reported during that same period. *See* Centers for Disease Control and Prevention, *United States COVID-19 Cases and Deaths by State*, https://covid.cdc.gov/covid-data-tracker/#cases_totalcases (last visited Sept. 21, 2020). While even one (1) single death is too great, the scientific data demonstrates that the severity of the public health crisis in the Western District of Tennessee due to COVID-19 has been (and will continue to be) far less than that of New York City. For the CDC, HUD, and HHS to make a one-size-fits-all edict and prohibit Plaintiffs, and other property owners and managers nationwide, from evicting defaulting tenants — based only upon anecdotal data from New York City, and ignoring relevant data from other parts of the country— is a further baseless and arbitrary exercise of non-existent powers.

For at least these reasons, and likely more, the Halt Order is a wrongful and arbitrary exercise of executive power, not grounded in law, that violates Plaintiffs' constitutionally protected rights to substantive due process. As such, Plaintiffs are likely to prevail on the merits and the Halt Order should be struck down or, in the alternative, the prayed for injunctive relief should immediately issue.

### D. Plaintiffs are Likely to Prevail on the Merits of their Claim that the Halt Order Violates Plaintiffs' Rights to Procedural Due Process

The Fifth Amendment likewise provides Plaintiffs' with a right to procedural due process and strictly forbids any and all State action that would deprive Plaintiffs of their vested property rights without such process. This, however, is precisely what the Halt Order does in the instant case. Here, it is not merely that there is an insufficient procedure, but in fact, there is no procedure at all. The Halt Order simply commands that Plaintiffs shall be proscribed from taking any action to regain possession of their real property, to which they are entitled under both Tennessee law and the long held understanding of real property rights endemic in the Anglo-American legal tradition. Property rights are sacred and entitled to robust protection, particularly from the government, and those rights are rooted in the text of the Fifth Amendment, "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

Procedural due process thus requires that, before the government can deprive a person of any protected property interest, the government must provide notice and an opportunity to be heard. *Warren v. City of Athens Ohio,* 411 F.3d 697, 708 (6th Cir. 2005). A procedural due process claim requires a showing that the plaintiff has been deprived of a protected property interest without adequate process. *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999); *see EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012). Whether a person has a property interest is traditionally a question of state law. *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 855

(6th Cir. 2012) (*citing Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982); *see Hughes*, 387 S.W.3d at 474 (in Tennessee, property ownership is a fundamental right).

In this case, there is no dispute that these Plaintiffs have vested property interests in the Units. Each Plaintiff owns and manages Units in the Western District occupied by tenants who are delinquent in the payment of rent and/or who have lease agreements that have now expired and who would be otherwise lawfully evicted from the Units under URLTA, but for the Halt Order. (D.E. 1 at ¶ 79-81). Even assuming that the Defendants could demonstrate that the Halt Order is constitutional <u>in all other respects</u>, which they absolutely cannot, the Halt Order, both on its face and in its effect, is still unconstitutional because —by design— it deprives Plaintiffs of their constitutionally protected right to a hearing before their property rights are deprived. At such a hearing, Plaintiffs should be entitled to inquire and seek/present proof regarding, *inter alia*[25]:

- **Whether the defaulting tenant is a "covered person" under the Halt Order;**
- **Whether the Declaration form submitted by the defaulting tenant to preclude Plaintiffs' eviction action is true and accurate in all respects as specifically required under the Halt Order;**
- **Whether evidence exists that contradicts the Declaration form submitted by the defaulting tenant which would both negate the protection afforded to the tenant as a "covered person" under the Halt Order and subjects the tenant to penalty for perjury;**
- **Whether, if the tenant is in fact a "covered person" under the Halt Order at the time the tenant submitted the Declaration to the Plaintiff, there has been any subsequent material change in the defaulting tenant's circumstances which would change his or her status as a "covered person" under the Halt Order;**
- **Whether the tenant is infected with COVID-19, any member of the tenant's family residing in the Unit with the tenant is infected with COVID-19, or within an applicable time frame, whether the tenant or any member of the tenant's family residing in the Unit with the tenant has been exposed to someone with COVID-19;**

---

[25] Plaintiffs do not suggest that this list is all inclusive, merely that it represents areas of inquiry that if adjudicated by a Court, might potentially address the due process violations. Plaintiffs assert that in any event, it would be the non-paying tenant's burden to prove his or her qualification to the protections of any constitutionally grounded Halt Order.

