**TIGER LILY LLC;**
**HUNTER OAKS APARTMENTS UTAH, LLC;**
**NORTH 22ND FLAT, LLC;**
**CHERRY HILL GARDENS LLC;**
**CHURCHILL TOWNHOMES LLC; and**
**BRITTANY RAILEY**
**APPLEWOOD PROPERTY MANAGMENT, LLC**


      **Plaintiffs,**

**vs.**                                                  **No. 2:20-CV-2692**


**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT** and
**BENJAMIN S. CARSON, M.D**. in his official capacity as United States Secretary of Housing
and Urban Development;
**UNITED STATES DEPARTMENT OF JUSTICE** and **WILLIAM P. BARR**, in his official
capacity as United States Attorney General;
**UNITED STATES CENTER FOR DISEASE CONTROL AND PREVENTION** and **NINA
B. WITOVSKY,** in her official capacity as Acting Chief of Staff of the Center for Disease Control
and Prevention;
**UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES** and **ALEX
AZAR,** in his official capacity as United States Secretary of Health and Human Services;
**VICE ADMIRAL JEROME M. ADAMS, M.D.,** in his official capacity as United States
Surgeon General; and
**D.MICHAEL DUNAVANT,** in his official capacity as United States Attorney General for the
Western District of Tennessee

**Defendants.**

---

### PROPOSED INTERVENORS MOTION FOR LEAVE TO OPPOSE PLAINTIFFS' APPLICATION FOR EMERGENCY RELIEF COMBINED WITH MEMORANDUM IN SUPPORT

Now comes the proposed Intervenor-Defendant, Neighborhood Preservation Inc. d/b/a the Eviction Settlement Program ("ESP") for itself and on behalf of a putative class of individual tenants who are at risk of eviction ("Class"), by and through their attorneys, and, pursuant to Rule 7(b) of the Federal Rules of Civil Procedure, respectfully move that this Court allow them to enter an appearance as proposed Intervenor-Defendants to oppose Plaintiff's Motion for Emergency Relief.

## GRANTING THE PLAINTIFFS' MOTION FOR EMERGENCY RELIEF WILL CAUSE INCALCULABLE HARM TO THE PUBLIC AND TO MEMBERS OF THE PUTATIVE CLASS WHOSE VOICES SHOULD BE HEARD IN OPPOSITION

There exists in the nation an unprecedented virus that has affected tenants in our communities. The Novel Coronavirus ("COVID-19") has affected our entire nation's housing market. Across the Memphis community, the pandemic has caused individuals to lose their jobs, tenants to lose their homes, and landlords to lose their source of income. To help curtail the effects of the contagious virus, individuals need to have reliable and stable housing without fear that they could be kicked onto the streets. The Center for Disease Control and Prevention ("CDC") has exercised its authority to seek to mitigate the spread of the disease by attempting to ensure stability and safety for people who are in fear of being evicted. To do so, the CDC implemented the "Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID 19" ("Halt Order"). The Halt Order effectively prevents all evictions against persons unable to pay full or partial rent as a result of COVID-19 through December 31, 2020.

In conjunction with its Motion to Intervene as a Defendant, Neighborhood Preservation, Inc. through its Eviction Settlement Program brings this Motion for itself and on behalf of a diverse and innumerable group of tenants in this community who are at risk of being evicted from their homes as a result of COVID-19 (the "Class").

As the persons who have the most at stake in this litigation, the Class respectfully moves the Court for leave to file a brief in opposition to Plaintiffs' motion for preliminary injunction. The proposed brief is attached hereto as Exhibit A. The participation of the Class in this case will be of assistance to the Court and will not prejudice any party.

## **DISCUSSION**

The issues presented in this case are of urgent importance to the Class -- a diverse and innumerable group of tenants at risk of eviction and homelessness, leading to exposure to the deadly novel coronavirus. The order being challenged by the Plaintiffs in this case was enacted to curb the spread of the coronavirus by preserving at-risk tenants' ability to stay socially distant and isolated in their homes pursuant to public health recommendations.[1] The spread of this deadly virus is an epidemic at the city, state, and national level. The members of the Class who are at risk of eviction due to economic hardship attributable to the coronavirus, will be exposed to irrevocable economic and physical harm without the protections established by CDC's halt order. The outcome of this case will reach far beyond the currently litigating parties and will have a significant impact on individuals nationwide facing financial hardships at no fault of their own.

Granting the Class permission to oppose Plaintiff's motion for preliminary injunctive relief will allow this Court to fully consider and protect the interests of the numerous citizens at risk of eviction and grave illness should the injunction be granted.

