# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

TIGER LILY LLC, *et al.*,

    Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT, *et al.*,

    Defendants.

Case No. 2:20-cv-2692-MSN-atc

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

   I.   Statutory and Regulatory Background ........................................................................2

   II.   The COVID-19 Pandemic ..........................................................................................4

   III.   The CDC Order ...........................................................................................................6

   IV.   Plantiffs' Claim ..........................................................................................................9

ARGUMENT .......................................................................................................................9

   I.   Plaintiffs' Lack Standing To Obtain Preliminary Injunctive Relief Because They Fail To Show that the Order Caused Them Any Harm. ...............................................9

   II.   Plaintiffs Have Failed To Join Required Parties. ....................................................11

   III.   Plaintiffs Are Not Entitled to Extraordinary Injunctive Relief. ..............................12

      A.   Plaintiffs Have Not Shown Irreparable Injury. ..................................................13

         1.   Plaintiffs' Alleged Economic Losses Are Compensable. ...............................13

         2.   Plaintiffs Have Alleged No Irreparable Constitutional Violation. .................15

      B.   Plaintiffs Have Not Shown A Likelihood of Success on the Merits. ..................15

         1.   CDC Acted within Its Statutory and Regulatory Authority. ..........................15

         2.   The Order Does Not Constitute a Taking of Plaintiffs' Property. ..................22

         3.   Plaintiffs Have Identified No Due Process Violation. ....................................27

         4.   Plaintiffs' Federalism Challenges Fail. .........................................................29

         5.   The Order Does Not Deny Plaintiffs Access to Courts. ..................................31

      C.   The Injunction Plaintiffs Seek Is Contrary to the Public Interest. .....................33

   IV.   Any Relief Granted Should Be Narrowly Tailored. ................................................34

CONCLUSION ...................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*Am. Exp. Travel Related Servs. Co. v. Kentucky,*
  641 F.3d 685 (6th Cir. 2011) .................................................................................... 27, 28

*Auracle Homes, LLC v. Lamont,*
  No. 20-00829, 2020 WL 4558682 (D. Conn. Aug. 7, 2020) .......................................*passim*

*Baptiste v. Kennealy,*
  No. 20-11335, 2020 WL 5751572 (D. Mass. Sept. 25, 2020)........................... 23, 24, 25, 26

*Block v. Hirsh,*
  256 U.S. 135 (1921) .................................................................................................23

*Blue Diamond Coal Co. v. Sec'y of Health & Human Servs.,*
  79 F.3d 516 (6th Cir. 1996) ......................................................................................27

*Boat Basin Inv'rs, LLC v. First Am. Stock Transfer Inc.,*
  No. 03-493, 2003 WL 282144 (S.D.N.Y. Feb. 7, 2003)..............................................11

*Boddie v. Connecticut,*
  401 U.S. 371 (1971) .................................................................................................32

*Brott v. United States,*
  858 F.3d 425 (6th Cir. 2017)......................................................................................27

*Castillo v. Whitmer,*
  No. 20-1815, 2020 WL 5249576 (6th Cir. Sept. 2, 2020) ..................................... 13, 15

*Christopher v. Harbury,*
  536 U.S. 403 (2002) .................................................................................................31

*City of Arlington v. FCC,*
  569 U.S. 290 (2013)..................................................................................................16

*City of Los Angeles v. Lyons*
  461 U.S. 95 (1983) ...................................................................................................10

*D.T. v. Sumner Cty. Sch.,*
  942 F.3d 324 (6th Cir. 2019)............................................................................... 12, 13

*Daimler Chrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) .................................................................................................10

*Davis v. Goord,*
  320 F.3d 346 (2d Cir. 2003) ......................................................................................32

*Davis v. Pension Benefit Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ...................................................................13

*Elmsford Apt. Assocs., LLC v. Cuomo*,
  No. 20-4062, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) ...........................*passim*

*Elrod v. Burns*,
  427 U.S. 347 (1976) .......................................................................................15

*FCC v. Fla. Power Corp.*,
  480 U.S. 245 (1987) .......................................................................................24

*Friendship Materials, Inc. v. Michigan Brick, Inc.*,
  679 F.2d 100 (6th Cir. 1982) .........................................................................13

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ..............................................................................32, 34

*Glancy v. Taubman Ctrs., Inc.*,
  373 F.3d 656 (6th Cir. 2004) .........................................................................11

*Gonzales v. Raich*,
  545 U.S. 1 (2005) ...........................................................................................20

*Hadix v. Johnson*,
  230 F.3d 840 (6th Cir. 2000) .........................................................................28

*HAPCO v. City of Philadelphia*,
  No. 20-3300, 2020 WL 5095496 (E.D. Pa. Aug. 28, 2020) ...........................26

*Hartman v. Acton*,
  No. 20-1952, 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020) .........................29

*Haw. Hous. Auth. v. Midkiff*,
  467 U.S. 229 (1984) .......................................................................................22

*Heart of Atlanta Motel, Inc. v. United States*,
  379 U.S. 241 (1964) .......................................................................................20

*Holland v. Nat'l Mining Ass'n*,
  309 F.3d 808 (D.C. Cir. 2002) .......................................................................34

*Honicker v. Hendrie*,
  465 F. Supp. 414 (M.D. Tenn. 1979) .............................................................16

*Hughes v. New Life Dev. Corp.*,
  387 S.W.3d 453 (Tenn. 2012) .......................................................................28

*Keweenaw Bay Indian Cmty. v. State,*
    11 F.3d 1341, 1346 (6th Cir. 1993) ........................................................................ 11

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
    480 U.S. 470 (1987) ........................................................................ 25

*KM Enterprises, Inc. v. McDonald,*
    No. 11-5098, 2012 WL 540955, at *6 (E.D.N.Y. Feb. 16, 2012) ........................................................................ 12

*Klein v. U.S. Dep't of Energy,*
    753 F.3d 576 (6th Cir. 2014) ........................................................................ 10

*Knick v. Twp. of Scott,*
    139 S. Ct. 2162 (2019) ........................................................................ 27

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer,*
    814 F. App'x 125 (6th Cir. 2020) ........................................................................ 22, 34

*Leary v. Daeschner,*
    228 F.3d 729 (6th Cir. 2000) ........................................................................ 12

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) ........................................................................ 23, 26

*Louisiana v. Mathews,*
    427 F. Supp. 174 (E.D. La. 1977) ........................................................................ 20

*Lucas v. S.C. Costal Council,*
    505 U.S. 1003 (1992) ........................................................................ 24

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................ 10

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ........................................................................ 34

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.,*
    334 U.S. 219 (1948) ........................................................................ 20

*Marshall v. United States,*
    414 U.S. 417 (1974) ........................................................................ 1

*McNeilly v. Land,*
    684 F.3d 611 (6th Cir. 2012) ........................................................................ 15

*Morgan v. Sec'y of HUD,*
    985 F.2d 1451 (10th Cir. 1993) ........................................................................ 20

*Nasierowski Bros. Inv. Co. v. City of Sterling Heights*,
    949 F.2d 890 (6th Cir. 1991) ................................................................................28

*Neinast v. Bd. of Trustees of Columbus Metro. Library*,
    346 F.3d 585 (6th Cir. 2003) ................................................................................28

*New York v. United States*,
    505 U.S. 144 (1992) ..............................................................................................30

*Nken v. Holder*,
    556 U.S. 418 (2009) ..............................................................................................33

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*,
    305 F.3d 566 (6th Cir. 2002) ..................................................................12, 13, 15

*Oxford House-C v. City of St. Louis*,
    77 F.3d 249 (8th Cir. 1996) ..................................................................................20

*Patel v. AR Grp. Tenn., Ltd. Liab. Co.*,
    No. 20-52, 2020 U.S. Dist. LEXIS 182130 (M.D. Tenn. Oct. 1, 2020) ................10

*Penn Cent. Transp. Co. v. City of N.Y.*,
    438 U.S. 104 (1978) ..............................................................................................25

*Printz v. United States*,
    521 U.S. 898 (1997) ..............................................................................................30

*Prof'l Hockey Club Cent. Sports Club of the Army v. Detroit Red Wings, Inc.*,
    787 F. Supp. 706, 717 (E.D. Mich. 1992) ............................................................12

*Puerto Rico v. United States*,
    490 F.3d 50 (1st Cir. 2007) ..................................................................................16

*Russell v. United States*,
    471 U.S. 858 (1985) ..............................................................................................20

*S. Bay Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) ..........................................................................................17

*S. Milk Sales, Inc. v. Martin*,
    924 F.2d 98 (6th Cir. 1991) ..................................................................................13

*Sampson v. Murray*,
    415 U.S. 61 (1974) ................................................................................................14

*Sheffield v. City of Fort Thomas, Ky.*,
    620 F.3d 596 (6th Cir.2010) ................................................................................27

*Siler v. Louisville & Nashville R.R. Co.*,
   213 U.S. 175 (1909) ......................................................................................................29

*Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*,
   641 F.3d 197 (6th Cir. 2011) .......................................................................................29

*Smith v. Turner*,
   48 U.S. 283 (1849) .........................................................................................................2

*Stratford v. State-House, Inc.*,
   542 F. Supp. 1008 (E.D. Ky. 1982) ............................................................................27

*Sunset Homeowners Ass'n, Inc. v. DiFrancesco*,
   386 F. Supp. 3d 299 (W.D.N.Y. 2019) ................................................................10, 12

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) .....................................................................................................10

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
   535 U.S. 302 (2002) ........................................................................................23, 24, 25

*Talleywhacker, Inc. v. Cooper*,
   No. 20-218, 2020 WL 3051207 (E.D.N.C. June 8, 2020) ......................................22, 33

*Tenn. Scrap Recyclers Ass'n v. Bredesen*,
   556 F.3d 442 (6th Cir. 2009) .......................................................................................25

*Tigges v. Northam*,
   20-410, 2020 WL 4197610 (E.D. Va. July 21, 2020) ..........................................33, 34

