**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE**

TIGER LILY, LLC, et al.,

      Plaintiffs,

v.

DEPARTMENT OF HOUSING & URBAN
DEVELOPMENT, et al.,

      Defendants.

Case No. 2:20-cv-2692-MSN-atc

**BRIEF OF AMICUS CURIAE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## I. Introduction

Until the Centers for Disease Control and Prevention (CDC) announced on September 1, 2020, its intention to order a nationwide moratorium on residential evictions, communities across the U.S. were bracing for the arrival of a mass eviction crisis the likes of which the country had never seen. Earlier in the year, after the first pandemic-related emergency orders had closed offices and businesses, workers had filed unemployment claims by tens of millions, while many state and local governments adopted a patchwork of moratoria on evictions, foreclosures, and utility shutoffs to keep people and families safe at home. Not long after, Congress passed the CARES Act, sending $1,200 "stimulus" checks to many households, boosting unemployment benefits up to $600 per week, and prohibiting most evictions from properties with federal financing or participating in certain federal housing programs. Both Congress and state and local governments funded rental assistance programs to help pay rent arrearages owed to landlords.

By mid-summer, however, many of these measures had run their course. State and local eviction moratoria began to expire. Stimulus checks had been exhausted, as had the $600

unemployment benefits boost. Rental assistance programs began running out of money. Many tenants began falling behind on their rent, while others resorted to credit cards or other sources of emergency financing to stave off default. But no further relief came from Congress, and as the CARES Act eviction moratorium expired at the end of July and fall approached, the enormity of the potential eviction wave came into startling view: millions of renter households had already fallen behind in rent, millions more expected to default the following month, and tens of millions uncertain if they could pay or for how long. Experts predicted overwhelming numbers: 19 million or more evictions, up to 40 million people displaced--all within a matter of weeks. In a country that sees fewer than 1 million evictions in a typical calendar year, evictions on such a grand scale would inflict devastating consequences not only on the individual renters and families being evicted—but also on their employers, schools, healthcare facilities, neighborhoods, and increasingly cash-strapped local governments.

Though a handful of states and cities continued to restrict evictions, by and large only the CDC's "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19," which took effect upon publication in the Federal Register on September 4, has prevented those evictions from proceeding by the millions. The CDC order accomplishes this by prohibiting landlords from taking any action to remove, or cause the removal, of a tenant who provides a sworn declaration establishing, *inter alia,* that the household failed to pay rent due to a loss of income (or extraordinary medical expenses) and would be homeless or forced to live in close quarters if evicted. This challenge must fail on the merits because halting mass evictions is necessary to control a communicable disease, thus falling within the authority granted to CDC under the Public Health Services Act. A preliminary injunction is especially inappropriate in light of the massive public interest the CDC order serves.

## II. Identity & Interest of Amici Curiae

The National Housing Law Project (NHLP) is a nonprofit organization that advances housing justice for poor people and communities through providing technical assistance and training to legal aid attorneys, working organizers and other advocacy and service organizations to strengthen and enforce tenants' rights, increase housing opportunities for underserved communities, and preserve and expand the nation's supply of safe and affordable homes. For over 40 years NHLP has coordinated the Housing Justice Network, more than 1,600 legal services attorneys and other advocates dedicated to advancing the housing rights of poor individuals and families throughout the U.S. Since 1981 NHLP has published *HUD Housing Programs: Tenants' Rights*; commonly known as the "Greenbook" and widely-regarded as the seminal authority on the rights of HUD tenants and program participants.

Since the outset of the Covid-19 emergency, NHLP has been at the forefront of efforts to protect tenants and homeowners against eviction and displacement related to the pandemic and its economic fallout. NHLP staff have directly advocated at the federal level and in multiple states for eviction moratoria and other housing protections, as well as for funding to support both tenants and landlords. NHLP has created resources to help tenants, homeowners, and advocates learn about and exercise rights and protections, supplied training to a broad constellation of stakeholders, and provided leadership through national workgroups, communications, and media.

