IN THE UNITED STATES DISTRICT COURT  WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

**TIGER LILY LLC;**
**HUNTER OAKS APARTMENTS UTAH, LLC;**
**NORTH 22ND FLAT, LLC;**
**CHERRY HILL GARDENS LLC;**
**CHURCHILL TOWNHOMES LLC; and**
**BRITTANY RAILEY**
**APPLEWOOD PROPERTY MANAGMENT, LLC**

**Plaintiffs**

vs   No. 2:20-CV-2692

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT** and
**BENJAMIN S. CARSON, M.D**. in his official capacity as United States Secretary of Housing and Urban Development;
**UNITED STATES DEPARTMENT OF JUSTICE** and **WILLIAM P. BARR**, in his official capacity as United States Attorney General;
**UNITED STATES CENTER FOR DISEASE CONTROL AND PREVENTION** and **NINA B. WITOVSKY,** in her official capacity as Acting Chief of Staff of the Center for Disease Control and Prevention;
**UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES** and **ALEX AZAR,** in his official capacity as United States Secretary of Health and Human Services;
**VICE ADMIRAL JEROME M. ADAMS, M.D.,** in his official capacity as United States Surgeon General; and
**D.MICHAEL DUNAVANT,** in his official capacity as United States Attorney General for the Western District of Tennessee

**Defendants.**

**MEMORANDUM OF AMICUS  CURIAE NEIGHBORHOOD PRESERVATION, INC. IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1

COMES NOW, Neighborhood Preservation, Inc. ("NPI") and as invited by the Court in its Order Denying Intervention [DKT # 36], submits its Brief as Amicus Curiae in opposition to Plaintiff's Emergency Motion for a Preliminary Injunction. From the unique perspective of the Eviction Settlement Program (""ESP"), NPI will focus its opposition on the twin issues of harm to the public if the injunction were granted and the lack of harm to the Plaintiffs if the request for injunctive relief is denied.

In this regard, there is "no contest." Granting preliminary injunctive relief would unleash a torrent of evictions that could not be reversed if the Court ultimately finds in favor of the United States or Congress acts in the meantime to implement a supplemental stimulus package that, like the CARES Act did, brings relief to both tenants and landlords.

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED BECAUSE STRIKING DOWN THE HALT ORDER PRIOR TO A DECISION ON THE MERITS WOULD CAUSE IMMEASURABLE HARM TO THE PUBLIC THAT COULD NOT BE REVERSED.**

The Plaintiffs' motion for preliminary injunction must be denied because they cannot carry their burden to demonstrate the four elements necessary to warrant the extraordinary remedy of injunctive relief. "A preliminary injunction is an extraordinary and drastic remedy." *S.Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017). The party seeking the injunction must establish its case by clear and convincing evidence. *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331, 1998 WL 152951, at *3 (6th Cir. 1998) (TABLE, text in WESTLAW) (citing *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968)). The movant must show (1) a strong or substantial likelihood of success on the merits; (2) irreparable injury without the injunction; (3) that the preliminary injunction would not substantially harm third parties; and (4) that the public interest would be served by issuing the preliminary injunction. *BNSF Ry. Co. v. Tennessee Dep't of Revenue*, 800 F.3d 262, 268 (6th Cir. 2015)  See also

*Millennium Health, LLC v. Christopher Roberts*, No. 1:19CV2381, 2020 WL 2814440, at *8 (N.D. Ohio Mar. 4, 2020), report and recommendation adopted sub nom. Millennium Health, LLC v. Roberts, No. 1:19 CV 2381, 2020 WL 2812871 (N.D. Ohio May 29, 2020)

"Although the court balances these four considerations, the movant must demonstrate some irreparable harm before the injunction will issue." *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982). However, the Supreme Court has stated that "the basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 88 (1974). NPI will focus its arguments on the issues of harm to the public and the lack of harm to the Plaintiffs.

Plaintiffs cannot show irreparable injury; they cannot show an absence of harm to third parties; nor can they demonstrate that the public's interest would be served by the injunction. In the absence of any injury to the Plaintiffs (much less irreparable harm) and the substantial harm to the public resulting from the suspension of the Halt Order, Plaintiffs' Motion must fail.

