**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

TIGER LILY LLC, *et al.*,

    Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT, *et al.*,

    Defendants.

Case No. 2:20-cv-2692-MSN-atc

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

    I.    Statutory and Regulatory Background ...............................................................3

    II.    The COVID-19 Pandemic ....................................................................................6

    III.    The CDC Order .....................................................................................................8

    IV.    Plaintiffs' Claims ................................................................................................10

LEGAL STANDARDS ........................................................................................................10

ARGUMENT ......................................................................................................................12

    I.    The CDC Order Does Not Violate the Administrative Procedure Act (Count I) ................12

        A.    CDC Acted within Its Statutory and Regulatory Authority ................................12

            1.    The plain language of section 361 of the PHSA demonstrates that the Order falls within CDC's broad authority to prevent the spread of disease. ....................................13

            2.    Canons of construction do not negate Congress's clear intent to provide public health experts with broad authority to prevent the spread of disease. ..................................16

            3.    At a minimum, CDC's reasonable interpretation of the statute is entitled to deference ..21

        B.    CDC Was Not Required To Engage In Notice and Comment Rulemaking. ....................25

        C.    The CDC Order Was Neither Arbitrary Nor Capricious. ....................................27

    II.    The Order Does Not Effect a Taking of Plaintiffs' Property (Count II). ................................28

    III.    Plaintiffs Have Identified No Due Process Violation (Counts III, IV) ................................34

    IV.    Plaintiffs' Various Federalism Challenges Fail (Counts V, VI, VII). ................................36

    V.    The Order Does Not Deny Plaintiffs Access to Courts (Count VIII). ................................39

CONCLUSION ..................................................................................................................41

# TABLE OF AUTHORITIES

**Cases**

*767 Third Ave. Assocs. v. United States*,
 48 F.3d 1575, 1581 (Fed. Cir. 1995) ...................................................................29

*Air Transport Ass'n of Am. v. FAA*,
 169 F.3d 1 (D.C. Cir. 1999)..............................................................................26

*Ali v. Fed. Bureau of Prisons*,
 552 U.S. 214 (2008) ............................................................... 17, 18, 19, 20

*Am. Exp. Travel Related Servs. Co. v. Kentucky*,
 641 F.3d 685 (6th Cir. 2011)..............................................................................35

*Am. Hosp. Ass'n v. Azar*,
 964 F.3d 1230 (D.C. Cir. 2020) .........................................................................16

*Arangure v. Whitaker*,
 911 F.3d 333 (6th Cir. 2018)................................................................12, 16, 21

*Atrium Med. Ctr. v. HHS*,
 766 F.3d 560 (6th Cir. 2014) ........................................................................21, 22

*Auracle Homes, LLC v. Lamont*,
 No. 20-00829, 2020 WL 4558682 (D. Conn. Aug. 7, 2020) ........................*passim*

*Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or.*,
 515 U.S. 687 (1995) .....................................................................................17, 20

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
 462 U.S. 87 (1983) ..............................................................................................27

*Baptiste v. Kennealy*,
 No. 20-11335, 2020 WL 5751572 (D. Mass. Sept. 25, 2020).......................*passim*

*Bates v. Donley*,
 935 F. Supp. 2d 14 (D.D.C. 2013) .....................................................................11

*Barnhardt v. Walton*,
 535 U.S. 212 (2002)......................................................................................16, 22

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007).............................................................................................27

*Block v. Hirsh*,
 256 U.S. 135 (1921).......................................................................................30, 31

*Blue Diamond Coal Co. v. Sec'y of HHS,*
   79 F.3d 516 (6th Cir. 1996) .................................................................................................35

*Boddie v. Connecticut,*
   401 U.S. 371 (1971) .......................................................................................................40

*Brott v. United States,*
   858 F.3d 425 (6th Cir. 2017) ..........................................................................................34

*Brown v. Azar,*
   No. 20-03702, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020) ......................................*passim*

*Carter v. Welles-Bowen Realty, Inc.,*
   736 F.3d 722 (6th Cir. 2013) ..........................................................................................22

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984) .....................................................................................................*passim*

*Chickasaw Nation v. United States,*
   534 U.S. 84 (2001) .................................................................................................... 16, 17

*Christopher v. Harbury,*
   536 U.S. 403 (2002) .......................................................................................................39

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) .................................................................................................. 12, 13

*Clark v. Martinez,*
   543 U.S. 371 (2005) .......................................................................................................24

*Conn. Nat'l Bank v. Germain,*
   503 U.S. 249 (1992) .......................................................................................................16

*Council of S. Mountains, Inc. v. Donovan,*
   653 F.2d 573 (D.C. Cir. 1981) .......................................................................................26

*Davidson v. U.S. Dep't of Energy,*
   838 F.2d 850 (6th Cir. 1988) ..................................................................................... 27, 28

*Davis v. City of Memphis Fire Dep't,*
   940 F. Supp. 2d 786 (W.D. Tenn. 2013) ........................................................................12

*Davis v. Goord,*
   320 F.3d 346 (2d Cir. 2003) ...........................................................................................40

*Elmsford Apartment Ass'n v. Cuomo,*
   469 F. Supp. 3d 148 (S.D.N.Y. 2020) .......................................................................*passim*

*FCC v. Fla. Power Corp.*,
    480 U.S. 245 (1987) ................................................................................31

*Gonzalez v. Oregon*,
    546 U.S. 243 (2006) ................................................................................13

*Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
    559 U.S. 280 (2010) ................................................................................18

*Gundy v. United States*,
    139 S. Ct. 2116 (2019) ............................................................................24

*Hadix v. Johnson*,
    230 F.3d 840 (6th Cir. 2000) ..................................................................35

*HAPCO v. City of Philadelphia*,
    No. 20-3300, 2020 WL 5095496 (E.D. Pa. Aug. 28, 2020) ....................34

*Hartman v. Acton*,
    No. 20-1952, 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020) ..................36

*Haw. Hous. Auth. v. Midkiff*,
    467 U.S. 229 (1984) ................................................................................30

*Henry Ford Health Sys. v. HHS*,
    654 F.3d 660 (6th Cir. 2011) ..................................................................23

*Indep. Turtle Farmers of La. v. United States*,
    703 F. Supp. 2d 604 (W.D. La. 2010) ..............................................14, 17

*Jarecki v. G.D. Searle & Co.*,
    367 U.S. 303 (1961) ................................................................................17

*Jifry v. FAA*,
    370 F.3d 1174 (D.C. Cir. 2004) ..............................................................25

*JPMorgan Chase Bank, N.A. v. Winget*,
    510 F.3d 577 (6th Cir. 2007) ..................................................................10

*KC Tenants v. Byrn*,
    No. 20-784, 2020 WL 7063361 (W.D. Mo. Nov. 30, 2020) ...................40

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470 (1987) ................................................................................32

*Knick v. Twp. of Scott*,
    139 S. Ct. 2162 (2019) ............................................................................34

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer,*
814 F. App'x 125 (6th Cir. 2020) ................................................................. 20

*Loretto v. Teleprompter Manhattan CATV Corp.,*
458 U.S. 419 (1982) ...................................................................... 31, 33

*Louisiana v. Mathews,*
427 F. Supp. 174 (E.D. La. 1977) ................................................................. 14

*Lucas v. S.C. Costal Council,*
505 U.S. 1003 (1992) .................................................................. 31, 32

*Marshall Cty. Health Care Auth. v. Shalala,*
988 F.2d 1221 (D.C. Cir. 1993) ..................................................................... 11

*Marshall v. United States,*
414 U.S. 417 (1974) ........................................................................... 14

*Mistretta v. United States,*
488 U.S. 361 (1989) ........................................................................... 24

*Mixon v. State of Ohio,*
193 F.3d 389 (6th Cir. 1999) ...................................................................... 11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ............................................................................. 27

*Mozilla Corp. v. FCC,*
940 F.3d 1 (D.C. Cir. 2019) ........................................................................ 12

*Nasierowski Bros. Inv. Co. v. City of Sterling Heights,*
949 F.2d 890 (6th Cir. 1991) ...................................................................... 36

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,*
513 U.S. 251 (1995) ........................................................................... 22

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
545 U.S. 967 (2005) .................................................................. 13, 21, 22

*Neinast v. Bd. of Trustees of Columbus Metro. Library,*
346 F.3d 585 (6th Cir. 2003) ...................................................................... 36

*New York v. United States,*
505 U.S. 144 (1992) ........................................................................... 37

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n,*
499 U.S. 117 (1991) ........................................................................... 17

*Norman v. Baltimore & Ohio R.R. Co.*,
    294 U.S. 240 (1935) ..................................................................................29

*Northland Family Planning Clinic, Inc. v. Cox*,
    487 F.3d 323 (6th Cir. 2007) ................................................................24

*Omnia Commercial Co. v. United States*,
    261 U.S. 502 (1923) ......................................................................... 29, 30

*Palmyra Pac. Seafoods, LLC v. United States*,
    561 F.3d 1361, 1365–68 (Fed. Cir. 2009) ........................................ 29, 30

*Paskvan v. City of Cleveland Civil Serv. Comm'n*,
    946 F.2d 1233 (6th Cir.1991) ................................................................11

*Penn. Cent. Transp. Co. v. City of N.Y.*,
    438 U.S. 104 (1978) ..............................................................................32

*Pension Benefit Guaranty Corp. v. Gray*,
    467 U.S. 717 (1984) ..............................................................................29

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015) ..........................................................................27

*Printz v. United States*,
    521 U.S. 898 (1997) ......................................................................... 37, 38

*Rawe v. Liberty Mut. Fire Ins. Co.*,
    462 F.3d 521 (6th Cir. 2006) ................................................................11

*Rempfer v. Sharfstein*,
    583 F.3d 860 (D.C. Cir. 2009) .............................................................11

*Republic Steel Corp. v. Costle*,
    621 F.2d 797 (6th Cir. 1980) ................................................................26

*Rhinehimer v. U.S. Bancorp Investments, Inc.*,
    787 F.3d 797 (6th Cir. 2015) .......................................................... 12, 21

*Sebelius v. Auburn Reg'l Med. Ctr.*,
    568 U.S. 145 (2013) ..............................................................................21

*Serono Labs., Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998) ...........................................................21

*Sheffield v. City of Fort Thomas, Ky.*,
    620 F.3d 596 (6th Cir. 2010) ................................................................35

*Siler v. Louisville & Nashville R.R. Co.,*
213 U.S. 175 (1909) ..................................................................................................38

*Smith v. Jefferson Cty. Bd. of Sch. Comm'rs,*
641 F.3d 197 (6th Cir. 2011) ....................................................................................36

*Smith v. Turner,*
48 U.S. 283 (1849) ......................................................................................................3

*Stratford v. State-House, Inc.,*
542 F. Supp. 1008 (E.D. Ky. 1982) ..........................................................................34

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
535 U.S. 302 (2002) .......................................................................................30, 31, 32

*Tenn. Scrap Recyclers Ass'n v. Bredesen,*
556 F.3d 442 (6th Cir. 2009) ....................................................................................32

