---

**TIGER LILY LLC;**
**HUNTER OAKS APARTMENTS UTAH, LLC;**
**NORTH 22ND FLAT, LLC;**
**CHERRY HILL GARDENS LLC;**
**CHURCHILL TOWNHOMES LLC;**
**BRITTANY RAILEY; and**
**APPLEWOOD PROPERTY MANAGEMENT, LLC,**

      Plaintiffs

**vs.**                                       **No: 2:20-cv-02692-MSN-atc**

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
and **BENJAMIN S. CARSON, M.D.** in his official capacity as United States Secretary of
Housing and Urban Development;
**UNITED STATES DEPARTMENT OF JUSTICE**
and **WILLIAM P. BARR**, in his official capacity as United States Attorney General;
**UNITED STATES CENTER FOR DISEASE CONTROL AND PREVENTION**
and **NINA B. WITKOVSKY,** in her official capacity as Acting Chief of Staff of the Center for
Disease Control and Prevention;
**UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES**
and **ALEX AZAR,** in his official capacity as United States Secretary of Health and Human
Services;
**VICE ADMIRAL JEROME M. ADAMS, M.D.**, in his official capacity as United States
Surgeon General; and
**D. MICHAEL DUNAVANT,** in his official capacity as United States Attorney General for the
Western District of Tennessee,

      Defendants.

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

---

*On the brief:*

S. Joshua Kahane (TN# 23726)
jkahane@glankler.com

Aubrey B. Greer (TN# 35613)
agreer@glankler.com

**GLANKLER BROWN, PLLC**
6000 Poplar Ave., Suite 400
Memphis, Tennessee 38119
Telephone:  (901) 525-1322
Facsimile:   (901) 525-2389


ATTORNEYS FOR PLAINTIFFS TIGER LILY LLC, HUNTER OAKS APARTMENTS UTAH, LLC, NORTH 22ND FLAT, LLC, CHERRY HILL GARDENS LLC, CHURCHILL TOWNHOMES LLC, BRITTANY RAILEY and APPLEWOOD PROPERTY MANAGEMENT, LLC.

*"All sorts of things can be called an emergency or disaster of major proportions.  Simply slapping on that label cannot provide the grounds for abrogating our most fundamental rights. And whenever fundamental rights are restricted, the Supreme Court and other Courts cannot close their eyes....Judges dedicated to the rule of law have a clear duty.  They cannot compromise principle or rationalize departure from what they are obligated to do."*

- Justice of the Supreme Court, The Honorable Samuel Alito, Public Address on the Covid-19 Crisis, November 12, 2020.

# TABLE OF CONTENTS

PLAINTIFFS HAVE STANDING IN THIS ACTION ...................................................... 1

STANDARD OF JUDICIAL REVIEW ......................................................................... 1

THE ADMINISTRATIVE RECORD ........................................................................... 3

ARGUMENT............................................................................................................... 4

I.   THE CDC'S HALT ORDER IS A "RULE" UNDER THE APA .................................. 4

II.  THE HALT ORDER EXCEEDS THE CDC'S AUTHORITY UNDER THE
     ENABLING STATUTE ........................................................................................ 6

     A.   The CDC does not have the authority under the Enabling Statute to
          issue or enforce the Halt Order, and it is therefore an unlawful
          exercise of the CDC's delegated authority ................................................ 9

     B.   The CDC's interpretation of the Enabling Statute is inconsistent with
          controlling jurisprudence and applicable canons of construction ........... 13
          1.  *Explicitness* ...................................................................................... 15
          2.  *Federalism* ....................................................................................... 16
          3.  *Avoidance of Constitutional Concerns* ............................................. 18
          4.  *Cannons of Statutory Interpretation* ................................................ 19
          5.  *Intent and Context* ........................................................................... 22
          6.  *The Halt Order is Inconsistent with all 5 Guideposts and
              Violates the APA* ............................................................................. 26
          7.  *The Halt Order further violates the Enabling Regulation as the
              CDC failed in its requirement to determine the insufficiency of
              local measures before issuing the Halt Order and thus acted in
              excess of its delegated authority* ...................................................... 27

III. THE HALT ORDER IS ARBITRARY AND CAPRICIOUS IN VIOLATION OF THE
     APA .............................................................................................................. 28

     A.   Based upon its own pretext and stated purpose, the Halt Order is not
          a pandemic response and therefore the Halt Order cannot in any way
          be an authorized agency act under the quarantine related Enabling
          Statute ..................................................................................................... 29

     B.   The Halt Order is void for vagueness and ambiguity ............................. 33

     C.   The Halt Order is based upon insufficient, and nonexistent,
          scientific evidence .................................................................................. 38

      D.   The Halt Order is overbroad and therefore results in extreme economic impact .................................................................................. 40

      E.   The Halt Order is arbitrary and capricious ............................................. 42

IV.   THE HALT ORDER VIOLATED THE PROCEDURAL DUE PROCESS REQUIREMENTS OF THE APA ........................................................ 42

      A.  The Halt Order is not a Major Rule under the CRA and therefore must comply with the APA .................................................................. 44

      B.  The Halt Order is not exempted from the APA's due process procedural mandates under the "good cause" exception ......................... 45

         1.  *The SNAP Rule - District of Columbia, et al. v. U.S.D.A* ................... 47
         2.  *The CDC's Removal Order - PJES vs. Wolf* ..................................... 47

V.   THE HALT ORDER VIOLATES THE UNITED STATES CONSTITUTION ................... 50

CONCLUSION ........................................................................................... 50

EXHIBITS TO BRIEF:

  A. Executive Order 13132, August 4, 1999
  B. September 1, 2020, White House Fact Sheet
  C. Office of the Attorney General. Memorandum for all Components, Prohibition on Improper Guidance Documents. November 16, 2017
  D. Annotated Bibliographies of the internet sources cited by the CDC in the Halt Order
  E. Memorandum Opinion, *District of Columbia, et al. v. U.S. Department of Agriculture, et al.*, 1:20-cv-119-BAH, March 13, 2020
  F. *P.J.E.S. v. Wolf*, No. 120CV2245EGSGMH, 2020 WL 5793305 (D.D.C. Sept. 25, 2020)

The Halt Order, and its practical effect upon owners of residential real property in the Western District of Tennessee —and nationwide for that matter— is unlawful and unconstitutional *in toto*. The Halt Order exceeds Defendants' lawful authority, is arbitrary and capricious, violates the due process procedural requirements of the Administrative Procedures Act, 5 U.S.C. §§ 501, *et seq*. ("APA"), and impermissibly infringes upon constitutionally guaranteed and protected rights. For the reasons set forth herein, as well as those asserted in all other pleadings, papers, and arguments of counsel for the Plaintiffs' in this cause[1], this Honorable Court must strike down, set aside, and declare unlawful the Halt Order. To allow the Halt Order to escape judicial review would cause substantial harm to Plaintiffs and invite similar over-reach and unlawful conduct by executive agencies in the future.

## PLAINTIFFS HAVE STANDING IN THIS ACTION

As this Honorable Court has already found[2], Plaintiffs have standing to challenge the Halt Order. Plaintiffs have each demonstrated specific, concrete, and particularized injury traceable to the Halt Order. (*See* D.E. 49-1 to 49-7). This injury is actual and can only be redressed by this Honorable Court striking down and vacating the Halt Order.[3]

## STANDARD OF JUDICIAL REVIEW FOR STRIKE DOWN AND VACATUR

Congress provided the framework and the remedy for unlawful and unconstitutional actions by executive agencies through the APA. *See* 5 U.S.C. §§ 501, *et seq*. A "reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and

---

[1] To the extent not so expressed, Plaintiffs incorporate by reference all of their collective filings in this cause, as well as those of Plaintiffs' amici. As this Honorable Court has addressed the need for additional briefing, particularly on the APA substantive and procedural claims of the Plaintiffs, this Memorandum focuses its attention on those issues; however, Plaintiffs specifically incorporate by reference their constitutional arguments and supporting law contained in their Amended Complaint and Motion, Application For Emergency Hearing and Preliminary Injunction, (D.E. 12), and their oral arguments made before the Court on October 30, 2020, (*see* D.E. 77, Transcript).
[2] (D.E. 69 at pg. 12).
[3] *Bennet v. Spear*, 520 U.S. 154 (1997).

determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Upon

review, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions

found to be[:]"

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance
> with law;
> (B) contrary to constitutional right, power, privilege, or immunity[4];
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory
> right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557
> of this title or otherwise reviewed on the record of an agency hearing provided by
> statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo
> by the reviewing court . . . .

5 U.S.C. § 706(2); *see Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 370 (6th Cir. 2010)

(acknowledging that Section 706 governs review of agency action). "Courts may invalidate

agency adjudication or rulemaking which is 'inconsistent with the statutory mandate or that

frustrate[s] the policy that Congress sought to implement.'" *Lansing Dairy, Inc. v. Espy*, 39 F.3d

1339, 1350 (6th Cir. 1994) (quoting *Federal Election Comm'n v. Democratic Senatorial Campaign

Comm.*, 454 U.S. 27, 32 (1981)). Likewise, "where the court determines that, given the intention

of Congress to achieve some goal set forth by statute, there are compelling reasons that the agency

interpretation is wrong, the court may invalidate the agency's action." *Boettger v. Bowen*, 923

F.2d 1183, 1186 (6th Cir.1991) (internal quotations omitted). A rule that violates the APA <u>must</u>

be vacated. *See Am. Bar Ass'n v. United States Dep't of Educ.*, 370 F. Supp. 3d 1, 40 (D.D.C.

---

[4] Courts review questions of constitutionality under a *de novo* standard as the inquiry is typically merely a
question of law. *See New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 252 (2d Cir. 2015);
*Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006); *Anderson v. Milwaukee
County*, 433 F.3d 975 (7th Cir. 2006); *United States v. Dorris*, 236 F.3d 582, 584 (10th Cir. 2000); *see also
Western Energy Co. v. U.S. Dept. of Interior*, 932 F.2d 807 (9th Cir. 1991) (claims that administrative agency
violated claimant's constitutional rights is reviewed de novo). While APA claims are analyzed under the
APA's framework, including 5 U.S.C. § 706, challenges raising constitutional claims independent of the
APA are examined separately. *See Commercial Drapery Contractors, Inc. v. United States*, 967 F. Supp.
1, 3 (D.D.C. 1997), *aff'd*, 133 F.3d 1 (D.C. Cir. 1998); *U.S. v. White Plume*, 447 F.3d 1067 (8th Cir. 2006).

2019) (vacating and remanding for agency to comply with procedural requirements); *Penobscot Indian Nation v. U.S. Dep't of Hous. & Urban Dev.*, 539 F. Supp. 2d 40, 54 (D.D.C. 2008) (granting vacatur of HUD rule given the seriousness of the APA violations). Here, this Honorable Court's finding that the Halt Order violates <u>any</u> element of the APA <u>or</u> the Constitution necessitates the immediate strike down and vacatur of the Halt Order.

## <u>THE ADMINISTRATIVE RECORD</u>

On December 11, 2020, the CDC filed over 1000 pages —purporting to be the Administrative Record[5]— comprised of internet posts and blogs, outdated literary studies, and a handful of eviction moratorium orders instituted, at different times, by eight (8) state legislatures or their governors. Sadly, the totality of the Administrative Record is available, in under ten minutes, to anyone with internet access and a Google browser. Not a single independent study, email, memorandum, opinion statement, resolution, drafting document, minute entry, agency determination relating to measures taken by local health authorities[6], or Executive Order 13132 Federalism Study, is included by the CDC in its Administrative Record submission.[7] Not a single document included in the "Administrative Record" now before this Honorable Court supports,

---

[5] The APA provides that in reviewing agency action, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) (review is to be based on "the full administrative record" that was before the agency at the time of the decision). The court's review is "based on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). The administrative record includes "all materials 'compiled' by the agency that were 'before the agency at the time the decision was made.'" *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir.1997) (quoting *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C.Cir.1996)). The agency's designation of the Administrative Record is entitled to a presumption of regularity. *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir.1993) ("[D]esignation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity."). "The court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary." *Id.*; *see also United States v. Martin*, 438 F.3d 621, 634 (6th Cir.2006) (noting that agency action is entitled to a presumption of regularity that may be overcome only by "clear evidence").

[6] As required under 42 C.F.R. § 70.2.

[7] D.E. 79 <u>does not even include the Halt Order,</u> signed by Nina Witkofsky, Acting Chief of Staff for the CDC, and published in the Federal Register on September 4, 2020 (*See,* D.E. 1-12 at pg. 2-7, 85 Fed. Reg. 55292 to 55297).

documents, or justifies the action taken by the CDC or the procedural violations committed by the CDC. Nothing contained in the Administrative Record lends insight into, or substantiates the basis for, the CDC's wholesale infringement upon Plaintiffs' civil liberties and protected constitutional rights caused by the Halt Order. This gaping void of any meaningful documentation in the Administrative Record stems directly from the CDC's blatant and unlawful procedural violations of the APA, namely, the CDC's refusal to undertake the requisite notice and comment period, from which the Administrative Record in these agency actions is always built. Instead, haphazardly stitched together like Frankenstein's monster, the CDC – *ex post facto* – now tries to manufacture a record, solely for the purpose of complying with the Order[8] of this Honorable Court.

