IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

TIGER LILY, LLC;
HUNTER OAKS APARTMENTS UTAH, LLC;
NORTH 22ND FLAT, LLC;
CHERRY HILL GARDENS, LLC;
CHURCHILL TOWNHOMES, LLC;
BRITTANY RAILEY; and
APPLEWOOD PROPERTY MANAGEMENT, LLC,

    Plaintiffs,

v.                                                                                       No: 2:20-cv-02692-MSN-atc

UNITED STATES DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT and BENJAMIN S. CARSON, M.D.,
in his official capacity as United States Secretary of Housing
and Urban Development;
UNITED STATES DEPARTMENT OF JUSTICE and WILLIAM
P. BARR, in his official capacity as United States Attorney General;
UNITED STATES CENTER FOR DISEASE CONTROL AND
PREVENTION and NINA B. WITKOVSKY, in her official capacity
as Acting Chief of Staff of the Center for Disease Control and Prevention;
UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES
and ALEX AZAR, in his official capacity as United States Secretary of
Health and Human Services;
VICE ADMIRAL JEROME M. ADAMS, M.D., in his official capacity as
United States Surgeon General; and
D. MICHAEL DUNAVANT, in his official capacity as United States Attorney General for the
Western District of Tennessee,

    Defendants.

---

**ORDER GRANTING PLAINTIFFS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

This cause comes before the Court on Plaintiffs' Motion for Judgment on the Administrative Record (ECF No. 84) and Defendants' Motion for Judgment on the Pleadings. (ECF No. 82). The parties filed their respective responses on January 15, 2021.[1] (ECF Nos. 87, 88.) The parties then filed their replies on January 29, 2021. (ECF Nos. 91, 92.) For the reasons below, the Court **GRANTS** Plaintiffs' Motion and **DENIES** Defendants' Motion.

## FACTUAL BACKGROUND

On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. The next day, Tennessee Governor Bill Lee issued Executive Order No. 14 declaring a State of Emergency in response to the COVID-19 outbreak. Then-President Trump declared a national emergency for COVID-19 on March 13, 2020.

On March 27, 2020, then-President Trump signed into law the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, 134 Stat. 281 (2020). Sections 4022 and 4023 of the CARES Act protected those with federally backed mortgages from foreclosures until at least August 31, 2020 and allowed for a mortgage forbearance for up to 180 days. Section 4024(b) provided for a 120-day eviction moratorium for rental units in properties that participated in federal assistance programs or had a federally backed mortgage or multifamily loan. Congress did not renew the CARES Act protections for homeowners or renters upon their expiration.

On August 8, 2020, then-President Trump issued an executive order directing the Secretary of Health and Human Services and the Director of the Centers for Disease Control and Prevention (the "CDC") to "consider whether any measures temporarily halting residential evictions for any

---

1. In conjunction with their Response, Defendants requested for leave to file excess pages. (ECF No. 87.) Plaintiffs do not oppose Defendants' request. (*Id.* at PageID 2499.) The Court finds the motion well-taken and hereby **GRANTS** the motion.

tenants for failure to pay rent [were] reasonably necessary to prevent the further spread of COVID-19 from one State or possession into any other State or possession." Less than a month later, on September 4, 2020, the CDC issued the "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19" (the "Halt Order"). 85 Fed. Reg. 55,292 (Sept. 4, 2020).

The Halt Order imposes a moratorium on evictions of certain tenants under residential leases, "subject to further extension, modification, or rescission." *Id.* at 55,296. To qualify for protection under the Halt Order, a tenant must submit a declaration under penalty of perjury affirming that the tenant:

(1) has used best efforts to obtain government assistance to make rental payments;

(2) expects to earn less than $99,000 in annual income in 2020, was not required to pay income taxes in 2019, or qualified for a stimulus check under the CARES Act;

(3) is unable to pay full rent due to substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses;

(4) is using best efforts to make partial payments;

(5) would likely experience homelessness or need to move into a shared residence if evicted;

(6) understands that rent obligations still apply; and

(7) understands that the moratorium was to end on December 31, 2020.

*Id.* at 55,297.