- **Whether if the tenant is evicted, the tenant has alternate housing options or whether the eviction will render the tenant homeless; and/or**
- **Whether Plaintiffs' eviction of the defaulting tenant would materially increase the risk of spread of COVID-19 in the Western District of Tennessee.**

Instead, under the Halt Order, once a Declaration is delivered to the owner or manager by the defaulting tenant, the Halt Order forbids the owner or manager from taking any steps to evict the defaulting tenant, without an opportunity to be heard or verify the veracity of the Declaration, for four (4) months –through at least December 31, 2020. (D.E. 1-12 at pg. 6).

Under the Halt Order, Plaintiffs are completely deprived of their constitutionally protected property and procedural due process rights. As such, Plaintiffs are likely to prevail on the merits and the Halt Order should be struck down or, in the alternative, the prayed for injunctive relief should immediately issue.

**E.** **Plaintiffs are Likely to Prevail on the Merits of their Claim that the Halt Order Violates the Tenth Amendment**

The Halt Order unlawfully infringes upon the sovereignty of the States and completely destroys citizens' ability to rely upon State law. The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. const. amend. X. Nothing in 42 U.S.C. § 264(a) nor 42 C.F.R. § 70.2 purports to give the CDC, HUD, or HHS the authority: to "temporarily halt residential evictions to prevent the further spread of COVID-19"; to issue an eviction-moratorium for owners and managers in the Western District of Tennessee that preempts URLTA; to disregard the Contracts Clause of Article I, Section 10 of the Constitution[26]; to

---

[26] "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility." U.S. Const. art. I, § 10 (a.k.a. the Contracts Clause).

disregard the Contracts Clauses of the Tennessee State Constitution[27]; and/or to otherwise preempt or supplant duly enacted Tennessee law regarding contracts and interests in real property. Instead, under 42 U.S.C. § 264(a) and 42 C.F.R. § 70.2, the CDC, HUD, and HHS are only granted the limited authority to undertake measures providing for the:

> **. . . inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings.**

42 U.S.C. § 264(a) (emphasis added).

Although "state laws can be pre-empted by federal regulations as well as by federal statutes," *Hillsborough County, Fla. v. Automated Medical Lab, Inc.*, 471 U.S. 707, 713 (1985), 42 U.S.C. § 264 expressly prevents preemption.[28]

In other words, the statute expressly de-authorizes the CDC from issuing orders (such as the Halt Order) as the effect would be to supersede Tennessee law. Tennessee's laws relating to real property and contracts do not conflict with the CDC's authority under 42 U.S.C. § 264(a).

Property laws (such as URLTA) and laws relating to non-impairment of contracts have "long been regarded as a virtually exclusive province of the States upon which the federal government cannot intrude." *Sosna v. Iowa*, 419 U.S. 393, 404 (1975). The Halt Order, ostensibly, displaces applicable Tennessee law and authority over residential evictions and real property rights and therefore violates the Tenth Amendment. As such, Plaintiffs are likely to prevail on the merits and the Halt Order should be struck down or, in the alternative, the prayed for injunctive relief should immediately issue.

---

[27] That no retrospective law, or law impairing the obligations of contracts, shall be made. Tenn. Const. art. I, § 20.
[28] 42 U.S.C. § 264(e).