---

[1] "Furthermore, housing stability helps protect public health because homelessness increases the likelihood of individuals moving into congregate settings, such as homeless shelters, which then puts individuals at higher risk to COVID-19. The ability of these settings to adhere to best practices, such as social distancing and other infection control measures, decreases as populations increase. Unsheltered homelessness also increases the risk that individuals will experience severe illness from COVID-19." Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292, 55292 (Sept. 4, 2020).

**WHEREFORE**, ESP respectfully requests that this Court grant its motion to be heard in opposition to Plaintiffs' Emergency Motion for a Temporary Injunction.

Respectfully Submitted

/s/ Earle J. Schwarz

Earle J. Schwarz (007192)
2157 Madison Ave, Suite 201
Memphis TN 38104
901.272.0607
eschwarz@earle-schwarz.com

Webb A. Brewer (9030)
The Law Offices of Webb A. Brewer
1755 Kirby Parkway, Suite 110
Memphis, TN 38120
Tele: (901) 757-3358
webbbrewer@comcast.net

Counsel for Intervening Defendants

Dated: October October 13, 2020

OF COUNSEL

Daniel M. Schaffzin (028601)
Associate Professor of Law
Co-Director, Neighborhood Preservation Clinic
Cecil C. Humphreys School of Law
1 N. Front Street, Suite 101
Memphis, TN 38103-2189
(O) 901.678.5056 | (C) 215.380.0969

Kathryn Ramsey
Assistant Professor of Law & Director, Medical-Legal Partnership Clinic
University of Memphis Cecil C. Humphreys School of Law
1 North Front Street
Memphis, TN 38103
Office: (901) 678-4589
Kramsey1@memphis.edu

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of notice of the foregoing has been served upon all counsel of record by electronic means via the Court's ECF system this October 13, 2020

/s/ Earle J. Schwarz

EXHIBIT A

(PROPOSED MEMORANDUM OF  LAW
IN OPPOSITION TO  MOTION FOR A
TEMPORARY INJUNCTION)

---

**TIGER LILY LLC;**
**HUNTER OAKS APARTMENTS UTAH, LLC;**
**NORTH 22ND FLAT, LLC;**
**CHERRY HILL GARDENS LLC;**
**CHURCHILL TOWNHOMES LLC; and**
**BRITTANY RAILEY**
**APPLEWOOD PROPERTY MANAGMENT, LLC**


      **Plaintiffs,**

vs.                                                  **No. 2:20-CV-2692**


**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT** and **BENJAMIN S. CARSON, M.D**. in his official capacity as United States Secretary of Housing and Urban Development;
**UNITED STATES DEPARTMENT OF JUSTICE** and **WILLIAM P. BARR**, in his official capacity as United States Attorney General;
**UNITED STATES CENTER FOR DISEASE CONTROL AND PREVENTION** and **NINA B. WITOVSKY,** in her official capacity as Acting Chief of Staff of the Center for Disease Control and Prevention;
**UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES** and **ALEX AZAR,** in his official capacity as United States Secretary of Health and Human Services;
**VICE ADMIRAL JEROME M. ADAMS, M.D.,** in his official capacity as United States Surgeon General; and
**D.MICHAEL DUNAVANT,** in his official capacity as United States Attorney General for the Western District of Tennessee


      **Defendants.**

---

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

**INTRODUCTION**

The United States is currently being affected by a global pandemic during which the respiratory disease COVID-19 has infected tens of millions worldwide and resulted in the death of more than 200,000 people within our borders. *See* Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292, 55292 (Sept. 4, 2020). The disease spreads easily between persons within close contact (approximately six feet) via respiratory droplets. *Id.* It can cause severe illness but may also be transmitted by persons who are pre-symptomatic or asymptomatic—meaning that infected persons have the potential to infect others unknowingly. *Id.* Despite drastic measures by federal, state, and local government entities, including border closures, stay-at-home orders, mask mandates, and travel restrictions, COVID-19 continues to spread. *Id.*

In light of these rare circumstances, the Center for Disease Control and Prevention ("CDC") has exercised its authority under the Public Health Service Act ("PHSA") and its implementing regulations to order a temporary halt in residential evictions to prevent the further spread of COVID-19 ("Halt Order"). *Id.* This order is intended to be an effective public health measure because, among other things, it facilitates self-isolation by ill and at-risk persons, eases implementation of stay-at-home and social distancing measures, and decreases the likelihood that persons will experience homelessness or move in to congregate settings, such as crowded shelters, both of which increase the risk of COVID-19 spread. *Id.* at 55295–96.