*TJM 64, Inc. v. Harris*,
   No. 20-02498, 2020 WL 4352756 (W.D. Tenn. July 29, 2020) .......................22, 33, 34

*Tower Realty v. City of East Detroit*,
   196 F.2d 710 (6th Cir. 1952) .......................................................................................29

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) .................................................................................................34

*United States v. May*,
   500 F. App'x 458, 465 (6th Cir. 2012) .......................................................................30

*United States v. Lundy*,
   No. 15-146, 2016 WL 5920229 (M.D. Tenn. Oct. 11, 2016) .....................................20

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) .....................................................................................................10

*Wickard v. Filburn,*
   317 U.S. 111 (1942) ...................................................................................20

*Winter v. NRDC, Inc.,*
   555 U.S. 7 (2008) .......................................................................................12

*Yee v. City of Escondido,*
   503 U.S. 519 (1992) ..............................................................................24, 26

**Legislative Materials**

H.R. Rep. No. 78-1364 (1944) ................................................................... 3, 18

**Constitutional Provisions**

U.S. Const. art. I ...........................................................................................30

U.S. Const. art. VI, cl. 2 ................................................................................29

**Rules**

Fed. R. Civ. P. 19 ..................................................................................... 11, 12

**Statutes**

Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) ...........................................2

Act of Feb. 25, 1799, ch. 12, 1 Stat. 619 (1799) ...........................................2

Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893) .......................................2

5 U.S.C. § 702 ..............................................................................................16

20 U.S.C. § 3508 ............................................................................................3

42 U.S.C. § 264 .....................................................................................*passim*

Pub. L. No. 76-861, 54 Stat. 1178 (1940) ...................................................33

Pub. L. No. 96-88, 93 Stat. 695 (Oct. 17, 1979) ...........................................3

CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020) ...............5

New York Tenant Safe Harbor Act, 2020 N.Y. Sess. Laws (McKinney) ...................6

**Regulatory and Executive Materials**

42 C.F.R. § 70.1 ....................................................................................... 4, 21

42 C.F.R. § 70.2 .....................................................................................*passim*

31 Fed. Reg. 8855, 63 Stat. 203 (June 25, 1966) .......................................................................... 3

65 Fed. Reg. 49906 (Aug. 16, 2000) ............................................................................................ 4

Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)
    Outbreak, 85 Fed. Reg. 15337 (Mar. 13, 2020) ............................................................. 4, 5

Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19,
    85 Fed. Reg. 55292 (Sept. 4, 2020) ............................................................................... *passim*

**Other Authorities**

Richard J. Pierce, Jr., 2 Administrative Law Treatise § 9.2 (5th ed. 2010) .............................. 28

## INTRODUCTION

These are extraordinary times. The United States is affected by a global pandemic, during which the respiratory disease COVID-19 has infected tens of millions worldwide and resulted in the death of more than 200,000 people within our borders. *See* Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292, 55292 (Sept. 4, 2020). The disease spreads easily between persons within close contact (approximately six feet) via respiratory droplets. *Id.* It can cause severe illness but may also be transmitted by persons who are pre-symptomatic or asymptomatic—meaning that infected persons have the potential to infect others unknowingly. *Id.* Despite drastic measures by federal, state, and local government entities, including border closures, stay-at-home orders, mask mandates, and travel restrictions, COVID-19 continues to spread. *Id.*

In light of these rare circumstances, the Centers for Disease Control and Prevention (CDC) has exercised its authority under the Public Health Service Act (PHSA) and its implementing regulations to order a temporary halt in residential evictions to prevent the further spread of COVID-19 (the Order). *Id.* CDC found that this moratorium is an effective public health measure because, among other things, it facilitates self-isolation by ill and at-risk persons, eases implementation of stay-at-home and social distancing measures, and decreases the likelihood that persons will experience homelessness or move in to congregate settings, such as crowded shelters, both of which increase the risk of COVID-19 spread. *Id.* at 55295–96. The Order protects some of society's most vulnerable: low-income persons who have lost work or incurred extraordinary medical bills, have made every effort to pay their rent, and would not have available housing options if evicted. *Id.* at 55297. It does not excuse any tenant's obligation to pay rent or impair any landlord's ability to impose fees, interest, or other penalties short of eviction. *Id.* at 55292. Nor does it prevent landlords from evicting tenants for reasons other than failure timely to pay rent, such as criminal activity or property damage. *Id.* at 55294.

Plaintiffs are several landlords who allege that the Order has prevented them from evicting tenants for nonpayment of rent. They seek emergency injunctive relief to invalidate the Order. But Plaintiffs lack standing to obtain preliminary relief because they have not shown that the Order caused their purported injuries: while they claim to have tenants subject to eviction for nonpayment of rent, they offer no evidence that any of their tenants has actually invoked the Order's protections. And in any event, they cannot meet any of the elements required to qualify for such extraordinary relief. In particular, there is no irreparable harm where a plaintiff's injury is monetary. And, although Plaintiffs raise a plethora of claims, none is likely to succeed on the merits. Moreover, the balance of the harms and public interest overwhelmingly favor the government, which is acting to protect the citizenry at large from a potentially deadly disease, as opposed to the economic interests of a few. Finally, the relief Plaintiffs seek—invalidation of a nationwide order issued to protect public health during a global pandemic—is overbroad and disproportionate to their alleged injuries. For all of these reasons, as explained below, Plaintiffs' motion should be denied.

## BACKGROUND

### I.      Statutory and Regulatory Background

The federal government has a long history of acting to combat the spread of communicable disease. Congress enacted the first federal quarantine law in 1796 in response to a yellow fever outbreak, authorizing the President to direct federal officials to help states enforce quarantine laws. Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) (repealed 1799); *see Smith v. Turner*, 48 U.S. 283, 300 (1849). Following a subsequent yellow fever outbreak, Congress replaced this Act with a federal inspection system for maritime quarantines. Act of Feb. 25, 1799, ch. 12, 1 Stat. 619 (1799). And in 1893, Congress authorized the Secretary of the Treasury to adopt additional regulations to prevent the introduction of disease into the United States or across state lines where the Secretary considered state or local regulation inadequate. Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893).

In 1944, Congress enacted the provision at issue here, section 361 of the PHSA, as part of a broader effort to consolidate and clarify existing public health laws. H.R. Rep. No. 78-1364, at 1 (1944). In section 361(a), Congress broadened the federal government's "basic authority to make regulations to prevent the spread of disease into this country or between the States." *Id.* at 24. For example, Congress removed references to specific diseases to provide federal health authorities flexibility to respond to new types of contagion and "expressly sanction[ed] the use of conventional public-health enforcement methods" by the government in disease-control efforts. *Id.* at 24–25.

The resulting statute, 42 U.S.C. § 264, authorizes the Secretary of Health and Human Services (HHS)[1] "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). Subsection (a) further clarifies that "[f]or purposes of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id.* Subsection (b) imposes specific limits on the Secretary's ability to "provide for the apprehension, detention, or conditional release of individuals"—a power not referenced in subsection (a)—mandating that such impositions on a person's physical movement be specified by Executive Order. *Id.* § 264(b). Subsections (c) and (d) set further limits on the detention of individuals. *See id.* § 264(c)–(d). The final subsection provides that the statute and any regulation adopted thereunder

---

[1] Although the statute assigns authority to the Surgeon General, Reorganization Plan No. 3 of 1966 abolished the Office of the Surgeon General and transferred all statutory powers and functions of the Surgeon General to the Secretary of Health, Education, and Welfare, now the Secretary of HHS, 31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966), *see also* Pub. L. No. 96-88, § 509(b), October 17, 1979, 93 Stat. 695 (codified at 20 U.S.C. 3508(b)). The Office of the Surgeon General was re-established in 1987, but the Secretary has retained these authorities.

supersede state law "to the extent that such a provision conflicts with an exercise of Federal authority." *Id.* § 264(e).

The Secretary of HHS has promulgated regulations implementing these provisions and delegating their enforcement to CDC. *See* 42 C.F.R. pt. 70; 65 Fed. Reg. 49906, 49907 (Aug. 16, 2000). In particular, 42 C.F.R. § 70.2 provides the CDC Director (or his or her authorized representative) with discretion to take measures to address uncontrolled contagion.[2] Specifically, where the CDC Director "determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases" between or among States, he is empowered to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." 42 C.F.R. § 70.2. These measures include, but are not limited to, "inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection." *Id.* Other regulations authorize CDC to limit interstate travel, *see id.* § 70.3, apprehend and detain persons, *id.* § 70.6, and conduct medical examinations, *id.* § 70.12, to control the spread of disease. The regulations additionally provide for penalties for violations of these regulations. *Id.* § 70.18.

## II.    The COVID-19 Pandemic

In December 2019, a novel coronavirus dubbed SARS-CoV-2 was first detected in Wuhan, Hubei Province, in the People's Republic of China. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15337 (Mar. 13, 2020). The virus causes a respiratory disease known as COVID-19. *Id.*

COVID-19 is a serious illness that spreads easily. Contracting COVID-19 poses a risk of

---

[2] The term "Director" as used in these regulations signifies "the Director, Centers for Disease Control and Prevention, Department of Health and Human Services, or another authorized representative." 42 C.F.R. § 70.1.

"severe" respiratory illness, meaning that persons who have the disease may require hospitalization, intensive care, or the use of a ventilator.  85 Fed. Reg. at 55292.  Severe cases of COVID-19 may be fatal.  *Id.*  The likelihood of becoming severely ill is greater among certain vulnerable populations.  *Id.* at 55295.  CDC has cautioned that the virus that causes COVID-19 transmits "very easily and sustainably" between people within "close contact"—approximately six feet—of one another.  *Id.* at 55293.  Persons not displaying symptoms are capable of transmitting the virus.  *Id.* at 55292.