## III. Corporate Disclosure Statement and Certifications

Amicus NHLP certifies, based on Rule of Appellate Procedure 29(a)(4)E), that:

1. NHLP is a nonprofit organization; NHLP has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

2. No party or party's counsel authored this brief in whole or in part.

3. No party or party's counsel contributed money that was intended to fund the preparation or submission of this brief.

4. No person or entity other than Amicus NHLP, its staff, and its counsel contributed money that was intended to fund the preparation or submission of this brief.

## IV. Argument

The CDC's order temporarily halts most residential evictions in the U.S. It does so by prohibiting landlords from taking any action to remove or cause the removal of a covered person from residential premises. But for this order, the nation would be undergoing an unprecedented wave of mass evictions, destabilizing communities and frustrating efforts to control Covid-19.

### A. The CDC order prohibits landlords from taking any action to remove or cause the removal of a covered tenant prior to December 31, 2020.

In Tennessee, as in most states, a landlord cannot lawfully expel a residential tenant from leased premises without first obtaining a court order. *See* T.C.A. § 66-28-511. The CDC's halt order thus stops mass evictions by prohibiting landlords from filing or prosecuting most eviction lawsuits. See 85 Fed.Reg. at 55296. During the order, landlords may file eviction actions only against non-covered persons, or against covered persons if based on one of five enumerated exceptions. See 85 Fed.Reg. at 55294. No other eviction actions are allowed.

### 1. The CDC order prohibits any action to remove or cause the removal of a covered tenant, which must include filing and prosecuting eviction suits.

The CDC, in response to this and other constitutional challenges, has nonetheless argued the order "does not bar a landlord from commencing a state court eviction proceeding, provided that that actual eviction does not occur while the Order remains in place." See Br. of CDC at 32. Yet this contention is at odds with both the text and the purpose of the order itself, and should not form the basis of this Court's opinion.

The order states that a landlord "shall not evict any covered person from any residential property," and defines "evict" to include "any action by a landlord … to remove or cause the

4

removal of a covered person from a residential property." 85 Fed. Reg. at 55293. The plain meaning of an "action" to remove or cause the removal of a tenant must surely include filing an eviction lawsuit. *See U.S. v. Miller,* 734 F.3d 530, 540 (6th Cir. 2013) ("The language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear."), *citing U.S. v. Choice,* 201 F.3d 837, 840 (6th Cir. 2000). An eviction lawsuit is, by definition, filed "to remove or cause the removal" of the person against whom the suit is filed. *See* T.C.A. § 29-18-106 ("Where the action is to recover real property, ejectment, or forcible or unlawful entry or detainer may be brought."). Though the CDC order presumably also extends to other actions that might be taken to remove, or cause the removal of, covered persons (such as serving notices to vacate, prosecuting filed eviction cases, arranging for physical evictions to be carried out, or engaging in extrajudicial "self-help"), the CDC order prohibits "any" such actions. *See* Fed.Reg. at 55294.

The large majority of eviction lawsuits are summary unlawful detainer actions limited to determining the present right to possession of the disputed premises. *See* T.C.A. § 29-18-119 (court unlawful detainer case to "ascertain whether the plaintiff or defendant is entitled to the possession of the premises … and give judgment accordingly," and "merits of the title, shall not be inquired into"). Under the CDC order, a landlord has no right to possession of premises occupied by a covered person until after December 31, 2020. See 85 Fed. Reg. 55296. Thus, a landlord has no plausible basis for bringing an eviction lawsuit against a covered person while the CDC order remains in effect.

Interpreting the CDC order to allow eviction case filings and only stay physical evictions would lead to a host of practical difficulties in state eviction proceedings, not only because such an interpretation would enable landlords to maintain eviction lawsuits and even obtain judgments

5

against tenants who are not unlawfully holding over—but also because tenants would remain in premises for weeks or even months after such eviction judgments were entered.  Within such time periods, tenants might enter into new leases or other agreements, need critical repairs or maintenance, or otherwise interact with their landlords in ways that implicate the legal rights and duties of landlord and tenants—and which may create new facts affecting the tenant's ongoing status.  *See, e.g., Smith v. Holt,* 193 S.W.2d 100, 101-02 (Tn. App. 1945) (Acceptance of rent from tenant remaining in occupancy after termination of tenancy may create new tenancy).  Yet once a judgment or writ of restitution has been issued, it may later be executed with no further notice to the tenant or opportunity to contest removal--a circumstance raising serious due process concerns.  See *Flatford v. City of Monroe,* 17 F.3d 162, 167 (6th Cir. 1994) (due process requires notice and hearing before eviction).