A.   IT IS THE PUBLIC THAT WILL SUFFER IRREPARABLE HARM IF THE HALT ORDER WERE ENJOINED.  THE PLAINTIFFS WILL NOT.

    a. <u>In Their Pursuit of Injunctive Relief, Plaintiffs Ignore the Harm to the Public that would come from enjoining the Halt Order.</u>

NPI wants to make abundantly clear the damage that will result from enjoining the Halt Order preliminarily. NPI is a non-profit, tax exempt organization whose mission is to promote policies and programs that resolve systemic causes of blighted properties in Memphis and Shelby County, Tennessee. NPI considers the potential of an epidemic of homelessness to be an existential threat to the health of neighborhoods and a potential cause of widespread property abandonment and an increase in property blight.

Accordingly, NPI launched the Eviction Settlement Program to administer CARES Act funding as a subgrantee of the City of Memphis, in partnership with Shelby County, The Cecil C. Humphreys School of Law and Memphis Area Legal Services to assist tenants faced with eviction for non-payment of rent. ESP manages an eviction settlement fund which is comprised of $825,000 from Memphis, Tennessee and $600,000 from Shelby County, Tennessee, sourced from their respective CARES Act appropriations. As of this filing, 2,247 people have applied to ESP. Three fourths of applicants were either not behind or less than a month behind before the pandemic. ESP is prioritizing service to applicants facing an active eviction in court.

ESP utilizes a cadre of local attorneys and law students who, on a purely pro-bono basis, assist tenants who have fallen in arrears because of COVID-19. ESP's volunteer attorneys work with landlords, such as the Plaintiffs in this case and/or their attorneys to negotiate a direct payment to the landlord to settle the tenant's arrearage. The agreed payments are funded by CARES Act funds received by Memphis and Shelby County, Tennessee and serve to benefit both the landlords and the tenant. To date nearly $200,000 in cash payments have been made directly to landlords pursuant to settlements reach by ESP volunteer attorneys. This leaves an undistributed balance of $1,225,000 available to be paid out to landlords, including those before the Court, to settle pandemic related rent arrearages. Counsel for the Plaintiffs in the present case, Glankler Brown PLLC, represents multiple landlords who have worked with ESP volunteer attorneys to settle tenant arrearages in exchange for cash payments. See Declaration of Steve Barlow, Exhibit A.

In pursuit of safe housing for its clients, NPI through ESP has developed a body of information that illustrates how the CARES Act eviction moratorium and now the Halt Order have been a lifeline for their clients. Included among the Declarations from ESP clients attached hereto as Exhibit B is just one stark example of what ESP clients are facing:

>Helen Lemons is a sixty seven year old widow, who rents a single-family house in the 38125 zip code of Memphis, Tennessee.  She applied to ESP in September after being served with a Forcible Entry and Detainer Warrant by her landlord. She is partially disabled and works part-time from home at her job with United Way of the Mid-South. Ms. Lemon's daughter, her only child fell ill with COVID-19 on May 26 and died on May 29, 2020. Her daughter's three children have moved in with her after their mother's death. The youngest of the three is sixteen and two of the three grandchildren have had the virus. There is not enough room for the four of them in Ms. Lemon's home. Hospital bills and funeral expenses caused her to fall two months behind on rent. In desperation to save her home she has taken out two extremely high interest auto title loans totaling $2,500.  If she is evicted, she and her grandchildren would have nowhere to go.  Her youngest grandchild is still in school and attending through virtual classes.  If Ms. Lemons were forced to leave her home, she does not know how her grandson would be able to continue his education until in-person learning resumes.

Many ESP clients such as Ms. Lemons presently have housing stability in the midst of the global pandemic solely as a result of the CDC Halt Order and would very soon be homeless if the Halt Order is stayed by this Court.  See Collective Exhibit B: Declarations of ESP Clients.

The epidemic of evictions that would follow if the Court were to grant a preliminary injunction will, according to Reuters, rival the number of reported cases of COVID-19 in the United States as of this filing.[1] In a story published on October 19, 2020, Reuters estimated that:

> At that point [January 1, 2020], . . . . up to 8 million tenants are facing eviction filings, according to a tracking tool developed by the global advisory firm Stout Risius and Ross, which works with the nonprofit National Coalition for a Civil Right to Counsel.
>
> * * * * * *
>
> Health experts say evictions may contribute to a second wave COVID-19 crisis, as the newly homeless are forced into shelters or tight quarters with friends and relatives, potentially exposing them to infection. The danger is particularly acute in the winter when colder weather pushes people indoors.
>
> * * * * * *
>
> "I hear these stories from entire families who are on the side of the street," said [Nick] Toman [Milwaukee Legal Aid lawyer], choking up during an interview with Reuters in his Milwaukee office. "These families have no place to go and no options, and I think it's abundantly clear that the safety net is just not big enough to handle something like this."
>
> * * * * * * * * *
>
> "January is going to be a mess," he said. "Nobody can get a new place because they have an eviction case pending against them - and they don't have any money anyway."