*TJM 64, Inc. v. Harris,*
No. 20-02498, 2020 WL 4352756 (W.D. Tenn. July 29, 2020) .............................20

*Tower Realty v. City of East Detroit,*
196 F.2d 710 (6th Cir. 1952) ....................................................................................38

*United States v. May,*
500 F. App'x 458 (6th Cir. 2012) .............................................................................37

*United States v. Mead Corp.,*
533 U.S. 218 (2001) .............................................................................................21, 22

*Univ. Med. Ctr. of S. Nev. v. Shalala,*
173 F.3d 438 (D.C. Cir. 1999) .................................................................................11

*Wright v. City of Euclid, Ohio,*
962 F.3d 852 (6th Cir. 2020) ....................................................................................28

*Yee v. City of Escondido,*
503 U.S. 519 (1992) .............................................................................................31, 33

**Statutes**

5 U.S.C. § 553 .........................................................................................................25, 27

42 U.S.C. § 264 ...................................................................................................*passim*

Pub. L. No. 76-861, 54 Stat. 1178 (1940) ...................................................................41

Pub. L. No. 96-88, 93 Stat. 695 (Oct. 17, 1979) ..........................................................4

Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020) ...................................................7

**Rules**

Fed. R. Civ. P. 8(a)(2) ........................................................................................38

Fed. R. Civ. P. 12(c) ...................................................................................10, 11

**Legislative Materials**

Act of May 27, 1796, 1 Stat. 474 (1796) ...................................................3

Act of Feb. 25, 1799, 1 Stat. 619 (1799) ...................................................3

Act of Feb. 15, 1893, 27 Stat. 449 (1893) .................................................3

H.R. Rep. No. 78-1364 (1944) ....................................................................4

**Regulations**

42 C.F.R. § 70.1 ..............................................................................................6

42 C.F.R. § 70.2 ......................................................................................*passim*

11 Fed. Reg. 9389 (Aug. 27, 1946) ..........................................................5

12 Fed. Reg. 3189 (May 16, 1947) ............................................................5

12 Fed. Reg. 6210 (Sept. 16, 1947) ..........................................................5

65 Fed. Reg. 19772 (Apr. 12, 2000) .........................................................5

31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966) ..................................4

65 Fed. Reg. 49906 (Aug. 16, 2000) ........................................................5

85 Fed. Reg. 15337 (Mar. 13, 2020) ...............................................6, 7, 23

85 Fed. Reg. 55292 (Sept. 4, 2020) ..................................................*passim*

## INTRODUCTION

In the Public Health Services Act (PHSA), Congress authorized the Secretary of Health and Human Services "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). The Secretary, in turn, promulgated regulations authorizing the Director of the Centers for Disease Control and Prevention (CDC) to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." 42 C.F.R. § 70.2. Such broad delegations of authority—for specific, defined purposes—reflect clear and purposeful grants of broad discretion to the nation's top public health authorities to regulate in ways that, in their expert judgment, are necessary to combat contagion. And there have been few periods in our history when halting the spread of disease has been more important than it is now.

The COVID-19 global pandemic continues to worsen. Nearly 17 million people within the United States have been infected, and over 300,000 have died. *See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last visited Dec. 18, 2020). The state of Tennessee alone reported over 64,000 new cases in the past seven days—the highest number in the country per capita, and the sixth-highest total of any state during that period. *Id.* As our nation passes one grim milestone after another, Americans have made and continue to make countless sacrifices in the interest of preserving public health. The weight of the pandemic has not fallen equally on all shoulders: essential workers have put themselves and their families in harm's way each day; countless businesses have been shuttered; and many have lost loved ones. None of it has been easy.

In the face of this ongoing crisis, the Centers for Disease Prevention and Control (CDC) has used its statutory and regulatory authority to combat the continuing spread of COVID-19 by issuing the temporary residential eviction moratorium at issue here. *See* Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292, 55292 (Sept. 4, 2020).

Given that COVID-19 spreads easily and quickly among persons within close contact, CDC's expert judgment was that such an Order was necessary to prevent the further spread of the disease. *See id.* Among other things, a residential eviction moratorium facilitates self-isolation by ill and at-risk persons, eases implementation of stay-at-home and social distancing measures, and decreases the likelihood that persons will experience homelessness or move in to congregate settings, such as crowded shelters, both of which increase the risk of COVID-19 spread. *Id.* at 55295–96. The Order protects some of society's most vulnerable: low-income persons who have lost work or incurred extraordinary medical bills, have made every effort to pay their rent, and would not have available housing options if evicted. *Id.* at 55297. It does not excuse any tenant's obligation to pay rent or impair any landlord's ability to impose fees, interest, or other penalties short of eviction. *Id.* at 55292. Nor does it prevent landlords from evicting tenants for reasons other than failure timely to pay rent, such as criminal activity or property damage. *Id.* at 55294.

Plaintiffs—several Tennessee landlords—have challenged the Order, alleging that it has prevented them from evicting tenants who have certified they meet its criteria for nonpayment of rent. To start, they raise various claims under the Administrative Procedure Act (APA). But each of these claims fails as a matter of law. First, the Order falls well within CDC's statutory and regulatory authority, and even if the Court thought those provisions ambiguous, it must defer to CDC's reasonable interpretation of them. Second, CDC has complied with the APA's procedural requirements, as the Order is not a rule, and even if it were, good cause—the exigency created by an ever-worsening global pandemic—justified its issuance without notice and comment. And third, Plaintiffs have made no allegation that could overcome the presumption that agency action is valid; the Order is demonstrably not arbitrary or capricious.

Plaintiffs' constitutional claims fare no better. Clear Supreme Court precedent forecloses Plaintiffs' assertion that the Order effects a taking of their property. Their due process claims fail

because the Order (1) passes the extremely deferential rational basis test applied to substantive due process challenges to economic regulations and (2) is the type of broadly applicable governmental action to which procedural due process rights do not attach. Plaintiffs' Tenth Amendment claims are redundant of their statutory claims and, if the Court determines—as it should—that CDC had the authority to issue the Order, then the Supremacy Clause leaves no doubt that that federal law trumps conflicting state law. Finally, the Order does not deny Plaintiffs access to courts because it prohibits only the physical removal of covered persons from residential property, not antecedent legal actions.

For all of these reasons, as explained below, the Court should grant judgment in favor of Defendants as a matter of law.

## BACKGROUND

### I. Statutory and Regulatory Background

The federal government has a long history of acting to combat the spread of communicable disease. Congress enacted the first federal quarantine law in 1796 in response to a yellow fever outbreak, authorizing the President to direct federal officials to help states enforce quarantine laws. Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) (repealed 1799); *see Smith v. Turner*, 48 U.S. 283, 300 (1849). Following a subsequent yellow fever outbreak, Congress replaced this Act with a federal inspection system for maritime quarantines. Act of Feb. 25, 1799, ch. 12, 1 Stat. 619 (1799). And in 1893, Congress authorized the Secretary of the Treasury to adopt additional regulations to prevent the introduction of disease into the United States or across state lines where the Secretary considered state or local regulation inadequate. Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893).

In 1944, Congress enacted the provision at issue here, section 361 of the PHSA, as part of a broader effort to consolidate and clarify existing public health laws. H.R. Rep. No. 78-1364, at 1 (1944). In section 361(a), Congress broadened the federal government's "basic authority to make regulations to prevent the spread of disease into this country or between the States." *Id.* at 24. For

example, Congress removed references to specific diseases to provide federal health authorities flexibility to respond to new types of contagion and "expressly sanction[ed] the use of conventional public-health enforcement methods" by the government in disease-control efforts. *Id.* at 24–25.

The resulting statute, 42 U.S.C. § 264—part of a broader statutory scheme authorizing the Department of Health and Human Services (HHS) to take wide-ranging public health actions, *see* 42 U.S.C. §§ 264–272—authorizes the Secretary of HHS[1] "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession," 42 U.S.C. § 264(a). Subsection (a) further clarifies that "[f]or purposes of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id.* Subsection (b) imposes specific limits on the Secretary's ability to "provide for the apprehension, detention, or conditional release of individuals"—a power not referenced in subsection (a)—mandating that such impositions on a person's physical movement may be implemented only with respect to diseases specified by Executive Order. *Id.* § 264(b). Subsections (c) and (d) set further limits on the detention of individuals. *See id.* § 264(c)–(d). The final subsection provides that the statute and any regulation adopted thereunder supersede state law "to the extent that such a provision conflicts with an exercise of Federal authority." *Id.* § 264(e).

---

[1] Although the statute assigns authority to the Surgeon General, all statutory powers and functions of the Surgeon General were transferred to the Secretary of HHS in 1966, 31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966), *see also* Pub. L. No. 96-88, § 509(b), 93 Stat. 695 (Oct. 17, 1979) (codified at 20 U.S.C. § 3508(b)). The Secretary has retained these authorities despite the reestablishment of the Office of the Surgeon General in 1987.

The Secretary of HHS has promulgated regulations implementing these provisions and delegating their enforcement to CDC. *See* 42 C.F.R. pt. 70; 65 Fed. Reg. 49906, 49907 (Aug. 16, 2000). The Secretary appears to have first promulgated the regulation entitled "measures in the event of inadequate local control" in 1947, *see* 12 Fed. Reg. 3189 (May 16, 1947) (codified at 42 C.F.R. § 12.3 (1947)), following publication of a "general notice of proposed rule making" in the Federal Register, *see* 11 Fed. Reg. 9389 (Aug. 27, 1946).[2] The regulation has been relocated within the Code of Federal Regulations a number of times over the years without substantive change. *See, e.g.*, 12 Fed. Reg. 6210 (Sept. 16, 1947) (recodifying provision at 42 U.S.C. § 73.2). In 2000, again without any alteration to its substance, the regulation was repromulgated to transfer, in part, authority from the Food & Drug Administration (FDA) to CDC, *see* Final Rule, Control of Communicable Diseases; Apprehension and Detention of Persons With Specific Diseases; Transfer of Regulations, 65 Fed. Reg. 49906 (Aug. 16, 2000), and the agency provided a notice-and-comment period during which interested parties could comment on the repromulgation, *see* Proposed Data Collections Submitted for Public Comment and Recommendations, 65 Fed. Reg. 19772 (Apr. 12, 2000). Although the notice specifically requested comments regarding proposed data collection projects, *see* 65 Fed. Reg. at 19772, it referenced the provision at issue here, stating that "[t]he regulations . . . being assumed by CDC were developed to facilitate Federal action in the event of large outbreaks of disease requiring a coordinated effort involving several States, or in the event of inadequate local control," *id.*

That regulation, now codified at 42 C.F.R. § 70.2, provides the CDC Director (or his or her authorized representative) with discretion to take measures to address uncontrolled contagion.[3]

---

[2] This "general notice of proposed rulemaking" does not specifically seek comments on the "measures in the event of inadequate local control" provision, *see* 11 Fed. Reg. at 9389, but is referenced as the relevant notice for that regulation in subsequent Federal Register publications, *see* 12 Fed. Reg. at 3189.