## ARGUMENT

### I. THE CDC'S HALT ORDER IS A "RULE" UNDER THE APA

The CDC did not invoke its rulemaking authority to promulgate a "rule" by and through its issuance of the Halt Order. As a result, and as described more fully below, the CDC is therefore <u>not entitled</u> to the judicial deference upon review that would typically be afforded an agency that did exercise delegated rulemaking authority. Nonetheless, it is important to emphasize, that while the Halt Order was not promulgated through the CDC's required rulemaking procedures, the Halt Order is, nonetheless, a "rule" under the APA because it sets out generally applicable rules of conduct. Rules under the APA are legislative in nature and have the force and effect of law despite being promulgated by a federal agency. *See* 5 U.S.C. § 551(4). As rulemaking is undertaken by unelected agencies and individuals, Congress requires these agencies' actions strictly adhere to certain pre-conditions and mandates enshrined within the APA. *See*, *e.g*., 5 U.S.C. § 553. Rules promulgated by an agency, and governed by the APA, are subject to judicial review to determine whether the rule is "in excess of statutory jurisdiction, authority, or limitations or short of statutory

---

[8] (D.E. 76).

right;" and/or is "arbitrary and capricious"; and/or is "without observance of procedure required by law" and/or is "contrary to constitutional right."[9]  Rules that fail judicial review must be held unlawful, struck down, and set aside.  5 U.S.C. § 706(2).

The CDC proclaims in the Halt Order that "[t]his Order is not a "Rule" within the meaning of the Administrative Procedure Act."[10]  This unilateral proclamation is wrong.  Agencies, like the CDC, do not themselves define the applicability of statutes to their own actions and rulemaking, nor do they have any authority to unilaterally characterize (or re-characterize as the case may be here) their actions as they see fit.  *See Columbia Broad. Sys. v. United States*, 316 US 407, 416 (1942) ("The particular label placed upon it by the [agency] is not necessarily conclusive, for it is the substance of what the [agency] has purported to do and has done which is decisive…When as here the regulations avowedly adopted in the exercise of regulatory power they must be taken by those entitled to rely upon them as what they purport to be – an exercise of the delegated legislative power").  Under 5 U.S.C. § 551(4), the APA defines a "Rule" as any "agency statement of general or particular applicability and future effect designed to <u>implement</u>, <u>interpret</u>, or <u>prescribe law or policy</u>," (emphasis added).  *See Am. Tort Reform Ass'n v. Occupational Safety & Health Admin*., 738 F.3d 387, 406 (D.C. Cir. 2013).  ("Substantive rules" or "legislative rules" subject to notice and comment rulemaking under the Administrative Procedure Act (APA) are those that grant rights, impose obligations, or produce other significant effects on private interests, or which effect a change in existing law or policy.").  Neither the APA generally, nor 5 U.S.C. § 551(4) specifically, provides any exemption from this straightforward definition.[11]  The Halt Order

---

[9]  5 U.S.C. § 706(2)(A)-(D).
[10]  (D.E. 1-12 at pg. 6); 85 Fed. Reg. 55296.
[11]  The CDC stated its reasoning for not classifying the Halt Order as an APA rule by proclaiming that, rather than being a Rule, the Halt Order is "an emergency action taken under the existing authority of 42 CFR 70.2."  (D.E. 1-12 at pg. 6); 85 Fed. Reg. 55296.  As discussed elsewhere, 42 C.F.R. 70.2 provides no authority for the CDC's action here, nor does Section 70.2 expressly exempt the Halt Order from the rulemaking process.

purports to <u>implement</u> a new policy on state sanctioned and governed eviction practices and property rights; <u>interprets</u> the existing enabling statute; and <u>prescribes,</u> through authoritative direction, how the state law contractual relationship between owners and their tenants is to be carried out during the term of the Halt Order.  In other words, the Halt Order is a rule that consummates the CDC's decision-making process[12] and is determinative of the rights, obligations, and legal consequences between owners and non-paying tenants.[13]  The Halt Order is, therefore, undoubtedly a rule under the APA.

Despite its unilateral proclamation to the contrary, the CDC seems to itself acknowledge that the Halt Order is a rule under the APA, and in the Halt Order pre-emptively justifies the CDC's clear APA due process violations by claiming: (1) that the Halt Order is exempt from the APA due process pre-conditions because it is a Major Rule under the Congressional Review Act and (2) that the Halt Order is exempt from the APA's due process requirements because the CDC has shown "good cause" for non-compliance.  As discussed in detail herein, both of these claimed exemptions are erroneous, and neither is supported by the facts or relevant law.

Because the Halt Order is a rule under the APA and materially violates both the substantive and procedural prescriptions of the APA, the Halt Order is *ultra vires*, void *ab initio*, and must be struck down and vacated by this Honorable Court.

## II. THE HALT ORDER EXCEEDS THE CDC'S AUTHORITY[14] UNDER THE ENABLING STATUTE

The CDC's purported authority to issue the Halt Order arises out of 42 U.S.C§ 264 (the "Enabling Statute").[15]  The Enabling Statute appears within the "Quarantine and Inspection"

---

[12] *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).

[13] *Id*. (quoting *Port of Bos. Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62 (1970)).

[14] In fact, the Halt Order likely violates even the legislative authority of Congress, as will be discussed more fully herein.

[15] The CDC also cites 42 C.F.R.  § 70.2, a regulation similar to the Enabling Statute but which imposes an even greater pre-condition on the CDC that was <u>likewise</u> violated by the CDC in its promulgation of the

sections of the Public Health and Welfare Services statutes. The purpose of the Enabling Statute is to provide the CDC the authority to take certain actions to prevent the "introduction, transmission, or spread of communicable diseases" into the United States from a foreign country or into a State or territory from another State or territory (inter-state spread) "from infected people or animals." 42 U.S.C§ 264(a). To this end, Congress through the Enabling Statute, spoke clearly and precisely to delineate specific public health related measures that the CDC is authorized to undertake to prevent the transmission or spread of a communicable disease, namely, "inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected and dangerous to human beings . . . and other measures, as in his judgment may be necessary".[16]

The CDC's Enabling Regulation[17] adds an additional pre-condition requiring the CDC, before undertaking any action under the Enabling Statute, to first determine that "measures taken by local health authorities…are insufficient to prevent the spread of any of communicable diseases".[18] In other words, for the CDC to undertake any action under the Enabling Statute, even one that the parties may agree is well within the CDC's delegated authority under the Enabling Statute —like killing an infected chicken[19]— the CDC is not free to simply kill the chicken. The CDC must first determine that local measures —say, here in Shelby County— are inadequate to stem the spread of the disease at issue without killing the chicken and that the CDC must therefore kill the chicken to prevent inter-state spread. Without first determining insufficient local measures,

Halt Order; however, for purposes of an APA analysis of "authority" delegated by Congress, a review of the Enabling Statute is most relevant.

[16] *Id.*

[17] 42 C.F.R. § 70.2.

[18] *Id.*

[19] This example was offered by counsel for the Defendants in her oral argument at the Injunction Hearing, as well as in other federal forums.

the CDC's action, even if otherwise authorized by the Enabling Statute, for purposes of judicial review, is deemed to have been taken without authority and is not lawful.

Ordinarily, when the judiciary is asked to serve as a referee between the agency and the public, undertaking review of an agency rule promulgated under claimed delegated congressional authority, the reviewing court applies the two-pronged *Chevron*[20] analysis, granting *Chevron* deference to the agency action; however, neither *Chevron* deference nor the two-pronged *Chevron* analysis[21] apply in this case because the CDC has not purported to exercise its rulemaking authority.[22] There is no "lawmaking pretense" with the Halt Order; in fact, the CDC has disavowed the idea that the Halt Order is a "rule."[23] This is precisely why the CDC itself has said time and time again, that it neither seeks nor desires *Chevron* deference. Accordingly, this Honorable Court should not grant the CDC *Chevron* deference[24], nor consider whether the CDC's

---

[20] *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc. et al.*, 467 U.S. 837 (1984).

[21] The two-pronged analysis is derived from the Supreme Court decisions in *Chevron*, 467 U.S. 837 and *Auer v. Robbins*, 467 U.S. 837 (1984). Under *Chevron* (statutory review) and *Auer* (regulatory review) a reviewing court is to examine (1) was Congress's intent as to the authority it delegated to the agency in the enabling statute spoken clearly and precisely in the text of the enabling statute? If yes, that is "the end of the matter" and the reviewing court must enforce the "unambiguously expressed intent of Congress"; however, in the event that the reviewing court finds that Congress's intent within the text of the enabling statute is "silent or ambiguous" then the court must (2) determine whether the agency action was a reasonable interpretation of the delegated authority stated in the text of the enabling statute. As stated above, neither the two-pronged analysis nor the *Chevron* agency deference is applicable in this case.

[22] (*See* D.E. 1-12); 85 Fed. Reg. 55292-55297.

[23] (*See* D.E. 1-12 at pg. 6); 85 Fed. Reg. 55296.

[24] *See Landmark Legal Foundation v. IRS*, 87 F. Supp. 2d 21 (D.D.C. 2000) ("We would owe deference to the IRS's interpretation of § 6103 under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* if the Service had reached the interpretation asserted here in a notice-and-comment rulemaking, a formal agency adjudication, or in some other procedure meeting the prerequisites for *Chevron* deference stated in *United States v. Mead*. But the Service makes no claim that the interpretation it developed in litigation here arose in any such procedure. Accordingly, we can give its views no more than the weight derived from their "power to persuade." Additionally, the Supreme Court has also often declined to grant deference to an agency interpretation under *Chevron* when a particular case presents an interpretive question of such significance that "there may be reason to hesitate before concluding that Congress ... intended" to delegate resolution of that question to the agency. Although the Supreme Court has not fully articulated when the so-called "major questions doctrine" applies, and indeed, has never used this phrase itself, previous applications of this principle appear to rest on a determination by the reviewing court that one of the core assumptions underlying *Chevron* deference—that Congress intended the agency to resolve the statutory ambiguity—is no longer tenable. The fact that an agency interpretation implicates a major question is deemed to render the *Chevron* framework of review inapplicable by the reviewing court.

action through the Halt Order might fall within a range of <u>reasonable interpretations</u> of the Enabling Statute.  Instead, this Honorable Court must limit its review only to interpreting the Enabling Statute, independently, and deciding whether the Halt Order is consistent with the <u>best interpretation</u> of Congressional intent.[25]

### A. The CDC does not have the authority under the Enabling Statute to issue or enforce the Halt Order. The Halt Order is therefore an unlawful exercise of the CDC's delegated authority.

A clear reading of the Enabling Statute evidences Congress' unambiguous intent to *only* delegate to the CDC the authority to take certain <u>quarantine</u> related actions.  Namely, actions regarding people, animals, or goods, located within one State and infected with a contagious disease, for purposes of restraining the activities of those infected people, animals, or goods, to prevent the spread of that contagious disease to another State.  It is equally clear in the Enabling Statute that Congress unambiguously chose *not* to delegate to the CDC broad and expansive authority to: (1) take the real property of private citizens; (2) exercise authority over individuals, animals, or personal property neither infected with a contagious disease nor even believed to be infected with a contagious disease; (3) exercise authority over the residential housing market; (4) exercise authority over residential evictions which implicate only intra-state concerns and have nothing to do with inter-state or foreign concerns; (5) suppress state rights and state real property laws reserved exclusively to the authority of the state; (6) take action without any determination of insufficiency at the local level; and (7) create new and drastic criminal conduct.  The Halt Order simply has no relationship to quarantine or quarantine related activities and cannot fit within the clear and precise text of the Enabling Statute.

---

[25] *See Miller v. Clinton*, 687 F.3d 133 (D.C. Cir. 2012)("With *Chevron* inapplicable, we proceed to determine the meaning of the Basic Authorities Act the old-fashioned way: we must decide for ourselves the <u>best reading</u>).  *See also Global Tel\*Link v. Federal Communications Com'n*, 866 F.3d 397 (D.C. Cir. 2017)("The important point here is that we have carefully analyzed the contested provisions of the FCC's *Order* and found that they cannot survive review under the "best reading" of the statute standard").

Perhaps equally egregious, without any authority in the Enabling Statute, the CDC instituted criminal penalties —intended by Congress to punish infected individuals or individuals believed to be infected who violate their quarantine orders and, among other things, infect others[26] —to now impose jail time and hundreds of thousands of dollars in monetary fines against real property owners doing nothing more than enforcing their fundamentally protected real property rights. This was obviously not Congress' intent in enacting the quarantine statutes or its criminal penalties. There can simply be no dispute that the text of the Enabling Statute does not support the Halt Order, nor can it be disputed that Congress deliberately chose *not* to expressly expand the CDC's authority to take action beyond quarantine measures relating to infected people, animals, and personal, property (or those suspected of being infected) who might spread the contamination between states.