The Halt Order provides extensive background on COVID-19 and its historic threat to public health. The Halt Order notes that "[t]he virus that causes COVID-19 spreads very easily

between people who are in close contact with one another (within about 6 feet), mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks." *Id*. at 55,293. In light of this, the Halt Order makes specific findings about the use and effectiveness of eviction moratoria in the context of a pandemic, providing that such moratoria "facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID-19 due to an underlying medical condition." *Id*. at 55,294. Further, eviction moratoria "allow State and local authorities to more easily implement stay-at-home and social distancing directives to mitigate the community spread of COVID-19," while also facilitating "housing stability [that] helps protect public health because homelessness increases the likelihood of individuals moving into close quarters in congregate settings, such as homeless shelters, which then puts individuals at higher risk to COVID-19." *Id*.

While the Halt Order prohibits evictions at the national level, it contains several exceptions. It provides that it "does not apply in any State, local, territorial, or tribal area with a moratorium on residential evictions that provides the same or greater level of public-health protection" as the Halt Order's requirements. *Id*. It does not relieve any individual of the obligation to pay rent, and nothing in the Halt Order prevents landlords from charging or collecting fees, penalties, or interest as a result of a failure to pay rent. *Id*. The Halt Order also does not preclude evictions based on a tenant, lessee, or resident: (1) engaging in criminal activity while on the premises; (2) threatening the health or safety of other residents; (3) damaging property; (4) violating any applicable building code or other similar regulations as to health and safety; or (5) violating any other contractual obligation other than the timely payment of rent. *Id*.

The Halt Order imposes criminal penalties for those that violate its provisions: Individuals could be subject to a fine of up to $250,000, one year in jail, or both, while organizations could be subject to a fine of up to $500,000. *Id.* at 55,296.

The Halt Order was originally set to expire on December 31, 2020. However, prior to its expiration, Congress passed the Consolidated Appropriations Act, 2021 (the "CAA"), which extended the Halt Order an additional month until January 31, 2021. H.R. 133, 116th Cong., div. N, tit, V, § 502. Additionally, the CAA allocated $25 billion to states to aid individuals behind on rent. H.R. 133, 116th Cong., div. N, tit, V, § 501.

On January 20, 2021, Joseph R. Biden Jr. was sworn in as President of the United States. Upon taking office, President Biden asked the CDC to consider extending the Halt Order until March 31, 2021. *Fact Sheet: President-elect Biden's Day One Executive Actions Deliver Relief for Families Across America Amid Converging Crises*, THE WHITE HOUSE (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-president-elect-bidens-day-one-executive-actions-deliver-relief-for-families-across-america-amid-converging-crises/. On January 29, 2021, the Director of the CDC signed an order extending and superseding the original Halt Order. (ECF No. 93-1 at PageID 2590–603.) As it stands, the Halt Order, as extended and superseded by the CDC's January 29th order, is in place until March 31, 2021, unless further extended, modified, or rescinded. (ECF No. 93-1 at PageID 2603.)

## **PROCEDURAL BACKGROUND**

Plaintiffs in this matter are a group of business organizations and individuals who own and/or manage residential real property in the form of multi-family apartment complexes, duplexes, townhomes, and single-family residences located within the Western District of Tennessee. (ECF No. 21 at PageID 195, 199–200.) On September 16, 2020, Plaintiffs filed their

Complaint for Declaratory Judgment and Injunctive Relief, (ECF No. 1), seeking a declaratory judgment that the Halt Order violates the Constitution and for injunctive relief to prevent Defendants from enforcing the Halt Order. On September 27, 2020, Plaintiffs filed a Motion and Application for Emergency Hearing and Preliminary Injunction. (ECF No. 12.) On October 8, 2020, Plaintiffs filed an Amended Complaint, which presents an additional claim but seeks the same relief set forth in their original Complaint. (See ECF No. 21.)

On November 6, 2020, this Court issued an Order denying Plaintiffs' Motion for Preliminary Injunction. (ECF No. 69.) In the Order, this Court found that it had jurisdiction to hear the matter but held that Plaintiffs were not entitled to a preliminary injunction because they were unable to demonstrate that they would face irreparable harm because Plaintiffs' harm was reducible to monetary damages. (*Id*. at PageID 967–71, 975–81.)

Defendants filed their Answer to First Amended Complaint (ECF No. 80), as well as the Administrative Record (ECF No. 79), on December 11, 2020. Defendants supplemented the administrative record on December 16, 2020. (ECF No. 81.)