**F. Plaintiffs are Likely to Prevail on the Merits of their Claim that the Halt Order Violates the Anti-Commandeering Doctrine**

The CDC seeks to coopt the judiciaries of the States in furtherance of a federal objective, albeit an unconstitutional federal objective, and force state officials to act against the wishes and interests of the laws and citizens of the State of Tennessee. Under the Tenth Amendment and its Anti-Commandeering Doctrine, neither the CDC, HUD, nor HHS (nor any other federal agency) has the authority to commandeer Tennessee resources to achieve federal policy objectives or to commandeer Tennessee officers and judges to execute federal mandates which are in express contravention of the Tennessee Constitution and applicable State law. And yet, the Halt Order impermissibly commandeers Tennessee state courts and Tennessee state officers to act as arms of these federal agencies in order to apply, enforce, and implement the unconstitutional federal mandate, embodied by the Halt Order, while simultaneously infringing upon lawful and protected State laws and rights. *New York v. United States*, 505 U.S. 144 (1992); *Printz v. United States*, 521 U.S. 898 (1997).

Neither 42 U.S.C. § 264(a) nor 42 C.F.R. § 70.2, grants the CDC, HUD, or HHS any authority to: (i) order Tennessee state courts to abstain from processing residential evictions duly compliant with URLTA and forcible entry and detainer statutes; (ii) "halt" pending or forthcoming Tennessee state adjudicatory proceedings; and/or (iii) to modify Tennessee state judicial processes by dictating that a Declaration executed by a non-paying, delinquent, and defaulting tenant "*shall be adequate proof or otherwise suffice to halt or suspend the judicial eviction action*." (D.E. 1-12 at pg. 7). The Halt Order is clearly a federal mandate promulgated to achieve a federal policy objective. The CDC, HUD, and HHS's effort to commandeer Tennessee officers and the Tennessee judiciary to execute this mandate violates the Tenth Amendment and its Anti-Commandeering Doctrine. *Printz*, 521 U.S. 898. As such, Plaintiffs are likely to prevail on the

merits and the Halt Order should be struck down or, in the alternative, the prayed for injunctive relief should immediately issue.

G.     **Plaintiffs are Likely to Prevail on the Merits of their Claim that the Halt Order Cannot Pre-Empt State Law under the Supremacy Clause**

The Halt Order, unlawfully, purports to be the supreme law of the land.  Article VI, Section 2 of the Constitution provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof…shall be the supreme law of the land." U.S. Const. art. VI, § 2 (emphasis added).  The Supremacy Clause grants "supreme" status only to the "Laws of the United States which shall be made in Pursuance of [this Constitution], *Id*. (emphasis added)."  Thus, the Supremacy Clause is conditional in nature, and only accords supremacy to federal statutes or regulations made "in Pursuance of" the Constitution.  Federal law may preempt state law when Congress withdraws specified powers from the States by enacting a statute containing an express preemption provision. *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718 (9th Cir. 2016) (citing *Arizona v. United States*, 567 U.S. 387, 397 (2012)); however, this is not the case with Halt Order or the alleged statutory basis upon which it was issued.  Under Section 4024 of the Cares Act, Congress granted no authority to any federal agencies to promulgate any further orders involving evictions.  Neither the CDC, HUD, nor HHS has identified any act of Congress that demonstrates that the issuance of the Halt Order is within the scope of some congressionally delegated authority to impose a restriction on Plaintiffs' real property and/or real property rights, or otherwise supplant state law authorizing residential evictions.  Without Congressionally delegated authority, agencies like the CDC, HUD, and HHS "literally ha[ve] no power to act, let alone to pre-empt the validly enacted legislation of a sovereign State." *New York v. FERC*, 535 U.S. 1, 18 (2002).  "[P]reemption takes place only when and if the agency is acting within the

scope of its congressionally delegated authority." *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019).

The failure by the CDC, HUD, and HHS to establish the requisite authoritative link between relevant federal statute and the authority to issue the Halt Order makes fatal and unconstitutional these agencies' efforts to invoke the Supremacy Clause and deprive Plaintiffs of their property rights under Tennessee law. As such, Plaintiffs are likely to prevail on the merits and the Halt Order should be struck down or, in the alternative, the prayed for injunctive relief should immediately issue.