The Halt Order intends to ease the burden and stress regarding tenant's housing that stems from the unprecedented events occurring because of the pandemic. Individuals who have lost work or incurred extraordinary medical bills are at risk of being evicted because they are unable to acquire the funds to pay their rent. <u>Importantly, the Halt Order does not excuse any tenant's</u>

2

obligation to pay rent or impair any landlord's ability to impose fees, interest, or other penalties short of eviction. *Id.* at 55292. Nor does it prevent landlords from evicting tenants for reasons other than failure to pay rent timely, such as criminal activity or property damage. *Id.* at 55294. The Plaintiffs are a diverse group of individuals and business organizations that own and/or manage residential real property in the form of multi-family apartment complexes, duplexes, townhomes and single-family residences all located within the Western District of Tennessee. They seek emergency injunctive relief to invalidate the Order. They are unlikely to succeed on the merits because they have not met their burden to show that the Halt Order violates the Administrative Procedure Act ("APA") or denies any Plaintiff the right to access courts. While litigation over the CDC's authority is an interesting intellectual exercise, the real world consequences of invalidating the Order pending a trial on the legal merits of the attack on the Order, would be catastrophic. And the damage from throwing individuals and families out in the street pending a final decision cannot be remedied if the Government and the Class prevail on the merits. Thus, the balance of the harms -- the public's interest in reducing the spread of the virus and the putative Class's interest in continued health, safety, and security -- tip overwhelmingly against the Plaintiffs' short term economic interest.

## BACKGROUND[2]

### I.   Statutory and Regulatory Background

The federal government has a long history of acting to combat the spread of communicable disease. Congress enacted the first federal quarantine law in 1796 in response to a yellow fever

---

[2] The proposed Intervenor Defendants rely heavily on and incorporate substantially herein the points and arguments made by the United States in Brown v. Azar, No. 1:20-cv-3702-JPB, at 3–13 (N.D. Ga. Oct. 2, 2020).

outbreak, providing the President with the ability to direct federal officials to help states enforce quarantine laws. Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) (repealed 1799); *see Smith v. Turner*, 48 U.S. 283, 300 (1849). Following a subsequent yellow fever outbreak, Congress repealed this Act, establishing in its place a federal inspection system for maritime quarantines. Act of Feb. 25, 1799, ch. 12, 1 Stat. 619 (1799). In 1893, Congress authorized the Secretary of the Treasury to adopt additional regulations to prevent the introduction of disease into the United States or across state lines where the Secretary considered state or local regulation inadequate. Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893).

In 1944, Congress enacted the provision at issue here, section 361 of the PHSA, as part of a broader effort to consolidate and clarify existing public health laws. H.R. Rep. No. 78-1364, at 1 (1944). In section 361(a), Congress broadened the federal government's "basic authority to make regulations to prevent the spread of disease into this country or between the States." *Id.* at 24. For example, Congress removed references to specific diseases to provide federal health authorities flexibility to respond to new types of contagion and "expressly sanction[ed] the use of conventional public-health enforcement methods" by the federal government in disease-control efforts. *Id.* at 24–25.

The resulting statute, 42 U.S.C. § 264, authorizes the Secretary of Health and Human Services ("HHS")[3] "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession."

---

[3] Although the statute assigns authority to the Surgeon General, Reorganization Plan No. 3 of 1966 abolished the Office of the Surgeon General and transferred all statutory powers and functions of the Surgeon General to the Secretary of Health, Education, and Welfare, now the Secretary of HHS, 31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966), see also Pub. L. No. 96-88, § 509(b), October 17, 1979, 93 Stat. 695 (codified at 20 U.S.C. 3508(b)). The Office of the Surgeon General was reestablished in 1987, but the Secretary has retained these authorities.

42 U.S.C. § 264(a). Subsection (a) further clarifies that "[f]or purposes of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id.* Subsection (b) imposes specific limits on the Secretary's ability to "provide for the apprehension, detention, or conditional release of individuals"—a power not referenced in subsection (a)—mandating that such impositions on a person's physical movement be specified by Presidential Executive Order. *Id.* § 264(b). Subsections (c) and (d) set further limits on the detention of individuals. *See id.* § 264(c)–(d). The final subsection provides that the statute and any regulation adopted thereunder supersede state law "to the extent that such a provision conflicts with an exercise of Federal authority." *Id.* § 264(e).

The Secretary of HHS has promulgated regulations implementing these provisions and delegating their enforcement to CDC. *See* 42 C.F.R. pt. 70; 65 Fed. Reg. 49906, 49907 (Aug. 16, 2000). In particular, 42 C.F.R. § 70.2 provides the CDC Director (or his or her authorized representative) with discretion to take measures to address uncontrolled contagion.[4] Specifically, where the CDC Director "determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases" between or among States, he is empowered to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." 42 C.F.R. § 70.2. These measures include, but are not limited to, "inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection." *Id.*

---

[4] The term "Director" as used in these regulations signifies "the Director, Centers for Disease Control and Prevention, Department of Health and Human Services, or another authorized representative." 42 C.F.R. § 70.1.