From its origins in late 2019, COVID-19 spread quickly across the globe, including to the United States.  *See* 85 Fed. Reg. at 15337.  On January 31, 2020, the Secretary of HHS declared a public health emergency due to the rise in confirmed COVID-19 cases in this country.  Determination that a Public Health Emergency Exists, https://www.phe.gov/emergency/news/healthactions/phe/ Pages/2019-nCoV.aspx (Jan. 31, 2020).  On March 11, 2020, the World Health Organization classified the COVID-19 epidemic as a pandemic due to the increase in infections throughout the world, including in the United States.  85 Fed. Reg. at 15337.  On March 13, 2020, the President declared the COVID-19 outbreak a national emergency.  *Id.*  By late August 2020 the virus had spread to all 50 states.  *Id.* at 55292.  To date, it has infected over seven million and caused the death of over 200,000 persons within the United States.  *See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last visited Oct. 13, 2020).  New cases continue to be reported daily, *see id.*, and CDC has called COVID-19 "a historic threat to public health."  85 Fed. Reg. at 55294.

To combat the spread of this easily transmitted, widespread, and potentially deadly virus, governments at all levels have taken "unprecedented or exceedingly rare actions" in the interest of protecting the public health.  *Id.*  These include border closures, travel restrictions, stay-at-home orders, and mask requirements.  *Id.*  In March 2020, Congress provided a 120-day moratorium on eviction filings based on nonpayment of rent, as well as other protections, to tenants residing in certain federally financed rental properties.  CARES Act, Pub. L. No. 116-136, § 4024, 134 Stat. 281 (Mar.

27, 2020).  Although this measure temporarily helped mitigate the public health effects of tenant displacement during the pandemic, it expired on July 24, 2020.  85 Fed. Reg. at 55294.  And while certain states implemented their own temporary eviction moratoria, *see, e.g.*, New York Tenant Safe Harbor Act, 2020 N.Y. Sess. Laws (McKinney), S.8192B/A.10290B (Jun. 30, 2020), some such measures have also begun to expire.[3]  *See* 85 Fed Reg. at 55296 n.36.  Other states provided no separate protection for renters during the pandemic.  *Id.*

### III.    The CDC Order

In light of these circumstances, on September 4, 2020, CDC issued an Order under 42 U.S.C. § 264(a) and 42 C.F.R. § 70.2 providing for a temporary halt on residential evictions until December 31, 2020.  85 Fed. Reg. at 55292.  The agency found this moratorium "a reasonably necessary measure . . . to prevent the further spread of COVID-19," and that state and local measures that did not meet or exceed its protections were insufficient to prevent interstate spread.  *Id.* at 55296.

CDC determined that eviction moratoria help reduce the risk of transmission of COVID-19. *Id.* at 55294.  They do so by facilitating self-isolation for sick and high-risk persons, easing implementation of stay-at-home orders and social distancing measures, reducing the need for congregate housing, and helping to prevent homelessness.  *Id.*

As CDC explained, evictions present a public health concern because the movement of evicted renters could lead to "multiple outcomes that increase the risk of COVID-19 spread."  *Id.*  First, evicted renters are likely to move in with friends or family, leading to potential household crowding

---

[3] *See, e.g.*, In Re: Amendment of the Eighth Order Extending Declaration of Judicial Emergency in Response to COVID-19 Emergency, https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/ORD-08-07-2020-Amendment-of-8th-DJE-order.pdf (Virginia moratorium expired Sept. 7, 2020); State of Connecticut, Executive Order No. 7DDD, https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7DDD.pdf (Connecticut moratorium expired August 24, 2020).

with new sources of infection.  *Id.*  This increases the risk of spreading COVID-19 because "transmission occurs readily within households," and "household contacts are estimated to be 6 times more likely to become infected by an index case of COVID-19 than other close contacts."  *Id.*

Second, the risk of transmission in shared housing increases exponentially if evicted persons move into congregate settings, such as homeless shelters, transitional housing, or domestic violence shelters.  *Id.*  Maintaining social distance may be difficult in these settings, especially where residents must share small spaces, like stairwells and elevators, or equipment, such as kitchen or laundry facilities.  *Id.*  Indeed, "[e]xtensive outbreaks of COVID-19 have been identified in homeless shelters," including in Seattle, Boston, and San Francisco.  *Id.* at 55295.  These public health risks "may increase seasonally" as persons experiencing homelessness seek shelter in colder months.  *Id.* at 55296.

Finally, evicted persons may experience unsheltered homelessness, which places them at "a higher risk for infection where there is community spread of COVID-19."  *Id.* at 55295.  Their vulnerability to COVID-19 is higher due to exposure to the elements, as well as inadequate access to hygiene, sanitation, and healthcare.  *Id.*  The risk of unsheltered homelessness has increased during the pandemic, where safety precautions at shelters have reduced their capacities.  *Id.*

In addition, research suggests that persons who would be evicted and become homeless as a result "include many who are predisposed to developing severe disease from COVID-19."  *Id.*  For example, evicted persons are more likely to experience hypertension, an underlying condition associated with severe COVID-19.  *Id.*  And among patients with COVID-19, experiencing homelessness has been associated with an increased likelihood of hospitalization.  *Id.* at 55296.

These negative public health consequences could become enormous if evictions were to proceed unchecked during the pandemic.  *Id.* at 55294–95.  Research suggests that as many as 30 to 40 million people in the United States could be at risk of eviction in the absence of state and local protections.  *Id.* at 55295.  "A wave of evictions on that scale would be unprecedented in modern

times." *Id.* Given that approximately 15 percent of moves each year are estimated to be interstate, "mass evictions would likely increase the interstate spread of COVID-19." *Id.*

CDC thus determined that it was reasonably necessary to prevent the interstate spread of COVID-19 to order that "a landlord . . . shall not evict any covered person from any residential property in any State . . . that provides a level of public-health protections below the requirements listed in [the] Order." *Id.* at 55296. To qualify as "covered persons," tenants must certify under penalty of perjury that they have (1) used best efforts to obtain government assistance to make rental payments; (2) expect to earn less than $99,000 in annual income in 2020, were not required to pay income taxes in 2019, or qualified for a stimulus check under the CARES Act; (3) are unable to pay full rent due to "substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses"; (4) are using best efforts to make partial payments; (5) would likely experience homelessness or need to move into a shared residence if evicted; (6) understand that rent obligations still apply; and (7) understand that the moratorium ends on December 31, 2020. *Id.* at 55297.

The Order does not alter a tenant's obligation to pay rent or comply with any other contractual obligation. *Id.* at 55294. It does not prevent the accrual or collection of fees, penalties, or interest under the terms of an applicable contract. *Id.* It also does not prevent evictions of persons who do not qualify as "covered persons," or evictions based on circumstances other than nonpayment of rent, including criminal activity, damage to property, or violation of contractual obligations other than the timely payment of rent. *Id.*

Following the Order's issuance, CDC provided further guidance regarding its operation. *See* CDC/HHS Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, Frequently Asked Questions, https://www.cdc.gov/coronavirus/2019-ncov/downloads/eviction-moratoria-order-faqs.pdf, Exhibit A (FAQs). These FAQs confirm that the Order is not

"intended to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order." *Id.* Nor is it "intended to terminate or suspend the operations of any state or local court." *Id.*

## IV.    Plaintiffs' Claims

Plaintiffs are seven organizations or individuals, each of which claims to own residential rental units in Tennessee. Am. Compl. ¶¶ 1–9, ECF No. 21. Plaintiffs allege that each of them has tenants occupying rental units who are delinquent in rent payments, and that these tenants would be evicted but for the operation of the Order. *Id.* ¶¶ 80–82. Plaintiffs' amended complaint raises eight causes of action challenging the Order, claiming violations of the Administrative Procedure Act (APA), *id.* ¶¶ 100–35; the Takings Clause of the Fifth Amendment, *id.* ¶¶ 136–62; substantive and procedural due process rights, *id.* ¶¶ 126–79; various principles of federalism, *id.* ¶¶ 198–239; and the right to access the judiciary, *id.* ¶¶ 240–49.[4] They seek declaratory and injunctive relief. *Id.* ¶¶ 250–81.

## ARGUMENT

Plaintiffs' motion for preliminary injunction should be denied because their suit is jurisdictionally defective, and they have not carried their burden to demonstrate the four elements necessary to warrant the extraordinary remedy of injunctive relief.

## I.    Plaintiffs Lack Standing To Obtain Preliminary Injunctive Relief Because They Fail To Show that the Order Caused Them Any Harm.

Plaintiffs' claims fail at the outset for lack of standing because they fail to show that the Order has caused them any harm. By its terms, the Order applies only to "covered persons"—that is, those who submit a declaration to their landlords attesting that they qualify for its protections—and

---

[4] Plaintiffs amended their complaint after filing their motion for preliminary injunction. *See generally* Pls.' Mot. for Prelim. Injunction, ECF No. 12. Plaintiffs' motion thus does not address claims raised for the first time in the amended complaint—specifically, Plaintiffs' claims under the APA. *See id.* This opposition likewise addresses only the claims pressed in the preliminary injunction motion.

Plaintiffs have not shown that any of their tenants has done so here.

"Before bringing a case in federal court, a plaintiff must establish standing to do so." *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 579 (6th Cir. 2014). "[T]he irreducible constitutional minimum of standing contains three elements": injury, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 560). Plaintiffs must also show a "causal connection between the injury and the conduct complained of," and that their requested relief would remedy that injury. *Lujan*, 504 U.S. at 560 (citation omitted). Moreover, to obtain prospective injunctive relief—the only type of relief sought in their preliminary injunction motion—Plaintiffs must show that there is a "real and immediate threat" of future harm. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). In other words, the threatened injury must be "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990); *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006).