Interpreting the CDC order not to prohibit the filing of lawsuits, or predicate actions such as issuing eviction notices, frustrates public policy.  Some tenants may simply move out to avoid acquiring an eviction case record, which can deeply limit a person's rental housing opportunities long into the future.[1]  Preventing such moves is the major purpose behind the CDC order.  *See* 85 Fed.Reg. at 55294 ("Evicted renters must move, which leads to multiple outcomes that increase the risk of Covid-19 spread.").  A tenant against whom an eviction lawsuit is filed also faces liability for a landlord's attorney fees.  *See* T.C.A. § 66-28-510.  Even if the tenant does not move, those fees may then become a drain on governmental rental assistance funds, which tenants protected under the CDC order are obligated to pursue.  See 85 Fed.Reg. at 55293.

---

[1]     *See* Allyson E. Gold, No Home for Justice: How Eviction Perpetuates Health Inequity Among Low-Income and Minority Tenants, 24 Geo. J. on Poverty L. & Pol'y 59, 66 (2016) ("One of the greatest, most debilitating consequences of a record of an eviction proceeding is the inability to secure decent, affordable housing," explaining how the creation of electronic eviction record drastically impairs a person's ability to rent future housing, irrespective of case outcome).

Note CDC's interpretation is not entitled to deference because the text of the original order is not genuinely ambiguous. *See Kisor v. Wilkie,* __ U.S. __, 139 S.Ct. 2400, 2414 (2019). Even if it was ambiguous, deference to an agency's interpretation (of its own regulation) is also not appropriate where, as here, it reflects merely a "convenient litigating position" or to "a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties. [or] substitutes one view of a rule for another." See *Kisor* at 2417-8, *citing Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 155 (2012) and *Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158, 170 (2007). State landlord-tenant and eviction matters fall outside CDC's area of expertise entirely, and this is hardly cured by HUD's limited involvement. See *Kisor* at 2414 (deference shown only to on "an agency's authoritative, expertise-based" judgment).

**B. The CDC eviction moratorium is constitutional because it serves a rational basis.**

Even though the CDC's halt order does prohibit landlords from filing eviction lawsuits, there is no impermissible infringement upon the plaintiffs' access to court because the halt order serves a rational basis in stopping mass evictions that would spread Covid-19.

**1. Temporary delay in eviction filings still does not infringe upon plaintiffs' right of access to the judicial system.**

CDC's argument that its halt order does not preclude filing eviction lawsuits appears intended to head off the plaintiffs' contention that the order impermissibly infringes on access to court. Yet such a flawed construction is not necessary to preserve its constitutionality. *See, e.g., Baptiste v. Kennedy,* __ F.Supp.3d __, 2020 WL 5751572 at *25 (D. Mass. 2020) (rejecting access to court claims against state eviction moratorium); *Elmsford Apartment Assocs., LLC v. Cuomo,* __ F.Supp.3d __, 2020 WL 3498456 at *16 (S.D.N.Y. 2020) (state eviction moratorium did not violate right to petition clause because restriction was temporary and other types of suits were available). A limitation on court access in the civil context generally requires only a rational

basis. *See Baptiste at * 25; see U.S. v. Kras,* 409 U.S. 434, 445 (1973) (upholding, on rational basis standard, fees that impeded indigent debtor from filing bankruptcy petition). The CDC's temporary halt on (some) eviction lawsuits easily survives under this standard.