"Time's up: After a reprieve, a wave of evictions expected across U.S.," Reuters Business News, October 19, 2020  https://apple.news/AIpVPPknYT5aO6-Wv9foPeg

If the Court grants the preliminary injunction, January 1st will come early. Plaintiffs and other property owners are in the position to promptly evict a substantial number of people on the day

---

[1] Cases        Deaths
8.78M        226K
+74,323      +534

shortly following an Order of this Court granting a preliminary injunction. [See Declarations of Kathryn Ramsey ("Ramsey Declaration") at Exhibit C and Barlow Declaration].

One can only imagine the chaos that will ensue when the eviction mill is turned back on. Fortunately, however, this is not left to imagination. At least one court of which Amicus is aware has made findings on this issue in denying injunctive relief to halt Massachusetts' Eviction Moratorium. *Mitchell Matorin v Commonwealth*, slip op at p. 33 Superior Court of Massachusetts #2084CV10334 (August 26, 2020). The slip opinion is attached as Exhibit D.

The Massachusetts Eviction Moratorium is similar to the Halt Order. The Court's complete analysis is persuasive. On the issue of harm to the public, the Court found:

[Continued on Next Page]

### III. Risk of Harm to Defendants/Public Interest

Finally, I briefly turn to the companion questions of the balance of harms that would be suffered by the parties, and the harm to the public interest should injunction issue.

A preliminary injunction against enforcement of the Eviction Moratorium Law would permit not only these Plaintiffs, but all landlords across the Commonwealth, to immediately commence eviction proceedings against tenants who have fallen behind in the rent. Many of those non-paying (or slow-paying) tenants have lost their jobs in the economic downturn associated with the COVID-19 pandemic, and so lack the resources, at least temporarily, to pay their rent. According to studies cited by several amici, the commencement of an eviction lawsuit – indeed, even the receipt of a notice of default, a notice to quit, or a notice of lease termination that precedes the filing of an eviction lawsuit – often causes tenants to bow to the inevitable by moving out. Without economic resources, many of these tenants will be unable to find other housing. Even those lucky enough to have some place to move will inevitably increase their potential exposure to COVID, by the mere fact of searching for housing, moving their possessions, and, often, doubling up in overcrowded apartments. And, as amici point out, there

> are also numerous other devastating consequences that have been shown to result from eviction such as loss of jobs, stress, anxiety, loss of childcare, and interruptions of the education of children.
>
> Further, access to stable housing is a crucial component of containing COVID-19 for every citizen of Massachusetts. The Eviction Moratorium Law benefits the health of all in several ways. By temporarily keeping people where they currently live, it ensures efficacy of social distancing guidelines, prevents homelessness, and limits housing overcrowding, thereby limiting the spread of the disease. The Law also promotes economic health not only for the potentially displaced tenants but also for all residents of Massachusetts, as displacement and increased reliance on the shelter system and emergency services would increase costs to the Commonwealth. Finally, the government is using the pause in evictions to put together financial aid programs that allow tenants across the Commonwealth to pay their rent with government dollars, at least temporarily – payments that also benefit landlords, the ultimate recipients of those government dollars.

*Mitchell Matorin v Commonwealth*, slip op at p. 33 Superior Court of Massachusetts #2084CV10334 (August 26, 2020)

In attempting to staunch the tsunami of evictions, the Center for Disease Control and Prevention ("CDC") ordered a temporary halt in residential evictions to prevent the further spread of COVID-19 ("Halt Order"). Id. In doing so, the CDC identified the same concerns expressed by Judge Wilson in *Mitchell*. The Order eases implementation of State and Municipal stay-at-home and social distancing measures and decreases the likelihood that persons will experience homelessness or move in to congregate settings, such as crowded shelters, both of which increase the risk of COVID-19 spread. Maintaining social distance may be difficult in these settings,

especially where residents must share small spaces, like stairwells and elevators, or equipment, such as kitchen or laundry facilities.