[3] The term "Director" as used in these regulations signifies "the Director, Centers for Disease Control and Prevention, Department of Health and Human Services, or another authorized representative."

Specifically, where the CDC Director "determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases" between or among states, he is empowered to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." 42 C.F.R. § 70.2. These measures include, but are not limited to, "inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection." *Id.* Other regulations authorize CDC to limit interstate travel, *see id.* § 70.3, apprehend and detain persons, *id.* § 70.6, and conduct medical examinations, *id.* § 70.12, to control the spread of disease. The regulations also provide for penalties for their violation. *Id.* § 70.18.

## II.    The COVID-19 Pandemic

In December 2019, a novel coronavirus later dubbed SARS-CoV-2 was first detected in Wuhan, Hubei Province, in the People's Republic of China. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15337 (Mar. 13, 2020). The virus causes a respiratory disease known as COVID-19. *Id.*

COVID-19 is a serious illness that spreads easily. Contracting COVID-19 poses a risk of "severe" respiratory illness, meaning that persons who have the disease may require hospitalization, intensive care, or the use of a ventilator. 85 Fed. Reg. at 55292. Severe cases of COVID-19 may be fatal. *Id.* The likelihood of becoming severely ill is greater among certain vulnerable populations. *Id.* at 55295. CDC has cautioned that the virus that causes COVID-19 transmits "very easily and sustainably" between people within "close contact"—approximately six feet—of one another. *Id.* at 55293. Persons not displaying symptoms are capable of transmitting the virus. *Id.* at 55292.

From its origins in late 2019, COVID-19 spread quickly across the globe, including to the

---

42 C.F.R. § 70.1.

United States. *See* 85 Fed. Reg. at 15337. On January 31, 2020, the Secretary of HHS declared a public health emergency due to the rise in confirmed COVID-19 cases in this country. Determination that a Public Health Emergency Exists, https://www.phe.gov/emergency/news/healthactions/phe/ Pages/2019-nCoV.aspx (Jan. 31, 2020). On March 11, 2020, the World Health Organization classified the COVID-19 epidemic as a pandemic due to the increase in infections throughout the world, including in the United States. 85 Fed. Reg. at 15337. On March 13, 2020, the President declared the COVID-19 outbreak a national emergency. *Id.* By late August 2020 the virus had spread to all 50 states. *Id.* at 55292. To date, it has infected nearly 17 million and killed over 300,000 persons within the United States. *See* CDC COVID Data Tracker. Thousands of new deaths and hundreds of thousands of new cases are now reported daily, *see id.*, and CDC has called COVID-19 "a historic threat to public health." 85 Fed. Reg. at 55294.

To combat the spread of this easily transmitted, widespread, and potentially deadly virus, governments at all levels have taken "unprecedented or exceedingly rare actions" in the interest of protecting the public health. *Id.* These include border closures, travel restrictions, stay-at-home orders, and mask requirements. *Id.* In March 2020, Congress provided a 120-day moratorium on eviction filings based on nonpayment of rent, as well as other protections, to tenants residing in certain federally financed rental properties. CARES Act, Pub. L. No. 116-136, § 4024, 134 Stat. 281 (Mar. 27, 2020). Although this measure temporarily helped mitigate the public health effects of tenant displacement during the pandemic, it expired on July 24, 2020. 85 Fed. Reg. at 55294. And while certain states implemented their own temporary eviction moratoria, *see, e.g.*, Administrative Record (AR) 966–72, 986–1024, ECF No. 79, many such measures have expired, *see, e.g., id.* at 966–72, 986–92, 1010–14, 1023–24; *see also* 85 Fed Reg. at 55296 n.36. Other states provided no separate protection for renters during the pandemic. *See* AR 966–72; *see also* 85 Fed Reg. at 55296 n.36.

### III.    The CDC Order

In light of these circumstances, on September 4, 2020, CDC issued an Order under 42 U.S.C. § 264(a) and 42 C.F.R. § 70.2 providing for a temporary halt on residential evictions until December 31, 2020.  85 Fed. Reg. at 55292.  The agency found this moratorium "a reasonably necessary measure . . . to prevent the further spread of COVID-19," and that state and local measures that did not meet or exceed its protections were insufficient to prevent interstate spread.  *Id.* at 55296.

CDC determined that eviction moratoria help reduce the risk of transmission of COVID-19. *Id.* at 55294.  They do so by facilitating self-isolation for sick and high-risk persons, easing implementation of stay-at-home orders and social distancing measures, reducing the need for congregate housing, and helping to prevent homelessness.  *Id.*

As CDC explained, evictions present a public health concern because the movement of evicted renters could lead to "multiple outcomes that increase the risk of COVID-19 spread."  *Id.*  First, evicted renters are likely to move in with friends or family, leading to potential household crowding with new sources of infection.  *Id.*  This increases the risk of spreading COVID-19 because "transmission occurs readily within households," and "household contacts are estimated to be 6 times more likely to become infected by an index case of COVID-19 than other close contacts."  *Id.*

Second, the risk of transmission in shared housing increases exponentially if evicted persons move into congregate settings, such as homeless shelters, transitional housing, or domestic violence shelters.  *Id.*  Maintaining social distance may be difficult in these settings, especially where residents must share small spaces, like stairwells and elevators, or equipment, such as kitchen or laundry facilities.  *Id.*  Indeed, "[e]xtensive outbreaks of COVID-19 have been identified in homeless shelters," including in Seattle, Boston, and San Francisco.  *Id.* at 55295.  These public health risks "may increase seasonally" as persons experiencing homelessness seek shelter in colder months.  *Id.* at 55296.

In addition, research suggests that persons who would be evicted and become homeless as a

result "include many who are predisposed to developing severe disease from COVID-19." *Id.* For example, evicted persons are more likely to experience hypertension, an underlying condition associated with severe COVID-19. *Id.* And among patients with COVID-19, experiencing homelessness has been associated with an increased likelihood of hospitalization. *Id.* at 55296.

These negative public health consequences could become enormous if evictions were to proceed unchecked during the pandemic. *Id.* at 55294–95. Research suggests that as many as 30 to 40 million people in the United States could be at risk of eviction in the absence of state and local protections. *Id.* at 55295. "A wave of evictions on that scale would be unprecedented in modern times." *Id.* Given that approximately 15 percent of moves each year are estimated to be interstate, "mass evictions would likely increase the interstate spread of COVID-19." *Id.*

CDC thus determined that it was reasonably necessary to prevent the interstate spread of COVID-19 to order that "a landlord . . . shall not evict any covered person from any residential property in any State . . . that provides a level of public-health protections below the requirements listed in [the] Order." *Id.* at 55296. To qualify as "covered persons," tenants must certify under penalty of perjury that they have (1) used best efforts to obtain government assistance to make rental payments; (2) expect to earn less than $99,000 in annual income in 2020, were not required to pay income taxes in 2019, or qualified for a stimulus check under the CARES Act; (3) are unable to pay full rent due to "substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses"; (4) are using best efforts to make partial payments; (5) would likely experience homelessness or need to move into a shared residence if evicted; (6) understand that rent obligations still apply; and (7) understand that the moratorium ends on December 31, 2020. *Id.* at 55297.

The Order does not alter a tenant's obligation to pay rent or comply with any other contractual obligation. *Id.* at 55294. It does not prevent the accrual or collection of fees, penalties, or interest

under the terms of an applicable contract. *Id.* It also does not prevent evictions of persons who do not qualify as "covered persons," or evictions based on circumstances other than nonpayment of rent, including criminal activity, damage to property, or violation of contractual obligations other than the timely payment of rent. *Id.*

Following the Order's issuance, CDC provided further guidance regarding its operation. *See* CDC/HHS Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, Frequently Asked Questions, https://www.cdc.gov/coronavirus/2019-ncov/downloads/ eviction-moratoria-order-faqs.pdf, Exhibit A (FAQs). These FAQs confirm that the Order is not "intended to prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order." *Id.* Nor is it "intended to terminate or suspend the operations of any state or local court." *Id.*

## IV. Plaintiffs' Claims

Plaintiffs are seven organizations or individuals, each of which claims to own residential rental units in Tennessee. First Am. Compl. ¶¶ 1–9, ECF No. 21 (Am. Compl.). Plaintiffs allege that each of them has tenants occupying rental units who are delinquent in rent payments, and that these tenants would be evicted but for the Order. *Id.* ¶¶ 80–82. Plaintiffs' amended complaint raises eight causes of action, claiming violations of the APA, *id.* ¶¶ 100–35; the Takings Clause of the Fifth Amendment, *id.* ¶¶ 136–62; substantive and procedural due process rights, *id.* ¶¶ 126–79; various principles of federalism, *id.* ¶¶ 198–239; and the right to access the judiciary, *id.* ¶¶ 240–49. They seek declaratory and injunctive relief. *Id.* ¶¶ 250–81.

## LEGAL STANDARDS

A motion for judgment on the pleadings made pursuant to Federal Rule of Civil Procedure 12(c) "is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007)

(quoting *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir.1991)). Although "well-pleaded material allegations of the pleadings of the opposing party must be taken as true" in adjudicating a Rule 12(c) motion, *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006), courts "need not accept as true legal conclusions or unwarranted factual inferences," *Mixon v. State of Ohio*, 193 F.3d 389, 400 (6th Cir. 1999).

In APA actions, "a court may consider the administrative record and public documents without converting the motion into a motion for summary judgment," although it also "may convert the motion into a motion for summary judgment under Rule 12(d)." *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013). "[W]hen a party seeks review of agency action under the APA . . . , the district judge sits as an appellate tribunal." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009); *see also Bates*, 935 F. Supp. 2d at 17. "The entire case on review is a question of law, and only a question of law. . . . [T]here is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). Under these circumstances, review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously." *Rempfer*, 583 F.3d at 865; *see also Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (explaining that when reviewing agency action the question whether the agency acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record, regardless of whether it is presented in the context of a motion for judgment on the pleadings or in a motion for summary judgment).

Even outside the APA context, in ruling on a Rule 12(c) motion, a court "considers all available pleadings, including the complaint and the answer," and may also consider "(1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion for judgment on the pleadings that are referred to in the complaint and are central to the plaintiff's

allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice." *Davis v. City of Memphis Fire Dep't*, 940 F. Supp. 2d 786, 801 (W.D. Tenn. 2013).

## ARGUMENT

Here, judgment on the pleadings in favor of Defendants is warranted because there are no material facts in dispute, and Defendants are entitled to judgment as a matter of law on each of the counts asserted in Plaintiffs' Amended Complaint.

## I. The CDC Order Does Not Violate the Administrative Procedure Act (Count I).

Plaintiffs allege a number of APA violations, including that the Order allegedly exceeds CDC's statutory and regulatory authority, *see, e.g.*, Am. Compl. ¶¶ 118–22; that it is procedurally infirm, *see, e.g.*, *id.* at ¶¶ 123–26; and that it is arbitrary and capricious, *see, e.g.*, *id.* at ¶¶ 127–31. Each fails.