Without citing any evidence for the proposition, the CDC argues that the delegated authority articulated by Congress in the text of the Enabling Statute was intended to be so broad and so expansive that it would allow the CDC to do *anything* it wanted, even when such action "infringe[d] on personal liberties or property rights..."[27] Following the logical extension of the CDC's proposition, at the Injunction Hearing, this Honorable Court asked counsel for the Defendants whether the Enabling Statute authorized the CDC to order the halting of all in-person voting, for the then upcoming presidential election, as a means of limiting the spread of COVID-19.[28] With difficulty, counsel for the Defendants tap danced around the question, refusing to answer, as she recognized that the answer would necessarily poke fatal holes in the very proposition the CDC incorrectly asserts and relies upon in defending this litigation. If the CDC remained consistent in arguing congressionally delegated broad and unmeasured power to infringe

[26] 42 U.S. Code § 271(a).
[27] (D.E. 29 at pg. 17).
[28] (*See* D.E. 77 at pg. 62, lines 68).

upon personal liberties, counsel for the Defendants should have responded in response to this Honorable Court's question, "Yes, the Enabling Statute authorizes the CDC to halt the public's right to cast an in-person ballot." But that would have necessarily begged the question, why then did the CDC not issue such an order to limit the congregating of more than fifty million people[29], on a single day, as cases of COVID-19 around the nation spiked? Even more, had counsel for the Defendant answered "yes" in response to the Honorable Court's question, she would have exhibited the unending and limitless breadth of the CDC's absurd position by suggesting that Congress, without expressly saying or even hinting so in the text of the Enabling Statute, specifically intended to authorize the CDC —through quarantine provisions— to infringe upon the public's sacred right to vote in-person. At the same time, had counsel for the Defendants, correctly, responded, "No, the Enabling Statute does not authorize the CDC to halt the public's right to cast an in-person ballot," the CDC would be conceding that limits do exist to the CDC's delegated authority under the Enabling Statute, destroying the CDC's entire claimed justification for the Halt Order.

And yet, a halt on in-person voting is not the only example that illustrates the absurdity of the CDC's position and the excessiveness and overreach of the Halt Order. Counsel for the Defendants should be asked whether Congress intended the Enabling Statute to authorize the CDC to order the closure of all houses of worship –institutions whose primary purpose is congregating for prayer.[30] Or, whether Congress intended the Enabling Statute to authorize the CDC to curtail congregating for ritual ceremonies? Or, whether Congress intended the Enabling Statute to

_____

[29] As of November 12, 2020, One Hundred Fifty-Nine Million Five Hundred Eight-Nine Thousand Three Hundred Seventy-Nine (149,589,379) votes were cast in the 2020 Presidential Election. Estimates report that approximately Ninety-Seven Million (97,000,000) votes were cast early, either by mail or pre-election day in person-voting, leaving more than Fifty-Two Million (52,000,000) election day, in-person, voters.
[30] *See Roman Catholic Diocese of Brooklyn v. Cuomo*, --- S.Ct. ---, 2020 WL 6948354 (U.S. Nov. 25, 2020) (striking down order issued by the Governor of New York placing limits on houses of worship due to the COVID-19 pandemic and finding the relevant order to be a violation of the First Amendment).

authorize the CDC to halt congregating for otherwise lawful political rallies? Or, whether Congress intended the Enabling Statute to authorize the CDC to halt the congregating of children by closing public schools?[31] Or, whether Congress intended the Enabling Statute to authorize the CDC to promulgate other orders that regulate business (like the Halt Order) such as requiring grocery stores to allow people claiming financial distress resulting from COVID-19 to take food off the shelves without having to pay? Or, requiring pharmacies, under the Enabling Statute, to allow people claiming financial distress resulting from COVID-19 to take medicine without having to pay? Or, requiring hotels and motels, under the Enabling Statute, to allow people claiming financial distress resulting from COVID-19 to stay in rooms for months without having to pay?

These examples may seem outlandish when reading the clear text of the Enabling Statute[32] –a statute dealing *only* with specifically delineated quarantine measures relating to infected people, animals, and personal, property who might spread the contamination between states. However, these examples are not at all outlandish and, instead, become critically relevant, if this Honorable Court were to adopt the CDC's false argument that the Enabling Statute delegates to the CDC — by implication— the broad and expansive authority the CDC claims herein, to take whatever actions it deems may be, in its judgment, necessary.

When pressed by this Honorable Court on whether the CDC is authorized by Congress under the Enabling Statute to halt all in-person voting, counsel for the Defendants ultimately answered that the analysis would be fact specific because "voting is a fundamental right." While

---

[31] Article XI, Section 12 of the Tennessee Constitution guarantees to the school children of the state the right to public education.

[32] Plaintiffs would concede that state and federal legislatures and/or state and federal executives may have mechanisms by which to lawfully effect some of the measures illustrated above by example; however, the is not the proper analysis here. It is not germane to the present inquiry whether a relevant legislature could do precisely what the CDC did here, though Plaintiffs would argue they cannot; rather the proper analysis is only whether the CDC, under the Enabling Statute, was delegated the authority by Congress to take such action.

Plaintiffs continue to be unclear as to what counsel intended by her suggestion that the analysis would be fact specific, Plaintiffs contend that the right to own and have exclusive and unfettered use of real property and the right to liberty by not being criminally prosecuted and jailed for the exercise of lawful rights, are equally if not more fundamental than the right to vote. Counsel for the Defendants' clear reticence to answer this Honorable Court's question, or state on the record whether it is the CDC's position that Congress did or did not in fact delegate to the CDC in the the Enabling Statute the authority to curtail the right to in-person vote, speaks volumes as to what the CDC really believes about the argument it has asserted in defense of the Halt Order and the real scope of its own limited authority. [33]

The best interpretation of Congress' intent as to the authority granted to the CDC in the text of the Enabling Statute is clear and precise and does not cover the Halt Order. The CDC did not have the authority to issue the Halt Order and the sweeping nationwide eviction moratorium therein. There is no ambiguity on this point and this Honorable Court must enforce the unambiguously expressed intent of Congress. As such, this Honorable Court should conclude — without further analysis— that the Halt Order is in excess of the CDC's statutory authority and must be struck down and vacated.

**B. The CDC's interpretation of the Enabling Statute is inconsistent with controlling jurisprudence and applicable canons of construction.**

The CDC argues that despite being nowhere in the text of the Enabling Statute, the Enabling Statute clearly and unambiguously "evinces"[34] Congress' intent to "vest the CDC with broad authority to take decisive action if required to control the spread of dangerous infectious

---

[33] In contrast with the rights violated by the Halt Order (e.g., to own and exclusively control real property, personal liberty without government infringement, and to be guaranteed other fundamental constitutional rights free from government violation) the right to vote is not a right expressly stated in the Constitution. As such, whatever protections the CDC believes are to be afforded the right to vote, should likewise be afforded, if not expanded, to those foundational rights enshrined within the words of the Constitution.
[34] (D.E. 29 at pg. 15).

diseases,"[35] but then, turns right around and concedes that this authority is actually *not* contained within the express text of the Enabling Statute and must be interpreted from Congress's use of the phrase "such regulations as in his judgment are necessary."[36]

The CDC's real (<u>but wrong</u>) argument is that Congress' intent is ambiguous as to the breadth of the authority it intended to delegate to the CDC, that Congress granted the CDC broad, expansive, and an almost limitless grant of authority[37], and that, as a result, this Honorable Court should conclude that the CDC's action through the Halt Order is the <u>best interpretation</u> of Congressional intent.[38]  In other words, the CDC asks this Honorable Court to find that the <u>best interpretation</u> of Congressional intent is that the Enabling Statute empowers the CDC to issue and enforce anything it wants as long as the CDC veils the rule —rightfully or not— in the cloak of a "public health" measure.

But this is also patently untrue and not a permissible construction of the Enabling Statute. Well established canons of construction and jurisprudence offer guideposts to aid a court in its exercise of statutory interpretation: (1) Explicitness; (2) Federalism; (3) Avoidance of Constitutional Problems; (4) Cannons of Statutory Interpretation – *Ejusdem Generis* and *Noscitur a Sociis*; and (5) Intent and Context.  Just as before, evaluating the Halt Order under this interpretation framework makes clear that the <u>best interpretation</u> of the Enabling Law is that the Halt Order exceeds the statutory authority delegated by Congress to the CDC, and the Halt Order must therefore be struck down and vacated.

---

[35] (*Id*. at pg. 15).
[36] (*Id*. at pg. 16).
[37]  As discussed in detail below the CDC's position requires this Honorable Court to find that the authority delegated to the CDC by Congress under these quarantine statues exceeds Congress's own inherent legislative authority.  In other words, this Honorable Court must find that the CDC had greater authority than even Congress had when it enacted a far more narrow and restrictive eviction moratorium under the Cares Act.  This is a fundamentally ludicrous position.
[38] *See Miller v. Clinton*, 687 F.3d 133.  Se*e also Global Tel*Link*, 866 F.3d 397.

**1. *Explicitness*:**  Congress delegates authority to agencies to address issues of great importance only when saying so explicitly in the text of the enabling statute.  If the authority is not explicitly delegated by Congress to the agency in the text of the enabling statute, a court should conclude that Congress explicitly intended <u>not</u> to delegate such authority to the agency and such authority does not exist.  *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 121 (2000).[39]

Congress did not grant the CDC authority to impose nationwide eviction requirements regulating relationships between landlords and tenants.  Nothing in the language of the Enabling Statute grants the CDC the authority to expand its action: (1) **<u>from</u>** persons, animals, or personal property **<u>to</u>** real property; (2) **<u>from</u>** infected persons, animals, or personal property **<u>to</u>** those that are neither infected nor even believed to be infected; (3) **<u>from</u>** certain inter-state or foreign spread **<u>to</u>** mere possible intra-state spread; and (4) **<u>from</u>** recognized principles of deference to federalism **<u>to</u>** actions that supersede states' rights and states' real property laws.

This Honorable Court's review of explicitness should be even more narrow considering the Halt Order's enormous economic impact.  According to the CDC itself, the Halt Order affects between 30 and 40 million people[40], at a cost of several billion dollars per month[41], and constitutes a Major Rule under the Congressional Review Act[42], meaning it has a net effect on the national economy in excess of One Hundred Million Dollars ($100,000,000).  If Congress intended to

---

[39] In *Brown*, since the enabling statute <u>did not expressly</u> state that the FDA had the authority to regulate tobacco, the Supreme Court held that Congress did not intend to give the FDA that regulatory authority. This was especially true as tobacco sales comprised a large segment of the economy and regulation of tobacco had great economic effect.  Equally salient, the Court found that Congress had spoken on tobacco elsewhere, thus there would be no need to delegate such authority to the FDA.  Therefore, the FDA regulations concerning tobacco were found to be invalid and struck down. 529 U.S. at 120 ("it is plain that Congress has not given the FDA the authority to regulate tobacco products").

[40] (D.E. 1-12 at pg. 5); 85 Fed. Reg. 55295.

[41] Moody's Analytics, August 12, 2020, Capital Market Research.

[42] (D.E. 1-12 at pg. 6); 85 Fed. Reg. 55296.

delegate authority to the CDC under the Enabling Statute for this type of broad, unilateral, and hugely impactful economic action, Congress would have explicitly delegated this authority to the CDC in the text of the Enabling Statute without any ambiguity or need for judicial interpretation. However, because Congress clearly <u>did not</u> delegate this authority to the CDC in the text of the Enabling Statute, this Honorable Court <u>must find</u> that Congress <u>did not intend</u> to delegate such authority and that the CDC, therefore, does not have the authority it seeks to implement under the Halt Order. The Halt Order is therefore in excess of the CDC's statutory authority, and a violation of the APA.

       **2.** ***Federalism***: If Congress intends to delegate authority to an agency that will upset the delicate and important balance of federalism, Congress will state in the text of the enabling statute its clear and unequivocal intent to do so. Absent Congress' express statement of intent in the text, the enabling statute should not be interpreted as to allow intrusion upon areas regulated by the States.

Actions by federal agencies are not intended to disturb the important and sensitive balance between federal law and States' rights unless Congress clearly and unambiguously grants such power. *See Gonzales v. Oregon*, 546 U.S. 243 (2006) ("A rule must be promulgated pursuant to authority Congress has delegated to the official… The idea that Congress gave [the Attorney General] such broad and unusual authority through an implicit delegation is not sustainable… when Congress wants to regulate, it does so by explicit statutory language.) *American Bar Association v. FTC*, 671 F.Supp.2d 64 (D.D.C. 2009) (The District Court further noted that, even if the statutory language were ambiguous, the agency's broad interpretation of "creditor" as including any lawyer who bills clients on a monthly basis would be unreasonable, "and therefore not 'entitled to respect' because it lacks the 'power to persuade… It is clear when Congress wrote the [FACT Act], they never contemplated including these types of businesses within the broad

scope of that law."). In both *Gonzales* and *American Bar Association*, the respective reviewing courts correctly determined that Congress had not granted the authority to the respective agencies to intrude upon areas traditionally regulated by the States, or to supersede State law, and therefore in both cases the Court struck down the agency action.