On December 18, 2020, Defendants filed a Motion for Judgment on the Pleadings. (ECF No. 82.) In their motion, Defendants argue:

1. the Order does not violate the Administrative Procedure Act ("APA");
2. Plaintiffs have made no allegation that could overcome the presumption that agency action is valid;
3. the Order is demonstrably not arbitrary or capricious; and
4. Plaintiffs' due process claims fail because the Halt Order: (1) passes the extremely deferential rational basis test applied to substantive due process challenges to economic

6

regulations; and (2) is the type of broadly applicable governmental action to which procedural due process rights do not attach. (*Id.* at PageID 2169.)

Plaintiffs also filed a Motion for Judgment on the Administrative Record on December 18, 2020. (EFC No. 84.) In their motion, Plaintiffs argue that the Halt Order exceeded the CDC's authority under the enabling statute, is arbitrary and capricious in violation of the APA, violates the procedural due process requirements of the APA, and is unconstitutional. (ECF No. 84 at PageID 2248.)

On January 15, 2021, Plaintiffs responded in opposition to Defendants' Motion for Judgment on the Pleadings. (ECF No. 88.) In their response, Plaintiffs echo the arguments included in their Motion for Judgment on the Administrative Record. (*Id.*) On the same day, Defendants filed their response in opposition to Plaintiffs' Motion for Judgment on the Administrative Record and argued that in light of congressional action, Count 1 of Plaintiffs' Amended Complaint was now constitutionally moot,[2] or, in the alternative, the matter should be dismissed because Congress had ratified the Halt Order. (ECF No. 87-1 at PageID 2513–18.)

On January 29, 2021, the parties filed replies to one another. (ECF Nos. 91, 92.) Both replies contained the same arguments made in the past with Plaintiffs alleging the Halt Order was both unlawful and unconstitutional and Defendants contending otherwise. On February 1, 2021, Defendants filed Notice with the Court that the Halt Order has now been extended March 31, 2021. (ECF No. 93.) On February 23, 2021, Defendants filed the supplemental administrative record which contained the information on which the CDC Director based her decision to extend the Halt Order. (ECF No. 94.) On February 25, 2021, Plaintiffs filed Notice that the United States District Court for the Eastern District of Texas had deemed the Halt Order unconstitutional under the

---

2. Defendants have since withdrawn this argument. (ECF No. 93 at PageID 2587.)

Commerce Clause. (ECF No. 95.) In response, Defendants asserted that the holding of this case was irrelevant to the one before the Court because Plaintiffs did not contend that the Halt Order was unconstitutional under the Commerce Clause, and because that case did not extend beyond the parties involved in the case. (ECF No. 96 at PageID 2839.) On March 1, 2021, Plaintiffs replied that the Halt Order cannot be unconstitutional in the Eastern District of Texas but lawful in the Western District of Tennessee. (ECF No. 98 at PageID 2843.) Lastly, Plaintiffs filed Notice of the decision of the United States District Court for the Northern District of Ohio on March 12, 2021. (ECF No. 100.) Defendants responded that same day. (ECF No. 101.) At a status conference today, March 15, 2021, the parties confirmed that the American Rescue Plan Act of 2021, H.R. 1319, 117th Cong. (2021), (the "Rescue Act") does not extend the Halt Order.

## **STANDARD OF REVIEW**

As an initial matter, the Court notes what appears to be a discrepancy between the parties. Plaintiffs have titled their Motion "Plaintiffs' Motion for Judgment on the Administrative Record," (ECF No. 84) and ask that the Court review the Halt Order under the APA. (ECF No. 84-1 at PageID 2257–59.) Defendants, on the other hand, title their Motion "Defendants' Motion for Judgement on the Pleadings," which asks the Court to review the Halt Order under the standard set forth under Federal Rule of Civil Procedure 12(c). (ECF No. 82-1 at PageID 2191–92.) In reality, there is not much daylight between the two sides for the Court's review: Under either a Rule 56 motion or a Rule 12(c) motion, the standard of review is the same when it comes to agency action. *See Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) ("[T]here is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment."). When reviewing agency action, the district court "sits as

8

an appellate tribunal," *see Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009), and the question before it "is a question of law, and only a question of law." *Shalala*, 988 F.2d at 1226.