### H. Plaintiffs are Likely to Prevail on the Merits of their Claim that the Halt Order Constitutes an Unlawful Suspension of Law

Evictions are a function of the police power of the states. *Cf. Edgar A. Levy Leasing Co. v. Siegel*, 258 U.S. 242, 247 (1922). In Tennessee, an owner's or manager's rights and remedies upon a material breach of the lease agreement, including the right to an eviction and to recover possession based on nonpayment of rent, are governed by a comprehensive statutory scheme. *See* Tenn. Code Ann. §§ 66-28-512; 29-18-104; 29-18-125, *et seq*. Neither the CDC, HUD, nor HHS has the authority to waive, dispense with, or suspend duly enacted state laws. *Baker v. Carr*, 369 U.S. 186, 244 n.2 (1962) ("No tribunal or department in our system of governments ever can be lawfully authorized to dispense with the laws, like some of the tyrannical Stuarts, or to repeal, or abolish, or suspend the whole body of them[.]") (quoting *Luther v. Borden*, 48 U.S. 1, 69 (1849) (Woodbury, J., dissenting)). To the contrary, the Constitution expressly forbids the executive branch from suspending State law. The constitutional doctrine of separation of powers precludes the suspension of State law through federal executive action, as it would effect a merger of the executive and legislative powers.

The powers of the executive branch are confined to those expressly set forth by the Constitution in Article II, *see* U.S. Const. art. 2, and rulemaking power originates in the legislative branch and becomes an executive function only when delegated by the legislature to the executive branch. *Mistretta v. United States*, 488 U.S. 361, 387 (1989). Neither the executive, nor an agency thereunder, is empowered to make law or suspend and supplant the duly enacted laws of the States as such power is not conferred by the Constitution and, to the contrary, violates the Constitution. *See*, *e.g*., U.S. Const. amend. X; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 690 (1952) (Vinson, C.J. dissenting) ("The function of making laws is peculiar to Congress, and the Executive can not exercise that function to any degree."); *Id*. at 586 (The "power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself.").

As the Halt Order seeks to operate as a "law" —even though it is not— such action may only emanate from the Congress pursuant to its powers to make law, or a proper delegation. *See* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States[.]"); *see also I.N.S. v. Chadha*, 462 U.S. 919, 966 n. 7 (1983). The CDC's purported authority to promulgate and enforce something with the force and effect of the Halt Order constitutes an impermissible merger of legislative and executive powers. With no applicable grant of statutory authority to suspend laws, neither the CDC, HUD, nor HHS —even in these most challenging of times— has authority to do anything to infringe upon Plaintiffs' property rights or to diminish Tennessee's comprehensive laws governing real property interests and evictions. *See Home Bldg & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425 (1934) ("Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved.").

Because the CDC could not lawfully waive the application of Tennessee's laws governing evictions, the Halt Order is void *ab initio* and must fail. As such, Plaintiffs are likely to prevail on the merits and the Halt Order should be struck down or, in the alternative, the prayed for injunctive relief should immediately issue.

## I. Plaintiffs are Likely to Prevail on the Merits of their Claim that the Halt Order Violates Plaintiffs' Rights to Access the Judiciary

The Article IV Privileges and Immunities Clause[29], the First Amendment Petition Clause[30], the Fifth and Fourteenth Amendment Due Process Clauses[31], and the Fourteenth Amendment's Equal Protection Clause[32], collectively provide Plaintiffs' a federal constitutional right to access the courts. *Christopher v. Harbury*, 536 U.S. 403, 415, 415 n. 12 (2002); *Ringgold-Lockhart v. Cty. of Los Angeles*, 761 F.3d 1057, 1061 (9th Cir. 2014) ("The right of access to the courts is a fundamental right protected by the Constitution."). No state actor may systemically frustrate a plaintiff "in preparing and filing suits" by foreclosing a particular type of relief. *Christopher*, 536 U.S. at 413.

In the Western District of Tennessee, a Forcible Entry and Detainer (FED) Warrant under Tenn. Code Ann. §§ 66-28-512 and 29-18-104 is an owner's or manager's exclusive means of reacquiring possession of his or her Unit from a tenant. Any self-help exercised by an owner or manager to gain possession of a Unit from a defaulting tenant is wholly unlawful and subjects the owner or manager to both compensatory and punitive damages under Tenn. Code Ann. § 66-28-504. This is precisely why Plaintiffs are entitled under the lease agreement, URLTA, and general contract principles of Tennessee law, to file a Forcible Entry and Detainer (FED) Warrant with the

---

[29] U.S. Const art. IV, § 2.
[30] U.S. Const. amend. I.
[31] U.S. Const. amend. V; U.S. Const. amend. XIV.
[32] U.S. Const. amend. XIV.