Other regulations authorize CDC to limit interstate travel, *see* 42 C.F.R. § 70.3, apprehend and detain persons, *id.* § 70.6, and conduct medical examinations, *id.* § 70.12, to control the spread of disease. The regulations additionally provide for penalties for violations of these regulations. *Id.* § 70.18.

## II.    The COVID-19 Pandemic

In December 2019, a novel coronavirus dubbed SARS-CoV-2 was first detected in Wuhan, Hubei Province, in the People's Republic of China. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15337 (Mar. 13, 2020). The virus causes a respiratory disease known as COVID-19. *Id.*

COVID-19 is a serious illness that spreads easily. Contracting COVID-19 poses a risk of "severe" respiratory illness, meaning that persons who have the disease may require hospitalization, intensive care, or the use of a ventilator. 85 Fed. Reg. at 55292. Severe cases of COVID-19 may be fatal. *Id.* The likelihood of becoming severely ill is greater among certain vulnerable populations. *Id.* at 55295. CDC has cautioned that the virus that causes COVID-19 transmits "very easily and sustainably" between people within "close contact"—approximately six feet—of one another. *Id.* at 55293. Persons not displaying symptoms are capable of transmitting the virus. *Id.* at 55292.

From its origins in late 2019, COVID-19 spread quickly across the globe, including to the United States. *See* 85 Fed. Reg. at 15337. On January 31, 2020, the Secretary of HHS declared a public health emergency due to the rise in confirmed COVID-19 cases in this country. Determination that a Public Health Emergency Exists, https://www.phe.gov/emergency/news/healthactions/phe/Pages/ 2019-nCoV.aspx (Jan. 31, 2020). On March 11, 2020, the World Health Organization classified the COVID-19 epidemic as a

pandemic due to the increase in infections throughout the world, including in the United States. 85 Fed. Reg. at 15337. On March 13, 2020, the President declared the COVID-19 outbreak a national emergency. *Id.* By late August 2020, the virus had spread to all 50 states. 85 Fed. Reg. at 55292. To date, it has infected over seven million and caused the death of over 200,000 persons within the United States. *See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last visited Oct. 8, 2020). New cases continue to be reported daily, *see id.*, and CDC has called COVID-19 "a historic threat to public health." 85 Fed. Reg. at 55294.

To combat the spread of this easily transmitted, widespread, and potentially deadly virus, governments at all levels have taken "unprecedented or exceedingly rare actions" in the interest of protecting the public health. *Id.* These include border closures, travel restrictions, stay-at-home orders, and mask requirements. *Id.* In March 2020, Congress provided a 120-day temporary moratorium on eviction filings based on nonpayment of rent, as well as other protections, to tenants residing in certain federally financed rental properties. CARES Act, Pub. L. No. 116-136, § 4024, 134 Stat. 281 (2020). Although this measure temporarily helped mitigate the public health effects of tenant displacement during the pandemic, it expired on July 24, 2020. 85 Fed. Reg. at 55294. While certain States implemented their own temporary eviction moratoria, *see*, *e.g.*, New York Tenant Safe Harbor Act, S.8192B/A.10290B (Jun. 30, 2020), some such measures have also begun to expire.[5] *See* 85 Fed Reg. at 55296 n.36. Other States provided no separate protection for renters during the pandemic. *Id.*

---

[5] See, e.g., In Re: Amendment of the Eighth Order Extending Declaration of Judicial Emergency in Response to COVID-19 Emergency, https://www.governor.virginia.gov/media/governorvirginiagov/governor-ofvirginia/pdf/ORD-08-07-2020-Amendment-of-8th-DJE-order.pdf (Virginia moratorium expired Sept. 7, 2020); State of Connecticut, Executive Order No. 7DDD, https://portal.ct.gov/-/media/Office-of-the-Governor/ExecutiveOrders/Lamont-Executive-Orders/Executive-Order-No-7DDD.pdf (Connecticut moratorium expired August 24, 2020).

### III. The CDC Halt Order

In light of these circumstances, on September 4, 2020, CDC issued a Halt Order under 42 U.S.C. § 264(a) and 42 C.F.R. § 70.2 providing for a temporary halt on residential evictions until December 31, 2020. 85 Fed. Reg. at 55292. The agency found this Halt Order "a reasonably necessary measure . . . to prevent the further spread of COVID-19," and that state and local measures that did not meet or exceed its protections were insufficient to prevent interstate spread. *Id.* at 55296.