Here, Plaintiffs' allegations fail to show any certainly impending injury that is fairly traceable to the Order. To be sure, Plaintiffs allege that each has rented property to tenants that have "both refused to pay rent and refused to surrender [their] Units." Am. Compl. ¶ 82. But the only allegation that connects this alleged injury to the Order is the vague claim that Plaintiffs' "tenants in Units who are delinquent in the payment of rent . . . would be otherwise lawfully evicted from the Units under the URLTA, but for the [CDC] Order." *Id.* ¶ 80. The Order, however, does not preclude *all* evictions for nonpayment of rent. Instead, it protects "covered persons" who provide their landlord with a declaration under penalty of perjury affirming that they meet certain requirements, including that they fall below certain income thresholds and have used best efforts to obtain government assistance. *See* 85 Fed. Reg. at 55292–93. Plaintiffs nowhere allege—much less offer evidence—that any of their tenants have claimed protection under the Order. *See, e.g., Patel v. AR Grp. Tenn., Ltd. Liab. Co.*, No.

20-52, 2020 U.S. Dist. LEXIS 182130, at *6–7 (M.D. Tenn. Oct. 1, 2020) ("Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with more than 'scant evidence' to substantiate their allegations."). Without such evidence, there is no basis to assume either that Plaintiffs' tenants meet the specific requirements to qualify as "covered persons," or that, assuming they do, those tenants would actually seek the Order's protections. Absent evidence that the Order applies to Plaintiffs' tenants, as required to show a causal connection between the Order and Plaintiffs' alleged injuries, they have no standing to challenge it. That alone is fatal to their request for preliminary relief.

## II.  Plaintiffs Have Failed To Join Required Parties.

Preliminary injunctive relief is also inappropriate here due to a second threshold deficiency: Plaintiffs have not joined their tenants in this action. Because of their interest in the action, the tenants are required parties under Federal Rule of Civil Procedure 19(a), and an injunction should not issue in their absence. *See, e.g.*, *Sunset Homeowners Ass'n, Inc. v. DiFrancesco*, 386 F. Supp. 3d 299, 307 (W.D.N.Y. 2019) ("the nonjoinder of a necessary party is grounds to deny a preliminary injunction for failure to demonstrate a likelihood of success on the merits"); *Boat Basin Inv'rs, LLC v. First Am. Stock Transfer, Inc.*, No. 03-493, 2003 WL 282144, at *1 (S.D.N.Y. Feb. 7, 2003) ("In the absence of . . . a necessary party under Rule 19(a) of the Federal Rules of Civil Procedure, the merits may not be reached and a preliminary injunction may not be granted.").

Pursuant to Rule 19(a), an absent party is "required" and "must be joined" if, among other things, the party has an interest in the action and their absence from it may "as a practical matter impair or impede [their] ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i); *see Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 666, 671 (6th Cir. 2004). A district court has significant discretion to make "the preliminary determination as to whether a party is necessary to the action." *Keweenaw Bay Indian Cmty. v. State*, 11 F.3d 1341, 1346 (6th Cir. 1993).

Here, each of Plaintiffs' tenants is a required party due to both their importance to and interest in the litigation.  As discussed above, the underlying actions of the tenants—i.e., whether they are eligible for the Order's protections and have submitted the required declaration—are critical to whether the Order applies to each Plaintiff.  And the tenants undoubtedly have an interest in this litigation because each faces potential eviction if Plaintiffs prevail.  *See* Am. Compl. ¶ 80.  Thus, the tenants are "required" to be joined before an injunction that would affect their interest may issue.  *See* Fed. R. Civ. P. 19(a); *Sunset Homeowners Ass'n*, 386 F. Supp. 3d at 307 (collecting cases); *see also Prof'l Hockey Club Cent. Sports Club of the Army v. Detroit Red Wings, Inc.*, 787 F. Supp. 706, 717 (E.D. Mich. 1992) (conducting Rule 19 inquiry prior to considering motion for preliminary injunction); *accord KM Enterprises, Inc. v. McDonald*, No. 11-5098, 2012 WL 540955, at *6 (E.D.N.Y. Feb. 16, 2012) (observing that it was "proper and reasonable" to consider "whether the Plaintiff has failed to join necessary parties" in the preliminary injunction context).  For this additional reason, Plaintiffs' motion for preliminary injunction must be denied.

### III.    Plaintiffs Are Not Entitled to Extraordinary Injunctive Relief.

Even if Plaintiffs could establish standing, and all required parties were before the Court, their request for preliminary relief would fail.  A preliminary injunction is an "extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Courts consider four factors when determining whether a plaintiff has fulfilled its burden: "(1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest."  *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019); *see also Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "[T]he proof required for [a] plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion," *Leary v. Daeschner*, 228 F.3d 729, 739 (6th

Cir. 2000), and Plaintiffs fall far short of offering it here.

### A. Plaintiffs Have Not Shown Irreparable Injury.

To start, Plaintiffs fail to carry an "indispensable" part of their burden to obtain preliminary injunctive relief.[5]  *Sumner Cty. Sch.*, 942 F.3d at 326–27.  "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* at 327; *see also S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991) ("The district court was well within its province in determining that a preliminary injunction was not necessary if [plaintiff] would not suffer 'irreparable harm' in the absence of such relief.").  The Sixth Circuit has long held that "[a] district court abuses its discretion when it grants a preliminary injunction without making specific findings of irreparable injury." *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982).  Here, Plaintiffs claim irreparable harm as a result of their rental businesses becoming "commercially impractical" and unspecified constitutional violations. Pls.' Mem. of Law in Supp. of Pls.' Mot. for Prelim. Injunction 36, ECF No. 12-1 (Pls.' Mem.).  Neither of these alleged injuries fulfills Plaintiffs' burden.

#### 1.  Plaintiffs' Alleged Economic Losses Are Compensable.

As an initial matter, "money damages are not irreparable."  *Sumner Cty. Sch.*, 942 F.3d at 327; *see also, e.g.*, *Castillo v. Whitmer*, No. 20-1815, 2020 WL 5249576, at *3 (6th Cir. Sept. 2, 2020) ("Nor is monetary loss or logistical burden sufficient.").  Even economic injuries that are "substantial, in terms

---

[5] The Sixth Circuit has, at times, described the preliminary injunction inquiry as a "balancing test." *See, e.g.*, *Overstreet*, 305 F.3d at 573.  But this practice is inconsistent with, and thus does not survive, the Supreme Court's decision in *Winter*, which held "[a] plaintiff seeking a preliminary injunction *must* establish" the four prerequisite factors.  *See Sumner Cty. Sch.*, 942 F.3d at 328 (Nalbandian, J., concurring) (quoting 555 U.S. at 20); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295–96 (D.C. Cir. 2009) (Kavanaugh, J., concurring).  Although there does appear to be some confusion on this score, *see Sumner Cty. Sch.*, 942 F.3d at 326–27, even where this Circuit has considered a balancing test post-*Winter*, it has made clear that "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *Id.* (citation omitted).

13

of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Perhaps in recognition of these precepts, Plaintiffs hardly press the argument that their alleged financial injuries are irreparable. *See* Pls.' Mem. 36. But to the extent they do, those injuries have a remedy: Plaintiffs may sue their tenants for unpaid rent. *See Elmsford Apt. Assocs., LLC v. Cuomo*, No. 20-4062, 2020 WL 3498456, at *15 (S.D.N.Y. June 29, 2020) (pointing out, with respect to the New York state eviction moratorium, that "tenants are still bound to their contracts, and the landlord may obtain a judgment for unpaid rent if the tenants fail to honor their obligations"). The CDC Order "does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other [contractual] obligation." 85 Fed. Reg. at 55292. Nor does it "preclude[] the charging or collecting of fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis." *Id.* Accordingly, by its plain terms, the Order does not relieve Plaintiffs' tenants of their obligations to make rental payments; it also does not constrain Plaintiffs' ability to pursue available legal remedies to seek payment.

Moreover, the Order does not preclude Plaintiffs from evicting their tenants altogether; it merely postpones this remedy for a limited time in furtherance of urgent public health goals. *See Elmsford*, 2020 WL 3498456, at *15 ("The eviction moratorium does not eliminate the suite of contractual remedies available to the Plaintiffs; it merely postpones the date on which landlords may commence summary proceedings against their tenants."). A court in the Southern District of Ohio recently denied a landlord's motion for a temporary restraining order in a substantially similar challenge to the CDC Order on this basis. As it explained, "Plaintiff has not demonstrated that enforcement of the CDC's Order will cause it irreparable harm," only that it "postpones Plaintiff's collection of debt until after its expiration." Order, *KBW Inv. Props. LLC v. Azar*, No. 20-4852 (Sept. 25, 2020 S.D. Ohio), ECF No. 16, Exhibit B. So too here.

### 2.   Plaintiffs Have Alleged No Irreparable Constitutional Violation.

Plaintiffs' only other assertion of irreparable harm is a vague allusion to constitutional violations.  Pls.' Mem. 36.  They assert that irreparable injury is invariably assumed where a plaintiff has alleged constitutional violations.  *Id.*  But the principal cases they cite in support of this proposition—*Elrod v. Burns*, 427 U.S. 347 (1976) and *McNeilly v. Land*, 684 F.3d 611 (6th Cir. 2012)— are First Amendment cases that cases that contain no such broad statement.  *See McNeilly*, 684 F.3d at 620 ("The Elrod Court found that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'").  And while the Sixth Circuit has noted that other cases have found irreparable harm based on violations of other constitutional provisions, *see, e.g.*, *Overstreet*, 305 F.3d at 578 (citing Fourth Amendment and privacy cases), Plaintiffs cite none extending this principle to the sorts of constitutional claims they raise here.  Regardless, even if such constitutional violations fell within this class, the presumption is nonetheless inapplicable because, for the reasons explained below, Plaintiffs have not demonstrated a likelihood of success on the merits of any constitutional claim.  *See id.* (because plaintiff failed to show a likelihood of success on the merits "his argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit"); *see also, e.g.*, *Castillo*, 2020 WL 5249576, at *3; *McNeilly*, 684 F.3d at 621 ("Because [plaintiff] does not have a likelihood of success on the merits, . . . his argument that he is irreparably harmed by the deprivation of his First Amendment rights also fails.").  For these reasons, Plaintiffs have not made a showing of irreparable harm.