Only where access to a judicial procedure is the "only effective means" of protecting a fundamental interest does heightened scrutiny apply to a restriction on court access. *See Kras* at 445, *discussing Boddie v. Connecticut,* 401 U.S. 371, 443-44 (1971). Yet an eviction concerns a business relationship, not a fundamental human condition. See *Baptiste* at *25 ("for purposes of a due process claim, it does not follow that there is a fundamental right to evict.... In fact, the Constitution establishes no such fundamental right."), citing *Rubinovitz v. Rogato,* 60 F.3d 906, 910-11 (1st Cir. 1995); *see also Kras* at 445-46 ("Government's role with respect to the private commercial relationship is qualitatively and quantitatively different from its role in the establishment, enforcement, and dissolution of marriage."). And an eviction lawsuit is not the only judicial means by which a landlord can vindicate its claim. *See Elmsford Apartment Assocs.* at *16 ("Although nonpayment proceedings have been suspended, Plaintiffs can still sue their tenants for arrearages through a breach of contract action … and the fact that is not their preferred remedy is of no moment.").

Furthermore, mere delay in bringing an eviction suit "cannot form the basis of a Petition Clause violation when the plaintiff will, at some point, regain access to legal process." *Elmsford Apartment Assocs.* at *16, *citing Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003); *see, accord, Auracle Homes LLC v. Lamont,* __ F.Supp.2d __, 2020 WL 4558686 (D.Conn. 2020) (moratoria did not violate due process because they "only delay[ed] Plaintiffs' ability to initiate evictions; they do not eradicate all future opportunity for Plaintiffs to pursue evictions"). The CDC halt order is temporary and expires on December 31, 2020. See Fed. Reg. at 55296.

## 2. Preventing mass evictions during a pandemic is a rational basis.

As the CDC order has made clear, "mass evictions would likely increase the interstate spread of COVID-19." 85 Fed.Reg. at 55295. This alone is a sufficient basis upholding the CDC order. But recent empirical research further supports the CDC's premise. One study (of 43 states and the District of Columbia) compared the 26 states that had lifted their local eviction moratoria to the other 18 that had not; after controlling for mask orders, stay-at-home orders, school closures, testing rates, and other factors, the researchers found lifting eviction moratoria was associated with a 1.5-times higher incidence of Covid-19 after eighteen weeks.[2] The same study found lifting eviction moratoriums was associated with higher Covid-19 mortality rates as well: 1.4 times higher after seven weeks, and 2.1 times higher after eighteen weeks.[3]

A separate study concluded that "evictions have a measurable impact on the spread of COVID-19, and . . . that policies to prevent evictions are an important component of epidemic control."[4] This latter study, which "use[d] a mathematical model of COVID-19 spread to predict the potential impact of evictions on the epidemic course," specifically noted that the effects of failing to prevent evictions in cities like Memphis "could be large. We observed a ~2% increase in the population infected under an eviction rate of 0.25%/month and ~12% increase with a 2% eviction rate."[5]

In summary, the challengers will not be able to refute the grounds on which CDC's halt order is based. *See F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 314-15 (1993) (on

---

[2]     *See* Kathryn M. Leifheit et al., Expiring Eviction Moratoriums and COVID-19 Incidence and Mortality (Oct. 2020) (manuscript pending publication).
[3]     *See Id.*
[4]     Justin Sheen et al., Covid-19 Eviction Simulations, https://github.com/alsnhll/COVID19EvictionSimulations, last visited Oct. 21, 2020
[5]     *See Id.*

rational basis review, challenger has burden to negate every conceivable basis which might support the policy). The evidence corroborates, not contradicts, CDC's position: evictions contribute significantly to the spread of Covid-19 and restricting evictions helps counteract transmission.

**V. Conclusion**

For the foregoing reasons, the motion for preliminary injunction should be denied.

Presented by:

s/Jef Feibelman
**BURCH, PORTER & JOHNSON, PLLC**
Jef Feibelman (#7677)
Lani Lester (#35226)
130 North Court Avenue
Memphis, TN 38103
(901) 524-5000 (Telephone)
(901) 524-5024 (Facsimile)
jfeibelman@bpjlaw.com
llester@bpjlaw.com

s/Eric Dunn
**NATIONAL HOUSING LAW PROJECT**
Eric Dunn, *seeking admission pro hac vice*
919 E. Main Street, Ste. 410
Richmond, VA 23219
edunn@nhlp.org
(415) 546-7000 (Telephone)

*Attorneys for Amicus National Housing Law Project*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of notice of the foregoing has been served upon all counsel of record by electronic means via the Court's ECF system this October 21, 2020.

s/Jef Feibelman