Evicted persons will also experience unsheltered homelessness, which places them at "a higher risk for infection where there is community spread of COVID-19. Their vulnerability to COVID-19 is higher due to exposure to the elements, as well as inadequate access to hygiene, sanitation, and healthcare. Evicted persons are more likely to experience hypertension, an underlying condition associated with severe COVID-19. Among patients with COVID-19, experiencing homelessness has been associated with an increased likelihood of hospitalization.

Finally, as pointed out above when describing real persons at risk of eviction, in addition to the risks identified by the CDC, forcing families with school aged children into the street works a de facto suspension from school.  Without access to electricity and the internet, students in the Shelby County School system are forced into truancy.  Indeed, a decision in favor of the Plaintiffs' request for interim relief would most severely impact low-income residents such as the clients whom ESP most often represents, more so than any other existing party to the litigation. Low-income tenants facing job loss and the worst financial insecurity of their lives will not only lose their homes but also have additional difficulty finding substitute housing with a recent judgment for eviction on their credit history.

The harm to the public if the Court were to grant preliminary injunctive relief is impossible to calculate.  Nonetheless, it far exceeds the theoretical harm that Plaintiffs will attempt to claim. Therefore, the Court must deny Plaintiffs Motion for a Preliminary Injunction.

> b. <u>While Plaintiffs may experience some slight inconvenience in the absence of preliminary injunctive relief, they will not suffer any harm, much less irreparable harm.</u>

The Halt Order does not alter a tenant's obligation to pay rent or comply with any other contractual obligation. *Id.* at 55294. It does not prevent the accrual or collection of fees, penalties, or interest under the terms of an applicable contract. *Id.* It also does not prevent evictions of persons who do not qualify as "covered persons," or evictions based on circumstances other than nonpayment of rent, including criminal activity, damage to property, or violation of contractual obligations other than the timely payment of rent. *Id.*

The Halt Order does not strip landlords of their rights or their property as Plaintiffs claim. [First Amended Complaint [DKT #21] at Page ID 222 (alleging that they are being "deprived use and enjoyment of their property by the Halt Order); Id. at Page ID 225 (alleging that they have been deprived of the "use and benefit of their property currently held by non-paying, delinquent, and defaulting tenants"); Id. at Page ID 226 (alleging the Halt Order "deprives Plaintiffs of their property rights in the Units"); Id. at Page ID 236 (alleging that the Government has "taken their property and property rights causing Plaintiff's uncompensable damages."]   The landlords' financial and property interests are still being protected although the opportunity to regain possession of the rental units as been slightly delayed. The reality is that the Plaintiffs' financial interests have been protected all along.  Programs such as ESP were born under the CARES Act to provide Plaintiffs the opportunity to obtain cash settlements for unpaid rent both before and during the period of the Halt Order even where their tenant is a covered person under the Halt Order.  Since its inception only a few months ago ESP has entered into many settlements and funneled over $200,000.00 to landlords in Shelby County, some of whom are Plaintiffs in this case and many others of whom are represented in General Sessions Court by Glankler Brown. [See

11

Barlow Declaration] Shelby County continues to administer CARES Act funding to finance settlements on an ongoing basis.  <u>The opportunity for settlement and a cash infusion remains available to those Plaintiffs willing to engage with ESP to achieve resolution of their FED's.</u>  If the Plaintiffs are unwilling to receive rent payments through settlements with ESP, blame cannot be laid at the feet of the Halt Order.

Nor has the imposition of the Halt Order impeded Plaintiffs' access to the Courts as they originally claimed. Id. at Page ID 214 (alleging that "[t]he Halt Order frustrates Plaintiffs' constitutional right to access the State courts . . ."). Counsel for these Plaintiffs and other counsel representing local landlords have taken full advantage of their continued access to the Courts. From October 19 to October 23, 2020, Counsel for the Plaintiffs filed 110 new FED suits and took 5 judgments (for possession and cost) on behalf of landlords [See Barlow Declaration] These Plaintiffs have filed at least 10 cases and obtained 6 judgments.  [See Declaration of Kathryn ("Ramsey Declaration") at Exhibit D].  In the cases pursued to judgment, if the Court were to grant the preliminary injunction, Writs of Possession would be in process the next day.