### A. CDC Acted within Its Statutory and Regulatory Authority.

As a matter of law, CDC acted within its statutory and regulatory authority when issuing the Order. This issue is one of straightforward statutory analysis, and thus can be analyzed under the framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, the Court first asks "whether Congress has directly spoken to the precise question at issue." *Mozilla Corp. v. FCC*, 940 F.3d 1, 19 (D.C. Cir. 2019) (per curiam) (quoting *Chevron*, 467 U.S. at 842). "If the statute is unambiguous, then the court applies it as-written: 'that is the end of the matter.'" *Arangure v. Whitaker*, 911 F.3d 333, 337–38 (6th Cir. 2018) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013)). But "if Congress has not spoken to the precise issue by statute," then "[u]nder *Chevron*, courts defer to an agency's permissible interpretation of the law." *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 809 (6th Cir. 2015).

Here, Congress unambiguously vested the Secretary with broad authority to take decisive action to control the spread of dangerous infectious diseases, which he has delegated to the public

health experts at CDC. *See* 42 U.S.C. § 264; 42 C.F.R. § 70.2. As the only federal court to rule on the question opined, CDC acted both pursuant to its delegated authority and in the interest of public health in issuing the challenged Order. *Accord Brown v. Azar*, No. 20-3702, 2020 WL 6364310, at *6–10 (N.D. Ga. Oct. 29, 2020). But even if the Court were to find the statute ambiguous, CDC's reasoned interpretation warrants deference. Accordingly, Defendants should be granted judgment on Plaintiffs' claim that the Order exceeds CDC's statutory and regulatory authority. *See* Am. Compl. ¶¶ 110–22.

      1. <u>The plain language of section 361 of the PHSA demonstrates that the Order falls within CDC's broad authority to prevent the spread of disease.</u>

Section 361 of the PHSA empowers the Secretary "to make and enforce such regulations *as in his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases" from abroad or among the states. 42 U.S.C. § 264(a) (emphasis added). The plain text of the statute thus evinces a legislative determination to defer to the "judgment" of public health authorities about what measures they deem "necessary" to prevent contagion, *see id.*—a determination made in the light of history and experience, given the havoc wreaked by past scourges like yellow fever, *see supra* p. 3. Indeed, Congress's use of the phrase "such regulations as in his judgment are necessary" shows that it intended to defer to agency expertise, as "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington*, 569 U.S. at 296. And the Supreme Court has recognized that similar congressional delegations of authority that empower agencies to take actions that are "necessary" provide "broad power to enforce all provisions of [a] statute." *Gonzalez v. Oregon*, 546 U.S. 243, 258–59 (2006); *see also, e.g.*, *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.* (*Brand X*), 545 U.S. 967, 980–81 (2005) (statute permitting agency to "prescribe such rules and regulations as may be necessary in the public interest" undisputedly provided agency authority to promulgate order). As the *Brown* court explained, "Congress' intent, as evidenced by the plain language of the delegation provision, is clear: Congress gave the Secretary of

HHS broad power to issue regulations necessary to prevent the introduction, transmission or spread of communicable diseases." 2020 WL 6364310, at *7; *see also Louisiana v. Mathews*, 427 F. Supp. 174, 176 (E.D. La. 1977) ("Congress has granted broad, flexible powers [in 42 U.S.C. § 264(a)] to federal health authorities who must use their judgment in attempting to protect the public against the spread of communicable disease."). This expansive statutory language comports with the Supreme Court's observation that "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation." *Marshall v. United States*, 414 U.S. 417, 427 (1974).

The examples Congress gave of specific measures the Secretary may take to control infectious disease—which are illustrative, not exhaustive—underscore the breadth of this authority, showing that it may infringe on personal liberties or property rights where appropriate to protect the public health. *See Indep. Turtle Farmers of La. v. United States*, 703 F. Supp. 2d 604, 619–20 (W.D. La. 2010) (explaining that "the list does not act as a limitation upon the types of regulations that may be enacted under Section 361 [of the PHSA]"). Such measures include the authority to impose restrictions on individuals' freedom of movement, including the "apprehension, detention, or conditional release of individuals." 42 U.S.C. § 264(b)–(c). They also include intrusions on private property, such as its "inspection, fumigation, disinfection, sanitation," and even "destruction." *Id.* § 264(a). The terms of the statute—including the examples of measures that the Secretary may adopt—invite the Secretary's exercise of expert judgment to determine what regulations may be appropriate to "prevent the introduction, transmission, or spread of communicable diseases." *Id.* This point is bolstered by the fact that, although subsection (a) makes no mention of the Secretary's ability to detain persons, it is plainly contemplated as within the scope of what may be "necessary" in his "judgment," given the restrictions placed on any such regulations in subsections (b) through (d). *See id.* § 264(a)–(d). The court in *Brown* agreed: "The presence of the additional subsections governing detainment of

individuals means that the list contained in the first subsection is not an exhaustive list of the permissible measures available to the Secretary of HHS." 2020 WL 6364310, at *8 (citation omitted).

The regulation, which largely paraphrases the statutory language, is consistent with Congress's intent to provide flexibility in combatting the spread of disease. *See* 42 C.F.R. § 70.2. It allows the CDC Director to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." *Id.* It further makes clear that, in order to control disease transmission, intrusions on private property, "including inspection, fumigation, disinfection, sanitation," and even "destruction" may be required. *Id.* The *Brown* court correctly observed that, because the statute and the regulation are so similar, "for the same reasons the Secretary of HHS has broad authority to make and enforce regulations as in his judgment are necessary to prevent the spread of disease, the CDC likewise has the same authority."[4] 2020 WL 6364310, at *8.

Here, CDC's determination that a "temporary halt in evictions" is a "reasonably necessary measure under 42 C.F.R. 70.2 to prevent the further spread of COVID–19 throughout the United States," 85 Fed. Reg. at 55296, is well supported and falls firmly within the scope of its authority. A number of findings underpin CDC's decision. First, "[t]he virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet)." *Id.* at 55293. In addition, research suggests that, in the absence of eviction moratoria, tens of millions of Americans could be at risk of eviction, on a scale that would be "unprecedented in modern times." *Id.* at 55295. The CDC has also determined that, in light of statistics regarding interstate moves, such "mass evictions would likely increase the interstate spread of COVID-19." *Id.*

Based on this knowledge, CDC found that, in the context of this pandemic, eviction moratoria

---

[4] The regulation does impose the additional requirement that CDC "determine[] that the measures taken by the health authorities of state or local governments are insufficient to prevent the spread of disease." *Brown*, 2020 WL 6364310, at *8; *see* 42 C.F.R. § 70.2. CDC has made that finding here. *See Brown*, 2020 WL 6364310, *13–14 (citing 85 Fed. Reg. at 55295–96 & n.36).

are an "effective public health measure utilized to prevent the spread of communicable disease." *Id.* at 55294. Eviction moratoria "facilitate self-isolation" by ill or at-risk persons; aid the implementation of "stay-at-home and social distancing directives"; and by reducing homelessness, decrease "the likelihood of individuals moving into close quarters in congregate settings." *Id.* Evictions, on the other hand, increase the risk of COVID-19 spread by increasing the likelihood that evicted renters will move into "shared housing or other congregate settings," including homeless shelters, that pose a high risk of transmission. *Id.* These are among the reasons that the Order constitutes a "reasonably necessary" measure under the regulations and is thus within the broad authority of CDC, conferred by the PHSA, to take steps to protect public health by preventing disease transmission.

   2. Canons of construction do not negate Congress's clear intent to provide public health experts with broad authority to prevent the spread of disease.

   Despite the plain text of section 361, which confers broad authority to regulate for the purpose of preventing the spread of disease, Plaintiffs contend that canons of statutory construction require a constrained reading of the statute and regulation that precludes the issuance of the Order. *See* Am. Compl. ¶ 114; *see also* Hr'g Tr. 32:14–24; 34:13–35:2. But Plaintiffs cannot prevail at *Chevron* step one unless they demonstrate that the statutory language "unambiguously forbid[s]" the agency's action. *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1241 (D.C. Cir. 2020) (quoting *Barnhardt v. Walton*, 535 U.S. 212, 218 (2002)). They have not carried that burden here.

   Although canons are among the "traditional tools of statutory interpretation" used at *Chevron* step one, *Arangure*, 911 F.3d at 336 (citation omitted), "canons are not mandatory rules," and should not be used to "produce an interpretation that . . . would conflict with the intent embodied in the statute Congress wrote," *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("canons of construction are no more than rules of thumb that help courts determine the meaning of legislation"). Where, as here, congressional intent to empower an agency with wide-ranging authority to regulate for a specific purpose is clear, resort to

such "guides" is unnecessary. *Chickasaw Nation*, 534 U.S. at 94; *accord Brown*, 2020 WL 6364310, at *9 ("the implementing statute (and derivative regulation) demonstrate Congress' unambiguous intent to delegate broad authority to the CDC to enter an order such as the one at issue here").

In any event, the canons of construction that Plaintiffs invoke do not so constrain the measures CDC may take as to preclude a temporary eviction moratorium to prevent the spread of an easily transmissible, potentially deadly disease. Plaintiffs rely upon the canon of ejusdem generis, or the idea that "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008) (quoting *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991)). They also invoke the noscitur a sociis canon, which "counsels that a word 'gathers meaning from the words around it.'" *Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or.*, 515 U.S. 687, 702 (1995) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). Pointing to these canons, Plaintiffs argue that the list of measures Congress provided that the Secretary "may" implement to prevent the spread of disease—which the regulation likewise includes—bars CDC from issuing a temporary eviction moratorium under section 361. *See* Hr'g Tr. 32:14–24; 34:13–35:2. But other federal courts have rejected similar arguments; the structure of the statute does not lend itself to this construction; and even if it did, the temporary eviction moratorium is not so different than the actions listed in the statute as to exceed CDC's authority.

The only federal courts to have considered the question have uniformly rejected the contention that the Secretary's regulatory authority is cabined by the subsequent list of measures set forth in the statute. For example, in holding that a ban on the sale of baby turtles fell within the scope of the statute, a court in the Western District of Louisiana held that "the list does not act as a limitation upon the types of regulations that may be enacted under Section 361." *Indep. Turtle Farmers*, 703 F. Supp. 2d at 620. Likewise, the *Brown* court found that "the clear and broad delegation of authority in

the first sentence of § 264(a); the context provided by the subsequent subsections; the parroting language of § 70.2, which specifically uses the term including—a term of enlargement; and persuasive authority from the *Independent Turtle Farmers* court" demonstrate that the grant of authority in the first sentence of subsection (a) is not limited by the second sentence so as to preclude issuance of the Order. 2020 WL 6364310, at *9.