This Congressional deference, preserving the delicate balance of federalism in the legislative realm, likewise exists in the executive branch. In 1999, then President Bill Clinton, issued Executive Order 13132 —which remains in full force and effect today— and which <u>requires</u> agencies to conduct a detailed study of any contemplated regulatory action, <u>before issuing any such action</u>, to ensure that the action does <u>not</u> implicate the principles of federalism. Under Executive Order 13132, if the findings of the detailed study reflect that the agency's contemplated action will impact the balance of federalism, the study must then make a formal determination of whether the agency has the clearly delegated congressional authority to act. *See* Executive Order 13132, August 4, 1999, a copy of which is attached hereto and incorporated herein as **Exhibit "A"**. When promulgating the Halt Order, the CDC <u>did not undertake</u> the requisite federalism study in clear and intentional violation of Executive Order 13132. The CDC clearly recognized that the Halt Order, as issued, upsets the balance of federalism and that Congress had not delegated to the CDC the authority to upset the balance of federalism. In other words, since the CDC knew that the Halt Order was in excess of its delegated authority under the Enabling Statute, it simply chose to ignore the mandates of Executive Order 13132 and issue the Halt Order without conducting the detailed study.[43]

---

[43] This approach of ignoring substantive and procedural pre-conditions when the CDC knows the results will not be favorable for its desired action is employed <u>again</u> when the CDC ignored the APA's due process requirements in promulgating the Halt Order and <u>then again</u> when the CDC failed to inquire into local health measures as required under the Enabling Regulation.

Nothing in the clear language of the Enabling Statute grants the CDC any right to upset the balance of federalism by superseding States' rights on purely intra-state matters. Quite to the contrary, Congress made abundantly clear its expressed intent in the text of the Enabling Statute not to authorize the CDC to supersede States' rights under the quarantine statutes when the Enabling Statute included the unambiguous statement:

> **"Nothing in this section or section 266 of this title, or the regulations promulgated under such sections, may be construed as superseding any provision under State law including regulations and including provisions established by political subdivisions of States.[44]**

Since it is clear that Congress intended to restrict the CDC by not delegating to it the authority to upset the balance of federalism, and the CDC nevertheless issued the Halt Order which significantly upsets that sensitive balance, the Halt Order is in excess of the CDC's statutory authority.

**3. *Avoidance of Constitutional Concerns*:** When a court is asked to find the best interpretation of an enabling statute in light of two (2) (or more) competing reasonable interpretations, the reviewing court should find that the best interpretation is that which avoids constitutional concerns. In other words, if one interpretation creates a constitutional concern and the other interpretation does not create a constitutional concern, the court should find that Congress only intended the interpretation that <u>does not</u> create a constitutional concern. *Zadvydas v. Davis*, 533 US 678 (2001) ("The Court applies a "cardinal principle" of statutory interpretation: when there is a serious constitutional concern, the court should apply a "fairly possible" interpretation of a statute to avoid constitutional concern).

---

[44] 42 U.S.C § 264(e).

The parties offer this Honorable Court two (2) possible interpretations of the Enabling Statute:

> **Plaintiffs' Proposed Interpretation:**
> *The broad and sweeping nationwide eviction moratorium instituted by the CDC under the Halt Order is inconsistent with fundamental and protected constitutional liberties and Congress <u>did not</u> delegate such authority to the CDC in the Enabling Statute.*

> **CDC's Proposed Interpretation:**
> *Congress <u>did not</u> expressly delegate to the CDC the authority to institute a broad and sweeping nationwide eviction moratorium like that promulgated under the Halt Order; however, Congress <u>did</u> <u>intend</u> for a court, under judicial review, to find that the actions of the Halt Order are nevertheless within the delegated authority granted to the CDC in the Enabling Statute, despite the fact that they infringe upon fundamental and protected constitutional liberties.*
>
> *Moreover, Congress intended to exempt the CDC from both the APA and constitutional procedural due process requirements in enacting the Halt Order.*

Unlike Plaintiffs' proposed interpretation, which avoids all constitutional concerns, the CDC's proposed interpretation raises serious substantive and procedural concerns under the APA, and no fewer than eight (8) areas of the Constitution. As this Honorable Court must always construe the best interpretation of the Enabling Statute away from constitutional concerns, this Honorable Court must find that the CDC's action through the Halt Order is not the best interpretation of the Enabling Statute, that the Halt Order is in excess of the CDC's statutory authority, and that it is a violation of the APA.

      **4.** ***Cannons of Statutory Interpretation***: The doctrines of e*jusdem generis* and *noscitur a sociis* are well-established rules of statutory construction which provide that when a court undertakes judicial review of an agency's interpretation of the text in an enabling statute, <u>context must be a dispositive factor</u>. More specifically, when the text of an enabling statute contains a list of items accompanied by a conclusory "other measures" catch-all, under e*jusdem generis* the scope of the conclusory "other measures" catch-all <u>is strictly defined by the list that preceded it</u>. Any action taken under authority alleged to have been delegated by the "other measures" catch-all must be consistent with, and fit concisely within, those actions so delegated by Congress in the preceding list.

Moreover, when there is any alleged ambiguity as to the meaning or breadth of a conclusory "other measures" catch-all in the text of an enabling statute, under n*oscitur a sociis* the conclusory "other measures" catch-all must be defined by considering the associated words in the text as a <u>narrowing limitation</u> -keeping any additional action under the "other measures" catch-all strictly within the same context and confined to substantially similar acts and measures. *Washington Dept of Social & Health Services v. Guardianship Estate of Keffeler*, 537 U.S. 371 (2003) ("The statute uses that term restrictively, for under the established interpretative canons of *noscitur a sociis* and *ejusdem generis,* where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar to those enumerated by the specific words."); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) ("The wording thus calls for application of the maxim *ejusdem generis,* under which the residual clause should be controlled and defined by reference to those terms. Application of *ejusdem generis* is also in full accord with other sound considerations bearing upon the proper interpretation of the clause. This fact alone does not provide any basis to adopt by judicial decision, rather than amendatory legislation an expansive construction of the FAA's exclusion provision that goes beyond the meaning of the words Congress used").

The CDC incorrectly argues that the "and other measures, as in his judgment may be necessary" clause in the Enabling Statute is a broad and expansive catch-all provision illustrative of Congress's intent to authorize the CDC to take *any* action it deems "necessary," regardless of whether the action is consistent with, or outside of, the activities and/or actions specifically designated by Congress in the text of the Enabling Statute. <u>Unfortunately for the CDC, this is completely wrong</u>. If this had been Congress's intent, Congress would have certainly said so. Equally salient, well-established rules of statutory construction require the precise <u>opposite analysis</u>. This Honorable Court must confine and restrict the conclusory "other measures" catch-

all by reference to the other terms in the list and find that Congress intended to only delegate to the CDC the authority to act as either explicitly stated within the Enabling Statute or in ways that embrace objects materially similar to those enumerated in the text of the conclusory "other measures" catch-all.

In response to this Honorable Court's necessary application of *ejusdem generis* and *noscitur a sociis*, the CDC then tries to argue that the Halt Order is really "not so different from the actions contemplated in the statute or regulation as to exceed CDC's authority."[45] This, perhaps, is the most baffling of all the CDC's problematic statements. The "actions contemplated in the Enabling Statute" allow only for CDC measures sought to curtail inter-state or foreign spread of infection through: (1) inspection; (2) fumigation; (3) disinfection; (4) sanitation; (5) pest extermination; and (6) destruction of animals or articles found to be infected or contaminated.

The conclusory "other measures" catch-all, cannot be augmented to include (1) action involving the taking of real property of private citizens; (2) exercising authority over individuals, animals, or personal property neither infected nor even believed to be infected with a contagious disease; (3) exercising authority over the residential housing market; (4) exercising authority over residential evictions which implicate only intra-state concerns and have nothing to do with inter-state or foreign concerns; (5) suppressing and superseding State rights and State real property laws reserved exclusively to the State; or (6) creating new and drastic criminal conduct.

Despite the CDC's unfounded claim[46], the broad, sweeping, nationwide eviction moratorium involving all tenants and all owners assessing criminal penalty for noncompliance <u>is not</u> "a comparable imposition" to "inspection," "fumigation," and even "destruction" sought to prevent the disease of actually contaminated individuals.

---

[45] (D.E. 29 at pg. 21).
[46] (*Id.*).

The CDC's proposed interpretation requires this Honorable Court to employ a constructive expansion of the Enabling Statute that goes beyond the meaning of the words Congress used, or ever intended to use. This <u>very same argument</u> now being made by the CDC —to misconstrue Congressional intent by constructive expansion beyond the meaning of the words in the Enabling Statute— was likewise argued by the CDC's Co-Defendant HHS in an effort to justify its own unauthorized agency action which was recently challenged, rebuked, <u>and struck down</u> by the Court of Appeals for the District of Columbia in *Merck vs HHS*, 962 F.3d 531 (D.C. Cir. 2020). As HHS did in *Merck*, the CDC seeks to expand its delegated authority to actions without any "actual or discernable nexus"[47] to the list of delegated authority stated in text of the conclusory "other measures" catch-all in the Enabling Statute. Without expressed authority or this actual nexus, <u>the action is wrong and wholly outside of the CDC's authority delegated to it by Congress in the Enabling Statute</u>. This Honorable Court should, therefore, confine and restrict the conclusory "other measures" catch-all to the preceding list of authorized actions explicitly delegated in the text of the Enabling Statute. As such, the Halt Order is wholly outside of the CDC's authority delegated to it by Congress in the Enabling Statute and is a violation of the APA.

**5.** ***Intent and Context***: When a court is asked to interpret the authority granted by Congress to an agency under an enabling statute, the court should view both the expressed intent of Congress in delegating authority to the agency and the context surrounding the enabling statute within the larger U.S. Code. *Davis v Michigan Dept of Treasury*, 489 U.S. 803 (1989*)* ("The enabling statute's language, purpose, and legislative history establish the scope . . . and must be determined by reference to those elements.).

The Enabling Statute is codified in the "Quarantine and Inspection" sections of the Public Health and Welfare Services statute. The clear and unambiguous purpose of the Enabling Statute

---

[47] *Merck*, 962 F.3d at 537-38.

is to provide the CDC the authority to quarantine infected individuals and take other actions to prevent the "introduction, transmission, or spread of communicable diseases" into the United States from a foreign country or into a State or territory from another State or territory (intrastate spread) "from infected people or animals." Because of Plaintiffs' challenge to the Halt Order, the CDC now asks this Honorable Court to grant it extremely broad deference in allowing a virtually limitless interpretation of the text of the Enabling Statute "in light of history and experience given the havoc wrecked by past scourges like yellow fever."[48] Essentially, the CDC claims that COVID-19 allows the CDC to expand its authority beyond what Congress authorized in the Enabling Statute because, when Congress promulgated the Enabling Statute, it was not able to fully contemplate all the measures the CDC would need to employ to effectively respond to COVID-19. In other words, the CDC asks this Honorable Court to find, as a matter of law, that had Congress been able to fully understand a health pandemic like Yellow Fever, or the 1918 Flu, or even COVID-19, Congress would have explicitly expanded the CDC's authority in the text of the Enabling Statute to include the actions taken by the CDC under the Halt Order. But the CDC has it completely backwards. Expanding an agency's delegated authority is the sole and exclusive function of Congress. Restraining agency action that is in excess of delegated congressional authority is the function of the judiciary.

While the CDC's request of this Honorable Court is inherently flawed and entirely unlawful, the CDC's argument, in any event, completely fails when this Honorable Court recognizes that, despite what the CDC claims, the Enabling Statute was enacted in 1944 well after the 1855 Yellow Fever and 1918 Flu Pandemics. At the time of enactment, Congress was well aware of the extent to which these health pandemics impacted the nation. Armed with that knowledge and awareness, Congress made the reasoned choice to grant the CDC only quarantine-

---

[48] (D.E. 29 at pg. 16).

related powers relating to contaminated people (and animals and objects) during the period of contamination and <u>not</u> to grant the CDC authority over anything more.

Examining the authority granted by Congress to the CDC within the context of the Enabling Statute and the broader statutory scheme, the CDC asks this Honorable Court to jam the proverbial "square peg" (of stopping evictions) into the "round hole" (of delegated quarantine authority). This was not Congress' intent —"in light of history and experience given the havoc wrecked by past scourges like yellow fever"[49]— and the CDC does not have the authority to self-expand its authority in order to promulgate and enforce an over-reaching mandate like the Halt Order.