The Court reviews the propriety of agency action under the Administrative Procedure Act ("APA"). *See Freeman v. United States Dep't of Labor*, 653 F. App'x 405, 409 (6th Cir. 2016).

> [T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . .

5 U.S.C. § 706(2); *see also Bangura v. Hansen*, 434 F.3d 487, 502 (6th Cir. 2006) ("The APA directs courts to review agency actions under a deferential standard. A court may not set aside or hold unlawful an agency action unless that action is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." (internal citations omitted)). An agency's interpretation of a statute "is entitled to deference, but the courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute . . . that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32 (1981) (internal citations omitted).

## **DISCUSSION**

This is no ordinary case. The task at hand, statutory construction of the Public Health Act and scrutiny of the Halt Order under the Administrative Procedure Act, is not unusual per se, but the circumstances precipitating it are rather extraordinary. Prompted by the worst pandemic in

more than a century, the Executive and Legislative branches of two different Administrations and two different Congresses have played ping pong, if not "hot potato," with an eviction moratorium spanning two different years, impacting the lives and property of thousands of souls in ways never before experienced in the history of the United States.

The "on-again, off-again" activity between the Legislative and Executive Branches of Government has made adjudication of the Halt Order something of a "greased pig." No sooner may courts get a grasp than it slips away. From the CARES Act to Executive Order to the Consolidated Appropriations Act, 2021 to and back Executive Order, the Halt Order (or its equivalent) has been embraced at various times as executive action, legislative action, or both. But it has never been made law.

One hundred and three years ago this month, in 1918, the last great flu epidemic began. And, just last week, Congress enacted its latest version of pandemic relief, the Rescue Act. American Rescue Plan Act of 2021, H.R. 1319, 117th Cong. (2021). The Rescue Act provides over $20 billion to underwrite rental assistance, but it does not extend the moratorium on evictions. Whereas Defendants previously asserted Congress had ratified the Halt Order under the Consolidated Appropriations Act, 2021 (ECF No. 87-1 at PageID 2516–18), any such ratification was of limited duration, and now the opposite appears true. Either Congress no longer embraces the Halt Order, or Congress feels it has served its purpose. The Halt Order will apparently come to its end, as we hope this pandemic is also finally coming to its end; however, if recent history is any guide, additional executive action might occur or is at least capable of repetition.

As the Sixth Circuit has recently said, "[w]hile the law may take periodic naps during the pandemic, we will not let it sleep through one." *Maryville Baptist Church, Inc., et al. v. Beshear*,

957 F.3d 610, 615 (6th Cir. 2020).[3] Therefore, the Court must adjudicate the request for declaratory relief.

### I.     42 U.S.C. § 264 does not authorize the Halt Order.

The question has been presented, and it is thus necessary to decide, whether the Court must declare *ultra vires*, and set aside, the Halt Order—the original CDC action at issue. "The Administrative Procedure Act . . . prohibits agencies from taking action 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1037 (6th Cir. 2018) (citing 5 U.S.C. § 706(2)(C)). It is for the Court to determine and declare whether the Halt Order is:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege or immunity; [or]

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right .

. . .

5 U.S.C. § 706(2)(A)–(C).

Though much has recently been made by other litigants in other courts concerning similarly alleged constitutional violations or the absence of same, this Court seeks to avoid constitutional entanglement altogether by construing the statute narrowly at the outset as it was written for the

---

3. Similarly, in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63 (2020), the Supreme Court said, "But even in a pandemic, the Constitution cannot be put away and forgotten." The *per curiam* opinion went on to explain that relief was warranted because "[i]t is clear that this matter is not moot" and because the applicants remained under "constant threat" that the local government could again reimpose the challenged action. *Id.* at 68–69; *see also id.* at 72 (Gorsuch, J., concurring) ("The parties before us have already shown their entitlement to relief. Saying so now will establish clear legal rules and enable both sides to put their energy to productive use, rather than devoting it to endless emergency litigation. Saying so now will dispel, as well, misconceptions about the role of the Constitution in times of crisis, which have already been permitted to persist for too long.").

11

limited purpose for which it was designed.  "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988); *United States v. Green*, 654 F.3d 637, 646 (6th Cir. 2011).