Shelby County Court and to obtain a Writ of Possession pursuant to Tenn. Code Ann. §§ 29-18-125, 126.

Plaintiffs all have Units with tenants that are in material breach of their lease agreements for non-payment of rent and/or are unlawfully holding over in exclusive possession of the Units after the lease term has expired. These tenants have no defenses to their material breaches and delinquencies other than the Halt Order. By operation of the Halt Order, Plaintiffs are unable to access the Shelby County Courts to obtain a possessory judgment under Tenn. Code Ann. §§ 66-28-512 and 29-18-104, nor are they able to obtain a Writ of Possession[33] pursuant to Tenn. Code Ann. §§ 29-18-125, 126. The Halt Order directly upsets Plaintiffs expectations relating to government interference with their business operations and robs the Plaintiffs' of their value in these Units. As a result of the Halt Order, Plaintiffs have no ability to legally dispossess tenants for non-payment, delinquency, and default and re-gain possession of their Units. *See* Tenn. Code Ann. § 66-28-504. Indeed, any attempt by the Plaintiffs to bypass the forcible entry and detainer statutes and, by extension, URLTA, and regain possession of their leaseholds would subject the Plaintiffs to claims for damages under Tennessee law. *Id*. The Halt Order, therefore, systemically frustrates Plaintiffs' right to access the Court and unlawfully forecloses necessary relief. As such, Plaintiffs are likely to prevail on the merits and the Halt Order should be struck down or, in the alternative, the prayed for injunctive relief should immediately issue.

---

[33] The inability to obtain a Writ of Possession is even true in cases wherein the Shelby County Court rendered a lawful possessory judgement in favor of a Plaintiff *prior* to the issuance of the Halt Order on September 4, 2020. Because of the ten (10) day statutory appeal period under Tenn. Code Ann. § 27-5-108, a Plaintiff who obtained a possessory judgment ten (10) days prior to the Halt Order is now precluded from obtaining a Writ of Possession as the Halt Order purports to even affect judgments which have already occurred.

### III. WITHOUT AN EMERGENCY HEARING AND INJUNCTIVE RELIEF, PLAINTIFFS AND REAL PROPERTY OWNERS NATIONWIDE ARE SUBJECT TO IMMEDIATE, IRREPARABLE, AND CONTINUOUS HARM FROM THE HALT ORDER

The Plaintiffs here and, indeed, all persons owning and operating residential rental property throughout the United States are being subjected to very real, immediate, and continuous harm. It is not simply that the Halt Order violates the Plaintiffs' expectations relating to lawful government interference in their business operations, but also that the loss of rental income and exclusive use of their Units have made their businesses commercially impracticable. Perhaps equally if not more importantly, the Halt Order is a clear violation, by government action, of Plaintiffs' long-established and fundamentally protected constitutional rights[34].

"When reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *McNeilly v. Land*, 684 F.3d 611, 620 (6th Cir. 2012) ("Once a probability of success on the merits [is] shown, irreparable harm follow[ ]."). Plaintiffs request for a preliminary injunction on the basis of a "potential constitutional violation" is entirely appropriate. *Obama*, 697 F.3d at436 (internal quotations omitted); *Schimmel*, 751 F.3d at 430.

Because, as demonstrated *supra*, the likelihood of Plaintiffs' success on the merits of their claims is grounded in the *ultra vires* promulgation and constitutional infringements, the substantive and procedural enforcement of the Halt Order constitutes an overt unlawful action that violates the rights of free citizens and must be challenged. Plaintiffs submit that the instant challenge to the Halt Order is meritorious and therefore demands emergency Court intervention and action – without delay.

---

[34] *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 513 (1977) (Stevens, J., concurring) (right to own property precedes the Constitution).