CDC determined that eviction moratoria help reduce the risk of transmission of COVID-19. *Id.* at 55294. They do so by facilitating self-isolation for sick and high-risk persons, easing implementation of stay-at-home orders and social distancing measures, reducing the need for congregate housing, and helping to prevent homelessness. *Id.*

As CDC explained, evictions present a public health concern because the movement of evicted renters could lead to "multiple outcomes that increase the risk of COVID-19 spread." *Id.* First, evicted renters are likely to move in with friends or family, leading to potential household crowding with new sources of infection. *Id.* This increases the risk of spreading COVID-19 because "transmission occurs readily within households," and "household contacts are estimated to be 6 times more likely to become infected by an index case of COVID19 than other close contacts." *Id.*

Second, the risk of transmission in shared housing increases exponentially if evicted persons move into congregate settings, such as homeless shelters, transitional housing, or domestic violence shelters. *Id.* Maintaining social distance may be difficult in these settings, especially where residents must share small spaces, like stairwells and elevators, or equipment, such as

kitchen or laundry facilities. Id. Indeed, "extensive outbreaks of COVID-19 have been identified in homeless shelters," including in Seattle, Boston, and San Francisco. *Id.* at 55295. These public health risks "may increase seasonally" as persons experiencing homelessness seek shelter in colder months. *Id.* at 55296.

Finally, evicted persons may experience unsheltered homelessness, which places them at "a higher risk for infection where there is community spread of COVID-19." *Id.* at 55295. Their vulnerability to COVID-19 is higher due to exposure to the elements, as well as inadequate access to hygiene, sanitation, and healthcare. *Id.* The risk of unsheltered homelessness has increased during the pandemic, where safety precautions at shelters have reduced their capacities. *Id.*

In addition, research suggests that persons who would be evicted and become homeless as a result "include many who are predisposed to developing severe disease from COVID-19." *Id.* For example, evicted persons are more likely to experience hypertension, an underlying condition associated with severe COVID-19. *Id.* Among patients with COVID-19, experiencing homelessness has been associated with an increased likelihood of hospitalization. *Id.* at 55296.

These negative public health consequences could become enormous if evictions were to proceed unchecked during the pandemic. *Id.* at 55294–95. Research suggests that as many as 30 to 40 million people in the United States could be at risk of eviction in the absence of state and local protections. *Id.* at 55295. "A wave of evictions on that scale would be unprecedented in modern times." *Id.* Given that approximately 15 percent of moves each year are estimated to be interstate, "mass evictions would likely increase the interstate spread of COVID19." *Id.*

CDC thus determined that it was reasonably necessary to prevent the interstate spread of COVID-19 to order that "a landlord . . . shall not evict any covered person from any residential property in any State . . . that provides a level of public-health protections below the requirements

listed in [the] Order." *Id.* at 55296. To qualify as "covered persons," tenants must certify under penalty of perjury that they have (1) used best efforts to obtain government assistance to make rental payments; (2) expect to earn less than $99,000 in annual income in 2020, were not required to pay income taxes in 2019, or qualified for a stimulus check under the CARES Act; (3) are unable to pay full rent due to "substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses"; (4) are using best efforts to make partial payments; (5) would likely experience homelessness or need to move into a shared residence if evicted; (6) understand that rent obligations still apply; and (7) understand that the temporary moratorium ends on December 31, 2020. *Id.* at 55297.

The Order does not alter a tenant's obligation to pay rent or comply with any other contractual obligation. *Id.* at 55294. It does not prevent the accrual or collection of fees, penalties, or interest under the terms of an applicable contract. *Id.* It also does not prevent evictions of persons who do not qualify as "covered persons," or evictions based on circumstances other than nonpayment of rent, including criminal activity, damage to property, or violation of contractual obligations other than the timely payment of rent. *Id.*

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED BECAUSE STRIKING DOWN THE HALT ORDER PRIOR TO A DECISION ON THE MERITS WOULD WREAK HAVOC THAT COULD NOT BE UNDONE.**

The Plaintiffs' motion for preliminary injunction should be denied because they cannot carry their burden to demonstrate each of the four elements necessary to warrant the extraordinary remedy of injunctive relief. A preliminary injunction is an "extraordinary and drastic remedy not to be granted unless the movant [has] clearly established the 'burden of persuasion' as to each of the four prerequisites.'" *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). The movant must show (1) "a substantial threat of irreparable injury"; (2) "a substantial likelihood

of success on the merits"; (3) "the threatened injury to the plaintiff outweighs the potential harm to the defendant"; and (4) "the injunction will not disserve the public interest." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002). Failure to show any one of these factors is "fatal." *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