**B.  Plaintiffs Have Not Shown A Likelihood of Success on the Merits.**

Although Plaintiffs' complaint raises numerous challenges to the Order, they fail to show a likelihood of success on the merits of any one of them.  *See* Pls.' Mem. 14–35.

### 1.   CDC Acted within Its Statutory and Regulatory Authority.

Plaintiffs principally contend that the Order "is *ultra vires* in that it exceeds the statutory and

regulatory authority of the CDC."[6]  Pls.' Mem. 11; *see id.* at 14–19.  This argument fails.  Congress vested the Secretary of HHS with broad authority to take decisive action if required to control the spread of dangerous infectious diseases, which the Secretary has delegated to the public health experts at the CDC.  *See* 42 U.S.C. § 264; 42 C.F.R. § 70.2.  CDC acted both within the scope of its delegated authority and in the interest of public health in issuing the challenged Order.

Section 361 of the PHSA empowers the Secretary "to make and enforce such regulations *as in his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases" from abroad or among the states.  42 U.S.C. § 264(a) (emphasis added).  The plain text of the statute thus evinces a legislative determination to defer to the "judgment" of public health authorities about what measures they deem "necessary" to prevent contagion, *see id.*—a determination made in the light of history and experience, given the havoc wreaked by past scourges like yellow fever, *see supra* pp. 2– 3.  Indeed, Congress's use of the phrase "such regulations as in his judgment are necessary" shows that it intended to defer to agency expertise, as "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."  *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).

The examples Congress gave of specific measures the Secretary may take to control infectious disease—which are illustrative, not exhaustive—underscore the breadth of this authority, showing

---

[6] Although Plaintiffs' memorandum categorizes this argument as a challenge to "*ultra vires*" agency action, *e.g.*, Pls.' Mem. 14, such "[n]onstatutory review is available only in the absence of a specific statute authorizing review in a particular court." *Honicker v. Hendrie*, 465 F. Supp. 414, 418 (M.D. Tenn. 1979); *accord Puerto Rico v. United States*, 490 F.3d 50, 59–60 (1st Cir. 2007).  Because the APA provides aggrieved persons with a cause of action, 5 U.S.C. § 702, to challenge agency action that is "in excess of statutory jurisdiction, authority, or limitations" or "otherwise not in accordance with law," *id.* § 706(2)(A), (C), Defendants construe Plaintiffs' "*ultra vires*" claim as arising under the APA.  This construction is bolstered by the facts that Plaintiffs never pleaded a separate "*ultra vires*" claim, *see generally* Compl., ECF No. 1, and that after filing their motion for preliminary injunction, Plaintiffs amended their complaint to add an APA claim (which was not raised in the preliminary injunction motion), *see* Am. Compl. ¶¶ 100–35.

that it may infringe on personal liberties or property rights where needed to protect the public health. Such measures include the authority to impose limitations on individuals' freedom of movement, including the "apprehension, detention, or conditional release of individuals." *Id.* § 264(b)–(c). They also include intrusions on private property, such as its "inspection, fumigation, disinfection, sanitation," and even "destruction." *Id.* § 264(a). The terms of the statute—including the examples of measures that the Secretary may adopt—invite the Secretary's exercise of expert judgment to determine what regulations may be appropriate to "prevent the introduction, transmission, or spread of communicable diseases." *Id.* This point is bolstered by the fact that, although subsection (a) makes no mention of the Secretary's ability to detain persons, it is plainly contemplated as within the scope of what may be "necessary" in his "judgment," given the restrictions placed on any such regulations in subsections (b) through (d). *See id.* § 264(a)–(d).

The regulation likewise reflects Congress's intent to provide flexibility in combatting the spread of disease. *See* 42 C.F.R. § 70.2. It allows the CDC Director to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." *Id.* It further makes clear that, in order to control disease transmission, intrusions on private property, such as "inspection, fumigation, disinfection, sanitation," and even "destruction" may be required. *Id.*

The expansive language in both the statute and the regulation comports with the Supreme Court's recognition that "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation." *Marshall v. United States*, 414 U.S. 417, 427 (1974). Chief Justice Roberts recently reaffirmed this principle in connection with the COVID-19 pandemic. *See S. Bay Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) (observing that "[w]hen [state] officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad") (citation omitted). This principle is consistent with legislative history demonstrating

that Congress used broad language in section 361 of the PHSA to provide federal health authorities flexibility to respond to novel disease outbreaks.  *See* H.R. Rep. No. 78-1364, at 24–25.

Here, CDC's determination that a "temporary halt in evictions" is a "reasonably necessary measure under 42 C.F.R. 70.2 to prevent the further spread of COVID–19 throughout the United States," 85 Fed. Reg. at 55296, is well supported and falls firmly within the scope of its authority.  A number of findings support CDC's decision.  First, "[t]he virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet)."  *Id.* at 55293.  In addition, research suggests that, in the absence of eviction moratoria, tens of millions of Americans could be at risk of eviction, on a scale that would be "unprecedented in modern times."  *Id.* at 55295.  The CDC has also determined that, in light of statistics regarding interstate moves, such "mass evictions would likely increase the interstate spread of COVID-19."  *Id.*

Based on this knowledge, CDC found that, in the context of this pandemic, eviction moratoria are an "effective public health measure utilized to prevent the spread of communicable disease."  *Id.* at 55294.  Eviction moratoria "facilitate self-isolation" by ill or at-risk persons; aid the implementation of "stay-at-home and social distancing directives," and, by reducing homelessness, decrease "the likelihood of individuals moving into close quarters in congregate settings."  *Id.*

Evictions increase the risk of the spread of COVID-19 in multiple ways.  An evicted renter who cannot afford alternative housing often "move[s] into close quarters in shared housing or other congregate settings" that pose a high risk of transmission among household contacts.  *Id.*  Due to potential crowding and shared facilities, persons residing in homeless shelters may have difficulty adhering to social distancing and other measures intended to prevent the spread of COVID-19.  *Id.* at 55294–95.  Unsheltered homeless persons are at a higher risk of infection due to lack of access to hygienic measures, sanitation, and medical care, as well as exposure to the elements.  *Id.*  These are among the reasons that the Order constitutes a "reasonably necessary" measure under the regulations

and is therefore within the broad authority of CDC, conferred by the PHSA, to take steps to protect public health by preventing disease transmission.

Plaintiffs assert that the Order falls outside CDC's statutory and regulatory authority because: (1) the statute purportedly precludes the Order from superseding state law, Pls.' Mem. 16–17; (2) the Order could affect non-infected persons not currently engaged in interstate travel, *id.* at 17–18; (3) the Order supposedly falls outside the scope of the activities listed in the statute and the regulation, *id.*; and (4) CDC has allegedly not made a finding that local measures are insufficient to control the spread of disease, *id.*  The plain text of the statute, regulation, and Order—as well as established Supreme Court precedent—refute these contentions.

First, 42 U.S.C. § 264 provides that "[n]othing in this section . . . , or the regulations promulgated under such sections, may be construed as superseding any provision under State law . . . *except* to the extent that such a provision conflicts with an exercise of Federal authority."  42 U.S.C. § 264(e) (emphasis added).  Plaintiffs ignore the latter clause, which expressly permits a regulation to supersede a state law that "conflicts with an exercise of Federal authority."  *Id.*  As Plaintiffs appear to recognize, Pls.' Mem. 16, the Order directly conflicts with state law to the extent state law would allow covered persons to be removed from their residences for nonpayment of rent during the pendency of the Order, *see* 85 Fed. Reg. at 55293 (prohibiting "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or a possessory action, to remove or cause the removal of a covered person from a residential property").  Thus, both the plain text of the statute and general principles of the supremacy of federal law, *see infra* pp. 29–30, foreclose Plaintiffs' contention that the Order may not supersede state law.

Second, the Order falls squarely within the scope of the federal government's ability to regulate interstate commerce.  It is well established that Congress may regulate not only "the instrumentalities of interstate commerce, and persons or things in interstate commerce," but also "activities that

substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005). This includes "purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.*; *see also, e.g.*, *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) (holding that the commerce power "may be exercised in individual cases without showing any specific effect upon interstate commerce; it is enough that the individual activity when multiplied into a general practice is subject to federal control . . . or that it contains a threat to the interstate economy that requires preventive regulation"); *Wickard v. Filburn*, 317 U.S. 111, 125 (1942) ("even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce"). Indeed, the Supreme Court has expressly held that "rental of real estate is unquestionably" an activity affecting interstate commerce. *Russell v. United States*, 471 U.S. 858, 862 (1985) (upholding federal arson conviction for burning apartment building against Commerce Clause challenge). And courts have routinely upheld federal regulation of activities like hotel accommodations and housing to prevent or correct societal ills. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 257 (1964) ("That Congress was legislating against moral wrongs in many of these areas . . . does not detract from the overwhelming evidence of the disruptive effect that racial discrimination has had on commercial intercourse."); *Oxford House-C v. City of St. Louis*, 77 F.3d 249, 251 (8th Cir. 1996) (Congress had a rational basis for deciding that housing discrimination against the handicapped, like other forms of housing discrimination, has a substantial effect on interstate commerce); *Morgan v. Sec'y of HUD*, 985 F.2d 1451, 1455 (10th Cir. 1993) (similar); *United States v. Lundy*, No. 15-146, 2016 WL 5920229, at *3 (M.D. Tenn. Oct. 11, 2016) (similar).