In the evening of October 27th, Plaintiffs filed a series of virtually identical declarations from each Plaintiff [DKT No. 49] in an effort to overcome the Government's argument that Plaintiffs' lacked standing to pursue Declaratory and Injunctive Relief.  In each of these Declarations, a Plaintiff unabashedly admits that it is accessing the Courts and pursuing FED actions. Beyond that, the Declarations are extremely vague containing conclusory allegations that will not assist the Court in determining whether these Plaintiffs have suffered any harm.  What is particularly curious is the identical statement by each Declarant that  it "operates its multi-family real properties under different business names." What does that mean?  Are many if not most of the alleged 5,000 units owned by persons not before the Court? What does "operate" mean?  Does it mean "own" or does it mean "manage." This distinction is important on the issue of harm.

NPI's research suggests that most of the Units mentioned in the First Amended Complaint are not owned by the named Plaintiffs; instead, they are either owned by parent or affiliate companies of the Plaintiffs or are merely being managed by various of the Plaintiffs, while only a small proportion of these Units are owned by a Plaintiff. [See Barlow Declaration]. This goes directly to the issue of harm, if any.[2] If Plaintiffs do not to hold title to the Units that they claim to, in that sense they have not been deprived of access to the Units; except for possibly three of the Plaintiffs representing ownership of 200 or so units, the Plaintiffs have not been deprived of rental income. Where is there alleged any risk of harm to those Plaintiffs such as Applewood Properties, who are managers, not owners? Or to unnamed corporate affiliates of Plaintiffs who have an unstated, untraceable ownership interest in property in this District?

The Plaintiffs' call for a return to the *status quo ante* is equally misplaced. The relief they seek would actually upend the status quo by placing thousands of individuals at risk of immediate homelessness. The Halt Order did not change the status quo – it extended it following the expiration of the moratorium in place to protect tenants and the public implemented under the CARES Act. The *status quo ante* is that covered individuals are protected from eviction while landlords are pursuing actions through judgment, but short of eviction. Plaintiffs have not even attempted to make a factual showing that delaying until January 2, 2021 to put tenants out will cause them irreparable harm. Nor can they. The damage they claim is theoretical at best. If there is any actual harm beyond the inconvenience of delay, it is financial only.

Plaintiffs have attempted to dodge the lack of irreparable harm by arguing based on their Declarations that most of their tenants are judgment proof, so they will never collect the back rent. First, that is totally speculative; second, it is not accurate as NPI stands ready to fund settlements

---

[2] It also bears on the issue of standing as well. If, as NPI's research suggests, only three of the named Plaintiffs own title to rental property in this District, the remainder of the named Plaintiffs lack standing as well as injury.

13

for these tenants with CARES Act money. Third, the harm is not the inability to recover the Units in lieu of rent it is as each Plaintiff claims in their declaration (using North 22nd Flat's declaration as an example:

> 37. The continued occupation of North 22nd Flat's properties by tenants who have not paid rent and who are not required to pay rent for at least another two months will further and severely compromise North 22nd Flat's ability to pay its loan obligation, maintain the property, and retain all of its employees.

This describes economic harm that is, by definition, not irreparable. See *Overstreet v. Lexington-Fayette Urban County Government*, 305 F. 3d 566, 579 (6th Circuit 2002). (The fact that an individual may lose his income for some extended period of time does not result in irreparable harm, as income wrongly withheld may be recovered through monetary damages in the form of back pay. *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (finding that "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury"); see *Aluminum Workers Int'l Union, AFL–CIO, Local Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 444 (6th Cir.1982) (finding that employees did not suffer irreparable harm from temporary unemployment pending arbitration).

Even if economic harm were "irreparable," these Plaintiffs have not even attempted to quantify the loss. The Court has not been presented with any evidence from which it could determine how many units are owned by these Plaintiffs as opposed to being either managed or owned by parties not before the Court; how much rent these Plaintiffs claim is owed to them by how many "defaulting" tenants; and what steps these Plaintiffs have taken to replace the uncollected rental income through loan forbearance, PPP loans, SBA Emergency Loans or in other ways. The conclusory allegations in the Plaintiffs declarations might be sufficient on the issue of standing, but they cannot support a request for injunctive relief.