Moreover, neither the statute nor the regulation has the type of syntactic structure to which ejusdem generis is properly applied. *See Ali*, 552 U.S. at 225 (declining to apply ejusdem generis where "[t]he structure of the phrase . . . does not lend itself to application of the canon"). The ejusdem generis canon is applicable only where "a general term follows a specific one." *Id.* at 223. And noscitur a sociis is used to interpret "a string of statutory terms" or "items in a list" harmoniously. *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 289 (2010) (citations omitted). But here, the statute begins with a complete sentence containing a broad grant of authority "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). Only in the subsequent sentence does the statute state that "[f]or the purpose of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary."[5] *Id.* Because the general grant of authority to make regulations to prevent disease

_____

[5] The fact that the second sentence of subsection 264(a) places the phrase "as in his judgment may be necessary" at the end of the list of possible measures the Secretary may provide for does not alter this result. As explained, that sentence follows the general grant of authority to regulate, which requires only that regulation be, in the Secretary's judgment, "necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. 264(a). This reading is underscored by the fact that, in delegating authority to CDC, the Secretary has purposefully chosen phrasing that makes clear the Director's ability to take measures to prevent the

transmission is separate from and precedes the specific list of measures the Secretary may provide for, interpretive canons concerning lists of items do not limit that grant of authority. Moreover, as explained, the statute as a whole makes clear that the authority provided in the first sentence of subsection (a) is not limited to measures closely related to those listed in the second sentence. *See Ali*, 552 U.S. at 226 (looking to "overall statutory context" instead of narrowly focusing on canons of construction). Instead, subsections (b) through (d) focus on apprehension, examination, and detention of individuals, meaning that such powers are included within the authority granted in the first sentence of subsection (a) despite differing significantly from the measures listed in the second sentence. *Accord Brown*, 2020 WL 6364310, at *8 ("The presence of the additional subsections governing detainment of individuals means that the list contained in the first subsection is not an exhaustive list of the permissible measures available to the Secretary.").

The structure of the regulation similarly precludes application of this canon. It provides that the CDC Director "may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, *including* inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection." 42 C.F.R. § 70.2 (emphasis added). Thus, the general phrase "such measures" as are "reasonably necessary" sets out the Director's baseline authority. *See id.* The ensuing list of measures are examples of things that fall within this authority, not limits on it. Therefore, as the *Brown* court found, "the [ejusdem generis] canon is not applicable to § 70.2 because that regulation does not contain the requisite list of specific terms followed by a general one," but "[i]nstead, the specific terms are preceded by the word 'including,' which signifies a more expansive, non-exhaustive list." 2020 WL 6364310, at *9; *see also id.* at *10 (declining to apply noscitur a sociis where plaintiffs "failed to identify the existing ambiguous

---

spread of disease according to his public health expertise "includ[es]," but is not limited to, the examples of possible measures listed. 42 C.F.R. § 70.2; *accord Brown*, 2020 WL 6364310, at *9.

*word* that must be defined in reference to other similar enumerated words").

Even if the unequivocally broad grant of authority to issue regulations that are "necessary" in the "judgment" of the CDC Director to prevent the spread of disease were interpreted in light of these canons, however, the temporary eviction moratorium is not so different from the illustrative actions listed in the statute or regulation as to exceed CDC's authority. The ejusdem generis canon focuses on "the common attribute" of specific items to aid in the interpretation of a "catchall phrase." *Ali*, 552 U.S. at 225. The noscitur a sociis canon likewise looks to surrounding words to inform meaning. *Babbitt*, 515 U.S. at 702. Here, the regulation permits CDC to take a number of actions that intrude upon property rights, including "inspection," "fumigation," and even "destruction," where the Director deems it reasonably necessary to prevent the spread of disease. 42 C.F.R. § 70.2. The temporary moratorium on evictions is a comparable imposition on property in the interest of preventing contagion. The scale of the temporary moratorium is "necessary" to prevent the spread of disease in light of the widespread and "historic" threat to public health COVID-19 poses. *See* 85 Fed. Reg. at 55292. Indeed, this action is entirely consistent with more extensive public health measures taken during this pandemic, such as border closures, travel restrictions, business closures, stay-at-home orders, and other eviction moratoria. *See id.*; *see also, e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (granting emergency stay of injunction against state order closing fitness facilities due to COVID-19); *Auracle Homes, LLC v. Lamont*, No. 20-00829, 2020 WL 4558682, at *21 (D. Conn. Aug. 7, 2020) (refusing to enjoin state eviction moratorium); *TJM 64, Inc. v. Harris*, --- F.3d ---, No. 20-02498, 2020 WL 4352756, at *8 (W.D. Tenn. July 29, 2020) (refusing to enjoin local restrictions on businesses).

For all of these reasons, the Order falls within CDC's statutory and regulatory authority under the plain meaning of the statute and regulation.

3. At a minimum, CDC's reasonable interpretation of the statute is entitled to deference.

The plain language of section 361 unambiguously provides HHS (and, by delegation, CDC) with the authority to issue the Order. Where, as here, a statute is not ambiguous, there is no need to reach the question of whether to defer to an agency's permissible interpretation under *Chevron*. *See Arangure*, 911 F.3d at 337–38.

If, however, the Court finds the statute ambiguous, *Chevron* step two requires deference to the agency's "permissible interpretation of the law." *Rhinehimer*, 787 F.3d at 809. The rationale underlying *Chevron* deference is that "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion"—decisions that "involve[] difficult policy choices that agencies are better equipped to make than courts." *Brand X*, 545 U.S. at 980. *Chevron* thus applies where "'Congress delegated authority to the agency generally to make rules carrying the force of law' and the agency interpretation was 'promulgated in the exercise of that authority.'" *Atrium Med. Ctr. v. HHS*, 766 F.3d 560, 566 (6th Cir. 2014) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)). In such circumstances, "courts are bound to uphold an agency interpretation as long as it is reasonable—regardless whether there may be other reasonable, or even more reasonable, views." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998); *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 158 (2013) ("A court must uphold the Secretary's judgment as long as it is a permissible construction of the statute, even if it differs from how the court would have interpreted the statute in the absence of an agency regulation." (quoting *Brand X*, 545 U.S. at 980)).

The prerequisites to applying *Chevron* deference are easily met here. There can be no serious dispute that section 361 reflects a congressional delegation of authority to HHS to make regulations with the force of law. The statute authorizes the Secretary "to make and enforce such regulations as in his judgment are necessary" to prevent the spread of disease into the United States or  between

states. 42 U.S.C. § 264(a). It further allows the Secretary to "provide for . . . measures [that] in his judgment may be necessary" in order to "carry[] out and enforc[e] such regulations." *Id.* As explained, the regulation paraphrases this language to delegate to the CDC Director the full authority Congress provided under the statute to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary"—provided he makes the additional determination that state and local disease-control measures are inadequate. 42 C.F.R. § 70.2. The statutory language clearly authorizes the agency to make binding regulations. *Accord Brand X*, 545 U.S. at 980–81 (analyzing a statute empowering an agency to "execute and enforce" an Act and "prescribe such rules and regulations as may be necessary in the public interest to carry out [its] provisions"). Finally, it is clear that the Order at issue here was issued pursuant to those authorities and has the force of law. *See* 85 Fed. Reg. at 55297.

That the Order was not issued via notice-and-comment rulemaking does not diminish the propriety of *Chevron* deference here. *See Barnhardt*, 535 U.S. at 221 ("that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking, . . . does not automatically deprive that interpretation of the judicial deference otherwise its due"); *Mead*, 533 U.S. at 231 ("we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded"). Indeed, "[a]ll kinds of administrative documents, ranging from manuals to opinion letters, sometimes receive *Chevron* deference." *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 732 (6th Cir. 2013) (Sutton, J., concurring); *see also Atrium Med. Ctr.*, 766 F.3d at 571–72. Here, the Order plainly carries the force of law, was formally published in the Federal Register, and reflects the agency's considered policy judgment and unquestionable public health expertise, making deference to its interpretation of the statute amply warranted. *See Mead*, 533 U.S. at 230–31; *see also NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257–58 (1995) (deferring, under *Chevron*, to agency's reasonable position articulated in interpretive letters).

Under *Chevron* step two, the Court must uphold the agency's action "unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Henry Ford Health Sys. v. HHS.*, 654 F.3d 660, 666 (6th Cir. 2011) (quoting *Chevron*, 467 U.S. at 843–44). Here, for the same reasons that CDC's interpretation of the statute and regulation are in line with its plain meaning, *see supra* pp. 13–20, the Order is not "manifestly contrary to the statute." Nor is it arbitrary or capricious. *See infra* pp. 27–28.

It is also not the case that deferring to CDC's interpretation would result in unbounded federal authority. The statute and regulation place clear limits on the agency's ability to act, requiring that measures be (1) enacted to "prevent the . . . spread of communicable disease[]," 42 U.S.C. § 264(a); 42 C.F.R. § 70.2; (2) considered "necessary" in the "judgment" of public health experts, 42 U.S.C. § 264(a); 42 C.F.R. § 70.2; and (3) conditioned on a finding that local health initiatives are "insufficient to prevent the spread" of disease "from such State or possession to any other State or possession," 42 C.F.R. § 70.2. These are not empty requirements, but real constraints reviewable by courts under the APA. *See* 5 U.S.C. § 706(2); *Brown*, 2020 WL 6364310, at *12–14. And these limitations have proved meaningful in practice. Although the PHSA has been law since 1944, HHS has rarely utilized the authority granted for disease-control purposes under section 361. The fact that CDC has done so here is a direct reflection of the severity of the once-in-a-century threat posed by COVID-19, which the President has declared a national emergency, *see* 85 Fed. Reg. at 15337; which has altered virtually every aspect of human interaction over the past several months; and which has ended the lives of hundreds of thousands of Americans, *see* CDC COVID Tracker. And the Order's findings reflect the extraordinary circumstances that prompted the CDC Director to determine that—as required by the statute and regulation—its issuance was necessary in his judgment to prevent the spread of disease. *See, e.g.*, 85 Fed. Reg. at 55292 (explaining that "the mortality associated with COVID–19 during the early phase of the outbreak in New York City was comparable to the peak mortality observed during the 1918 H1N1 influenza pandemic," in which "there were approximately 50 million influenza-related

23

deaths worldwide, including 675,000 in the United States"). These extensive findings further demonstrate why the Order falls within CDC's broad, but not unlimited, statutory and regulatory authority. *Accord Brown*, 2020 WL 6364310, at *12–14.

Plaintiffs are also incorrect that the constitutional avoidance doctrine applies here. *See* Am. Compl. ¶¶ 112–13. To start, that doctrine "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means of choosing between them*." *Clark v. Martinez*, 543 U.S. 371, 385 (2005). Because there are not two interpretations of the statute between which the constitutional avoidance doctrine could prove the tiebreaker here, the Court should decline to apply the doctrine for that reason alone. *See Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 336 (6th Cir. 2007) (declining to apply constitutional avoidance where "[t]he statute [was] not genuinely susceptible to two constructions" (cleaned up)).