In fact, perhaps the most compelling proof of Congress' clear and unambiguous <u>intent not to delegate</u> authority to the CDC —beyond the clear text of the Enabling Statute— is <u>Congress' own recent conduct</u>. Congress in fact spoke to the breadth of what is lawful government authority to enact eviction moratoria relating to the current health pandemic when it passed the CARES Act only a few months ago. What the CARES Act[50] clearly demonstrates is that, not only is the CDC Halt Order an unlawful exercise of <u>its own</u> delegated agency authority, but the Halt Order, in its current form, is most probably an unlawful exercise of <u>congressional authority</u>.

If Congress had in fact transferred the broad, expansive authority to impose nationwide eviction moratoria away from itself and to the CDC under the Enabling Statute, the 120-day eviction moratorium Congress passed as part of Section 4024 of the CARES Act would never have been necessary. Why would Congress act within a sphere that, as the CDC argues, was so clearly delegated to the CDC? There would have been no need for Congress to act if the CDC already had the very power Congress chose to wield. If the CDC had this broad power the whole

---

[49] (D.E. 29 at pg. 16)
[50] 15 U.S.C. §§ 9001, *et seq.*,

time[51], the CDC could and should have initiated the eviction moratorium itself under the Enabling Statute back in March 2020.  But it was the Congress through the CARES Act —not the CDC— that commenced the initial eviction moratorium.  And it was only after the Cares Act eviction moratorium expired, and when Congress chose not to exercise its legislative authority and renew such relief, that at the insistence of President Trump, the CDC rushed to promulgate the Halt Order, without Congressional authority and in violation of both the APA and the Constitution.

Moreover, the 120-day eviction moratorium passed by Congress as part of Section 4024 of the CARES Act was limited exclusively to owners of "covered properties," defined as owners with a nexus to the federal government, either because the property received federal rent assistance or because the property had a federally backed mortgage.[52]  Since these owners were precluded from evicting non-paying tenants living in their real property, the CARES Act contemporaneously provided owners relief in the form of mortgage and tax forbearances and Paycheck Protection Program (PPP) forgivable loans, and provided tenants stimulus funds to be used for, among other things, monthly rent obligations.[53]

Clearly, Congress recognized its own limitations to lawfully infringe upon landowners and their property rights, understanding the severe imposition on fundamental liberties caused by enforcement, and the constitutional restrictions of such action.  Congress therefore deliberately chose to tailor the 120-day eviction moratorium very narrowly to only certain owners having a nexus to the federal government —approximately 1 out of 4 tenants[54]—and to provide contemporaneous relief to landowners.  While an argument can be, and has been persuasively,

---

[51] Or at least since the passage of the Enabling Statute in 1944.

[52] *See* 15 U.S.C. § 9058(a)(2).

[53] *See*, *e.g.* 15 U.S.C. § 9057 (forbearance on mortgage loans for multi-family properties with federally backed loans).

[54] (*See* D.E. 1-12 at pgs. 4-5); 85 FR 55294-95.

made that even the CARES Act 120-day eviction moratorium would have been struck down if subjected to judicial review, as it too infringed upon constitutionally protected rights, this Honorable Court must contrast Congress' reasoned and narrowly enacted eviction moratorium legislation, with the rushed, broad, and overly expansive Halt Order.  The Halt Order, issued by the CDC in violation of substantive and procedural requirements of the APA, which applies to all owners nationwide —4 out of 4 tenants— without regard to any nexus with the federal government, which offers no contemporaneous relief to owners in any form, and which imposes excessive criminal penalties, including imprisonment, against any owner who tries to enforce his or her protected real property rights.  One could say that the CARES Act was enacted with the precision of a scalpel while the Halt Order was enacted with the precision of a chainsaw.

If Congress itself lacked the legislative authority to enact a sweeping nationwide eviction moratorium which implicates 100% of owners, without offering any contemporaneous relief, and imposes imprisonment on violators, without adhering to due process in the promulgation, then certainly Congress could not have, and would not have, delegated such expansive authority to an agency like the CDC.  If Congress could not have promulgated the Halt Order, then the CDC absolutely could not have promulgated the Halt Order.  And, even if Congress did have the authority through the legislative process to enact the Halt Order, it certainly did not intend to delegate, nor did it delegate, such authority to the CDC.

**6.  *The Halt Order is Inconsistent with all 5 Guideposts and Violates the APA***

What is abundantly and undeniably clear is that a reading of the text in the Enabling Statute evidences Congress' unambiguous intent to delegate to the CDC *only* the authority to take certain **quarantine** related actions and *not* to delegate to the CDC the expansive authority embodied in the Halt Order.  Similarly, based upon the 5 guideposts of statutory construction, the Halt Order is not the best interpretation of the Enabling Statute.  The CDC asks this Honorable Court to do no

less than rewrite the text of the Enabling Statute, to reform Congress' clear intent, and expand the limited quarantine authority delegated to the CDC. Based on the guiding principles, this Honorable Court must find that the Halt Order fails in all respects and therefore must be struck down and vacated under 5 U.S.C. § 706.

**7.** ***The Halt Order Further Violates the Enabling Regulation as the CDC Failed in its Requirement to Determine the Insufficiency of Local Measures Before Issuing the Halt Order and thus Acted in Excess of its Delegated Authority***

The Enabling Regulation[55] adds an additional pre-condition requiring the CDC to <u>first determine</u> that "measures taken by local health authorities…are insufficient to prevent the spread of any of communicable diseases" <u>before</u> having the delegated authority to issue or implement any agency action.[56] The CDC states in the Halt Order that it found "that measures in state and local jurisdictions…do not provide protections for renters equal or greater than the protections provided in the Order"[57] but offers no evidence that demonstrates that it undertook an investigation into local measures in the Western District of Tennessee, nor any evidence that it made a determination that the measures in the Western District of Tennessee were insufficient, before issuing the Halt Order. <u>Likewise, no such evidence was included in the Administrative Record</u>.[58] This failure by the CDC removes from it any authority to act under the Enabling Regulation, rendering the Halt Order an unlawful exercise.

While Plaintiffs have not themselves surveyed the health measures taken by local municipalities nationwide, Plaintiffs can offer this Honorable Court details of the health measures undertaken in the Western District of Tennessee by Shelby County Government.

---

[55] 42 C.F.R. § 70.2.
[56] *Id.*
[57] (D.E. 1-12 at pg. 6); 85 Fed. Reg. at 55296.
[58] (D.E.79, 81).

Shelby County Health Directive No. 14[59] provides in relevant part:

**Lessors of Residential Properties. Property owners, landlords, or their hired agents must distribute the following notice concurrently with the service of process of a Forcible Entry and Detainer Action (or Summons & Complaint) to any individual against whom an FED or other eviction action is filed. This safety measure helps to prevent and control the spread of COVID-19 that could be associated with the eviction process.**

**The notice must state: "If you or anyone in your household are currently quarantined or are in isolation due to COVID-19 and are unable to secure housing at this time, please notify the Shelby County Health Department by calling 901-222- MASK (which is 901-222-6275) or by faxing the information to 901-222- 8249. Temporary housing support may be available."**

Unlike the Halt Order, Shelby County Health Directive No. 14 is a local measure that was intentionally designed and implemented to prevent the spread of COVID-19 potentially resulting from evictions. The CDC did not make a determination that Shelby County Health Directive No. 14 is insufficient to prevent the spread of COVID-19 through evictions. And because the CDC violated the procedural notice and comment requirement, Shelby County and the landowners residing in Shelby County were denied their due process rights to appear and present evidence of these measures. Since the CDC failed to comply with the mandatory pre-condition it established for itself under the Enabling Regulation, any action taken by the CDC through the Halt Order must be deemed an action that exceeded any authority delegated by Congress to the CDC.

## III. THE HALT ORDER IS ARBITRARY AND CAPRICIOUS IN VIOLATION OF THE APA

"The Administrative Procedure Act embodies a basic presumption of judicial review." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019). Under the APA, if agency action is found to be arbitrary and capricious, it must be held unlawful and set aside. 5 U.S.C. § 706(2)(a); *Simms v. Nat'l Highway Traffic Safety Admin.*, 45 F.3d 999, 1003 (6th Cir. 1995). Section 706 requires the reviewing court to engage in "a substantial inquiry, *Id.*; limited to the administrative record, 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

---

[59] Shelby County, Tennessee, Health Department. Health Order and Directive No. 14. 2020.

A rule[60] fails the relevant inquiry, <u>and is thus arbitrary and capricious</u>, if any of the following factors are present: (1) the agency failed to examine the relevant data and articulate a satisfactory explanation for the action, including a rational connection between the facts found and the choice made; (2) the agency failed to provide the essential facts upon which the administrative decision was based and explain what justifies the determination with actual evidence beyond a conclusory statement; (3) the agency cannot demonstrate that the decision is the product of logical or consistent reasoning; (4) the agency cannot demonstrate it considered all important factors relevant to its action - such as the policy effects of its decision or vital aspects of the problem in the issue before it; (5) the agency cannot demonstrate it considered less restrictive, yet easily administered regulatory alternatives. *Motor Vehicle Manufacturers Association v. State Farm Auto Mutual Insurance Co.*,463 U.S. 29, 42-44 (1983); *see* 5 U.S.C. § 706; *see also City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir.2007). The presence of any of these factors dooms the rule in question as "arbitrary and capricious" and necessities that the Rule be vacated.

## A. Based upon its own pretext and stated purpose, the Halt Order is not a pandemic response and therefore the Halt Order cannot in any way be an authorized agency act under the quarantine related Enabling Statute.

The CDC seeks broad deference under the Enabling Statute claiming that the Halt Order is a health-related pandemic response[61] aimed at reducing the spread COVID-19. But this is simply not true! Based upon the pretext underpinning the Halt Order's promulgation and the CDC's own stated purpose for issuing the Halt Order (as reflected in its regulatory filings), the Halt Order is in fact <u>not</u> a pandemic response at all. To the contrary, <u>the Halt Order is an economic effort</u> unrelated to any alleged quarantine powers or the CDC's proffered purpose in reducing the spread of COVID-19. As there is no serious debate that the Enabling Statute is limited in all respects to

---

[60] As argued elsewhere, despite the fact that CDC did not invoke its rulemaking authority in its issuance of the Halt Order the APA provides a conclusive definition, which clearly encompasses the Halt Order.
[61] (D.E. 29 at pgs.15-22).

public health quarantine measures aimed at curtailing the spread of communicable diseases in an interstate context, the Halt Order's real purpose —as an economic measure— makes it "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law." 5 U.S.C. § 706(2)(a).

On August 8, 2020, President Trump issued an "Executive Order on Fighting the Spread of Covid-19 by Providing Assistance to Renters and Homeowners" (the "Executive Order"), the impetus for the CDC's promulgation of the Halt Order (*See* D.E. 1-13; D.E. 81-2). In "Section 2, Policy", President Trump recites the executive's express and stated purpose in pursuing certain health measures, "**It is the policy of the United States to minimize, to the greatest extent possible, residential evictions . . . during the ongoing COVID-19 emergency**." (*Id*. at pg. 4) "Section C" of the Executive Order directs the Secretary of HUD to take action "to promote the ability of renters and homeowners to avoid eviction . . . resulting from financial hardships caused by COVID-19." (*Id.*). The stated purpose of the Executive Order is to <u>relieve economic hardship</u> –a noble cause, but not one that is in anyway proper or achievable by the CDC under the quarantine Enabling Statute. On September 1, 2020, the very day the CDC announced the Halt Order —and only three (3) days before it took effect nationally— President Trump released a White House Fact Sheet in which he proclaimed the actual reason for the Halt Order. (*See* D.E. 1-14) (A copy of the September 1, 2020, White House Fact Sheet is attached hereto and incorporated herein as **Exhibit "B"**). "**I want to make it unmistakably clear that I'm protecting people from evictions**." (*Id*. at pg. 2). Yet again, the White House Fact Sheet reflects President Trump's <u>purely economic intent and purpose</u> for the Halt Order. And while these presidential and executive communications reflect the true intent and purpose for the Halt Order, the definitive statement of the CDC's economic pretext and purpose in promulgating the Halt Order is the regularity review conducted by the Office of Information and Regulatory Affairs ("OIRA") –the central authority for the review

of Executive Branch regulations and a part of the Executive Branch itself.[62]  Following the submission of the Halt Order by the CDC to the OIRA, the OIRA determined that the Halt Order (1) implicates issues of federalism; (2) is not a pandemic response to COVID-19; and (3) is economically significant.[63]



Upon information and belief, no enabling statute exists in which Congress delegates to the CDC the agency authority to promulgate economic action.  Certainly, the Enabling Statute in this case does not delegate this economic authority.  Any such economically motivated action by the CDC is completely outside the scope and mission of the CDC[64] and authority of the Enabling

---

[62] "The Office of Information and Regulatory Affairs (OIRA) is a statutory part of the Office of Management and Budget within the Executive Office of the President. OIRA is the United States Government's central authority for the review of Executive Branch regulations, approval of Government information collections, establishment of Government statistical practices, and coordination of Federal privacy policy." https://www.whitehouse.gov/omb/information-regulatory-affairs/ (last accessed Dec. 18, 2020).
[63] *See* Office of Information and Regulatory Affairs, *OIRA Conclusion of EO 12866 Regulatory Review*, RIN 0920-ZA05, https://www.reginfo.gov/public/do/eoDetails?rrid=131050 (last accessed Dec. 18, 2020).
[64] *See* Centers for Disease Control and Prevention, *Mission Statement*, https://www.cdc.gov/about/organization/cio-orgcharts/pdfs/CDCfs-508.pdf (last accessed Dec. 18, 2020)(The CDC's function is to "serve[] as the national focus for developing and applying disease prevention and control, environmental health, and health promotion and health education activities designed to improve the health of the people of the United States.")