> The statute provides:
>
> The Surgeon General, with the approval of the Secretary, is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. **For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.**

42 U.S.C. § 264(a) (emphasis added).

> The regulation promulgated thereunder provides:
>
> Whenever the Director of the Centers for Disease Control and Prevention determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases from such State or possession to any other State or possession, **he/she may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection.**

42 C.F.R. § 70.2 (emphasis added).

Defendants contend the statute permits the CDC Director to do whatever is necessary to prevent the spread of communicable disease. (ECF No. 82-1 at PageID 2194–97.)  That is not the case.  The plain meaning of the statute limits the agency's authority.  If it did not do so, it would likely amount to an unconstitutional delegation of authority by Congress in violation of the non-delegation doctrine under Article 1 Section 1.  This Court avoids this constitutional conundrum by construing the statute as written under norms of traditional statutory construction for this reason.

12

The statute clearly limits the agency's authority under the context of "Quarantine" set forth in the enabling language of the Public Health Act to those measures enumerated and others like them. *See* 42 U.S.C. § 264(a). These measures do not include moratoria on evictions.

"[The] Court does not revise legislation . . . just because the text as written creates an apparent anomaly[.]" *Michigan v. Bay Mills Indian Cmty.*, 572 U. S. 782, 794 (2014). Here we have an apparent anomaly; not because of the text of the statute as written, but because the CDC has historically confined its actions to those traditionally associated with quarantine as defined by law.[4]

"[T]he plain, obvious, and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing, but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." *Lynch v. Alworth-Stephens Co.*, 267 U.S. 364, 370 (1925) (citation and internal quotations omitted).

The Court does not minimize the gravity of the pandemic nor the exigency of this hard case. It is noteworthy, however, that Congress has neither acted to amend the Public Health Act, the CARES Act, nor provided for an ongoing moratorium on evictions as recently as the adoption of the Rescue Act last week. It is not the Court's role to revise the Public Health Act nor any subsequent legislation through its own ingenuity when Congress could do so through legislation instead. Judicial restraint is the order of the day. Alexander Hamilton quoted Montesquieu in Federalist No. 78 for good reason: "There is no liberty if the power of judging be not separated from the legislative and executive powers." The Federalist No. 78, at 379–80 (Alexander Hamilton) (Dover ed., 2014). This Court respects and maintains that separation.

---

4. Ironically, the last public health event prompting a response of this magnitude by the CDC was the quarantine imposed during the influenza pandemic of 1918. But the Halt Order is not a quarantine, and it is nothing like anything the CDC has ever undertaken.

13

Fortunately, traditional rules of statutory interpretation make this possible because to read the language otherwise ignores important canons of statutory construction — *noscitur a sociis, ejusdem generis,* Constitutional avoidance, and absurd results — among others.  In the recent case of *Donovan v. Firstcredit, Inc.*, 983 F.3d 246 (6th Cir. 2020), construing the Fair Debt Collection Practices Act, the Sixth Circuit once again makes clear, "[t]he traditional canons of statutory interpretation are useful in determining whether the statutory text is susceptible to more than one **reasonable** interpretation."  *Donovan*, 983 F.3d at 256 (emphasis added) (citing *United States v. Miller*, 734 F.3d 530, 541 (6th Cir. 2013)).  "[T]he question whether a statute is ambiguous arises after, not before, a court applies traditional canons of interpretation[.]" *OfficeMax, Inc. v. United States*, 428 F.3d 583, 592 (6th Cir. 2005); *Donovan*, 983 F.3d at 256.

Plaintiffs contend the CDC Director is limited to the types of measures to be undertaken. (ECF No. 84-1 at PageID 2265–69.)  Defendants contend she is not.  (ECF No. 82-1 at PageID 2194–201.)  Therein lies the rub.  Plaintiffs' interpretation is the more reasonable.  If the Director were not limited in his or her authority, why list any specific examples of measures within that authority?  Why not simply provide the Director "is authorized to make and enforce such regulations as in [her] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases."?  In other words, Defendants' theory renders the limitations of the statute—*e.g.* inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals, or articles to be so infected or contaminated—superfluous or surplusage which must be resisted.  *See Yates v. United States*, 574 U.S. 528, 543 (2015).