## IV.     THE RELATIVE BALANCE OF THE HARDSHIPS AND THE PUBLIC'S INTEREST WEIGH IN FAVOR OF GRANTING THE REQUESTED INJUNCTIVE RELIEF

The weighty constitutional issues at stake, the numerous infringements by the government on the rights of the Plaintiffs and other citizens, and the risk of profound and irreparable daily harm tip sharply in favor of issuing injunctive relief. The Halt Order is a wholly unprecedented attempt by any unauthorized federal agency to supplant the duly enacted laws of the States and to control one of the most fundamental rights afforded to the people –the ownership of property. Of equal importance, the Halt Order constitutes an intrusion upon the contractual rights of the Plaintiffs, and all other similarly situated owners, and is a damaging directive aimed at the operations of business. The Halt Order is so broad as to affect an enormous segment of our population without any rational basis. Nothing can matter to the public more than swift action to preserve, protect, and defend fundamental rights guaranteed to the people. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights. *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (*citing Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979); *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002) ("the public clearly has interest in vindicating constitutional rights"); *Dodds v. United States Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016) (Protection of constitutional and civil rights is a purpose that is always in the public interest for preliminary injunction purposes). Furthermore, the public interest is always implicated in "ensuring that statutes enacted by their representatives' are not imperiled by executive fiat." *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 855 (9th Cir. 2020).

Finally, the Halt Order purports to submit the Plaintiffs —or anyone who allegedly violates the Halt Order— to grave and disproportionate criminal penalties and sanctions including a fine of up to $250,000.00 or one (1) year in prison. (D.E. 1-12 at pg. 6). Such deprivations of liberty

are not only wholly unlawful and clearly unauthorized, but also grossly disproportionate to the alleged offense and, are therefore, truly offensive to our system of justice.

As such, the public is best served by striking down or, in the interim, suspending the Halt Order and enjoining its effect and enforcement pending an adjudication on the merits. The Halt Order is an affront to the Plaintiffs' constitutional rights and its enjoinder will cause no appreciable harm to the Defendants.

## V.   GIVEN THE DEFENDANTS' CLEAR VIOLATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS AND THE IMPORTANCE OF THE CHALLENGE HEREIN, PLAINTIFFS REQUEST THE COURT WAIVE THE NECESSITY OF A BOND

Given the importance of the challenge being made herein, and the implication of a number of constitutional rights and purported suspension of state law, the Plaintiffs request the Court waive and dispense with the necessity of the bond requirement. Fed. R. Civ. P. 65(c) states in relevant part that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The foregoing notwithstanding, "the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security," *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (internal citation omitted), and a court has no mandatory duty to impose a bond as a condition for issuance of injunctive relief, *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 952 (6th Cir. 2007). Given this Honorable Court's discretion, Plaintiffs respectfully request the bond requirement be waived.

## VI.   THIS COURT SHOULD APPLY A STRICT SCRUTINY ANALYSIS TO ITS REVIEW OF THE CONSTITUTIONAL VIOLATIONS OF THE HALT ORDER

Plaintiffs argue herein —in great detail— that the *ultra vires* promulgation and the substantive and procedural enforcement of the Halt Order violate a number of protected rights and

interests. The Supreme Court has long held that government action which infringes upon fundamental individual rights —even when duly authorized, enacted lawfully by the legislature, and approved by the executive— should receive robust judicial protection and should be scrutinized *very* strictly. Under a strict scrutiny analysis, this Honorable Court must strike down the Halt Order, as it cannot be concluded that the Halt Order was properly issued under clear authority or that the mandates of the Halt Order are "necessary" acts and the "most narrowly drawn means of achieving those compelling state interests." *Zablocki v. Redhail*, 434 U.S. 374, 389 (1978). The Halt Order was issued without proper authority and is neither necessary nor narrowly drawn to achieve the goals for which it is stated. The purported bases for the imposition of the Halt Order, looking at anecdotal data from Seattle and New York, as well as a minor study of COVID-19 transmission rates in homeless shelters, is scant and insufficient to meet the strict scrutiny analysis. The Halt Order makes no attempt to narrowly tailor a response to the feared harm and, instead, issues a broad, sweeping nationwide ban on evictions. Furthermore, as there is myriad alternative government action that could be taken to address the concern of COVID-19 spread, the Halt Order cannot possibly be deemed a necessary action. And even if the Defendants could demonstrate —which they cannot— that in all respects the Halt Order is necessary and narrowly drawn to achieve the goals, the Halt Order's intended violation of procedural due process and its effect of interfering with Plaintiffs' constitutionally protected right to access the judiciary require it be struck down under a strict scrutiny analysis. For all these reasons, and the reasons previously stated herein, the Halt Order cannot survive a strict level of scrutiny and therefore must be struck down.