The members of the proposed Intervenor Defendant Class personify the extraordinary harm that would come from granting the emergency relief that Plaintiffs seek. It is they who would be displaced in the Winter; it is they whose children would lose the roof over their heads; it is they who would be forced into close proximity with carriers of the disease; it is they who might be carriers themselves (knowingly or unknowingly) who transmit the disease in the streets, the homes of relatives and friends, the shelters, on park benches, in the jails; it is they whose children could not attend school remotely in the absence of internet access. For these reasons, the proposed Intervenor Defendants will focus their arguments on the balancing of harms and the public interest while the United States demonstrates that Plaintiffs are unlikely to prevail on the merits of their challenge to the Halt Order.

### A. Injury to the Public Outweighs the Potential Harm to the Plaintiff

The Plaintiffs have failed to address the gravity of the impact that invalidating the Halt Order would have on the public. Not only will tenants be subjected to the dangers that can come from contracting COVID-19, but also they will be subjected to other serious potential health risks and the inability to secure safe and habitable housing in the future.

If the court were to invalidate the Halt Order, the number of individuals and families that would be affected would be innumerable. Most of these individuals would end up homeless without proper shelter. The Halt Order was enacted to extend the amount of time these individuals have in safe housing. "[H]ousing stability helps protect public health because homelessness

increases the likelihood of individuals moving into congregate settings, such as homeless shelters, which then puts individuals at higher risk to COVID-19." 85 Fed. Reg. at 55292. The individuals and families who are protected by the Halt Order include only those persons who have been economically disadvantaged through no fault of their own, and the Halt Order simply gives them additional time to get back on their feet.

The Halt Order does not strip landlords of their rights or their property. The Halt Order "does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other [contractual] obligation." 85 Fed. Reg. at 55292. Nor does it "preclude[] the charging or collecting of fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis." *Id. B*y its plain terms, the Halt Order does not relieve Plaintiffs' tenants of their obligations to make rental payments. Additionally, the Halt Order only prevents evictions for failure to pay rent; therefore, if the tenant does not comply with another part of the lease, the landlord may evict the tenant. Therefore, the landlord's financial and property interests are still being protected.

The reality is that the Plaintiffs' financial interests have been protected all along. Programs such as ESP were born under the CARES Act to provide Plaintiffs the opportunity to obtain cash settlements for unpaid rent both before and during the period of the Halt Order even where their tenant is a covered person pursuant to the CDC Rule.

The Plaintiffs' call for a return to the *status quo ante* is misplaced. The relief they seek would actually upend the status quo by placing thousands of individuals at risk of immediate homelessness. The Halt Order did not change the status quo – it extended it following the expiration of the moratorium in place to protect tenants and the public implemented under the CARES Act. The status quo now is protecting individuals from being evicted. Our nation cannot

and should not return to how things were before the pandemic because COVID-19 is still greatly impacting individuals now.

## II. Plaintiff is Unlikely to Succeed on the Merits[6]

### A. The CDC Order Comports with the Requirements of the APA.

Under the APA, a court may set aside agency action only when it determines that action is "arbitrary, capricious, an abuse of discretion, unconstitutional, in excess of statutory authority, without observance of procedure as required by law, or unsupported by substantial evidence." *Mahon v. U.S. Dep't of Agric.*, 485 F.3d 1247, 1253 (11th Cir. 2007); *see* 5 U.S.C. § 706(2). Plaintiffs' claims that CDC exceeded its statutory and regulatory authority, and the Halt order is *ultra vires*. Plf.s Brief 14 – 17.

The CDC acted within its statutory and regulatory authority in passing the halt order. Congress vested the Secretary of HHS with broad authority to take decisive action if required to control the spread of dangerous infectious diseases, which the Secretary has delegated to the public health experts at the CDC. *See* 42 U.S.C. § 264; 42 C.F.R. § 70.2. CDC acted within the scope of that authority and in the interest of public health in issuing the challenged Halt Order. Section 361 of the PHSA empowers the Secretary "to make and enforce such regulations *as in his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases" from abroad or among the states. 42 U.S.C. § 264(a) (emphasis added).