CDC's Order regulating the rental housing market is well within the bounds of this precedent—even if it affects, in some instances, landlords and tenants residing within the same state. *See Raich*, 545 U.S. at 16–17. Indeed, one of the few federal courts to have addressed the scope of 42

U.S.C. § 264 held that a ban on intrastate sales of small turtles was authorized under the statute and the Constitution, finding that preventing sales within the same state was "not only authorized by the law, but, under modern conditions of transportation and commerce" was "clearly reasonable to prevent the interstate spread of disease." *Louisiana v. Mathews*, 427 F. Supp. 174, 176 (E.D. La. 1977). So too here. And Plaintiffs' arguments based upon subsections (b) through (d) of the statute are inapposite, as those subsections apply only to the detention of persons, which the Order does not authorize (or even address).[7] *See id.* ("Plaintiff's contention that the provisions of the questioned regulation violate 42 U.S.C. § 264(b) because it authorizes the apprehension and detention of individuals is incorrect.").

Third, the temporary eviction moratorium is not so different from the actions contemplated in the statute or regulation as to exceed CDC's authority.[8] The regulation permits CDC to take a number of actions that constitute an intrusion upon or seizure of an individual's property, including "inspection," "fumigation," and even "destruction," where the Director deems it reasonably necessary to prevent the spread of disease. 42 C.F.R. § 70.2. The temporary moratorium on evictions is a comparable imposition on property in the interest of preventing contagion. And while the scale of

---

[7] Plaintiffs are also incorrect insofar as they argue that the statute permits only the apprehension and detention of individuals traveling interstate. *See* Pls.' Mem. 18. The statute also reaches individuals who are reasonably believed to be a "probable source of infection" to others moving interstate. 42 U.S.C. § 264(d)(1)(B).

[8] Plaintiffs' contention that the Order is invalid because it was not signed by the CDC Director is easily dispelled. *See* Pls.' Mem. 19. The Director signed the Order itself; the Acting Chief of Staff signed the Federal Register notice. *Compare* Order Under Section 361 of the Public Health Service Act and 42 Code Federal Regulations § 70.2, Exhibit C *with* 85 Fed. Reg. at 55297. Moreover, as used in 42 C.F.R. § 70.2, the term "Director" signifies "the Director, Centers for Disease Control and Prevention, Department of Health and Human Services, or another authorized representative as approved by the CDC Director or the Secretary of HHS." 42 C.F.R. § 70.1. And the CDC Director has delegated authority to sign Federal Register notices to the CDC Chief of Staff. *See* HHS Delegation of Authority No. 2019-DOA-23, Exhibit D. Thus, the Acting Chief of Staff had authority to sign the Federal Register notice as the Director's authorized representative. *See id.*

the temporary moratorium is no doubt expansive, it is entirely consistent with more extensive public health measures enacted to combat the widespread and "historic" threat to public health COVID-19 poses, such as border closures, travel restrictions, the shuttering of businesses, and stay-at-home orders.  *See* 85 Fed. Reg. at 55292; *see also, e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (granting emergency stay of injunction against state order closing fitness facilities due to COVID-19); *Auracle Homes, LLC v. Lamont*, No. 20-00829, 2020 WL 4558682, at *21 (D. Conn. Aug. 7, 2020) (refusing to enjoin state eviction moratorium); *TJM 64, Inc. v. Harris*, No. 20-02498, 2020 WL 4352756, at *8 (W.D. Tenn. July 29, 2020) (refusing to enjoin local restrictions on businesses); *Talleywhacker, Inc. v. Cooper*, No. 20-218, 2020 WL 3051207, at *14 (E.D.N.C. June 8, 2020) (same).

Finally, Plaintiffs ignore CDC's explicit finding that measures in state and local jurisdictions that do not provide protections for renters equal or greater than the protections provided in the Order are insufficient to prevent the spread of COVID-19.  85 Fed. Reg. at 55296.  These findings are supported by evidence presented in the Order—already discussed at length, *see supra* pp. 6–8, 18–19— showing why CDC expects eviction moratoria to help to prevent the spread of COVID-19.  The Order also sets forth evidence that evictions contribute to the spread of the disease.  *See id.*  The Order further notes that many States and jurisdictions do not provide protections against evictions during the pandemic.  85 Fed. Reg. at 55296 n.36.  Given CDC's determination that eviction moratoria may help to curb the spread of COVID-19, and that the absence of such measures is likely to contribute to interstate spread, its determination that States lacking protection against evictions have taken insufficient measures is satisfactory to trigger the CDC Director's authority under 42 C.F.R. § 70.2.

### 2.   The Order Does Not Constitute a Taking of Plaintiffs' Property.

Plaintiffs next assert that the Order is unconstitutional under the Takings Clause of the Fifth Amendment.  Pls.' Mem. 20–23.  That Clause provides, "[n]or shall private property be taken for

public use, without just compensation." U.S. Const. amend. V. Plaintiffs allege a violation of both parts, arguing that the Order is not for a public purpose, and that, even if it were, it effects a taking without just compensation. *See id.* As multiple federal district courts have recently found in refusing to enjoin state eviction moratoria, these arguments are unlikely to succeed. *See Baptiste v. Kennealy*, No. 20-11335, 2020 WL 5751572, at *20–22 (D. Mass. Sept. 25, 2020); *Auracle Homes*, 2020 WL 4558682, at *13–16; *Elmsford*, 2020 WL 3498456, at *7–12.

At the outset, it cannot seriously be disputed that CDC issued the Order for a public purpose. To be permissible under the Public Use Clause, governmental action need only be "rationally related to a conceivable public purpose." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984). The Supreme Court has long held the government may take actions that incidentally benefit one private party over another provided that they have such a "justifying public purpose." *Id.* And the Court has specifically found that a temporary emergency measure that froze rent and allowed tenants to hold over leases in light of wartime exigencies was "clothed . . . with a public interest so great as to justify regulation by law." *See Block v. Hirsh*, 256 U.S. 135, 155 (1921). This situation is no different. CDC issued the Order for the public purpose of "prevent[ing] the further spread of COVID–19 throughout the United States." 85 Fed. Reg. at 55296. That the Order requires some landlords temporarily to continue to provide housing to tenants they prefer to evict does not alter the fact that the moratorium was instituted in the interest of public health. *See Block*, 256 U.S. at 155. A finding to the contrary would call into question eviction moratoria in states throughout the country.

Regardless, there has been no governmental taking here in the first place. Takings may be either physical or regulatory. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321–22 (2002). A physical taking is "a permanent physical occupation of property" for which just compensation is required per se. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982). Whether "regulations that prohibit a property owner from making certain uses of her private

property" effect regulatory takings, in contrast, depends upon "essentially ad hoc, factual inquiries" and an "examination and weighing of all the relevant circumstances." *Tahoe-Sierra*, 535 U.S. at 321–22 (cleaned up).  And a narrow category of regulatory cases in which "a regulation deprives an owner of '*all* economically beneficial uses' of his land" requires compensation per se. *Id.* at 330 (quoting *Lucas v. S.C. Costal Council*, 505 U.S. 1003, 1019 (1992)).  Plaintiffs appear to argue that the Order results in a physical occupation of their property, Pls.' Mem. 20, a categorical regulatory taking, *id.* at 21–22, or, in the alternative, a regulatory taking under a multifactor analysis, *id.*

Clear Supreme Court precedent forecloses Plaintiffs' arguments that the Order constitutes a per se taking, and the Order likewise does not qualify as a regulatory taking under a balancing test. First, "[t]he government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992).  In this vein, the Supreme Court has held that no physical taking occurred where regulations prevented owners of mobile home plots from raising rents or evicting tenants from their land, reasoning that "[b]ecause they voluntarily open their property to occupation by others, petitioners cannot assert a per se right to compensation based on their inability to exclude particular individuals." *Id.* at 531; *see also FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("statutes regulating the economic relations of landlords and tenants are not per se takings").  The same logic applies here, where Plaintiffs voluntarily rented their properties, and the Order does no more than limit the reasons for which or delay the point at which they may evict the current tenants. *Accord Baptiste*, 2020 WL 5751572, at *20; *Auracle*, 2020 WL 4558682, at *13; *Elmsford*, 2020 WL 3498456, at *7–8.

Second, this is not the "extraordinary" case in which a categorical regulatory taking has occurred. *Tahoe-Sierra*, 535 U.S. at 330 (quoting *Lucas*, 505 U.S. at 1017).  The categorical rule was "carved out" for instances where "a regulation *permanently* deprives property of all value." *Id.* at 332 (emphasis added).  Indeed, the Supreme Court rejected the argument that a per se regulatory taking

24

occurred even where a 32-month land-development moratorium deprived plaintiffs of all economically beneficial use of their land for over two years. *Id.* at 337. In light of this precedent, the categorical rule is inapplicable here. The Order applies for a mere four months and, during that time, Plaintiffs may charge rent, apply fees or penalties for nonpayment of rent, or evict their tenants for contractual violations other than nonpayment of rent. *See* 85 Fed. Reg. at 55294. Thus, it does not deprive Plaintiffs of the value of their property in the short term, let alone permanently. *Accord Baptiste*, 2020 WL 5751572, at *20; *Auracle*, 2020 WL 4558682, at *14; *Elmsford*, 2020 WL 3498456, at *9.

Finally, a weighing of factors demonstrates that a regulatory taking has not occurred here. Factors courts typically examine when making such a determination include: "(1) the economic impact of the regulation; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 455 (6th Cir. 2009) (cleaned up). An analysis of the economic impact of a regulation "requires [courts] to compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). Further, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978) (citation omitted).

Here, all three factors weigh against finding that a taking has occurred. Plaintiffs have not attempted to show that the economic impact of the Order outweighs the value left in their property. They assert that each Plaintiff has "tenants in Units who are delinquent in payment of rent and who would otherwise be lawfully evicted" but for the Order, Am. Compl. ¶ 80, but they offer no specifics as to how many units are allegedly affected or the alleged losses from nonpaying tenants who have remained in their residences. Moreover, any economic impact is necessarily limited: the Order lasts

four months, and it neither excuses rent obligations nor precludes landlords from charging penalties or fees, or filing actions seeking unpaid rent. 85 Fed. Reg. at 55292, 55294. Thus, a consideration of economic impact does not support a finding that a regulatory taking has occurred. *Accord Baptiste*, 2020 WL 5751572, at *21; *Auracle*, 2020 WL 4558682, at *15; *Elmsford*, 2020 WL 3498456, at *10.