Another aspect of the *status quo ante* is that Congressional leadership has been negotiating with the Executive Branch to reach agreement on stimulus legislation that would include relief for tenants and landlords.  See, e.g. "We are hoping within weeks" Stimulus Negotiations get a new goalpost.  What it Means for you.   C/Net 10/27/2020 https://www.msn.com/en-us/news/politics/let-s-do-it-the-status-of-stimulus-bill-negotiations-today-and-when-a-package-could-pass/ar-BB17Ba0i   If those negotiations are successful and Congress enacts a new stimulus package, Plaintiffs' claims may be mooted or, the harms of which they complain will be substantially redressed.  For this reason alone, the Court should deny preliminary relief while there remains even the slightest chance that Congress will address Plaintiff's concerns.

B.   IF THE COURT WERE INCLINED TO GRANT A PRELIMINARY INJUNCTION PREVENTING THE OPERATION OF THE HALT ORDER, IT MUST REQUIRE A BOND COMMENSURATE WITH THE HARM THAT COULD RESULT

As the Government has pointed out in its Memorandum in Opposition to Injunctive Relief, the real parties in interest here are the Plaintiffs' tenants.  [Defendant's Memorandum in Opposition [DKT #29] at Page ID 399] along with unsuspecting members of the public who would be put at risk by a glut of displaced tenants.  They are the ones who will suffer the harm of eviction.  Of course, the potential damage is incalculable.  But, pursuant to Fed R. Civ. P. Rule 65(c), the Court must try.  Plaintiffs have alleged they control "more than 5,000 residential Units located within the Western District of Tennessee.  Assuming conservatively, an average of 3 tenants in each unit, but only 25% qualify for the protections of the Halt Order, (and ignoring for purposes of this analysis that Plaintiffs have failed to allege that any of its tenants are covered by the Halt Order), that's 3,750 people in this District.  The Halt Order establishes a fine against an organization violating this Order of no more than $200,000 per event if the violation does not result in a death or $500,000 per event if the violation results in a death or as otherwise provided

by law. Plaintiffs suggest, however, that for purposes of the Injunction Bond the amount be set at $10,000.00 per estimated tenant, or $37,500,000.00.

C.  CONCLUSION

The outcome of this hearing on Emergency Injunctive Relief will have far reaching and potentially devastating consequences on numerous Americans. If the Halt Order were to be enjoined, countless individuals and families will face the atrocities of homelessness and the dangers of this unprecedented pandemic. Plaintiffs' have failed to address the harm such an order would impose or show they are likely to suffer any harm much less harm that is irreparable. For the forgoing reasons, this Court should deny Plaintiffs' motion for preliminary injunction and maintain the actual *status quo* that protects the most vulnerable amongst us from the deadly virus and the other harms that eviction would cause.

## CERTIFICATION

In accordance with Rule of Appellate Procedure 29(a)(4)(E), NPI certifies that:

1. NPI is a nonprofit organization; NPI has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

2. No party or party's counsel authored this brief in whole or in part.

3. No party or party's counsel contributed money that was intended to fund the preparation or submission of this brief.

4. No person or entity other than Amicus NPI, its staff, and its counsel contributed money that was intended to fund the preparation or submission of this brief.

Respectfully Submitted,

/s/ Earle J. Schwarz
Earle J. Schwarz (007192)

          2157 Madison Ave, Suite 201
          Memphis TN 38104 901.272.0607
          eschwarz@earle-schwarz.com

          Webb A. Brewer (9030)
          The Law Offices of Webb A. Brewer
          1755 Kirby Parkway, Suite 110
          Memphis, TN 38120 Tele: (901) 757-3358
          webbbrewer@comcast.net

          Counsel for Amicus, NPI

OF COUNSEL
Daniel M. Schaffzin (028601)
Associate Professor of Law
Co-Director, Neighborhood Preservation Clinic
Cecil C. Humphreys School of Law
1 N. Front Street, Suite 101
Memphis, TN 38103-2189
(O) 901.678.5056 | (C) 215.380.0969

Kathryn Ramsey
Assistant Professor of Law & Director, Medical-Legal Partnership Clinic
University of Memphis Cecil C. Humphreys School of Law
1 North Front Street
Memphis, TN 38103
Office: (901) 678-4589
Kramsey1@memphis.edu

## CERTIFICATE OF SERVICE

   I hereby certify that a true and correct copy of notice of the foregoing has been served upon all counsel of record by electronic means via the Court's ECF system this October 27, 2020

                /s/Earle J. Schwarz