But regardless, CDC's interpretation of the statute does not raise constitutional issues. Plaintiffs allege that the Order violates "non-delegation and separation of powers principles." Am. Compl. ¶ 109. But Congress may delegate legislative power to the Executive so long as it provides an "intelligible principle" to guide the agency. *E.g.*, *Mistretta v. United States*, 488 U.S. 361, 372 (1989). The statute easily provides that here, requiring that any regulation promulgated thereunder be considered "necessary to prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). Indeed, congressional delegations of power have been struck down as unconstitutional only twice in United States history—both in 1935—and only because "Congress had failed to articulate *any* policy or standard" to confine discretion. *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality opinion) (emphasis added). That is not the case here—as Plaintiffs appear to recognize by declining to bring a separate nondelegation claim. And the constitutional claims Plaintiffs do raise are meritless for the reasons discussed below. *See infra* pp. 28–41.

For these reasons, if the Court finds the statute and regulation ambiguous, it should defer to CDC's reasonable interpretation under *Chevron*. But whether affording deference or simply applying their plain language, it should find that the Order is within CDC's statutory and regulatory authority.

**B. CDC Was Not Required To Engage In Notice and Comment Rulemaking.**

Plaintiffs next allege that the Order is void because CDC did not comply with the notice-and-comment requirements that apply to legislative rules under the APA. *See* Compl. ¶ 124. That claim fails because the Order is not a rule to which those requirements apply—and even if it were, there was good cause to proceed without notice and comment given the urgent circumstances, as the APA expressly permits. *See* 5 U.S.C. § 553(b)(B).

First, the APA's notice-and-comment requirements apply to "rule making," *see* 5 U.S.C. § 553, with the term "rule" defined to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy," *id.* § 551(4). But the Order is not a rule; it is an "an emergency action taken under the existing authority of 42 CFR 70.2," 85 Fed. Reg. at 55296. In contrast, 42 C.F.R. § 70.2 *is* a duly promulgated legislative rule, and it expressly permits the Director of CDC to take "such measures to prevent such spread of the diseases as he/she deems reasonably necessary" to prevent the further spread of disease. 42 C.F.R. § 70.2. Given that the very purpose of § 70.2 is to enable the CDC to take swift steps to prevent contagion, it cannot be that the actions it authorizes are *also* rules that require *yet another* round of notice and comment before they can take effect.

Second, even if the Order were a rule, notice-and-comment rulemaking is not required "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). This exception excuses notice and comment in emergency situations, or where delay could result in serious harm. *See Jifry v. FAA*, 370 F.3d 1174,

1179 (D.C. Cir. 2004). The agency's finding here easily meets that standard; as CDC explained, a "delay in the effective date of the Order . . . would defeat the purpose of the Order and endanger the public health. Immediate action is necessary." 85 Fed. Reg. at 55296. CDC acted quickly given the "life-saving importance" of the Order, *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981), just as the APA permits.

Plaintiffs' theory appears to be that CDC could have started a rulemaking earlier, thereby leaving time for a full notice-and-comment process. Yet CDC could not propose an eviction moratorium without first determining that such a moratorium was necessary and that state and local measures were insufficient. *See* 42 C.F.R. § 70.2; *see also, e.g.*, *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999) (holding that "critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation" (emphasis omitted)). And Congress and many states implemented similar eviction moratoria early in the pandemic; the expiration of these measures directly informed CDC's determination concerning the inadequacy of state measures and the necessity of the Order. *See* 85 Fed. Reg. at 55294 & n.14 (explaining that the CARES Act "helped alleviate the public health consequences of tenant displacement during the COVID-19 pandemic" but that the effects of its expiration were "expected to manifest" by August 27, 2020); *see also id.* at 55296 & n.36 (indicating that state and local eviction moratoria "have expired or are set to expire in many jurisdictions"); AR 966–72, 986–1024. By the time CDC made its determination, it had further determined that a delay would impede its critical public health goals. Thousands of Americans are now dying of COVID-19 every day, and if "the circumstances of this case do not justify employment of the good cause exception, we will be hard put to find any justification for its use." *Republic Steel Corp. v. Costle*, 621 F.2d 797, 804 (6th Cir. 1980).[6]

---

[6] The Court should not lose sight of the fact that the notice and comment process typically takes many months, if not longer. The agency must first issue a notice of proposed rulemaking, *see* 5 U.S.C.

### C. The CDC Order Was Neither Arbitrary Nor Capricious.

The Court should also grant summary judgment to Defendants on Plaintiffs' claim that the Order was arbitrary and capricious. *See* Am. Compl. ¶ 127. "This standard of review is deferential and accords agency action a presumption of regularity." *Davidson v. U.S. Dep't of Energy*, 838 F.2d 850, 855 (6th Cir. 1988). Agency action is arbitrary and capricious only where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Where an agency "is making predictions, within its area of special expertise, at the frontiers of science, . . . a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

Plaintiffs' arbitrary and capricious claim fails at the threshold because the Amended Complaint is utterly devoid of allegations stating *why* the Order is arbitrary or capricious. Even to survive a motion to dismiss, a complaint must contain "more than labels and conclusions," for a "formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs have pleaded the bare legal conclusion that the CDC order was arbitrary and capricious, but they fail to explain what factors the agency wrongly considered, what aspects of the problem it ignored, or what explanations it provided that ran counter to the evidence before it. The Court should therefore dismiss Plaintiffs' exceptionally vague and conclusory allegation of arbitrary

---

§ 553(b), then give the public an opportunity to comment on the proposed rule, *see id.* § 553(c), and then issue a final rule that "consider[s] and respond[s] to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). As the drafters of the APA recognized, such a drawn-out process is not appropriate in the midst of a national emergency.

and capricious agency action. *Cf., e.g.*, *Wright v. City of Euclid*, 962 F.3d 852, 879 (6th Cir. 2020) (objections to district court's grant of summary judgment forfeited where brief included "little more than a bare recitation of the elements of the cause of action").

Should the Court consider Plaintiffs' arbitrary and capricious claim, Defendants (and the Court) can only guess at Plaintiffs' objections to the Order. In an earlier brief (which the Court struck, *see* Order Granting Defs.' Mot. to Strike Pls.' Suppl., ECF No. 44), Plaintiffs suggested that the Order is arbitrary and capricious based on " (i) the weak and unsupported internet citations upon which the CDC bases its sweeping nationwide action; (ii) the enormous economic effect caused by the Halt Order; and (iii) the vagueness and ambiguity of the Halt Order itself." Suppl. to Pls.' Mot., ECF No. 30 at 6. Yet that threadbare argument fares no better than the allegations of the Amended Complaint. Plaintiffs do not explain why the materials relied upon by CDC are an insufficient basis for its Order, and CDC has now filed a thorough administrative record demonstrating the care with which it went about developing the Order. *See* Defs.' Notice of Filing of Admin. R., ECF No. 79. Nor do Plaintiffs explain why an agency action becomes arbitrary and capricious simply because it has significant economic effects—particularly one that is intended to combat a pandemic that has itself had extraordinarily sweeping economic (and humanitarian) effects. Finally, Plaintiffs fail to identify any relevant respect in which the order is vague or ambiguous.[7] The CDC Order is entitled to a presumption of regularity, *see Davidson*, 838 F.2d at 855, and Plaintiffs have put forward nothing to show how that presumption would be overcome here.

## II.     The Order Does Not Effect a Taking of Plaintiffs' Property (Count II).

The Order also does not constitute a governmental taking. *See* Am. Compl. ¶¶ 136–62. The

---

[7] The Amended Complaint does passingly allege that the Order is ambiguous because it "does not require the non-paying, delinquent, and defaulting tenant to renew or re-assert his or her continued status as a 'covered person' on a month-by-month basis." Am. Compl. ¶ 74. Plaintiffs may not like this aspect of the Order, but they appear to understand it.

28

Takings Clause of the Fifth Amendment provides, "[n]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

At the outset, the federal government's interference with private contractual rights is not a taking. *See Palmyra Pac. Seafoods, LLC v. United States*, 561 F.3d 1361, 1365–68 (Fed. Cir. 2009) ("As a general matter, the government does not 'take' contract rights pertaining to a contract between two private parties simply by engaging in lawful action that affects the value of one of the parties' contract rights."); *see also 767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1581 (Fed. Cir. 1995) ("no taking occurs when . . . expectations under a contract are merely frustrated by lawful government action not directed against the takings claimant"). It is well settled that "[c]ontracts, however express, cannot fetter the constitutional authority of Congress." *Norman v. Baltimore & Ohio R.R. Co.*, 294 U.S. 240, 307 (1935). Although no State may pass a law impairing the obligation of contracts, *see* U.S. Const. art. I, § 10, the Contract Clause does not bind the federal government. *See Pension Benefit Guaranty Corp. v. Gray*, 467 U.S. 717, 733 (1984) (contrasting "the limitations imposed on States by the Contract Clause with the less searching standards imposed on economic legislation by the Due Process Clauses"). It is also clear that the federal government does not "take" a contract in the Fifth Amendment sense if it merely limits the contractual remedies available for breach of the contract. Such an action does not amount to a taking unless the federal government appropriates the contract for its own use by substituting itself for the contracting party. As the Supreme Court has explained, "[t]here is no constitutional ground for denying to the Congress the power expressly to prohibit and invalidate contracts although previously made, and valid when made, when they interfere with the carrying out of the policy it is free to adopt." *Norman*, 294 U.S. at 309–10; *see also Omnia Commercial Co. v. United States*, 261 U.S. 502, 507, 511 (1923) (holding that the federal government's direction that a company must end a contract was not a taking, reasoning that the contract "was not appropriated, but ended"). In other words, unless the government becomes the beneficiary of the plaintiff's contract—

to the exclusion of the plaintiff—there has been no taking. *See Omnia*, 261 U.S. at 511; *Palmyra Pac. Seafoods*, 561 F.3d at 1365. Because the Order does not make the government the beneficiary of the landlord-tenant contracts it affects, there has been no taking.

Even putting this foundational problem to the side, Plaintiffs' takings claim still fails. To be permissible under the Public Use Clause, governmental action need only be "rationally related to a conceivable public purpose." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984). Although Plaintiffs try, *see* Am. Compl. ¶¶ 148–51, it cannot seriously be disputed that CDC issued the Order for a public purpose. The Supreme Court has long held the government may take actions that incidentally benefit one private party over another provided that they have such a "justifying public purpose." *Haw. Hous. Auth.*, 467 U.S. at 241. And the Court has specifically found that a temporary emergency measure that froze rent and allowed tenants to hold over leases in light of wartime exigencies was "clothed . . . with a public interest so great as to justify regulation by law." *See Block v. Hirsh*, 256 U.S. 135, 155 (1921). This situation is no different. CDC issued the Order for the public purpose of "prevent[ing] the further spread of COVID–19 throughout the United States." 85 Fed. Reg. at 55296. That the Order requires some landlords temporarily to continue to provide housing to tenants they prefer to evict does not alter the fact that the moratorium was instituted in the interest of public health. *See Block*, 256 U.S. at 155. A finding to the contrary would call into question eviction moratoria in states throughout the country.