Statute. The CDC <u>must therefore claim in defense</u> that the Halt Order is a measure aimed at preventing the spread of COVID-19 and that its authority is delegated under the Enabling Statute. But this is blatantly disingenuous and demonstrably untrue. By the government's own admissions, made publicly by the Chief Executive and through executive review documents, the Halt Order was intended to be, and is, an economic response. As such, the CDC is not authorized under the Enabling Statute to issue the Halt Order.

Moreover, the fact that the Halt Order only provides eviction protection for non-paying tenants but permits evictions of tenants who breach their lease for other reasons, offers further evidence of this CDC's purely economic intent. In the Halt Order, the CDC proffers the loose theory that the eviction of tenants anywhere and everywhere in the country, whether contaminated with COVID-19 or not, once evicted, will necessarily become homeless. In turn, the CDC reasons, this homelessness will force the evicted tenants to congregate together in homeless shelters or with others, resulting in the spread of COVID-19. As discussed herein this theory is wholly unsupported by science; however, even assuming for a moment, *arguendo*, that the CDC's theory had any legs on which to stand, how could the CDC possibly justify excluding any types of tenant evictions from protection if the purpose of the Halt Order is to curb the spread of COVID-19 caused by evicted tenants congregating together and with others? Could it possibly be the CDC's position that only non-paying tenants who are evicted are susceptible to spread COVID-19 but that a tenant with an unauthorized occupant, or that has damaged the property, or who might be harboring a non-approved pet, and is evicted for that conduct is somehow immune from homelessness[65] and/or from contracting or spreading COVID-19? Obviously, this cannot be true.

---

[65] In just another clear lack of fundamental understanding by the CDC about how evictions really work and how they impact the rental market – likely based upon the CDC's refusal to properly research the topic or provide notice and an opportunity for comment by members of the residential rental industry - the CDC argues that "an evicted renter <u>who cannot afford alternative housing</u> often move[s] into close quarters in

COVID-19 clearly does not discriminate between tenants in breach for non-payment and tenants in breach for any other lease obligation. Instead, it is clear the Halt Order is a purely economic effort implemented to protect those with financial hardships from being evicted. That is why only evictions for non-payment are precluded, but evictions unrelated to financial hardship may proceed.

Because the Halt Order is a purely economic effort, not a health-related measure, the CDC's actions generally, and the Halt Order specifically, are an "arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law" and must be struck down and vacated under 5 U.S.C. § 706(2)(a).

### B. The Halt Order is void for vagueness and ambiguity

The void for vagueness doctrine addresses at least two (2) connected but discrete concerns: first, that regulated parties should know what is required of them so they may act, accordingly; and second, precision and guidance in government action are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012). Looking at the plain text of the Halt Order reveals its extreme vagueness and ambiguity. For instance, the Halt Order protects "covered persons"; however, the Halt Order simply defines a covered person as any tenant that provides a Declaration to his or her landlord.

---

shared housing or other congregate settings that pose a high risk of transmission among household contacts." 85 Fed. Reg. at 55294. The CDC suggests that the eviction of a renter who "could afford" alternate housing (i.e. because their eviction was based on something other than non-payment) would not have any problem finding alternate housing and therefore poses no "risk of transmission among household contacts". *Id.* The reality, however, is that any tenant who is evicted will have an exceedingly difficult time finding alternative housing because the eviction appears on the tenant's rental history and typically serves a disqualifying factor on the application background check. Even more, when housing vacancies are very limited because the CDC has forced owners to house tenants despite their non-payment, a recent eviction on a tenant's application background check will typically preclude that tenant's ability to find alternate housing. When the eviction is for drugs, or violence, or criminal activity on the property, this is especially true. Because only evictions for non-payment are precluded, but evictions unrelated to financial hardship may proceed, it is clear that the Halt Order is a purely economic effort, not a health-related measure.

(D.E. 1-12 at pg. 3); 85 Fed. Reg. 55293. The physical act of providing the Declaration makes someone "covered" without regard to whether the Declaration is true or false. Within the Declaration itself, a covered person must attest that he has used his "best efforts to obtain all available government assistance." (*Id.*). But "best efforts" is never defined. Does that mean make a telephone call, mail a letter, leave a voicemail, fire off an email? How many times does one have to attempt contact in order for one's efforts to be considered "best?" The Court posed this very same question to counsel for the Defendants who, in turn, demurred, stating that what constitutes "best efforts" is a fact inquiry best left to the state courts and that what constitutes "best efforts" could encompass "different things." (*See* D.E. 77 at pg. 67, lines 3-6). This response proves that the CDC agrees the Halt Order is too ambiguous to understand on its face. The notion that it is the job of state courts to interpret federal orders necessarily means that the orders are susceptible to different meanings and are therefore vague and ambiguous.

Likewise, what constitutes a "substantial loss of household income?" (*Id.*). Is this "loss" from the loss of a job, or does it also result from garnishment, tax and/or bank levies, gambling losses, bad investments, child support, other loan obligations, etc.? What does it mean to "expect[] to earn no more than $99,000.00?" (*Id.*). When does an eviction "likely render the individual homeless" and what sort of living arrangement is considered to be "close quarters," "congregate," and "shared living?" (*Id.*). Does this mean the option to move into a friend's apartment where the friend is the sole occupant? How many is too many? What about "best efforts" to make rental payments? How is that determined and by whom?

More fundamentally than the ambiguity in the Declaration which, again, is the only thing that qualifies someone as being "covered" by the Halt Order, are the other patent ambiguities in the Halt Order's mechanics. Of paramount importance, what is an "eviction?" The Halt Order says ''[e]viction means any action by a landlord, owner of a residential property, or other person

with a legal right to pursue eviction or a possessory action, to remove or cause the removal of a covered person from a residential property." (*Id*.) (internal quotations omitted). The "any action" portion of that definition is of critical importance and yet the CDC offers no clarity as to what was intended. For instance, in the Western District of Tennessee, is filing the Forcible Entry and Detainer ("FED") Warrant considered "any action?" What about serving the FED? Setting a court date? Appearing in court? Arguing the case in court? What about having the clerk issue a Writ of Possession following a judgment? When does protection as a "covered person" for "any action" begin? Can a tenant tender a Declaration after a lawful judgment for possession is issued? After all adversarial court proceedings have ceased? After a lawful judgment becomes an unappealable judgement? After a Writ of Possession is issued? What happens with a tenant who tendered, for instance, a Declaration on September 5, 2020 (the day after the Halt Order took effect)? Does that Declaration protect the tenant for just the month of September? Does tendering the Declaration cover the tenant in perpetuity? What if the tenant's financial circumstances greatly improve? Does a tenant have to withdraw or amend his Declaration upon a change in financial circumstances? What if the tenant lost his job in September, but in October regained gainful employment at an even higher wage? What if the individual receives government assistance after using "best efforts" to obtain that assistance and after tendering the Declaration?

In yet another example, the CDC claims that landowners retain the right to challenge a Declaration tendered by a tenant. How is a landowner to assert this right to challenge? Who is to preside over this challenge? What if the tenant does not participate in the challenge proceeding? What is the effect of a court determination that the Declaration is deficient?

Plaintiffs could fill page after page with questions like these —all of which stem from the vagueness and ambiguity of the Halt Order— and all of which are real life, practical questions, that have posed significant issues and increased damages for landowners.

Despite the CDC's protestations of clarity —that somehow courts may continue to adjudicate eviction cases— nothing written in the Halt Order stands for such a proposition. And this is precisely the way the state court system in the Western District of Tennessee has construed the Halt Order. Despite having likely never stepped foot in a Shelby County General Sessions Court, lead counsel for the CDC objects, saying that there is no proof of this. Besides the fact that the undersigned, an officer of the Tennessee state courts, herein attests to this fact, Plaintiffs are happy to provide the Court with declarations or live testimony from various other eviction practitioners here in Shelby County, Tennessee, or members of the judiciary itself, if such becomes a dispositive question for this Honorable Court.

Finally, the ambiguity in the Halt Order threatens millions of land-owning Americans with prison time and draconian fines for simply taking lawful actions to recover their own real property. But the Halt Order fails to articulate what conduct is proscribed and subject to penalty. Is filing an eviction lawsuit a violation of the Halt Order? Is obtaining a judgment? Is obtaining a Writ of Possession? What relationship does a "covered person['s]" death have to have to an "eviction?" Must it have such a connection? Was it Congress' intent to imprison ordinary, property owning Americans for prosecuting a summary eviction proceeding? The Halt Order offers no clarity at all.

Indeed, the Halt Order was so vague and ambiguous in its initial incarnation that, on October 9, 2020, the CDC was forced to promulgate a set of Frequently Asked Questions (the "FAQs") in an effort to clarify for courts, lawyers, owners, and tenants what is and is not allowed under the Halt Order. The FAQs did not clarify complicated or obscure elements of the Halt Order but sought to address the vagueness and ambiguity surrounding its very fundamental elements: What does the Halt Order do? What does CDC mean by "eviction"? Who is a "covered person"? Must a new Declaration be tendered every month? The necessity of the FAQs on these most basic

elements of the Halt Order is proof enough that the Halt Order should be void for vagueness and ambiguity.

The CDC points to its FAQs, as some sort of panacea.[66]  This is untrue; even after the CDC promulgated the FAQs, the vagueness and ambiguity remained.  But even assuming for a moment, *arguendo*, that the FAQs were effective in offering practical clarity to the severe vagueness and ambiguity of the Halt Order, they are of no value from a legal perspective.  *See Tennessee Hosp. Ass'n v. Price*, No. 3:16-CV-3263, 2017 WL 2703540, at *7 (M.D. Tenn. June 21, 2017)[67], *aff'd and remanded sub nom. Tennessee Hosp. Ass'n v. Azar*, 908 F.3d 1029 (6th Cir. 2018).  A "non-binding guidance document," cannot remedy the fundamental vagueness and ambiguities in the Halt Order which necessitate its strike down.

This Honorable Court, at oral argument, rightly homed in on the impropriety and inapplicability of the FAQs that the CDC tries to use to resolve the vagueness and ambiguities in the Halt Order.  This Honorable Court referred to what it titled the "Sessions Memo" [68] (*See* D.E. 77 at pgs. 69-70).  Indeed, the former Attorney General's memorandum, titled "Prohibition on

---

[66] By way of example, the Halt Order defines "eviction" as "any action"; however, the FAQs then purports to redefine —and indeed contradicts— the language in the Halt Order.  Counsel for the Defendants attempts to get around the issue of the definition of "eviction" by focusing on the language at the end of the definition in the Halt Order: "'eviction'. . . means any action by a landlord . . . to <u>remove or cause the removal of</u> a covered person from a residential property."  (D.E. 1-12 at pg. 3); 85 Fed. Reg. 55293.  Thus, as the CDC's argument goes, the important term is "remove," so physical removal is really what the Halt Order means.  This is problematic though given the definitions of "action" that the CDC so clearly ignores.  An "action" means "[t]he process of doing something; conduct or behavior," or "<u>a civil or criminal judicial proceeding</u>."  Black's Law Dictionary (11th ed. 2019) (emphasis added).  Thus, an "action" to "remove" could be the process or doing something that results in removal, or a civil judicial proceeding to "remove or cause removal of a covered person."  (D.E. 1-12 at pg. 3); 85 FR 55293.  Very clearly, though apparently not intended, the definition of "eviction" clearly has foreclosed landowners from pursuing civil judicial proceedings to remove or cause the removal of a covered person.

[67] "Posting . . . FAQs on Defendants' website is not legally sufficient, . . .  In addition, the FAQ policies represent agency action that is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law because they were not promulgated pursuant to the required notice-and-comment rule-making procedures."

[68] Office of the Attorney General. *Memorandum for all Components, Prohibition on Improper Guidance Documents*. November 16, 2017.  Attached hereto and incorporated herein as **Exhibit "C"**.