In *Yates v. United States*, the Supreme Court was confronted with construction of the term "tangible object;" specifically, whether a small fish was a tangible object within the meaning of the Sarbanes-Oxley Act prohibiting tampering with "any record, document, or tangible object" in

14

an attempt to obstruct a federal investigation. *Yates*, 574 U.S. at 531–32. Did it refer to "something similar to records or documents" or, alternatively, "colonial farmhouses, crocodiles, or fish" instead? Justice Ginsburg wrote:

> We resist a reading of §1519 that would render superfluous an entire provision passed in proximity as part of the same Act.
>
> The words immediately surrounding "tangible object" in §1519—"falsifies, or makes a false entry in any record [or] document"—also cabin the contextual meaning of that term. As explained in *Gustafson* v. *Alloyd Co.*, 513 U.S. 561 (1995), we rely on the principle of *noscitur a sociis—*a word is known by the company it keeps—to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." In *Gustafson*, we interpreted the word "communication" in §2(10) of the Securities Act of 1933 to refer to a public communication, rather than any communication, because the word appeared in a list with other words, notably "notice, circular, [and] advertisement," making it "apparent that the list refer[red] to documents of wide dissemination." And we did so even though the list began with the word "any."
>
> The *noscitur a sociis* canon operates in a similar manner here. "Tangible object" is the last in a list of terms that begins "any record [or] document." The term is therefore appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects involving records and documents, *i.e.,* objects used to record or preserve information….
>
> A canon related to *noscitur a sociis*, *ejusdem generis*, counsels: "[W]here general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." In *Begay* v. *United States*, 553 U.S. 137, 142-143 (2008), for example, we relied on this principle to determine what crimes were covered by the statutory phrase "any crime . . . that . . . is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]" The enumeration of specific crimes, we explained, indicates that the "otherwise involves" provision covers "only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.'" Had Congress intended the latter "all encompassing" meaning, we observed, "it is hard to see why it would have needed to include the examples at all." Just so here. Had Congress intended "tangible object" in §1519 to be interpreted so generically as to capture physical objects as dissimilar as documents and fish, Congress would have had no reason to refer specifically to "record" or "document." The Government's unbounded reading of "tangible object" would render those words misleading surplusage.

15

*Id.* at 543–46 (internal citations omitted).

The statute before this Court sets forth a narrow list of measures which may be undertaken to make and enforce regulations necessary to prevent the spread of disease. The statute authorizes the Director to undertake certain specifically enumerated acts "and other measures, as in [her] judgment may be necessary." 42 U.S.C. § 264(a). But those "other measures" are limited by the specific examples listed. They provide the intelligible principle without which Congress' delegation of authority in this instance would be too broad to withstand Constitutional scrutiny.[5] To ignore them creates surplusage which is also to be avoided.

It would not be reasonable had Congress delegated such broad authority nor could it constitutionally have done so. The CDC was given broad authority to make and enforce regulations, and the statute specifically identifies the measures to be taken. To hold otherwise would be to construe the statute so broadly as to grant this administrative agency unfettered power to prohibit or mandate anything, which would ignore the separation of powers and violate the non-delegation doctrine. The agency could not only prohibit landlords from evicting tenants (whether occupying federally supported property or not) but any "congregate activity"—*e.g.*, in-person voting, interstate and intra-state travel or mass immigration—even though it has not done so. Under Defendants' theory, the agency could also mandate the nationwide wearing of masks even though it has not done so.

Once again from Federalist No. 78:

> There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void. No legislative act, therefore, contrary to the Constitution, can

---

5. Unfortunately, the regulation does the opposite of what the statute allows. It authorizes the Director to take such measures as she deems reasonably necessary, including those specifically enumerated. 42 C.F.R. § 70.2. This is arguably broader than—or beyond—the statute's authority. So, too, then is the Halt Order.

> be valid. To deny this would be to affirm that the deputy is greater than his principle; . . . that the representatives of the people are superior to the people themselves; that men acting by virtue of powers may do not only what their powers do not authorize, but what they forbid.

The Federalist No. 78, at 380 (Alexander Hamilton) (Dover ed., 2014).