The Defendants may argue —incorrectly— that the Halt Order involves only a mere "economic regulation," and therefore is entitled to the lowest level of scrutiny –a rational basis

analysis. *See, e.g., Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59 (1978). This is clearly wrong. Only economic regulations which do not violate or infringe upon fundamental individual rights are entitled to rational basis review. It is simply inarguable that the Halt Order does not implicate fundamental rights. When a government act violates not one —but no fewer than seven (7)— fundamental and protected constitutional rights and liberties, any argument against the application of strict scrutiny is meritless. Nevertheless, the overreach and unlawfulness of the Halt Order notwithstanding, even if this Honorable Court employs a rational basis analysis, this Honorable Court must still strike down the Halt Order as: (1) there is no evidence of authority for the CDC to promulgate the Order, (2) there exists no reasonable relationship between (a) homelessness and the spread of COVID-19 and (b) erasing Plaintiffs' property rights and Tennessee law. The Halt Order, in its operation and enforcement (both civil and criminal) is exceedingly unreasonable, arbitrary, and capricious. *Olsen v. Nebraska*, 313 U.S. 236 (1941); *Nebbia v. New York*, 291 U.S. 502 (1934). The Halt Order is not simply a duly enacted economic regulation, it is a direct and deliberate violation of Plaintiffs' fundamentally protected rights with no tether to any compelling government interest. Under any level of scrutiny this Honorable Court may choose to employ, the Halt Order must be struck down or, in the alternative, the prayed for injunctive relief should immediately issue until a trial upon the merits of these weighty issues can be held.

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request the relief granted herein.

Respectfully Submitted,

**GLANKLER BROWN, PLLC**

/s/ S. Joshua Kahane
    S. Joshua Kahane (TN# 23726)
    jkahane@glankler.com
Aubrey B. Greer (TN# 35613)
agreer@glankler.com
6000 Poplar Ave., Suite 400
Memphis, Tennessee 38119
Telephone: (901) 525-1322
Facsimile: (901) 525-2389

## CERTIFICATE OF SERVICE

    I hereby certify that on September 27, 2020, a copy of the foregoing Memorandum was served on the parties listed below via the Court's ECF System and Federal Express pre-paid:

Housing and Urban Development
Associate General Counsel for Litigation
Room 10258
451 Seventh Street, S.W.
Washington D.C. 20410

Honorable Nina B. Witkofsky
Center for Disease Control and Prevention
Acting Chief of Staff
1600 Clifton Road
Atlanta, Georgia 30333

Honorable Benjamin S. Carson, M.D.
Housing and Urban Development
Associate General Counsel for Litigation
Room 10258
451 Seventh Street, S.W.
Washington D.C. 20410

Honorable Secretary Alex Azar
Department of Health & Human Services
200 Independence Avenue, S.W., Rm 713-F
Washington, D.C. 20201

Honorable Attorney General William P. Barr
U.S. Department of Justice
950 Pennsylvania Avenue, NW, Room 1111
Washington, D.C. 20530

Honorable Vice Admiral Jerome M. Adams, M.D., Surgeon General
Department of Health & Human Services
200 Independence Avenue, S.W., Rm 713-F
Washington, D.C. 20201

Honorable D. Michael Dunavant
Attorney General
Western District of Tennessee
U.S. Attorney's Office
167 North Main Street, Suite 800
Memphis, Tennessee 38103

/s/ S/ Joshua Kahane
S. Joshua Kahane