The plain text of the statute thus evinces a legislative determination to defer to the "judgment" of public health authorities about what measures they deem "necessary" to prevent contagion, *see id.*—a determination made in the light of history and experience, given the havoc

---

[6] The proposed Intervenor Defendants again rely upon and incorporate herein the arguments and authorities offered by the United States in Brown v. Azar, No. 1:20-cv-3702-JPB, at 15–47 (N.D. Ga. Oct. 2, 2020).

wreaked by past scourges like yellow fever. The examples Congress gave of specific measures the Secretary may take to control infectious disease—which are illustrative, not exhaustive— underscore the breadth of this authority, showing that it may infringe on personal liberties or property rights where needed to protect the public health. Such measures include the authority to impose limitations on individuals' freedom of movement, including the "apprehension, detention, or conditional release of individuals." *Id.* § 264(b)–(c). They also include intrusions on private property, such as its "inspection, fumigation, disinfection, sanitation," and even "destruction." *Id.* § 264(a).

The regulations implementing section 361 delegate to the CDC Director the authority, in the event of state control measures insufficient to prevent the interstate spread of disease, to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." 42 C.F.R. § 70.2. Like the statute, the regulation gives the Director broad authority to take measures that he deems necessary to protect public health. *See id.* It makes clear that, in order to control disease transmission, intrusions on private property, such as "inspection, fumigation, disinfection, sanitation," and even "destruction" may be required. *Id.*

Here, CDC's determination that a "temporary halt in evictions" is a "reasonably necessary measure under 42 C.F.R. 70.2 to prevent the further spread of COVID–19 throughout the United States," 85 Fed. Reg. at 55296, is well supported and falls firmly within the scope of its authority. A number of findings support CDC's decision. First, the understanding that "[t]he virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet)." *Id.* at 55293. In addition, research suggests that, in the absence of eviction moratoria, tens of millions of Americans could be at risk of eviction, on a scale that would be "unprecedented in modern times." *Id.* at 55295. The CDC has also determined that, in light of statistics regarding interstate moves, such "mass evictions would likely increase the interstate

spread of COVID-19." *Id.* Based on this knowledge, CDC found that, in the context of this pandemic, eviction moratoria are an "effective public health measure utilized to prevent the spread of communicable disease." *Id.* Eviction moratoria "facilitate self-isolation" by ill or at-risk persons; aid the implementation of "stay-at-home and social distancing directives," and, by reducing homelessness, decrease "the likelihood of individuals moving into close quarters in congregate settings." *Id.*

Evictions increase the risk of the spread of COVID-19 in multiple ways. An evicted renter who cannot afford alternative housing often "move[s] into close quarters in shared housing or other congregate settings" that pose a high risk of transmission among household contacts. *Id.* at 55294. Due to potential crowding and shared facilities, persons residing in homeless shelters may have difficulty adhering to social distancing and other measures intended to prevent the spread of COVID-19. *Id.* at 55294–95. Unsheltered homeless persons are at a higher risk of infection due to lack of access to hygienic measures, sanitation, and medical care, as well as exposure to the elements. *Id.* These are among the reasons that the Order imposing a temporary halt of residential evictions to combat the spread of COVID-19 constitutes a "reasonably necessary" measure under the regulations, and is therefore within the broad authority of the CDC, conferred by the PHSA, to undertake measures to protect public health by preventing disease transmission.

The plain text of the regulation and its authorizing statute were intentionally and clearly drafted to give the federal public health authorities maximum flexibility to undertake measures that they deem necessary, in light of their public health expertise, to prevent the interstate spread of disease. *See* 42 U.S.C. § 264(a); 42 C.F.R. § 70.2. The terms of the statute—including the examples of measures that the Secretary may adopt—invite the Secretary's exercise of expert judgment to determine what regulations may be appropriate to "prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). Indeed, Congress's use

of the phrase "such regulations as in his judgment are necessary" shows that it intended to defer to agency expertise, as "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). This point is bolstered by the fact that, although subsection (a) makes no mention of the Secretary's ability to detain persons, it is plainly contemplated as within the scope of what may be "necessary" in his "judgment," given the restrictions placed on any such regulations in subsections (b) through (d). *See* 42 U.S.C. § 264(a)–(d).

The regulation reflects Congress's intent to provide flexibility in combatting the spread of disease. *See* 42 C.F.R. § 70.2. It provides the CDC Director with significant flexibility to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." 42 C.F.R. § 70.2. In light of the textual grant of broad authority to the Secretary and the CDC Director in the statute and regulation, the Court should decline to impose a textual constraint on the measures that medical experts may deem necessary to protect the public health when neither Congress nor the agency did so explicitly.

Moreover, the expansive language in the statute (and regulation) is consistent with the Supreme Court's recognition that "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation." *Marshall v. United States*, 414 U.S. 417, 427 (1974). Chief Justice Roberts recently reaffirmed this principle in connection with the COVID-19 pandemic. *See S. Bay Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) (observing that "[w]hen [state] officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad") (citation omitted). This principle comports with legislative history demonstrating that Congress used broad language in section 361

of the PHSA to provide federal health authorities flexibility to respond to novel disease outbreaks. *See* H.R. Rep. No. 78-1364, at 24–25.

B. <u>There has not been a taking</u>

Plaintiffs contend that "[i]t cannot be disputed that the Halt Order has the effect of taking property away from the Plaintiffs in that the Halt Order transfers all legal rights to exclusive use and possession of the properties at issue to non-paying tenants while simultaneously depriving Plaintiffs' of their protected property rights and entitlements." Plfs. Brief 20. This Court should decline to adopt Plaintiffs' erroneous characterization of the nature and effect of the halt order.

The Halt Order does not prevent a landlord from filing an eviction action in state court. First, the Order expressly permits eviction for various reasons other than nonpayment of rent. *See* 85 Fed. Reg. at 55294 (property damage, criminal activity, etc.). Second, nowhere does the Halt Order prohibit a landlord from attempting to demonstrate that a tenant has wrongfully claimed its protections. And third, even where a tenant is entitled to its protections, the Order does not bar a landlord from commencing a state court eviction proceeding, provided that that actual eviction does not occur while the Halt Order remains in place. *See id.* at 55292 ("the order prevents these persons from being evicted or removed from where they are living through December 31, 2020"); *id.* at 55293 (defining "evict" as "to remove or cause the removal of"). Where tenants fail to pay rent, nothing in the Order precludes landlords from filing a breach of contract action seeking payment. Plaintiffs may prefer a different remedy, but a preference of remedy when Plaintiffs clearly maintain access to the courts and are able to receive any arrears owed does not constitute a taking Here, there is no denial of landlord's right to receive rent, and there is certainly not a taking, merely a delay of any actual eviction action.

Plaintiffs also failed to acknowledge that many programs such as ESP are available to each of them to provide them with the opportunity to obtain cash settlements even where their tenant is a covered person pursuant to the CDC Rule. Many local, state, and national programs have been launched to provide landlords with just compensation under the circumstances of a global pandemic.

Finally, it bears emphasis that Plaintiffs' fundamental contention—that the federal government is powerless to delay a landlord's eviction of a residential tenant under state law—would have sweeping consequences. As just one example, for the past eighty years, federal law has provided that members of the armed forces may be entitled to a temporary stay of eviction proceedings under certain circumstances. *See* Soldiers' and Sailors' Civil Relief Act of 1940, Pub. L. No. 76-861, 54 Stat. 1178 (1940) (codified as amended at 50 U.S.C. § 3951(b)(1)). Defendants are unaware of any court that has even contemplated the possibility that this provision is unconstitutional.

## Conclusion

The outcome of this case will have far reaching and potentially devastating consequences on numerous Americans. If the Halt Order were to be erroneously and prematurely struck down, countless individuals and families will face the atrocities of homelessness and the dangers of this unprecedented pandemic. Plaintiffs' have failed to recognize the harm such an order would impose or show they are likely to prevail on the merits. For the forgoing reasons, this Court should deny Plaintiffs' motion for preliminary injunction and maintain the actual status quo that which protects the most vulnerable amongst us from the deadly virus and irreparable harm that evictions would cause.

**WHEREFORE**, ESP respectfully requests that this Court grant its motion to intervene in this case.

<div style="margin-left: 50%;">

Respectfully Submitted

/s/ _____

Earle J. Schwarz (007192)
2157 Madison Ave, Suite 201
Memphis TN 38104
901.272.0607
eschwarz@earle-schwarz.com

Webb A. Brewer (9030)
The Law Offices of Webb A. Brewer
1755 Kirby Parkway, Suite 110
Memphis, TN 38120
Tele: (901) 757-3358
webbbrewer@comcast.net

Counsel for Intervening Defendants

Dated:

</div>

OF COUNSEL

Daniel M. Schaffzin (028601)
Associate Professor of Law
Co-Director, Neighborhood Preservation Clinic
Cecil C. Humphreys School of Law
1 N. Front Street, Suite 101
Memphis, TN 38103-2189
(O) 901.678.5056 | (C) 215.380.0969

Kathryn Ramsey
Assistant Professor of Law & Director, Medical-Legal Partnership Clinic
University of Memphis Cecil C. Humphreys School of Law
1 North Front Street
Memphis, TN 38103
Office: (901) 678-4589
Kramsey1@memphis.edu

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of notice of the foregoing has been served upon all counsel of record by electronic means via the Court's ECF system this October 13, 2020

/s/ _____