Further, the Order has not interfered unduly with investment-backed expectations. Landlord-tenant relations are heavily regulated in most jurisdictions; it therefore cannot be unexpected that a regulation might affect a landlord's ability to pursue an eviction at his preferred time. *See Yee*, 503 U.S. at 528–29 ("This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." (quoting *Loretto*, 458 U.S. at 440)); *accord Auracle*, 2020 WL 4558682, at *15; *Elmsford*, 2020 WL 3498456, at *10–11.

The nature of the Order also weighs heavily against a finding that a taking has occurred. As explained above, the government has not physically occupied Plaintiffs' property, and the purpose of the Order is to promote the common good by preventing the spread of a potentially deadly disease. Indeed, as another federal district court found in determining that Massachusetts's eviction moratorium was not a regulatory taking, such an order "benefit[s] those tenants, who are now temporarily protected from eviction, and members of the public, who elected officials found would be at greater risk of COVID-19 infection if displaced tenants caused or contributed to the overcrowding of other dwellings and homeless shelters, or were required to live on the streets." *Baptiste*, 2020 WL 5751572, at *22; *accord Auracle*, 2020 WL 4558682, at *16; *Elmsford*, 2020 WL 3498456, at *11. Plaintiffs are thus unlikely to succeed in proving a regulatory taking.

Lastly, even if a taking had occurred, Plaintiffs are unlikely to succeed on the merits because injunctive relief is not a proper remedy here. *See HAPCO v. City of Philadelphia*, No. 20-3300, 2020 WL 5095496, at *12 (E.D. Pa. Aug. 28, 2020). As the Supreme Court recently reiterated, "Federal courts

26

will not invalidate an otherwise lawful uncompensated taking when the property owner can receive complete relief through a Fifth Amendment claim brought under the Tucker Act." *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2179 (2019). And "the Tucker Act vests in the Court of Federal Claims *exclusive* jurisdiction to hear such claims," *Brott v. United States*, 858 F.3d 425, 429 (6th Cir. 2017), depriving this Court of subject matter jurisdiction over them.

### 3. Plaintiffs Have Identified No Due Process Violation.

Plaintiffs next assert that the Order violates their substantive and procedural due process rights. Pls.' Mem. 23–28. These claims easily fail.

Plaintiffs' substantive due process challenge lacks any merit. "At one time substantive due process was widely employed to invalidate state economic regulations," but "[i]n the New Deal era, the doctrine fell into disrepute." *Stratford v. State-House, Inc.*, 542 F. Supp. 1008, 1014 (E.D. Ky. 1982). Indeed, "plaintiffs bringing substantive due process challenges to [economic] statutes must traverse unusually inhospitable legal terrain because the Supreme Court has not invalidated an economic statute on substantive due process grounds since . . . 1935." *Blue Diamond Coal Co. v. Sec'y of Health & Human Servs.*, 79 F.3d 516, 521 (6th Cir. 1996) (internal quotation marks omitted). It is now black letter law that "legislation that does not proscribe fundamental liberties" need only satisfy an extremely deferential form of rational basis review. *Sheffield v. City of Fort Thomas, Ky.*, 620 F.3d 596, 613 (6th Cir. 2010). As the Sixth Circuit has explained, if an economic regulation "can be upheld under any plausible justification offered by the state, or even hypothesized by the court, it survives rational-basis scrutiny." *Am. Exp. Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 690 (6th Cir. 2011) (emphasis added).

For all the reasons given above, see *supra* pp. 6–8, 18–19, the Order plainly survives this exceedingly deferential review: the Court need not "hypothesize" rational justifications for the Order because pages of such justifications appear on its face. While Plaintiffs believe that the differential

rates of COVID-19 prevalence across the nation weigh against the Order's nationwide application, *see* Pls.' Mem. 24–25, this is precisely the sort of public health judgment that calls for application of CDC's public health expertise, not second-guessing by Plaintiffs (or the Court).   Because Plaintiffs have not "carried their 'heavy burden of 'negativ[ing] every conceivable basis which might support'" the Order, *Am. Exp. Travel*, 641 F.3d at 694 (quoting *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000)), this Court should reject Plaintiffs' substantive due process challenge.   As the Sixth Circuit has made clear, substantive due process is not a license for federal courts to invalidate an economic regulation whenever it "think[s] it unwise."[9] *Id.*

Plaintiffs' contention that the Order violates their right to procedural due process is equally unlikely to succeed because "[g]overnmental determinations of a general nature that affect all equally do not give rise to a due process right to be heard."   *Neinast v. Bd. of Trustees of Columbus Metro. Library*, 346 F.3d 585, 596 (6th Cir. 2003) (quoting *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 896 (6th Cir. 1991)); *see also* Richard J. Pierce, Jr., 2 Administrative Law Treatise § 9.2 (5th ed. 2010) (due process doctrine recognizes a "distinction between individualized deprivations, that are protected by procedural due process, and policy-based deprivations of the interests of a class, that are not protected by procedural due process").   This concept applies to "discretionary[] policymaking decision[s]" with the "hallmarks of traditional legislation" that are "general in [their] scope rather than

---

[9] Because Plaintiffs plainly cannot prevail under the standard that actually applies here—i.e., an extraordinarily deferential form of rational basis review—they half-heartedly suggest that this Court should apply a more searching form of scrutiny on the theory that the Order implicates fundamental rights.  First, Plaintiffs cite a case from the Supreme Court of Tennessee for the proposition that "'[a] property owner's 'right to own, use, and enjoy private property is a fundamental right.'"  Pls.' Mem. 23 n.24 (quoting *Hughes v. Nnvew Life Dev. Corp.*, 387 S.W.3d 453, 474 (Tenn. 2012)).  That decision describes principles of state real estate law governing restrictive covenants; it has no bearing on the correct standard of review for substantive due process challenges to economic regulations under the federal Constitution.  And second, Plaintiffs suggest that the deferential standard does not apply because the Order violates "seven (7)— fundamental and protected constitutional rights and liberties." *Id.*  To the extent that Plaintiffs mean for their substantive due process claim to be duplicative of their various other constitutional claims, it fails for the reasons stated elsewhere herein.

targeted on a specific individual." *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 216 (6th Cir. 2011) (citations omitted).  The "generality" of such actions "provides a safeguard that is a substitute for procedural protections," and therefore "[n]o notice or hearing is required." *Id.*  For example, a court within this Circuit recently held that Ohio's order closing non-essential businesses to prevent the spread of COVID-19 did not violate the plaintiff businesses' due process rights because it "was a generally applicable order affecting thousands of businesses, and not a decision targeting an individual or single business." *Hartman v. Acton*, No. 20-1952, 2020 WL 1932896, at *8–10 (S.D. Ohio Apr. 21, 2020).  This situation is comparable.  The Order applies to any landlord in any jurisdiction that does not provide the same or greater level of public-health protections as the Order; it does not single out plaintiffs or any other individual.  *See* 85 Fed. Reg. at 55292.  For this reason, Plaintiffs are unlikely to succeed on their procedural due process claim.

### 4.   Plaintiffs' Federalism Challenges Fail.

Plaintiffs' various federalism claims, *see* Pls.' Mem. 28–34, all fail for the same reason: the Supremacy Clause provides that federal law "shall be the supreme law of the land; *and the judges in every state shall be bound thereby*, anything in the Constitution or laws of any State to the contrary notwithstanding."  U.S. Const. art. VI, cl. 2 (emphasis added).  Because the Order is a valid exercise of CDC's statutory authority, it validly preempts contrary state law, and Plaintiffs' federalism claims are thus unlikely to succeed.[10]

Turning first to Plaintiffs' Tenth Amendment claim, Pls.' Mem. at 28–29, Plaintiffs' argument rests upon the mistaken contention that "42 U.S.C. § 264 expressly prevents preemption," and that

---

[10] If the Court disagrees with the proposition that the Order falls within CDC's statutory authority, it would have no occasion to reach these constitutional claims.  *See Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 193 (1909) ("Where a case in this court can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued and is not departed from without important reasons."); *Tower Realty v. City of East Detroit*, 196 F.2d 710, 724 (6th Cir. 1952) (similar).

"the statute expressly de-authorizes the CDC from issuing orders (such as the Halt Order) as the effect would be to supersede Tennessee law." *Id.* at 29.  But that is simply not so:  the statute is clear that the CDC may preempt state law "to the extent that such a provision conflicts with an exercise of Federal authority under this section." 42 U.S.C. § 264(e); *see also supra* p. 19.  A clearer example of congressional intent would be hard to fathom.  Plaintiffs evidently believe that the Order falls outside "the CDC's authority under 42 U.S.C. § 264(a)," Pls.' Mem. 29, but that argument simply underscores that their Tenth Amendment claim is redundant of their statutory claim.  Plaintiffs' claims that the Order fails to lawfully preempt state law, *id.* at 31–32, or unlawfully suspends state law, *id.* at 32–34, both fail for the same reason: because CDC had the statutory authority to issue the Order, the Order validly preempts contrary state law.[11]

Plaintiffs' contention that the Order violates the Tenth Amendment's anti-commandeering doctrine, *id.* at 30–31, is equally infirm.  To be sure, there are limits upon the federal government's authority to force state officers to implement a federal regulatory program.  *See, e.g., Printz v. United States*, 521 U.S. 898, 933 (1997); *New York v. United States*, 505 U.S. 144 (1992).  Those limits, however, do not affect the obligation of state courts to faithfully apply federal law—an obligation explicitly stated in the constitutional text.  *See Printz*, 521 U.S. at 928–29 ("[S]tate courts cannot refuse to apply federal law—a conclusion mandated by the terms of the Supremacy Clause.").  And while Plaintiffs assert that the Order requires state courts to alter their usual procedural rules, Pls.' Mem. 30, in fact it

---

[11] Plaintiffs' Tenth Amendment claim is similarly redundant of any claim that the Order exceeds the commerce power, *see supra* pp. 19–21, to the extent one is raised.  *See, e.g., New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States").  And their passing assertion that the Order "disregard[s] the Contracts Clause of Article I, Section 10 of the Constitution," Pls.' Mem. 28 & n.26, is likewise misplaced:  consistent with the Clause's plain text, which provides that "*No State* shall . . . pass any . . . Law impairing the Obligation of Contracts," U.S. Const. art I, § 10 (emphasis added), the Sixth Circuit has confirmed that "the Contracts Clause does not apply to the federal government." *United States v. May*, 500 F. App'x 458, 465 (6th Cir. 2012).

does no such thing.  The Order operates on landlords, not courts; with respect to courts, it merely supplies federal law to apply, as with any other case involving federal law.  *See* FAQs at 1 ("The Order is not intended to terminate or suspend the operations of any state or local court. . . . State and local courts may take judicial notice of the CDC Order . . . in making a formal judgment about any pending or future eviction action filed while this Order remains in effect.").

Ultimately, Plaintiffs' constitutional arguments rise and fall with their statutory arguments.  *See* Pls.' Mem. 28 (Order violates Tenth Amendment because "[n]othing in 42 U.S.C. § 264(a) nor 42 C.F.R. § 70.2 purports to give the CDC, HUD, or HHS the authority"); *id.* at 30 (same, as to anticommandeering claim); *id.* at 32 (no preemption because of missing "link between relevant federal statute and the authority to issue the Halt Order"); *id.* at 32–33 (similar, as to suspension claim)).  Thus, if the Court reaches these claims at all, they are unlikely to succeed.

### 5.   The Order Does Not Deny Plaintiffs Access to Courts.

Nor does the CDC Order unlawfully deny Plaintiffs access to the courts.  Denial-of-access cases generally fall into two categories:  those where the plaintiff alleges that "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," *Christopher v. Harbury*, 536 U.S. 403, 413–14 (2002), and those where the plaintiffs bring "claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried," *id.* at 414.  Plaintiffs here presumably mean to bring a claim falling into the first category, but their argument rests upon multiple misunderstandings of the Order.

Most importantly, the Order does not prevent a landlord from filing an eviction action in state court.  *See* FAQs at 1 ("The Order is not intended to terminate or suspend the operations of any state or local court.").   First, the Order expressly permits eviction for various reasons other than nonpayment of rent.  *See* 85 Fed. Reg. at 55294 (property damage, criminal activity, etc.).  Second, nowhere does the Order prohibit a landlord from attempting to demonstrate that a tenant has

wrongfully claimed its protections.[12]  *See* FAQs at 1.  And third, even where a tenant is entitled to its

protections, the Order does not "prevent landlords from starting eviction proceedings, provided that

the actual eviction of a covered person for non-payment of rent does NOT take place during the

period of the Order."  *Id.*; *see* 85 Fed. Reg. at 55292 ("the order prevents these persons from being

evicted or removed from where they are living through December 31, 2020"); *id.* at 55293 (defining

"evict" as "to remove or cause the removal of").  This case thus bears no relationship to classic judicial

access cases in which the plaintiff is entirely deprived of a judicial forum because he cannot afford a

filing fee.  *Cf., e.g.*, *Boddie v. Connecticut*, 401 U.S. 371 (1971).

      Nor does the Order completely foreclose Plaintiffs from seeking judicial relief.  Where tenants

fail to pay rent, nothing in the Order precludes landlords from filing a breach of contract action

seeking payment.  Plaintiffs may prefer a different remedy, but they plainly have access to a judicial

forum.  As one court explained in rejecting a similar challenge to a state eviction moratorium,

"Plaintiffs can still sue their tenants for arrearages through a breach of contract action in the New

York Supreme Court—and the fact that is not their preferred remedy is of no moment."  *Elmsford*,

2020 WL 3498456, at *16; *see also id.* at *17.  The Order is also temporary, *see* 85 Fed. Reg. at 55296,

and "'mere delay' to filing a lawsuit cannot form the basis of a Petition Clause violation when the

plaintiff will, at some point, regain access to legal process."  *Elmsford*, 2020 WL 3498456, at *16

(quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)); *see also id.* at *17.

      Finally, it bears emphasis that Plaintiffs' fundamental contention—that the federal

government is powerless to delay a landlord's eviction of a residential tenant under state law—would

have sweeping consequences if accepted.  As just one example, for the past eighty years, federal law

---

[12] Plaintiffs purport to quote the Order, arguing that it states that a tenant's declaration "shall be adequate proof or otherwise suffice to halt or suspend the judicial eviction action."  Pls.' Mem. 30. That language does not appear in the Order.  *See generally* 85 Fed. Reg. 55292.

has provided that members of the armed forces may be entitled to a temporary stay of eviction proceedings under certain circumstances. *See* Soldiers' and Sailors' Civil Relief Act of 1940, Pub. L. No. 76-861, 54 Stat. 1178 (1940) (codified as amended at 50 U.S.C. § 3951(b)(1)). Defendants are unaware of any court that has even contemplated the possibility that this provision is unconstitutional.

### C. The Injunction Plaintiffs Seek Is Contrary to the Public Interest.

Finally, the balance of the harms overwhelmingly favors the government, and the injunction Plaintiffs seek is manifestly contrary to the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (pointing out that "[t]hese factors merge when the Government is the opposing party"). CDC issued the Order to prevent the spread of an easily transmissible, potentially serious, and sometimes fatal disease that has infected over seven million and killed over 200,000 persons within the United States. *See* 85 Fed. Reg. at 55292; *see also* CDC COVID Data Tracker.

Numerous federal courts have recognized the paramount public interest in preventing the spread of COVID-19, including in this District. *See, e.g., TJM 64*, 2020 WL 4352756, at *8 (refusing to enjoin local ordinance requiring closure of bars and clubs due to COVID-19 because such an injunction "would not be in the public interest" and would "present a risk of serious public harm and foster the continued spread [of the] COVID-19 virus"); *see also, e.g., Auracle Homes*, 2020 WL 4558682, at *21 ("given the nature of this pandemic, the balance of the equities and the public interest favor denying a preliminary injunction"); *Tigges v. Northam*, No. 20-410, 2020 WL 4197610, at *10 (E.D. Va. July 21, 2020) ("The Court cannot understate the public interest at stake here. The public interest in protecting human life—particularly in the face of a global and unpredictable pandemic—would not be served by enjoining state officials from taking executive action designed to slow the spread of COVID-19."); *Talleywhacker*, 2020 WL 3051207, at *14 (finding that "the public interest does not weigh in favor of injunctive relief" in a situation "where defendant has taken intricate steps to craft reopening policies to balance the public health and economic issues associated with the COVID-19 pandemic,"

33

and "neither the court nor plaintiffs are better positioned to second-guess those determinations").

Plaintiffs, on the other hand, are acting in their individual economic interests. As demonstrated above, they have not shown these interests will be irreparably harmed by the temporary restrictions in the Order. And even if they had, other federal courts have found that, due to the extraordinary nature of this pandemic, the public interest in protecting health outweighs even serious economic harm to individual plaintiffs, including the complete loss of a business. *TJM 64*, 2020 WL 4352756, at *8 (denying injunctive relief despite finding that plaintiffs would suffer "devastating economic injury" as a result of COVID-19 closure orders); *see also, e.g.*, *League of Indep. Fitness Facilities & Trainers*, 814 F. App'x at 129 (finding that "[t]hough Plaintiffs bear the very real risk of losing their businesses, the Governor's interest in combatting COVID-19 is at least equally significant"); *Tigges*, 2020 WL 4197610, at *10 (finding that although plaintiff "suffered significant economic hardship due to the COVID-19 pandemic," that economic loss did not outweigh the "urgent need to act to protect . . . health and safety"). In light of all of these considerations, the balance of the harms and the public interest tilt decisively in favor of the government.

## IV.    Any Relief Granted Should Be Narrowly Tailored.

Even if the Court were to disagree with Defendants' arguments, any relief should be no broader than necessary to provide Plaintiffs with relief and therefore should extend only to plaintiffs who have standing to sue. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Nationwide injunctions, in contrast, "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct.

2392, 2425 (2018) (Thomas, J., concurring); *see also, e.g.*, *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815

(D.C. Cir. 2002) ("Allowing one circuit's statutory interpretation to foreclose . . . review of the

question in another circuit" would "squelch the circuit disagreements that can lead to Supreme Court

review."). Here, the CDC Order is currently being challenged in another federal court, underscoring

why this Court should not attempt to decide its legality for all parties and for all time. *See Brown v.*

*Azar*, No. 20-3702 (N.D. Ga.); *see also KBW Inv. Props. v. Azar*, No. 20-1852 (S.D. Ohio) (federal

defendants dismissed by stipulation after TRO denied).

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.

Dated:  October 14, 2020                              Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC BECKENHAUER
Assistant Director, Federal Programs Branch

*/s/ Leslie Cooper Vigen*
LESLIE COOPER VIGEN
Trial Attorney (DC Bar No. 1019782)
Steven A. Myers
Senior Trial Counsel (NY Bar No. 4823043)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel:  (202) 305-0727
Fax:  (202) 616-8470
E-mail:  leslie.vigen@usdoj.gov

D. MICHAEL DUNAVANT
United States Attorney

By: *s/ Audrey M. Calkins*
Stuart J. Canale (TN BPR # 12590)
stuart.canale@usdoj.gov
Audrey M. Calkins (TN BPR # 30093)
audrey.calkins@usdoj.gov

Assistant United States Attorneys
167 N. Main St. Suite 800
Memphis, Tennessee 38103
Phone: 901-544-4231
Fax: 901-544-4230

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify I served this document today by filing it using the Court's CM/ECF system, which will automatically notify all counsel of record.

Dated:  October 14, 2020

*/s/ Audrey M. Calkins*
Assistant United States Attorney