Regardless, the Order is not a taking for the same reasons that multiple federal district courts have recently rejected analogous challenges to state eviction moratoria. *See Baptiste v. Kennealy*, --- F. Supp. 3d ---, No. 20-11335, 2020 WL 5751572, at *20–22 (D. Mass. Sept. 25, 2020); *Auracle Homes*, 2020 WL 4558682, at *13–16; *Elmsford Apartment Assocs. v. Cuomo*, 469 F. Supp. 3d 148, 162-68 (S.D.N.Y. 2020). Takings may be either physical or regulatory. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321–22 (2002). A physical taking is "a permanent physical

occupation of property" for which just compensation is required per se. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982). Whether "regulations that prohibit a property owner from making certain uses of her private property" effect regulatory takings, in contrast, depends upon "essentially ad hoc, factual inquiries" and an "examination and weighing of all the relevant circumstances." *Tahoe-Sierra*, 535 U.S. at 321–22 (cleaned up). And a narrow category of regulatory cases in which "a regulation deprives an owner of '*all* economically beneficial uses' of his land" requires compensation per se. *Id.* at 330 (quoting *Lucas v. S.C. Costal Council*, 505 U.S. 1003, 1019 (1992)). Contrary to Plaintiffs' allegations, the Order results in neither a physical occupation of their property, a categorical regulatory taking, nor a regulatory taking under a multifactor analysis. *See* Am. Compl. ¶¶ 139, 146.

Clear Supreme Court precedent forecloses Plaintiffs' arguments that the Order constitutes a per se regulatory taking, and the Order likewise does not qualify as a regulatory taking under a balancing test. First, "[t]he government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992). In this vein, the Supreme Court has held that no physical taking occurred where regulations prevented owners of mobile home plots from raising rents or evicting tenants from their land, reasoning that "[b]ecause they voluntarily open their property to occupation by others, petitioners cannot assert a per se right to compensation based on their inability to exclude particular individuals." *Id.* at 531; *see also FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("statutes regulating the economic relations of landlords and tenants are not per se takings"). The same logic applies here, where Plaintiffs voluntarily rented their properties, and the Order does no more than limit the reasons for which or delay the point at which they may evict the current tenants. *Accord Baptiste*, 2020 WL 5751572, at *20; *Auracle*, 2020 WL 4558682, at *13; *Elmsford*, 469 F. Supp. 3d at 162–64.

Second, this is not the "extraordinary" case in which a categorical regulatory taking has

occurred. *Tahoe-Sierra*, 535 U.S. at 330 (quoting *Lucas*, 505 U.S. at 1017). The categorical rule was "carved out" for instances where "a regulation *permanently* deprives property of all value." *Id.* at 332 (emphasis added). Indeed, the Supreme Court rejected the argument that a per se regulatory taking occurred even where a 32-month land-development moratorium deprived plaintiffs of all economically beneficial use of their land for over two years. *Id.* at 337. In light of this precedent, the categorical rule is inapplicable here. The Order applies for a mere four months (unless extended) and, during that time, Plaintiffs may charge rent, apply fees or penalties for nonpayment of rent, or evict their tenants for contractual violations other than nonpayment of rent. *See* 85 Fed. Reg. at 55294. Thus, it does not deprive Plaintiffs of the value of their property in the short term, let alone permanently. *Accord Baptiste*, 2020 WL 5751572, at *20; *Auracle*, 2020 WL 4558682, at *14; *Elmsford*, 469 F. Supp. 3d at 164–65.

Finally, a weighing of factors demonstrates that a regulatory taking has not occurred here. Factors courts typically examine when making such a determination include: "(1) the economic impact of the regulation; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 455 (6th Cir. 2009) (cleaned up). An analysis of the economic impact of a regulation "requires [courts] to compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). Further, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn. Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978) (citation omitted).

Here, all three factors counsel against finding that a taking has occurred. Plaintiffs have not attempted to show that the economic impact of the Order outweighs the value left in their property.

They assert that each Plaintiff has "tenants in Units who are delinquent in the payment of rent and who would be otherwise lawfully evicted" but for the Order, Am. Compl. ¶ 80, but they offer no specifics as to how many units are allegedly affected or the alleged losses from nonpaying tenants who have remained in their residences. Moreover, any economic impact is necessarily limited: the Order lasts four months (unless extended), and it neither excuses rent obligations nor precludes landlords from charging penalties or fees, or filing actions seeking unpaid rent. 85 Fed. Reg. at 55292, 55294. Indeed, to qualify as "covered persons," tenants must attest that they are "using best efforts to make timely partial payments that are as close to full payment" as possible. *Id.* at 55297. Thus, a consideration of economic impact does not support a finding that a regulatory taking has occurred. *Accord Baptiste*, 2020 WL 5751572, at *21; *Auracle*, 2020 WL 4558682, at *15; *Elmsford*, 469 F. Supp. 3d at 165–66.

Further, the Order has not interfered unduly with investment-backed expectations. Landlord-tenant relations are heavily regulated in most jurisdictions; it therefore cannot be unexpected that a regulation might affect a landlord's ability to pursue an eviction at his preferred time. *See Yee*, 503 U.S. at 528–29 ("This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." (quoting *Loretto*, 458 U.S. at 440)); *accord Auracle*, 2020 WL 4558682, at *15; *Elmsford*, 469 F. Supp. 3d at 166–68.

The nature of the Order also weighs heavily against a finding that a taking has occurred. As explained above, the government has not physically occupied Plaintiffs' property, and the purpose of the Order is to promote the common good by preventing the spread of a potentially deadly disease. Indeed, as another federal district court found in determining that Massachusetts's eviction moratorium was not a regulatory taking, such an order "benefit[s] those tenants, who are now temporarily protected from eviction, and members of the public, who elected officials found would

be at greater risk of COVID-19 infection if displaced tenants caused or contributed to the overcrowding of other dwellings and homeless shelters, or were required to live on the streets." *Baptiste*, 2020 WL 5751572, at *22; *accord Auracle*, 2020 WL 4558682, at *16; *Elmsford*, 469 F. Supp. 3d at 168.

Lastly, even if a taking had occurred, injunctive relief is not a proper remedy here. *See HAPCO v. City of Philadelphia*, No. 20-3300, 2020 WL 5095496, at *12 (E.D. Pa. Aug. 28, 2020). Indeed, Plaintiffs appear to concede as much. *See* Am. Compl. ¶ 152 ("If the Halt Order is in fact a government taking of Plaintiffs' property for a public use, the Government must provide Plaintiffs just compensation for their losses resulting from the government taking."). As the Supreme Court recently reiterated, "Federal courts will not invalidate an otherwise lawful uncompensated taking when the property owner can receive complete relief through a Fifth Amendment claim brought under the Tucker Act." *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2179 (2019). And "the Tucker Act vests in the Court of Federal Claims *exclusive* jurisdiction to hear such claims," *Brott v. United States*, 858 F.3d 425, 429 (6th Cir. 2017), depriving this Court of subject matter jurisdiction over them.[8]

## III. Plaintiffs Have Identified No Due Process Violation (Counts III, IV).

Plaintiffs' claims that the Order violates their substantive and procedural due process rights, Am. Compl. ¶¶ 163–97, likewise fail.

"At one time substantive due process was widely employed to invalidate state economic regulations," but "[i]n the New Deal era, the doctrine fell into disrepute." *Stratford v. State-House, Inc.*, 542 F. Supp. 1008, 1014 (E.D. Ky. 1982). Indeed, "plaintiffs bringing substantive due process challenges to [economic] statutes must traverse unusually inhospitable legal terrain because the

---

[8] Moreover, plaintiffs are required to litigate takings claims on the assumption the "action was both authorized and lawful." *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed. Cir. 2001). Plaintiffs here contest both.

Supreme Court has not invalidated an economic statute on substantive due process grounds since . . . 1935." *Blue Diamond Coal Co. v. Sec'y of HHS*, 79 F.3d 516, 521 (6th Cir. 1996) (internal quotation marks omitted). It is now black-letter law that "legislation that does not proscribe fundamental liberties" need only satisfy an extremely deferential form of rational basis review. *Sheffield v. City of Fort Thomas*, 620 F.3d 596, 613 (6th Cir. 2010). As the Sixth Circuit has explained, if an economic regulation "can be upheld under any plausible justification offered by the state, or even hypothesized by the court, it survives rational-basis scrutiny." *Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 690 (6th Cir. 2011).

For all the reasons given above, *see supra* pp. 8–10, 15–16, the Order plainly survives this exceedingly deferential review: the Court need not "hypothesize" rational justifications for the Order because pages of such justifications appear on its face. While Plaintiffs believe that the differential rates of COVID-19 prevalence across the nation weigh against the Order's nationwide application, *see* Am. Compl. ¶¶ 178–81, this is precisely the sort of public health judgment that calls for application of CDC's public health expertise, not second-guessing by Plaintiffs (or the Court).[9] Because Plaintiffs have not "carried their 'heavy burden of 'negativ[ing] every conceivable basis which might support'" the Order, *Am. Exp. Travel*, 641 F.3d at 694 (quoting *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000)), this Court should reject Plaintiffs' substantive due process challenge. As the Sixth Circuit has made clear, substantive due process is not a license for federal courts to invalidate an economic regulation whenever it "think[s] it unwise." *Id.*

Plaintiffs' contention that the Order violates their right to procedural due process is equally

---

[9] In any event, the premise upon which Plaintiffs' argument depends—that the pandemic has had lesser effects in Tennessee than in New York City—is faulty. As of the filing of this brief, Tennessee had reported by far the highest number of new cases in the country per capita over the past seven days. CDC COVID Data Tracker; *see also* Answer to First Am. Compl. ¶ 42, ECF No. 80 ("The mortality rate from COVID-19 in Tennessee has been higher than that of New York State, inclusive of New York City, since the end of June 2020.").

misplaced because "[g]overnmental determinations of a general nature that affect all equally do not give rise to a due process right to be heard." *Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585, 596 (6th Cir. 2003) (quoting *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 896 (6th Cir. 1991)); *see also* Richard J. Pierce, Jr., 2 Administrative Law Treatise § 9.2 (5th ed. 2010) (due process doctrine recognizes a "distinction between individualized deprivations, that are protected by procedural due process, and policy-based deprivations of the interests of a class, that are not protected by procedural due process"). This concept applies to "discretionary[] policymaking decision[s]" with the "hallmarks of traditional legislation" that are "general in [their] scope rather than targeted on a specific individual." *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 216 (6th Cir. 2011) (citations omitted). The "generality" of such actions "provides a safeguard that is a substitute for procedural protections," and therefore "[n]o notice or hearing is required." *Id.* (citation omitted). For example, a court within this Circuit recently held that Ohio's order closing non-essential businesses to prevent the spread of COVID-19 did not violate the plaintiff businesses' due process rights because it "was a generally applicable order affecting thousands of businesses, and not a decision targeting an individual or single business." *Hartman v. Acton*, No. 20-1952, 2020 WL 1932896, at *8–10 (S.D. Ohio Apr. 21, 2020). This situation is comparable. The Order applies to any landlord in any jurisdiction that does not provide the same or greater level of public-health protections as the Order; it does not single out Plaintiffs or any other individual. *See* 85 Fed. Reg. at 55292.

For these reasons, Defendants are entitled to judgment on Plaintiffs' substantive and procedural due process claims.

## IV.    Plaintiffs' Various Federalism Challenges Fail (Counts V, VI, VII).

Plaintiffs' various federalism claims, *see* Am. Compl. ¶¶ 198–239, all fail for the same reason: the Supremacy Clause provides that federal law "shall be the supreme law of the land; *and the judges in every state shall be bound thereby*, anything in the Constitution or laws of any State to the contrary

notwithstanding." U.S. Const. art. VI, cl. 2 (emphasis added). Once it is understood that the Order is a valid exercise of CDC's statutory authority, *see supra* pp. 12–25, it follows that it validly preempts contrary state law, and Plaintiffs' federalism claims thus fail.

Turning first to Plaintiffs' Tenth Amendment claim, Am. Compl. ¶¶ 198–214, Plaintiffs' argument depends entirely on the mistaken contention that the CDC Order is not authorized by federal law, *see, e.g., id.* ¶¶ 202–04, and that CDC is prohibited from "supersed[ing] Tennessee's URLTA and Tennessee law relating to enforceability and impairment of contracts," *id.* ¶ 206. But that is simply not so: the statute is clear that the CDC may preempt state law "to the extent that such a provision conflicts with an exercise of Federal authority under this section." 42 U.S.C. § 264(e). A clearer example of congressional intent would be hard to fathom. Plaintiffs evidently believe that the Order falls outside the CDC's authority under 42 U.S.C. § 264(a), but that simply underscores that their Tenth Amendment claim is redundant of their statutory claim. Plaintiffs' claims that the Order fails to lawfully preempt state law under the Supremacy Clause, Am. Compl. ¶¶ 215–26, or unlawfully suspends state law, *id.* ¶¶ 227–39, both fail for the same reason: because CDC had statutory authority to issue the Order, the Order validly preempts contrary state law.[10]

Plaintiffs' contention that the Order violates the Tenth Amendment's anti-commandeering doctrine, Am. Compl. ¶¶ 210–13, is equally infirm. To be sure, there are some limits on the federal government's authority to force state officers to implement a federal regulatory program. *See, e.g., Printz v. United States*, 521 U.S. 898, 933 (1997); *New York v. United States*, 505 U.S. 144 (1992). Those limits, however, do not affect the obligation of state *courts* to faithfully apply federal law—an obligation

---

[10] Plaintiffs' passing suggestion that the Order "preempt[s] the Contracts Clause of Article I, Section 10 of the Constitution," Am. Compl. ¶ 203, is likewise misplaced. Consistent with the Clause's plain text, which provides that "*No State* shall . . . pass any . . . Law impairing the Obligation of Contracts," U.S. Const. art I, § 10 (emphasis added), the Sixth Circuit has confirmed that "the Contracts Clause does not apply to the federal government," *United States v. May*, 500 F. App'x 458, 465 (6th Cir. 2012).

explicitly stated in the constitutional text. *See Printz*, 521 U.S. at 928–29 ("[S]tate courts cannot refuse to apply federal law—a conclusion mandated by the terms of the Supremacy Clause."). And while Plaintiffs assert that the Order requires state courts to alter their usual procedural rules, *see* Am. Compl. ¶ 212(a), (d), it in fact does no such thing. The Order operates on landlords, not courts; with respect to courts, it merely supplies federal law to apply, as with any other case involving federal law. *See* FAQs at 1 ("State and local courts may take judicial notice of the CDC Order . . . in making a formal judgment about any pending or future eviction action filed while this Order remains in effect.").

Ultimately, it is beyond serious dispute that Plaintiffs' federalism arguments rise and fall with their statutory arguments. *See* Am. Compl. ¶ 204 (Order violates Tenth Amendment because "[n]othing in the relevant statutes or regulations gives the CDC, HUD, or HHS the authority"); *id.* ¶ 212 (same, as to anticommandeering claim); *id.* ¶ 224 (alleging Tenth Amendment violation because of missing "authoritative link between relevant federal statute and the authority to issue the Halt Order"); *id.* ¶ 234 (alleging unlawful suspension of state law because "CDC has not identified any act of Congress that delegated authority to impose the Halt Order"). If Plaintiffs persuade the Court that the Order does in fact fall outside of CDC's statutory and regulatory authority, the Court should enter judgment for Plaintiffs without reaching the constitutional claims. *See Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 193 (1909) ("Where a case in this court can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued and is not departed from without important reasons."); *Tower Realty v. City of East Detroit*, 196 F.2d 710, 724 (6th Cir. 1952) (similar). But if the Court rejects Plaintiffs' statutory claims (as it should) and reaches these constitutional claims, they are guaranteed to fail. Plaintiffs could have saved Defendants and the Court considerable time—and come much closer to filing a complaint that is a "short and plain" statement of their claims, Fed. R. Civ. P. 8(a)(2)—by omitting them.

## V.    The Order Does Not Deny Plaintiffs Access to Courts (Count VIII).

Nor does the CDC Order unlawfully deny Plaintiffs access to the courts, *contra* Am. Compl. ¶¶ 240–49.[11]    As the *Brown* court explained in rejecting an identical challenge, at least three bases support that conclusion:  the Order does not prevent landlords from litigating eviction cases and seeking eviction judgments, provided that tenants are not actually removed from their homes while the Order remains in effect; the Order does not prevent Plaintiffs from suing their tenants for unpaid rent and taking all lawful steps to collect a money judgment; and in any case the Order is temporary. *See* 2020 WL 6364310 at *16-17; *see also, e.g.*, *Elmsford*, 469 F. Supp. 3d at 173–75 (rejecting similar challenge to New York State eviction moratorium); *Baptiste*, 2020 WL 5751572, at *25 (rejecting similar challenge to Massachusetts moratorium).

First, and most importantly, the Order does not prevent a landlord from filing an eviction action in state court.  As the FAQs state, the Order does not "prevent landlords from starting eviction proceedings, provided that the actual eviction of a covered person for non-payment of rent does NOT take place during the period of the Order."  FAQs at 1; *see* 85 Fed. Reg. at 55292 ("the order prevents these persons from being evicted or removed from where they are living through December 31, 2020"); *id.* at 55293 (defining "evict" as "to remove or cause the removal of").  Nor does the Order prevent landlords from seeking to demonstrate, using ordinary state court procedures, that a tenant has wrongfully claimed its protections.  *See* FAQs at 6 ("The Order does not preclude a landlord from challenging the truthfulness of a tenant's declaration in any state or municipal court.").  Every federal court to consider these FAQs has found that they reasonably construe the CDC Order.  *See Brown*,

---

[11]  Denial-of-access cases generally fall into two categories: those where the plaintiff alleges that "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," *Christopher v. Harbury*, 536 U.S. 403, 413 (2002), and those where the plaintiffs bring "claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried," *id.* at 413–14.  Plaintiffs here presumably mean to bring a claim falling into the first category.

2020 WL 6364310, at *15 ("As clarified by the CDC, under the Order, landlords are therefore not precluded from serving their tenants with any required non-payment notices, commencing court proceedings, attending trials or obtaining judgments. The Order only delays the actual eviction."); *KC Tenants v. Byrn*, No. 20-784, 2020 WL 7063361, at *2 (W.D. Mo. Nov. 30, 2020) ("[I]t seems that it was only certain evictions were forbidden, and not the unmentioned remote preliminaries. . . . The activity preceding an eviction, including lawsuits, is necessarily permitted under the Moratorium."). "Plaintiffs can immediately start eviction proceedings now and are only delayed in enforcing any eviction order they might obtain," *Brown*, 2020 WL 6364310, at *16, and this case thus bears no relationship to classic judicial access cases in which the plaintiff is entirely deprived of a judicial forum because he cannot afford a filing fee. *Cf., e.g.*, *Boddie v. Connecticut*, 401 U.S. 371 (1971).

Second, "the Order does not prohibit Plaintiffs from pursuing a breach of contract action either now or in the future," and thus "Plaintiffs still have some form of relief available to them within the courts." *Brown*, 2020 WL 6364310, at *16. Plaintiffs may prefer a different remedy, but they plainly have access to a judicial forum in which to seek judicial relief. *See Elmsford*, 469 F. Supp. 3d at 174 ("Plaintiffs can still sue their tenants for arrearages through a breach of contract action in the New York Supreme Court—and the fact that is not their preferred remedy is of no moment."). That is a second and wholly independent basis to reject Plaintiffs' access-to-courts claim.

Third, "the Order is temporary; therefore, Plaintiffs' ability to evict their tenants is only merely delayed until it expires on December 31, 2020, unless extended, modified or rescinded." *Brown*, 2020 WL 6364310, at *16. "'[M]ere delay' to filing a lawsuit cannot form the basis of a Petition Clause violation when the plaintiff will, at some point, regain access to legal process." *Elmsford*, 469 F. Supp. 3d at 174 (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)); *see also Baptiste*, 2020 WL 5751572, at *27 (highlighting "temporary" nature of eviction moratorium in rejecting access-to-courts challenge).

Finally, it bears emphasis that Plaintiffs' fundamental contention—that the federal government is powerless to delay a landlord's eviction of a residential tenant under state law—would have sweeping consequences if accepted. As just one example, for the past eighty years, federal law has provided that members of the armed forces may be entitled to a temporary stay of eviction proceedings under certain circumstances. *See* Soldiers' and Sailors' Civil Relief Act of 1940, Pub. L. No. 76-861, 54 Stat. 1178 (1940) (codified as amended at 50 U.S.C. § 3951(b)(1)). Defendants are unaware of any court that has even contemplated the possibility that this provision is unconstitutional.

## CONCLUSION

For the foregoing reasons, Defendants are entitled to judgment as a matter of law as to each claim in the Amended Complaint.

Dated: December 18, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC BECKENHAUER
Assistant Director, Federal Programs Branch

*/s/ Leslie Cooper Vigen*
LESLIE COOPER VIGEN
Trial Attorney (DC Bar No. 1019782)
STEVEN A. MYERS
Senior Trial Counsel (NY Bar No. 4823043)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-0727
Fax: (202) 616-8470
E-mail: leslie.vigen@usdoj.gov

D. MICHAEL DUNAVANT
United States Attorney

Stuart J. Canale (TN BPR # 12590)
stuart.canale@usdoj.gov
Audrey M. Calkins (TN BPR # 30093)

audrey.calkins@usdoj.gov
Assistant United States Attorneys
167 N. Main St. Suite 800
Memphis, Tennessee 38103
Phone: 901-544-4231
Fax: 901-544-4230

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify I served this document today by filing it using the Court's CM/ECF system, which will automatically notify all counsel of record.

Dated: December 18, 2020

_/s/ Leslie Cooper Vigen_
Trial Attorney