Improper Guidance Documents," directs that guidance documents (such as the FAQs) are improper because they circumvent the "Administrative Procedure Act's requirement to use, in most cases, notice-and-comment rulemaking when purporting to create rights or obligations binding on members of the public or the agency." *Id.* Likewise, the Court pointed to a January 25, 2018 memorandum from then Associate Attorney General Rachel Brand[69], reaffirming the former Attorney General's position on guidance documents and proscribing their use in civil enforcement actions. (*See Id.*). As the Department of Justice itself recognizes, the FAQs are of <u>no value</u> as they cannot possibly alter the plain terms of the Halt Order.

Thus, to the extent the FAQs themselves are interpreted to be a final agency action, which they arguably appear to be, the FAQs are likewise unlawful for the same reasons as the Halt Order –void for vagueness and ambiguity and in violation of the procedural requirements of the APA.

### C. The Halt Order is based upon insufficient, and nonexistent, scientific evidence

For the Halt Order to survive judicial review and an arbitrary and capricious determination, the CDC must articulate the relevant data, explanation, and rational connection between the facts the CDC found and the choice the CDC made. *See Judulang v. Holder*, 565 U.S. 42, 53 (2011). In the case of the Halt Order, the CDC must convince this Honorable Court that the "scientific" evidence in the Administrative Record, and upon which the CDC relied in justifying the administrative decision, is substantial and sufficient. "Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion*." Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1068–69 (6th Cir. 2013) (internal quotations omitted).

---

[69] Department of Justice. *Associate Attorney General Brand Announces End to Use of Civil Enforcement Authority to Enforce Agency Guidance Documents*. January 25, 2018; *see also*, U.S. Dep't of Justice, U.S. Attorneys' Manual §§ 1.20.000, *et seq.* (2018) (amending the Justice Manual to reflect both Session's and Brand's edicts).

The CDC's supposed "scientific" evidence upon which it relied in violating the property rights of tens of millions of Americans is a loose confederation of web-based sources, some of which are outdated, some of which are biased, none of which are statistically significant or representative, and none of which were created or verified by the CDC. In promulgating the Halt Order, the CDC relied exclusively on these sources (and nothing more) to manufacture a loose theory that the eviction of non-paying tenants —anywhere and everywhere in the country, and whether contaminated with COVID-19 or not— once evicted will necessarily become homeless forcing the evicted tenants to congregate together in homeless shelters or with others resulting in the spread of COVID-19. Using the scientific equivalent of a Rube Goldberg machine, the CDC tries to piece together disconnected "science" to bootstrap a theory justifying its unilateral nationwide eviction moratorium. Unfortunately for the CDC, just because A says A, and B says B, does not mean that A+B = C.[70] The sweeping overbreadth of the Halt Order is not justified by the weak, unsupported, biased, outdated, disconnected, internet citations and other data upon which the CDC purports to rely. The arbitrary and capricious standard requires that the CDC demonstrate that it considered <u>all factors</u> and found that <u>no other less restrictive regulatory alternatives</u> —other than the action taken— were available. The Halt Order, hastily thrown together and promulgated, largely based upon various Google searches, and undertaken without any authority, clearly fails this test.

And if somehow this Honorable Court were to find that the CDC's theory —eviction = homelessness = spread of COVID-19— was substantiated and verifiable with the "science" presented and, that the Halt Order was the most effective and least restrictive regularity measure available to prevent the spread of COVID-19, then, as discussed herein, how could the CDC

_____

[70] Indeed, the CDC utterly failed to prove the causal connection between eviction and COVID-19 transmission rates. The CDC's "science," vis-à-vis the Administrative Record, would never carry the burden of persuasion at trial.

possibly justify excluding any type of evictions from the moratorium? If the science underlying the Halt Order was persuasive, then any eviction, for any reason, would increase homelessness and increase the potential for the spread of COVID-19, and the Halt Order should have precluded all evictions for public health purposes without distinguishing between protected tenants who breach the lease for non-payment and unprotected tenants who breach the lease for any other reason. This too reflects the arbitrary and capricious nature of the Halt Order.

The CDC's scientific evidence utterly fails to prove the causal connection between eviction and COVID-19 transmission rates. The CDC's "science," vis-à-vis the Administrative Record, would fail to satisfy the burden of persuasion at trial and should fail here as well. This failure not only renders the Halt Order an action that exceeds any authority delegated to the CDC by Congress, but also further supports this Honorable Court's finding that the Halt Order is arbitrary and capricious.

### D. The Halt Order is overbroad and therefore results in extreme economic impact

An agency action that is overboard and fails to consider less restrictive, yet easily administered regulatory alternatives, fails the arbitrary and capricious test. This is especially true when the overbreadth results in extreme and unnecessary economic impact. The Halt Order's sweeping eviction ban implicates every residential owner and every residential tenant <u>nationwide</u> and is causing severe and substantial harm to landowners and the residential rental market.

The September 25, 2020, report[71] issued by Stout Risius Ross, LLC estimates that as of September 14, 2020, there were between 23.3 million and 34.0 million renters who were delinquent in their rent obligations and residing in rental properties without paying rent. Stout estimates that owners have already lost between $12.2 billion and $16.7 billion in delinquent rent,

---

[71]https://www.ncsha.org/wp-content/uploads/Analysis-of-Current-and-Expected-Rental-Shortfall-and-Potential-Evictions-in-the-US_Stout_FINAL.pdf (last accessed Dec. 18, 2020).

and that these amounts will increase to between $25.1 billion and $34.3 billion by the Halt Order's expiration on December 31, 2020.  The Stout Report is somewhat more promising compared with the Moody's Analytics Capital Market Research Report[72] which found that delinquent back rent resulting from the Halt Order will approach $70 billion by the Halt Order's expiration with the average renter owing his or her owner back rent at an average amount of $5,400 per renter.  A recent Credit Risk Loan Performance Report found that the Serious Delinquency Rate Percentage has increased from 3.91% in March 2020 when the Cares Act eviction moratorium began to 11.76% in August 2020 – an increase of 300% in only six (6) months.  Finally, according to Fitch Reports Summer 2020 Report[73], loan delinquencies have surged by 213 basis points (bps) to 3.59% from 1.46% a month earlier.  New delinquencies of $10.8 billion significantly exceeded resolution volume of only $172 million.  The current trajectory is tracking Fitch's expectation that the impact from the Halt Order is driving delinquency rates for Owners higher to a peak between 8.25% and 8.75% by the end of the quarter.  Fitch has also seen a greater rate of 30-day loan delinquencies rolling to 60 days, a trend likely to continue.

Because the CDC promulgated the Halt Order nationwide, without recognition of or sensitivity to, the individual circumstances on the ground in different parts of the country, and without consideration of less restrictive more narrowly tailored available measures, the Halt Order's overbreadth has resulted in enormous and unnecessary economic impact and is therefore arbitrary and capricious.

---

[72] https://therealdeal.com/2020/10/27/rent-debt-could-reach-70b-by-years-end-moodys/
[73] https://www.fitchratings.com/research/structured-finance/coronavirus-sparks-largest-ever-rate-jump-in-us-cmbs-delinquencies-06-07-2020#:~:text=Fitch%20Ratings%2DNew%20York%2D06,from%201.46%25%20a%20month%20earlier.

### E. The Halt Order is arbitrary and capricious

In sum, based upon: (i) its pretext and purpose as an economic measure, and not a pandemic measure; (ii) the vagueness and ambiguity of the Halt Order itself; (iii) the weak and unsupported "scientific" data upon which the CDC bases its sweeping nationwide action; and (iv) the Halt Order's overbreadth, resulting in enormous economic effect, this Honorable Court must find that the Halt Order is wholly arbitrary and capricious and must be immediately "set aside" and vacated. 5 U.S.C. § 706(2)(C).

### IV. THE HALT ORDER VIOLATED THE PROCEDURAL DUE PROCESS REQUIREMENTS OF THE APA

Regulatory action that constitutes a rule under the APA —like the Halt Order— are legislative in nature and have the force and effect of law despite being promulgated by federal agencies. As these agencies are not elected[74], in order to ensure due process and protect other fundamental rights, Congress requires that these agencies' actions strictly adhere to certain procedural pre-conditions and mandates enshrined within the APA. 5 U.S.C. § 553(b) of the APA requires:

---

[74] In fact, the Halt Order's issuing official within the CDC was Nina Witkofsky. According to the Halt Order, the issuance of the nationwide eviction moratorium was the result of the Ms. Witkofsky's "determine[ation]" that "the temporary halt in evictions in this Order constitutes a reasonably necessary measure under 42 CFR 70.2 to prevent the further spread of COVID-19 throughout the United States." Moreover, it was Ms. Witkofsky that "further determined that measures by states, localities, or U.S. territories … are insufficient to prevent the interstate spread of COVID-19." What is fascinating, however, is that these determinations were made by an individual – Ms. Witkofsky - with no public health background. Ms. Witkofsky studied finance and business administration in college and, before the CDC worked, as a publicist and talent booker for Turner Broadcasting's Cartoon Network. According to an October 16, 2020, article published in the *Business Insider*, "The White House planted [Ms. Witkofsky] with no public health experience at the U.S. Centers for Disease Control and Prevention to keep tabs on the agency and its scientists." That same day, the *Associated Press* reported that "[Ms. Witkofsky] was part of a push to get more politics into the CDC to help control messaging after a handful of leaks were upsetting the apple cart, said an administration official."

Any agency statement that implements, interprets, or proscribes law [any RULE] must be published in the Federal Register <u>30-days before going into effect</u> with <u>notice</u> which includes:
- Statement of Time, Place and Mature of Rile Making Proceedings
- Reference to Legal Authority for the Rule
- Terms/Description of the Rule

5 U.S.C. § 553(c) of the APA requires:

After notice required by this section, the agency shall give interested persons an opportunity <u>to participate in the rule making through submission of written data, views, or arguments</u> with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

These procedural pre-conditions allow those affected by the proposed rule an opportunity to be heard in order for the agency to understand, acknowledge, and address the potential effects of the proposed rule. The statutory requirement for notice-and-comment is neither a suggestion nor simply good practice; it is a <u>mandatory due process requirement</u> within the APA, without which the regulatory action is necessarily void *ab initio* and must be struck down.

There is no dispute in this litigation that, instead of complying with these due process mandates, the CDC waited until July 24, 2020, when the expiration of the eviction protections enacted under the CARES Act ended, and then waited again —an additional thirty-days until August 28, 2020, after the expiration of the notice period in the CARES Act expired— to, for the first time, promulgate the Halt Order on September 1, 2020 –only three (3) days before its publication and enactment[75], and <u>without undertaking the procedural due process notice-and-comment statutory requirement</u>. The Halt Order is, therefore, in clear violation of the APA's due process pre-conditions, void *ab initio*, and must be struck down and vacated under 5 U.S.C. § 706. *See Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165 (7th Cir. 1996) ("a rule promulgated by an agency that is subject to the Administrative Procedure Act is invalid unless the agency first issues a public

---

[75] 85 Fed. Reg. 55296.

notice of proposed rulemaking, describing the substance of the proposed rule, and gives the public an opportunity to submit written comments").

In an effort to justify its deliberate violation of the APA's due process pre-conditions, the CDC first sought to erroneously proclaim that the Halt Order is "an emergency action taken under the existing authority of 42 CFR 70.2" not "within the meaning of the Administrative Procedure Act."[76]  Recognizing, however, that the Halt Order is a rule and that the CDC's erroneous proclamation was insufficient to remove the Halt Order from the mandatory due process pre-conditions of the APA, the CDC then wrongly argues that the Halt Order is exempt from the APA's procedural pre-conditions because (1) it is actually a Major Rule under the Congressional Review Act, 5 U.S.C. §§ 801, *et seq*. ("CRA") or (2) because of "good cause".

### A.      The Halt Order is Not a Major Rule under the CRA

To qualify as a Major Rule[77] under the CRA, the CDC was required —prior to issuance of the Halt Order— to have, among other things, submitted the Halt Order and the required report to each House of Congress and the Comptroller General. 5 U.S.C. § 801.[78]  The Halt Order would then take effect 60 days after either the date on which Congress received the required report on the Halt Order <u>or</u> the date the Halt Order is published in the Federal Register, <u>whichever is later</u>.[79] The CDC did not undertake <u>any of the steps</u> needed to put the Halt Order through the Major Rule

---

[76] (D.E. 1-12 at pg. 6); 85 FR 55296.

[77] "The term 'major rule' is defined in 5 U.S.C. § 804(2).

[78] "Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing -- (i) a copy of the rule;(ii) a concise general statement relating to the rule, including whether it is a major rule; and (iii) the proposed effective date of the rule . . . .On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress -- (i) a complete copy of the cost-benefit analysis of the rule, if any; (ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609; (iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and  (iv) any other relevant information or requirements under any other Act and any relevant Executive orders."  5 U.S.C. § 801(a)(1)(A) – (B).

[79] 5 U.S.C. § 801(a)(3)(A).

process and, therefore the Halt Order cannot qualify as a Major Rule. Moreover, even had the CDC complied with the CRA requirements and submitted the Halt Order and its corresponding report to the House and Comptroller General, that would have suspended the effective date of the Halt Order, at the earliest, until approximately November 1, 2020. Clearly that did not occur, and the CDC rushed the Halt Order into effectiveness on September 4, 2020. As a result, the Halt Order does not qualify as a Major Rule under the CRA and must comply with the APA.

**B. The Halt Order is likewise not exempted from the APA's due process procedural mandates under the "good cause" exception**

In a final (unsuccessful) effort by the CDC to remove the Halt Order from the ambit of the APA, the CDC argues that the Halt Order is exempt from the APA's due process procedural requirements by making a singular conclusory claim under the "good cause" exception.[80]

The CDC's burden to show that good cause exists is a heavy one. *See United States v. Cain*, 583 F.3d 408, 420 (6th Cir. 2009) ("the good cause exception is narrowly construed and only reluctantly countenanced"). Like with the CDC's two (2) alternate —but equally unsustainable claimed due process exemptions[81]—the CDC's "good cause" exemption fails to satisfy that heavy burden. Good cause does not exist simply by virtue of an agency's proclamation of emergency. *See Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 707 (D.C. Cir. 2014). Nor can an agency establish good cause because of the mere existence of a deadline, *United States Steel Corp. v. United States Environmental Protection Agency*, 595 F.2d 207, 213 (5th Cir. 1979), especially when that deadline was artificially and unnecessarily created by virtue of the agency's own inaction. Unsurprisingly, those are the very two (2) arguments made by the CDC to support its "good cause" exemption claim. The CDC argues that COVID-19 is an emergency. While

---

[80] (D.E. 1-12 at pg. 6); 85 FR 55296.
[81] Namely, the Halt Order is an "Emergency Action" not a "Rule" and the Halt Order is as a Major Rule under the CRA.

Plaintiffs' agree with that general sentiment, for purposes of the "good cause" analysis under the APA, that designation is immaterial. The question is not whether an emergency exists but rather whether the failure to provide the notice and comment period stemmed directly from an emergency situation; here it did not. The CDC had from March 28, 2020 (when the CARES Act 120-day eviction moratorium took effect) until August 28, 2020 (when the CARES Act notification period expired) to: (i) consider and promulgate a lawful and proper rule, (ii) to satisfy the requisite requirement for a notice-and-comment period, and (iii) to lawfully issue the Halt Order. Each of these required steps could have been undertaken during the pendency of the CARES Act eviction protection. No emergency deadline existed during that time, and the fact that the CDC waited until September 1, 2020, creating for itself an "emergency deadline," does not relieve the CDC of the procedural requirements of the APA.

This Honorable Court must then ask, why did the CDC blatantly violate the mandatory due process requirements of the APA knowing that any subsequent challenge and judicial review would necessarily result in the Halt Order being immediately struck down on procedural due process grounds? The answer, quite candidly, is because the CDC had just learned from two (2) recent experiences that compliance with procedural due process involving agency action in excess of delegated congressional authority will either forestall the issuance of unlawful action like the Halt Order or enjoin its effect altogether. Given the edict under which the CDC was operating from the highest level of the executive branch, the CDC could not allow the Halt Order to share the same fate as other recently doomed agency rules. The CDC therefore made the calculated, deliberate, and unlawful choice to violate APA procedural due process, hoping the short duration[82] of the Halt Order would provide ample protection from judicial review.[83]

---

[82] September 4 through December 31, 2020.
[83] *See also*, (D.E.78), Plaintiffs' Motion to Modify the Briefing Schedule. December 8, 2020.

### 1. *The SNAP Rule - District of Columbia, et al. v. U.S. Department of Agriculture*

On December 5, 2019, the United States Department of Agriculture ("USDA"), issued a rule concerning the Supplemental Nutrition Assistance Program ("SNAP").[84] The USDA sought to use agency authority to unilaterally alter the parameters and eligibility of the SNAP program. Like with the Halt Order, the USDA rule was arbitrary and capricious, and failed to undertake the procedural requirements of the APA. On January 16, 2020, a legal challenge was filed seeking judicial review of the USDA's failures under the APA's due process requirements.[85] Plaintiffs sought (1) the issuance of a preliminary injunction against enforcement or (2) a strike down of the rule.[86] On March 13, 2020, the D.C. District Court issued a nationwide injunction finding that Plaintiffs were, *inter alia*, likely to succeed upon the merits of their claim that the Rule was arbitrary and capricious.[87] Following subsequent briefing, the District Court struck down and vacated the SNAP Rule, as arbitrary and capricious and in violation of the procedural requirements of the APA –namely, notice and comment.[88]

### 2. *The CDC's Removal Order - PJES vs. Wolf*

But even more directly on point with the Halt Order, on March 24, 2020, the CDC issued its first COVID-19 rule –the *Order Suspending the Right to Introduce Certain Persons from*

---

[84] 84 FR 66782-01
[85] Complaint, *District of Columbia, et al. v. U.S. Department of Agriculture, et al*., 1:20-cv-119-BAH, Jan. 1, 2020, D.E. 1.
[86] *Id*.
[87] Memorandum Opinion, *District of Columbia, et al. v. U.S. Department of Agriculture, et al*., 1:20-cv-119-BAH, March 13, 2020, D.E. 51. The Court did not address the plaintiffs' APA procedural claims as it found that they had already satisfied their burden of demonstrating they were likely to succeed on their arbitrary and capricious claims. "The plaintiffs are likely to succeed on their claim that the waiver changes in the Final Rule are arbitrary and capricious. Given this, the plaintiffs' other APA claims — that the Rule is contrary to law and was promulgated without observing procedural requirements — need not be addressed at this stage of the case." *Id*. at pg. 28. The Memorandum Opinion is attached here to for reference as **Exhibit "E"**.
[88] Memorandum Opinion, *District of Columbia, et al. v. U.S. Department of Agriculture, et al*., 1:20-cv-119-BAH, Oct. 18, 2020, D.E. 107.

*Countries Where a Quarantinable Communicable Disease Exists* (the "Removal Order").[89]  The stated purpose of the Removal Order was to give the CDC the power to prevent foreign nationals from entering the country, as well as expelling foreign nationals.[90]  Like the Halt Order, the CDC identified a quarantine enabling statute (42 U.S.C. § 265), as well as a corresponding quarantine enabling regulation (71 C.F.R. § 71.40).  Having just witnessed the injunction issued against the SNAP Rule only ten days earlier, the CDC appropriately undertook the requisite 5 U.S.C § 553 notice and comment due process requirement, publishing the Removal Order for comment while allowing the interim final rule to take effect.[91]  During the notice and comment period, on April 17, 2020, a legal challenge to the Removal Order was filed seeking judicial review of whether the CDC exceeded its delegated authority under the quarantine enabling statute to promulgate the Removal Order.[92]  On August 8, 2020, a motion for emergency injunctive relief was requested by the plaintiff.[93] Thereafter, Magistrate Michael Harvey issued a report and recommendation — which was ultimately adopted by the District Court[94]— to issue the preliminary injunction, halting any enforcement by the CDC of the Removal Order.[95]  The court determined that the canons of construction, and the statute's location within the quarantine sections, clearly demonstrate that Congress did not intend to give the CDC the power or authority to expel anyone from the country

---

[89] 85 FR 16559 (interim final rule); 85 FR 56424-01 (final rule).

[90] 85 FR 16559-01.

[91] *Id.*

[92] Complaint, *PJES vs. Wolf, 1:20-cv-2245*, 1:20-cv-2245, Aug. 14, 2020, D.E. 1.

[93] Motion for Preliminary Injunction, *PJES vs. Wolf, 1:20-cv-2245*, 1:20-cv-2245, Aug. 20, 2020, D.E. 15.

[94] *See P.J.E.S.*, 2020 WL 6770508, at *1.

[95] *P.J.E.S. v. Wolf*, No. 120CV2245EGSGMH, 2020 WL 5793305 (D.D.C. Sept. 25, 2020); *See P.J.E.S.*, 2020 WL 6770508, at *9 ("Neither Section 265 nor any of the definitions provided by the Government contain the word 'expel.' They do not even contain synonyms of the word expel, such as 'eject' or "evict." . . . The Court finds this to be significant, because even 'broad rulemaking power must be exercised within the bounds set by Congress," and the CDC "does not [have the] power to revise clear statutory terms[.]'"). The *P.J.E.S.* case is attached here to for reference as **Exhibit "F"**.

and, as a result the CDC's actions were likely to be found in excess of statutory authority and unlawful.[96]

Salient to the inquiry here, the CDC straightforwardly classified the Removal Order as a rule withing the meaning of the APA and subjected it to notice and comment, as well as the mandated review process. During the notice and comment period, public comments revealed: (i) objections to the CDC bypassing notice and comment in allowing the interim rule to go into effect; (ii) complaints that the Removal Order exercised powers not granted the Executive Branch; (iii) complaints of vagueness and ambiguity; (iv) objections to the science upon which the CDC relied; (v) complaints the Removal Order was arbitrary and capricious; (vi) allegations that the Removal Order conflicted with other established law; and (vii) objections that the CDC was in excess of the express powers granted under the enabling statute.[97] These are virtually identical to the issues raised herein concerning the Halt Order, and upon many of the same issues Magistrate Judge Harvey granted relief.

And perhaps, this now sheds light on the CDC's deliberate decision not to undertake the procedural due process requirements mandated by the APA. Having just largely adhered to those requirements, providing the requisite notice and comment, the CDC watched as another Rule —promulgated under the quarantine statutes— was besieged and ultimately enjoined on the very same bases identified by commenters. The CDC thus made the strategic (and knowingly unlawful) decision to violate the APA's procedurally due process mandates in the hope that by the time the legal challenge was asserted, and the judicial review completed, the term of the Halt Order will have concluded - mooting opposition.[98] The CDC's decision to violate the procedural requirements of the APA and deny the public its protected due process rights cannot be tolerated.

---

[96] *Id*. at *11-16.
[97] *See* 85 FR 56447-455.
[98] (*See* D.E.78, Plaintiffs' Motion to Modify the Briefing Schedule. December 8, 2020).

Since the Halt Order was promulgated "without observance of procedure required by law," this Honorable Court must "hold unlawful" the Halt Order and ensure that it is vacated and promptly "set aside." 5 U.S.C. § 706.

## V. THE HALT ORDER VIOLATES THE UNITED STATES CONSTITUTION

Plaintiffs' argue that the Halt Order violates the Takings Clause and is a denial and deprivation of Plaintiffs' rights to substantive and procedural Due Process under the Fifth Amendment; violates the Tenth Amendment and the Anti-Commandeering Doctrine; cannot pre-empt applicable State law under the Supremacy Clause; impedes Plaintiffs' fundamental right to access the judiciary; and acts as an unlawful suspension of law. As this Honorable Court has addressed the need for additional briefing on Plaintiffs' APA substantive and procedural claims, this Memorandum has focused in detail on those issues; however, Plaintiffs specifically incorporate by reference all constitutional arguments and supporting law contained in their Amended Complaint, Motion and Application for Emergency Hearing and Preliminary Injunction, and oral arguments made before the Court on October 30, 2020.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request the relief granted herein; that a final judgement be rendered on the merits of this case in favor of Plaintiffs; and that the Halt Order be declared unlawful, set aside, and struck down with no further force and effect. Plaintiffs further request expedited consideration of the instant Motion, as well as a ruling thereupon.

Respectfully Submitted,

**GLANKLER BROWN, PLLC**

/s/ S. Joshua Kahane
S. Joshua Kahane (BPR #23726)
jkahane@glankler.com


Aubrey B. Greer (BPR #35613)
agreer@glankler.com

6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
Telephone: (901) 525-1322
Facsimile: (901) 525-2389
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2020, a copy of the foregoing was served on all parties via the Court's ECF System:

United States Secretary of Housing and Urban Development
c/o Associate General Counsel for Litigation - Room 10258
451 Seventh Street, S.W.
Washington D.C. 20410

Honorable Benjamin S. Carson, M.D.
United States Secretary of Housing and Urban Development
c/o Associate General Counsel for Litigation - Room 10258
451 Seventh Street, S.W.
Washington D.C. 20410

Honorable United States Attorney General William P. Barr
U.S. Department of Justice
950 Pennsylvania Avenue, NW, Room 1111
Washington, D.C. 20530

Honorable Nina B.  Honorable Nina B. Witkofsky, Acting Chief of Staff
United States Center for Disease Control and Prevention
1600 Clifton Road
Atlanta, Georgia 30333

Honorable Secretary Alex Azar
United States Department of Health & Human Services
200 Independence Avenue, S.W., Room 713-F
Washington, D.C. 20201

Honorable Vice Admiral Jerome M. Adams, M.D., Surgeon General
United States Department of Health & Human Services
200 Independence Avenue, S.W., Room 713-F
Washington, D.C. 20201

Honorable D. Michael Dunavant,
United States Attorney General for the Western District of Tennessee
U.S. Attorney's Office
167 North Main Street, Suite 800
Memphis, Tennessee 38103

/s/ S. Joshua Kahane
S. Joshua Kahane