The Sixth Circuit recognizes and upholds this fundamental principle. "Just as the executive and judicial branches may not encroach on the power of Congress, Congress may not abdicate its responsibility to either of these two branches." *Green*, 654 U.S. at 649. The Supreme Court has emphasized that "the integrity and maintenance of the system of government ordained by the Constitution mandate that Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989) (internal quotation marks and citation omitted). The Supreme Court has recognized that "the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches." *Id*. at 372. "So long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Id*. (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (alteration in original); *Green,* 654 F.3d at 649.

The Court construes 42 U.S.C. § 264 narrowly in order to uphold the Separation of Powers and avoid violation of the non-delegation doctrine. Congress is vested with the sole authority to legislate. *See* U.S. Const., art. I, §§ 1, 8; *see also A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 529 (1935). Under the non-delegation doctrine, "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp.,* 295 U.S. at 529. However, the non-delegation doctrine does not

17

keep "Congress from obtaining the assistance of its coordinate Branches." *Mistretta*, 488 U.S. at 372; *Green* 654 F.3d at 649.

In *J.W. Hampton*, Chief Justice Taft invoked the maxim "delegata potestas non potest delegari"—no delegated powers shall be further delegated:

> The well-known maxim "*Delegata potestas non potest delegari*," applicable to the law of agency in the general and common law, is well understood and has had wider application in the construction of our Federal and State Constitutions than it has in private law. The Federal Constitution and State Constitutions of this country divide the governmental power into three branches. The first is the legislative, the second is the executive, and the third is the judicial, and the rule is that in the actual administration of the government Congress or the Legislature should exercise the legislative power, the President or the State executive, the Governor, the executive power, and the Courts or the judiciary the judicial power, and in carrying out that constitutional division into three branches it is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power. This is not to say that the three branches are not co-ordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch. In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination.

*J.W. Hampton*, 276 U.S. at 405–06.

Construing the statute in accord with this maxim guards against the devolution of delegation otherwise lawful into a disintegration of the Separation of Powers altogether. Congress may delegate but not abdicate. Upholding the Halt Order under these circumstances, particularly where criminal sanctions are ultimately ordered by the CDC, goes too far. It would amount to an impermissible delegation by Congress authorizing the CDC to make law. As Chief Justice Taft wrote, "[t]he true distinction . . . is [] between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the

latter no valid objection can be made." *J.W. Hampton, Jr.*, 276 U.S. at 407 (quoting *Cincinnati, Wilmington & Zanesville R.R. Co. v. Comm'r*, 1 Ohio St. 77, 88–89 (Ohio 1852)).

## II.     Congress did not permanently ratify the Halt Order.

Defendants argue that, because Congress extended the Halt Order in the Consolidated Appropriations Act, 2021, it ratified the Halt Order. (ECF No. 87-1 at PageID 2516–18.) The Court disagrees. Congress may have done so at one point in time, but not for all time; not to the present.

Congress has "the power to ratify the acts which it might have authorized." *United States v. Heinszen & Co.*, 206 U.S. 370, 384 (1907). This power of authorization extends to executive orders. *Muller Optical Co. v. EEOC*, 574 F. Supp. 946, 953 (W.D. Tenn. 1983) ("When the President, by executive order, has taken action that he may not have been authorized to take, Congress, in some situations, has the power to ratify the President's actions and thus legitimize any irregularity.") In particular, Congress may ratify an executive action where "both Houses of Congress either pass legislation appropriating funds to implement the executive order or make reference to the executive order in subsequently passed legislation." *Id.*

While the Court makes no determination as to whether Congress could have passed the Halt Order, Defendants' arguments are moot given the temporal limit that Congress included on the extension at that time. The Consolidated Appropriations Act, 2021 extended the eviction moratorium only through the end of January. H.R. 133, 116th Cong., div. N, tit, V, § 502. Despite the winding history of the Halt Order, it now rests within the Executive Branch, and it would no longer be effective but for executive action. As a result, it makes little sense to find that the Halt Order was permanently ratified by a Congressional extension of limited duration. In addition, a one-month extension of the Halt Order does not remedy the Constitutional infirmities of an open-

19

ended delegation. For these reasons, Defendants' arguments concerning ratification are unavailing.

## **CONCLUSION**

The Halt Order exceeds the statutory authority of the Public Health Act, 42 U.S.C. § 264. The Halt Order is *ultra vires* and unenforceable in the Western District of Tennessee.

**IT IS SO ORDERED**, this 15th day of March 2021.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE